LARRY W. GABRIEL [SBN 68329]
JERROLD L. BREGMAN [SBN 149896]
EZRA BRUTZKUS GUBNER LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA  91367
Telephone:  818.827.9000
Facsimile:  818.827.9099
Email:      lgabriel@ebg-law.com
            jbregman@ebg-law.com

Special Litigation Counsel for Plaintiff
Jeffrey I. Golden, Chapter 7 Trustee

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY I. GOLDEN, Chapter 7 Trustee of Aletheia Research and Management, Inc., | Case No. _____ |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | **1. PROFESSIONAL NEGLIGENCE (CONFLICT OF INTEREST);** |
| O'MELVENY & MYERS LLP; STEVEN J. OLSON, an individual; J. JORGE DENEVE, an individual; FREEDMAN + TAITELMAN, LLP; and DOES 1 through 12, | **2. BREACH OF FIDUCIARY DUTY;** |
| Defendants. | **3. AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS;** |
| | **4. AVOIDANCE AND RECOVERY OF FRAUDULENT CONVEYANCES [Two Year Transfers]; and** |
| | **5. AVOIDANCE AND RECOVERY OF FRAUDULENT CONVEYANCES [Four Year Transfers]** |

-------------------------------------------------------

Plaintiff, Jeffrey I. Golden, solely in his capacity as the duly appointed chapter 7 trustee (the "Plaintiff" or "Trustee") for the chapter 7 bankruptcy estate, *In re Aletheia Research and Management Inc.*, based upon the investigation of his counsel, and upon information and belief, alleges as follows:

///

///

///

**THE PARTIES**

1.     Plaintiff, Jeffrey I. Golden, is the duly appointed chapter 7 trustee in the bankruptcy case of Aletheia Research and Management, Inc., ("Aletheia," "Debtor" or "Company") now pending in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") Case No 2:12-BK-47718-BR (the "Bankruptcy Case").

2.     Defendant, O'Melveny & Myers LLP ("O'Melveny" or "Firm"), is a limited liability law partnership, organized and existing under the laws of the State of California.  During all relevant times, O'Melveny was and now is doing business in the County of Los Angeles, State of California.

3.     Defendant, Steven J. Olson ("Olson"), is a resident of the County of Los Angeles, State of California.  At times relevant Olson was employed by O'Melveny as an attorney with the Firm or employed by Aletheia as an officer of the Company.

4.     Defendant, J. Jorge deNeve ("deNeve"), is a resident of the County of Los Angeles, State of California.  At times relevant deNeve was employed by O'Melveny as an attorney with the Firm or employed by Aletheia as an officer of the Company.

5.     Defendant, Freedman + Taitelman, LLP, ("Taitelman" and, collectively, with O'Melveny, Olson and deNeve, "Defendants") is a California limited liability law partnership, organized and existing under the laws of the State of California, and at all times relevant was doing business in the County of Los Angeles, State of California.

**DOE DEFENDANTS AND AGENCY ALLEGATIONS**

6.     The Trustee does not know the true names and capacities, whether individual, corporate, associate, or otherwise, of defendants named herein as Does 1 through 12 (the "Doe Defendants") and therefore sues said Doe Defendants by such fictitious names.  On information and belief, each of the said Doe Defendants was intentionally, negligently, or in some other manner responsible together with the remaining Defendants for the events, acts, errors and omissions alleged in this Complaint and therefore are jointly and severally responsible for Aletheia's damages and injuries.  The Trustee will amend this Complaint to allege the true names and capacities of each such Doe Defendant, together with such additional allegations that may be appropriate, when the true names, capacities, and involvement of said Doe Defendants, and/or such additional information in

connection with such additional allegations, have been ascertained.

7.     During all relevant times herein, each of the Defendants was acting in concert with and as the agent, representative or employee of the Defendant(s) and within the course and scope of their agency or employment.

## JURISDICTION AND VENUE

8.     This action is a civil proceeding related to a case under Title 11 of the United States Code, as amended (the "Bankruptcy Code"). This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.§§ 157 and 1334, as well as the Local Bankruptcy rules of the United States Bankruptcy Court and the United States District Court for the Central District of California.

9.     Venue is proper in this Court, including venue pursuant to 28 U.S.C. §§ 1408 and 1409, because, among other things, this is the District in which the Bankruptcy Case is pending. Pursuant to 28 U.S.C. § 1391, venue is appropriate in this Central District of California as Defendants regularly carry out substantial business in this District, and the acts and conduct complained of herein took place within this District.  Accordingly, this Court also has personal jurisdiction over the Defendants.

## NATURE OF THE ACTION

10.     This is a malpractice action brought by the Trustee against the Defendants, the Debtor's former attorneys, for failing to recognize and then properly advise the Debtor as to an actual conflict of interest that existed as to the attorneys' joint representation of the Debtor and the Debtor's former co-founder, CEO, and controlling shareholder Peter J. Eichler, Jr. ("Eichler").  In failing to properly address the conflict issue, the Defendants, guided by their own economic self-interest, breached their fiduciary obligations owed to the Debtor, including among other things, their duty of loyalty.  In the process, the Defendants implemented a litigation strategy that favored Eichler over the interests of the Debtor, a strategy that eventually led to the Debtor's insolvency and other damages as described herein.  By this action the Trustee seeks to recover the losses and damages caused by the Defendants' acts and conduct.

///

**FACTS COMMON TO ALL CLAMS FOR RELIEF**

11.     O'Melveny is an international law firm with approximately 750 professionals. Among other specialties, O'Melveny advises companies and corporate directors in connection with complex and sensitive internal investigations concerning, among other issues, allegations of corruption and conflicts of interest.  Defendants Olson and deNeve practice within O'Melveny's "white-collar defense and corporate investigations" practice group.

12.     The Taitelman law firm prides itself as having the ability to provide a "seamless extension of its clients' in-house legal departments, providing legal services and expertise in a wide-range of practice areas ranging from closely held, entrepreneurial companies, to privately owned corporations, partnerships and sole proprietorships, to larger, public corporations."

13.     Aletheia was a Los Angeles based boutique investment advisory firm founded in 1997 by Eichler and former Executive Vice President and General Counsel, Roger Peikin ("Peikin"). Within 10 years of its founding Aletheia had billions of dollars under management.  Aletheia's target clients - high net worth individuals and institutional investors.

14.      Notwithstanding its financial success, in or around early 2006 Aletheia became interested in expanding its sales capabilities and began discussions with another investment firm, Proctor Investment Managers LLC ("Proctor IM")[1] about a possible sale of a minority stake in Aletheia in exchange for  Proctor's agreement to  market and sell Aletheia's investment products.

15.     The negotiations between Aletheia and Proctor culminated in the parties entering into several written agreements on or about November 3, 2006 (the "Proctor-Aletheia Agreements") pursuant to which, among other things, Proctor IM acquired a 10% stake in Aletheia for $16 million. In exchange, Proctor was to receive quarterly shareholder distributions and important corporate governance protections from Aletheia, as well as transparency into Aletheia's financial performance. In addition, Proctor IM (and later, its wholly-owned subsidiary and registered broker-dealer, Proctor ID) agreed to market and sell Aletheia's investment products. Procter IM also received agreed to

---

[1]  Proctor IM was formed in January 2006 for the purpose of making private equity investments in the asset management industry.  Proctor IM thereafter formed a wholly-owned subsidiary, Proctor Investment Distributions LLC ("Proctor ID" and, together with Proctor IM, "Proctor"), to provide sales and marketing services to asset managers.

fees for its services and an option to purchase additional Aletheia stock based on the amount of new investment funds that Proctor brought to Aletheia.  As Aletheia's largest shareholder, Eichler received more than $6 million from this transaction while retaining a majority interest in Aletheia.

16.    As part of the Proctor-Aletheia Agreements, Proctor IM and Aletheia entered into an agreement (the "Side Letter") that  required Aletheia to have one "Independent Director" – "an individual who (i) is a nominee of a shareholder [of Aletheia] that owns less than 25% of the aggregate then outstanding Series A and Series B shares [of Aletheia] and (ii) is not an employee or officer [of Aletheia] or a member of the family of an employee or officer [of Aletheia]."  The Side Letter further allowed that should the independent director resign, Proctor retained the right to nominate the successor for the Independent Director position.  Based upon the foregoing, Proctor nominated its president James Coley as the Independent Director, who was installed and served on Aletheia's board of directors (the "Board") until his resignation in 2007.

17.    The Side Letter further required Aletheia to "use its best efforts, consistent with its fiduciary duties, to cause and maintain the election of the Independent Director to the Board of Directors" and to "take such action as is reasonably necessary" to elect the Independent Director.

18.    Significantly, the Side Letter also prohibited Aletheia from increasing the employee bonus pool above "35% of the pre-tax, pre-bonus income relating to all hedge fund partnerships (e.g., performance and management), and 20% of all other pre-tax, pre-bonus income (e.g., management, commission)" without the prior written consent of the Independent Director.

19.    In April 2007, the parties amended the 2006 agreement pursuant to which Proctor IM's sales force became Aletheia's selling agent, and another entity, Overture, became Proctor IM's registered broker-dealer solely for the purpose of marketing on behalf of Aletheia and Aletheia Index (the "Selling Agreement").

20.    In March 2007, Aletheia's Board of Directors passed a resolution (the "Revenue Share Resolution") in which it purported to "adjust the quarterly pre-tax, post-bonus pool, post-business expense dividend distribution minimum from 45-50% to 20-30%."  The purported reduction in the minimum level of quarterly distributions occurred at the same time that Aletheia obligated itself to pay substantial amounts to Proctor IM under a revenue-sharing arrangement which

was incorporated into the Revenue Share Resolution.  Thus, although the Revenue Share Resolution purportedly reduced the amount that Aletheia was required to pay to Proctor IM in distributions as a shareholder, it obligated Aletheia to pay Proctor IM 1.8% of all Aletheia's revenues in addition to quarterly distributions.

21.     In or about November 2007, Mr. Coley resigned as Proctor IM's CEO and from Aletheia's Board.  In accordance with Section 6 of the Side Letter, Proctor IM thereafter requested that another Proctor IM representative be appointed to Aletheia's Board as the Independent Director.  Eichler rejected Proctor IM's nominees and the Independent Director position was left vacant for more than two years.

22.     On January 16, 2008, Proctor IM submitted to Aletheia (Eichler) a written demand for permission to inspect Aletheia's books of account and records in accordance with the Proctor-Aletheia Agreements.  Eichler ignored that request.

23.     Over the course of 2007, the relationship between Proctor and Aletheia deteriorated rapidly.  Eichler caused Aletheia to assert the position that it was Proctor who was not performing under the Proctor-Aletheia Agreements in that it purportedly had failed to raise the billions of dollars it hoped to raise for Aletheia.  Proctor maintained that Aletheia and Eichler purposely frustrated Proctor's substantial efforts and ability to effectively market and sell Aletheia investment products, refused to provide the agreed financial transparency, and refused to make required payments and distributions to Proctor.

24.     In December 2007, Aletheia delivered to Proctor a notice of breach based on its alleged failed effort to generate sales for Aletheia.

25.     In January 2008, Aletheia notified Proctor that it was terminating the Selling Agreement between the parties.  Proctor responded by denying that it had breached the Selling Agreement and claimed that it was Aletheia who breached the Selling Agreement.

26.     On or about April 8, 2009, the Securities and Exchange Commission (the "SEC") issued a subpoena to Aletheia that, among other things, notified Aletheia that the SEC had entered a formal order of investigation into Aletheia's business activities and affairs (the "SEC

Investigation"). Eichler and Peikin then engaged Loeb & Loeb LLP to represent them and Aletheia as to the SEC Investigation and to prosecute potential claims against Proctor.

27. In late 2009, Loeb & Loeb advised Eichler and Peikin that it believed it had a conflict of interest as to its joint representation of them and Aletheia in the SEC Investigation and suggested that they each retain separate counsel. Both did so. Peikin retained Robert Friese of Shartsis Friese, LLP, while Eichler retained O'Melveny's Seth Aronson, Olson and deNeve.

28. O'Melveny's retention is reflected in a letter agreement dated November 5, 2009, in which the Firm stated:

> We will represent only you in connection with the Subject Matter (SEC Investigation). We understand that you are the Chairman, CEO, Chief Investment Officer and Founder of Aletheia Research and Management, Inc. (the "Company"). We will not be representing the Company or any parent, subsidiary, related, affiliated or associated person or entity of yours  or the Company, or any of your or their respective officers, directors, investors, agents, partners or employees (each and all of the foregoing, "Related Persons"), in connection with the Subject Matter. Accordingly, you agree that we will not be precluded from representing other existing clients or future clients in legal matters relating or adverse to the Company or other Related Persons, even if you have an indirect interest therein as a result of your relationships to them.

29. Later on in early 2010, and despite Loeb & Loeb's identification of a conflict, O'Melveny began to represent jointly Aletheia and nearly all of Aletheia's officers, directors or employees that were the subject of the SEC Investigation, including Eichler.

30. Although relieved in the SEC matter, Loeb & Loeb continued to represent Aletheia in the Proctor dispute. On February 4, 2010, Loeb & Loeb, on behalf of Aletheia, filed suit against Proctor in the Los Angeles Superior Court, Case No. SC108700, seeking a declaration of its rights and remedies with respect to its agreements with Proctor.

31. A few days later, on February 16, 2010, Proctor filed suit in New York state court against Aletheia as well as Eichler and Peikin personally (the "New York Action"). In the New

York Action, Proctor alleged, among other things, that Eichler and Peikin had breached their fiduciary duty owed to Proctor and other minority shareholders by denying them distributions and other revenue to which they were entitled, by improperly refusing to appoint an independent director, by paying themselves exorbitant sums over the years, including amounts far in excess of the amounts permitted by the Proctor-Aletheia Agreements, and by refusing to furnish financial information as required by the agreements and by the law governing Aletheia's corporate governance.  Proctor specifically alleged in its complaint (the "Proctor New York Complaint"), among other things:

> 2008 was Aletheia Management's most successful year with revenues of approximately $78 million . . . . [however, its] net income in 2008 remained about the same as the prior year at $5.9 million because its employee compensation ballooned to *over $56 million* (more than 70% of its revenues).  Despite the fact that Aletheia Management's revenue in 2008 more than doubled from the prior year, Aletheia Management did not pay its shareholders a single penny of distributions while Eichler and Peikin, upon information and belief, paid themselves most of the $56 million that they caused Aletheia Management to pay out in "compensation."

> \* \* \*

> In particular, Eichler and Peikin, individually and as agents of the Aletheia Defendants, have denied Proctor IM (as well as other non-employee shareholders of Aletheia Management) distributions and revenue sharing that Proctor IM is legally entitled to receive as an investor in Aletheia Management, all in violation of their legal obligations to Proctor IM and other minority shareholders of Aletheia Management.  As part of their effort to deprive Proctor IM and other non-employee minority shareholders of the economic benefits of their ownership interest in Aletheia Management, Eichler and Peikin have paid themselves excessive compensation in violation of contractual requirements that ensure that non-employee minority shareholders like Proctor IM receive a share of the financial

success of Aletheia Management.  Eichler and Peikin have also breached their

fiduciary duties to Proctor IM.

Proctor New York Complaint ¶ 1.

32.    Within a few weeks after the filing of the complaints, on or about April 13, 2010, O'Melveny was retained to represent Aletheia, Eichler, and Peikin in the New York Action, and replaced Loeb & Loeb as Aletheia's counsel in the California action, pursuant to retention letters dated April 13, 2010.  Among other things, this retention letter provides in relevant part:

> Based on the information available to us at this time, we do not believe that representing these parties [Aletheia, Eichler and Peikin (Peikin had a separate engagement letter of the same date)] involves an actual conflict of interest. . . . A conflict of interest may develop if the parties' interests become inconsistent or adverse.  If that occurs, we will promptly notify you about any such conflict.
>
> * * *
>
> Common representation can be both efficient and effective, but involves risks the Company and the Individuals should assess in deciding whether to engage us at this time. First, our responsibilities must apply equally to our common clients, rather than exclusively to one party or client.  Although we do not presently see actual or reasonably foreseeable adverse effects of that shared responsibility, issues may arise that affect multiple clients in somewhat different ways.  For example, if one of our Common Clients asserts a claim against the other or if our Common Clients give us conflicting instructions, we may be required to withdraw from representing one, some, or all of them. Therefore, it is important to understand that our client responsibilities may directly or indirectly affect our ability to focus exclusively on one client's interests and may be materially limited by our representation of the other joint clients.

33.    On April 16, 2010, O'Melveny filed a First Amended Complaint in the California action whereby Aletheia dropped its claim for declaratory relief, and alleged that Proctor and several of its principals had engaged, *inter alia*, in fraud and breach of contract.

34.     In June of 2010, Eichler, in his capacity as majority shareholder of Aletheia, purportedly elected a long-time friend and college roommate, Bruce Lee ("Lee"), to Aletheia's Board, to serve together with Eichler, Peikin, and Barnes.  The election was accomplished without a meeting and by Written Consent of the Majority Shareholder, dated June 15, 2010.

35.     On or about July 1, 2010, Proctor by and through its counsel, Daniels, Fine, Israel Schonbuch & Lebovits, LLP, filed suit in the Los Angeles Superior Court contesting Eichler's appointment of Lee to the Board, *In re Aletheia,* LASC Case  No. SC108574.

36.     On or about July 13, 2010, O'Melveny issued another (supplemental) retention letter, which recognized its expanded representation to include Proctor's lawsuit in California and any related litigation, and added Lee as a represented party, along with Aletheia, Eichler and Barnes. This letter again addressed the potentiality of a conflict of interest that could arise among the parties.

37.     On or about October 22, 2010, the New York state court granted Aletheia's motion to dismiss the New York Action on *forum non conveniens* grounds on the condition that Proctor be allowed to file its claims against the Aletheia parties in the Los Angeles action.

38.     On or about January 19, 2011, Proctor filed a cross complaint in the Los Angeles action against Aletheia, and Eichler and Peikin personally, alleging, *inter alia*, claims for breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and for declaratory relief.

39.     At or about the same time, on or about January 18, 2011, O'Melveny filed a Second Amended Complaint in Los Angeles against Proctor asserting additional claims for breach of contract and fraud, among other claims.

40.     On March 10, 2011, Proctor filed its First Amended Cross-Complaint, in which it asserted essentially the same causes of action, adding Barnes and Lee as individual cross-defendants with Eichler and Peikin.

41.     On or about April 14, 2011, O'Melveny updated its retention agreement, to cover its joint representation of Aletheia, Eichler, Barnes and Lee in the Proctor litigation matters (the "April 14, 2011 Agreement").  That letter provides, in relevant part:

///

-10-

We will represent only the Company, Ms. Barnes, Mr. Eichler, and Mr. Lee [footnote says Eichler, Barnes and Lee are also referred to as the "Individuals"] in connection with the Subject Matter. . . . A conflict of interest may develop if the parties' interests become inconsistent or adverse.  If that occurs, we will promptly notify you about any such conflict.

* * *

Although we do not presently see actual or reasonably foreseeable adverse effects of that shared responsibility, issues may arise that affect multiple clients in somewhat different ways.  For example, if one of our common clients asserts a claim against the other or if our common clients give us conflicting instructions, we may be required to withdraw from representing one, some, or all of them.

42.    Moreover, in its April 14, 2011 Agreement, O'Melveny disclosed that it had consulted a third party law firm to advise O'Meleny about its ethical obligations in connection with its prior representation of Peikin in the Proctor litigation.  The letter recites that the clients agree to the confidentiality of O'Melveny's communications with its third party law firm, which communications were not disclosed to the clients.  Upon information and belief, O'Melveny was advised by such third party law firm concerning its conflict of interest in concurrently representing Aletheia and Eichler in the Proctor litigation, and it did not disclose this conflict of interest to its clients.

43.    Eichler signed each of O'Melveny's retention letters on his own behalf and also on behalf of Aletheia.  No other person signed these agreements on behalf of Aletheia.  Later, when O'Melveny was replaced as counsel in January 2012, Eichler signed Taitelman's retention letter with Aletheia on his own behalf and also on behalf of Aletheia.  No other person signed Taitelman's retention agreement on behalf of Aletheia.

44.    On or about April 19, 2011, four days after O'Melveny updated its retention letter, both Olson and deNeve, who had been part of O'Melveny's legal team in the Proctor litigation,

-11-

joined Aletheia as officers.  Olson became Aletheia's President and Chief Legal Officer, and deNeve became Aletheia's Senior Vice President and General Counsel.

45.    In a memorandum dated June 22, 2011, O'Melveny opined as to Aletheia's potential exposure to damages given the claims asserted by Proctor in its amended cross complaint (the "Damages Memo").  The Damages Memo was addressed only to Olson and deNeve, who at the time were employed by Aletheia.  The Damages Memo states, among other things, that "[a]lthough Proctor has not clearly articulated its damages theory on this claim, *Proctor, or other shareholders in a derivative action*, may argue that all bonuses paid monthly and in proportion to Eichler's and Peikin's equity ownership constituted disguised dividends that should be redistributed in *pro rata* portions to all shareholders." (Emphasis added.)  O'Melveny concludes that for 2008 alone, Aletheia was exposed to upwards of $16 million in potential damages to Proctor, and that Eichler may be liable for upwards of $14 million to Proctor and other shareholders for breaching his fiduciary obligations to Aletheia.  The Damages Memo further concludes, *inter alia*, that for 2007, Aletheia exceeded the estimated allowable employee bonus pool by more than $5 million.

46.    As presented in the O'Melveny Memo, during the time O'Melveny was counsel to Aletheia, Aletheia had viable and substantial causes of action for breach of fiduciary duty against Eichler arising from his actions and omissions during 2007.  Notwithstanding, O'Melveny did not advise Aletheia of the conflict of interest resulting from the palpable derivative claims on behalf of Aletheia against Eichler.  Nor did O'Melveny advise Aletheia to appoint an independent director and retain separate counsel to investigate and prosecute, or preserve, such claims.  Instead, O'Melveny undertook, and continued, to represent both Aletheia and Eichler in the Proctor litigation notwithstanding the known conflict that existed between their clients.  The same errors and omissions apply to the Taitelman law firm, in that it also failed to recognize and address the un-waivable conflict that existed and jointly represented Aletheia and Eichler in the Proctor litigation.

-12-

47.     In or around July 2011, the Los Angeles Superior Court held a hearing on Peikin's motion to disqualify O'Melveny as counsel in the various matters in which it was representing Aletheia in connection with the Proctor litigation. The Court denied the motion primarily based upon the Court's finding that Peikin was represented by separate counsel during the relevant periods and Peikin lacked standing, as a former client, to bring a disqualification motion regarding O'Melveny's joint representation of Aletheia and Eichler.   Nevertheless, the Court's written opinion acknowledges the apparent conflict of interest among O'Melveny's clients, as follows:

> There is no question but that there is a conflict of interest in this matter.  The First Amended Cross Complaint filed by Proctor on 3-10-11 asserts that the individual Cross-Defendants, Eichler, Peikin, Barnes, and Lee, have breached their fiduciary duties and the contracts between Aletheia and Proctor. . . . These allegations may, indeed, involve a dispute between the cross-defendants as to alleged breaches of fiduciary duty, if any by any one or more cross-defendants.

[*Ruling on Submitted Matter:  Cross-Defendant's Motion to Disqualify O'Melveny Myers*, Case Nos. SC108642; SC108674; BC441951; SC110372 (L.A. Super. Ct., July 12, 2011) at 17.]

48.     In or around September 2011, the Los Angeles Superior Court issued its order on the demurrer filed as to the Proctor action by Peikin, Barnes and Lee.  The Court denied the motion as to certain claims but granted the motion as to others, ruling that to the extent Proctor sought redress for payment of excessive compensation to Eichler and others, such claims were derivative in nature and had to be brought by the Company or derivatively on behalf of the Company.   The Court's memorandum decision provides, *inter alia*:

> In light of the directors' role in the operation of the business affairs of the corporation, where conduct, including mismanagement by corporate officers, causes damage to the corporation, it is the entity that must bring the suit; the individual shareholder may not bring an action for indirect personal losses (i.e., decrease in

share values) sustained as a result of the overall harm to the entity.   (Citation omitted.) . . . .

*[Ruling on Submitted Matters:   Cross-Defendants' Demurrers to the First Amended Cross Complaint of Proctor Investment Managers, LLC,* Case Nos. SC108642; SC108674; BC441951; BC450058; BC462946; SC110372 (L.A. Super. Ct., Aug. 30, 2011) at 7-8. ] Notwithstanding the foregoing, O'Melveny continued its joint representation of Aletheia and Eichler.

49.   On or about January 5, 2012, Olson resigned his positions as Aletheia's President and Chief Legal Officer, and rejoined O'Melveny on or about August 1, 2013 as a partner.

50.   Soon thereafter, on January 18, 2012, O'Melveny withdrew from representing Aletheia, Eichler, and other Aletheia employees in the Proctor litigation.

51.   O'Melveny was replaced in the Proctor litigation by Taitelman, who undertook to represent the same clients in the Proctor litigation as had O'Melveny, which representation continued through Aletheia's bankruptcy filing on November 11, 2012.

52.   In June 2012, the California State Franchise Tax Board ("FTB") filed a notice of lien against Aletheia with the Los Angeles County Recorder's Office due to unpaid state income taxes, asserting an amount due of more than $2 million for income taxes owing from the tax year 2008, and penalties for the tax years 2010, 2011 and 2012 for late filed returns, according to the Omnibus Declaration of Peter J. Eichler, Jr. in Support of First Day Motions that Aletheia filed its Bankruptcy Case (the "First Day Declaration") [Bankruptcy ECF No. 8.] (at para. 12).

53.   On or about September 17, 2012, deNeve resigned his positions as Aletheia's Vice President and General Counsel, and immediately rejoined O'Melveny as a counsel.

54.   During October 2012, the FTB suspended Aletheia's corporate status.  As a result "on October 30, 2012, the court in the Protctor Litigation and in the Peikin Litigation (and a third proceeding whereby Aletheia shareholders sought to have Peikin removed as a member of the company's board of directors) granted Aletheia's request for a continuance and stay of proceedings through November 11, 2012, and ruling that matters would proceed on November 12, 2012 regardless of Aletheia's corporate status and inability to defend itself in the litigation matters." [First Day Declaration at para. 15.]

55.     The Petition Date coincided with the ending of the reprieve from the Proctor and Peikin litigation matters.

56.     Over the course of nearly three years, Aletheia and Proctor engaged in a bitterly fought discovery battle resulting principally from the "scorched earth" litigation tactics the Defendants implemented at Eichler's direction and at Aletheia's expense.  This included, for example, the prosecution of pleadings, correspondence, memoranda, and myriad related activities, most if not all of which were of questionable merit yet pursued principally because they advanced Eichler's objective of delaying the proceedings at Aletheia's expense.  At one stage, a discovery referee was appointed.  The parties produced over 130,000 documents totaling three-quarters of a million pages and 14 individuals were deposed over the course of 28 days.  More than 20 motions were filed (many relating to discovery disputes) and nine separate hearings were held before the court or a referee whom the court was appointed to address discovery issues.  All of the foregoing was also done with the Defendants recognizing that Aletheia had exposure to Proctor for amounts in excess of $16 million.  During this time, Eichler was looting the company, paying himself excessive compensation, taking unauthorized loans, and using corporate funds for his personal expenses, all of which exceeded $1.5 million.   In the meantime, O'Melveny billed and collected from Aletheia more than $9.7 million of which more than $4.1 million was for its fees and costs in connection with representing Aletheia, Eichler, Barnes, and Lee in the Proctor litigation.  During its representation, Taitelman collected more than $63,800 for its fees and costs representing Aletheia, Eichler, Barnes, and Lee in the Proctor litigation.

57.     The Bankruptcy Case was commenced by the Debtor's filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code on November 11, 2012.  According to Aletheia's schedules filed in the Bankruptcy Case, Aletheia had unsecured liquidated debts of approximately $14 million which, significantly, did not include any amount in respect of the claims asserted by Proctor or Peikin.  Upon information and belief, Aletheia was indebted to one or more creditors at all relevant times.

58.     In the Bankruptcy Case, Eichler attributed Aletheia's financial collapse to the weight of litigation matters, and specifically, the Proctor litigation. In his First Day Declaration, Eichler

-15-

testified that the "litigation matters have decimated the firm – assets under management have declined approximately 75% in the last year.   Of these, the principal case involves Proctor Investment Managers, LLC ("Proctor"), a 10% shareholder in Aletheia." [First Day Declaration at para. 7.]

59.   On December 4, 2012, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in the Bankruptcy Case.   The Debtor and the Committee entered into a stipulation for the appointment of a chapter 11 trustee, which was approved by the Bankruptcy Court, and the Trustee was appointed on January 17, 2013.   On March 29, 2013, Bankruptcy Court converted the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, and the Bankruptcy Court appointed the Trustee in the chapter 7 case by order dated April 5, 2013.

60.   Based on his review of the voluminous records and discovery completed in the various litigations between the Debtor and Proctor, the Trustee concluded that the Debtor had "very little chance" of prevailing against Proctor and, instead, that it was highly likely that Proctor could prove Aletheia breached the Proctor-Aletheia Agreements.   The Trustee concluded that Proctor sustained significant monetary damages on account of Aletheia's breaches, and that Proctor was likely to recover a substantial portion if not all of its alleged damages, which exceeded $45 million, as follows:

      a.    Approximately $27 million owed to Proctor pursuant to the Revenue Share Resolution;

      b.    Approximately $9 million in unpaid shareholder distributions due to Proctor pursuant to the Side Letter;

      c.    Approximately $2.7 million in selling commissions due to Proctor pursuant to the Selling Agreement; and

      d.    More than $8 million in attorneys' fees.   Both the Selling Agreement and the Side Letter provide that the successful party in any dispute shall be entitled to its attorneys' fees.

[Bankruptcy ECF No. 383, at 25.]

///

-16-

61.     The foregoing amounts do not include additional damages to which Proctor may have been entitled had the litigation proceeded to a final judgment on the merits, including: (i) damages representing the expenses incurred by Proctor in establishing its sales force and attempting to sell the Aletheia products; (ii) claims by Proctor for "lost commissions" due to Aletheia's well documented refusal to enable Proctor to perform (by refusing to provide financial information and by claiming prior contact with Proctor's connections); and (iii) punitive damages based on Eichler's behavior and the frivolous nature of the scorched earth litigation employed by Eichler and Aletheia.

62.     Based upon the foregoing, the Trustee concluded it was in the best interests of the creditors of the Debtor's bankruptcy estate to compromise the Proctor litigation on the terms set forth in the settlement agreement between the parties (the "Proctor Settlement"), pursuant to which the parties would mutually release each other and end their litigation, and Proctor's claim would be allowed as a general unsecured claim in the Bankruptcy Case in an amount equal to the greater of $21,775,000.00 or 60% of the total pool of non-subordinated, non-priority, general unsecured claims finally allowed in the Bankruptcy Case.  The Bankruptcy Court, having determined that the Proctor Settlement was reasonable and in the best interest of the creditors, approved it by order entered May 5, 2014.

## FIRST CLAIM FOR RELIEF

### PROFESSIONAL NEGLIGENCE – MALPRACTICE (CONFLICT OF INTEREST)

[Against the Defendants and Does 1 through 12]

63.     The Trustee realleges and incorporates paragraphs 1 through 62 as though set forth in full.

64.     By virtue of the attorney-client relationship that existed between Aletheia and Defendants, Defendants at all relevant times owed a duty to Aletheia to represent it with undivided loyalty and to exercise reasonable care and skill in providing legal services on Aletheia's behalf. These duties required Defendants, at a minimum:  (1) to competently represent Aletheia; (2) to avoid multiple representations that posed or created conflicts of interest; (3) to act in Aletheia's best interests instead of protecting and enabling Eichler's wrongful conduct to Aletheia's detriment; (4) to place Aletheia's interests in being represented by attorneys with undivided loyalty to Aletheia

-17-

1    above Defendants' interests in billing and collecting fees; (5) to protect and preserve Aletheia's

2    interests above all others.

3         65.    Defendants, and each of them, breached their duties and obligations owed to Aletheia,

4    as set forth above by accepting and continuing the joint representation of Aletheia and Eichler and

5    other employees of Aletheia, that created non-waivable conflicts of interest, and by failing to fully

6    and accurately disclose the nature and extent of those conflicts and to advise Aletheia of the same;

7    and by failing to advise Aletheia to obtain independent counsel to review and if appropriate bring

8    claims, without limitation, against Eichler for corporate mismanagement and waste.

9         66.    Defendants undertook such actions and failed to make such requisite disclosures and

10   to protect Aletheia's interests because Defendants made the conscious decision, at Aletheia's

11   expense, to take direction from Eichler – who was approving and causing the payment to the

12   Defendants of their legal fees, and who was acting in his own best interest rather than protecting the

13   interests of Aletheia as he is required to do by law.  In addition to the legal fees paid to the

14   Defendants and the excessive compensation and other Aletheia funds utilized by Eichler, this

15   ultimately resulted in Defendants completely abandoning their client Aletheia's interests by failing

16   to make any effort to distinguish Aletheia from Eichler or otherwise resolve Proctor's valid claim in

17   a timely and cost effective way; and by failing to prosecute timely an action against Eichler for

18   corporate mismanagement and waste.

19        67.    By virtue of the acts alleged herein, Defendants, and each of them, breached their

20   fiduciary duties owed to Aletheia, as set forth in paragraph 65 above, which actions and conduct also

21   violated the applicable Rules of Professional Conduct, including but not limited to Rules 3-110, 3-

22   300, and 3-310, 3-500, 3-600, and 3-700.

23        68.    Had Defendants exercised proper skill and care in representing Aletheia, among other

24   things:  (1) Aletheia would not have incurred millions of dollars in legal fees defending the Proctor

25   litigation; (2) Eichler would not have been able to retain and receive excessive compensation without

26   Aletheia having pursued claims for recovery of such excessive amounts, or at least preserved such

27   causes of action, where Aletheia subsequently lost the ability to prosecute breach of fiduciary duty

28   claims arising more than four years before the Petition Date; (3) Proctor's claims would not have

been swollen by additional damages, as well as legal fees which were recoverable from Aletheia under fee shifting provisions of the Proctor-Aletheia Agreements; and (4) the confluence of economic and litigation pressures upon Aletheia resulting from the Proctor litigation would not have existed, and Aletheia would not have been forced to file bankruptcy to obtain relief from such litigation.

69.   As a direct, proximate and substantial cause and result of such acts and conduct set forth above, the Debtor's estate has sustained damages in an amount according to proof, but in excess of $4,000,000.00.

## SECOND CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY

[Against the Defendants and Does 1 through 12]

70.   The Trustee realleges and incorporates paragraphs 1 through 69 as though set forth in full.

71.   By virtue of the attorney-client relationship that existed between Aletheia and Defendants, Defendants at all times relevant herein owed Aletheia fiduciary obligations, including an unwavering commitment to loyalty, candor, and full disclosure to Aletheia.  As such, Defendants were bound to act in the highest good faith and with the highest regard for Aletheia's best interests, placing Aletheia's best interests above their own, in regard to Defendants' representation, to include but not limited to the Proctor litigation

72.   By reason of the acts and omissions set forth herein, Defendants breached their fiduciary obligations to Aletheia, including breaching their duty to: to: (1) competently represent Aletheia; (2) avoid multiple representations that posed or created conflicts of interest; (3) act in Aletheia's best interests instead of protecting and enabling Eichler's wrongful conduct to Aletheia's detriment; (4) place Aletheia's interests in being represented by attorneys with undivided loyalty to Aletheia above Defendants' interests in billing and collecting fees; and, (5) protect and preserve Aletheia's interests above all others.

73.   As a direct, proximate, and substantial cause and result of Defendants' breaches of fiduciary duty, Aletheia has suffered injuries and damages in an amount subject to proof at trial,

1174442

including, but not limited to:  (1)   incurring millions of dollars in legal fees defending the Proctor litigation; (2) Eichler retaining and receiving excessive compensation without Aletheia having pursued claims for recovery of such excessive amounts, or at least preserved such causes of action, where Aletheia subsequently lost the ability to prosecute breach of fiduciary duty claims arising more than four years before the Petition Date; (3) preventing Proctor from incurring enormous legal fees which are  recoverable from Aletheia under fee shifting provisions of the Proctor Agreements; and (4) the confluence of economic and litigation pressures upon Aletheia resulting from the Proctor litigation would not have existed, and Aletheia would not have been forced to file bankruptcy to obtain relief from such litigation.

### THIRD CLAIM FOR RELIEF

### AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS

### PURSAUNT TO 11 U.S.C. §§ 547 AND 550

[Against the Defendants and Does 1 through 12]

74.     The Trustee realleges and incorporates paragraphs 1 through 73 as though set forth in full.

75.     Upon information and belief, during the 90-day period before the Petition Date, the following transfers in addition to others that may be revealed through discovery (collectively, the "90-Day Preferential Transfers") to or for the benefit of Taitelman were made by or on behalf of Aletheia on or about the indicated dates:

       a.     $23,000.00 on September 18, 2012; and

       b.     $15,000.00 on October 2, 2012.

76.     Upon information and belief, during the one year period prior to the Petition Date, the following transfer in addition to others that may be released through discovery (collectively, the "1-Year Preferential Transfer") to or for the benefit of O'Melveny was made by or on behalf of Aletheia: $2,623,068.78 on or about December 31, 2011.  Upon information and belief, this payment to O'Melveny was made by Aletheia's insurance carrier in respect of an insurance claim, and claim proceeds, belonging to Aletheia.

///

-20-

77.     The 90-Day Preferential Transfers and the 1-Year Preferential Transfer (together, the "Preferential Transfers") were to or for the benefit of the indicated Defendants, each of whom was a creditor of Aletheia.

78.     Upon information and belief, O'Melveny on the one hand, and Olson and/or deNeve on the other, continued to have a sufficiently close relationship while Olson and deNeve were officers of Aletheia, which was not at arms'-length, including Olson and/or deNeve having some economic interest in the payments that O'Melveny received from Aletheia, sufficient for O'Melveny to be deemed an "insider" with respect to Aletheia for purposes of 11 U.S.C. § 547(b)(4)(B).

79.     Each of the Preferential Transfers was for or on account of antecedent debts owed by Aletheia to the recipient Defendants before each such Preferential Transfers was made.

80.     Upon information and belief, the Preferential Transfers were made to the Defendants while Aletheia was insolvent.

81.     The Preferential Transfers enabled the respective Defendants to recover more than they would have received if (a) the case was a case under chapter 7; (b) the Preferential Transfers had not been made; and (c) the Defendants had received payment of the debt to the extent provided by the provisions of Title 11 of the United States Code.

82.     By reason of the foregoing, each of the Preferential Transfers should be avoided and set aside as preferential pursuant to 11 U.S.C. § 547(b).

83.     By reason of the foregoing, the Trustee is entitled to recover for the benefit of Aletheia's bankruptcy estate each of the Preferential Transfers, pursuant to 11 U.S.C. §§ 544, 550(a)(1); and/or (2).

## FOURTH CLAIM FOR RELIEF

### AVOIDANCE AND RECOVERY OF FRAUDULENT CONVEYANCES

### PURSAUNT TO 11 U.S.C. §§ 548 and 550

[Against the Defendants and Does 1 through 12]

84.     The Trustee realleges and incorporates paragraphs 1 through 73 as though set forth in full.

///

85.     Upon information and belief, during the two year period before the Petition Date, the following transfers, in addition to others that may be revealed through discovery, were made to or for the benefit of O'Melveny, totaling at least $5,802,726.02 (the "O'Melveny Two Year Transfers"), by or on behalf of Aletheia, on or about the indicated dates:

   a.     $400,000.00 on or about November 17, 2010;

   b.     $100,000.00 on or about December 30, 2010;

   c.     $250,000.00 on January 14, 2011;

   d.     $100,000.00 on January 28, 2011;

   e.     $100,000.00 on January 28, 2011;

   f.     $200,000.00 on February 1, 2011;

   g.     $450,000.00 on March 22, 2011;

   h.     $450,000.00 on May 5, 2011;

   i.     $200,00.00 on July 28, 2011;

   j.     $125,000.00 on August 17, 2011;

   k.     $100,000.00 on August 31, 2011;

   l.     $250,000.00 on October 7, 2011

   m.     $454,657.24 on October 21, 2011; and

   n.     $2,623,068.78 on December 31, 2011.

86.     The legal services provided by O'Melveny in consideration of the O'Melveny Two Year Transfers were infected by O'Melveny's conflict of interest and legal malpractice, and were of little or no value to Aletheia, as set forth herein.  Accordingly, Althea received less than reasonably equivalent value in exchange for the O'Melveny Two Year Transfers, in an amount according to proof.

87.     Upon information and belief, during the two year period before the Petition Date, the following transfers, in addition to others that may be revealed through discovery, were made to or for the benefit of Taitelman, totaling at least $63,808.80  (the "Taitelman Two Year Transfers" and, together with the O'Melveny Two Year Transfers, the "Two Year Transfers") on or about the indicated dates:

a.     $10,000.00 on January 5, 2012;

b.     $15,808.80 on July 19, 2012;

c.     $23,000.00 on September 18, 2012; and

d.     $15,000.00 on October 2, 2012.

88.     The legal services provided by Taitelman in consideration of the Taitelman Two Year Transfers were infected by Taitelman's conflict of interest and legal malpractice, and were of little or no value to Aletheia, as set forth herein.   Accordingly, Aletheia received less than reasonably equivalent value in exchange for the Taitelman Two Year Transfers, in an amount according to proof.

89.     Upon information and belief, Aletheia::

a.     was insolvent on the date each of the Two Year Transfers was made, or became insolvent as a result of each such transfer;

b.     was engaged in business or transactions, or was about to engage in a business or transaction, for which any property remaining with Aletheia was a unreasonably small capital; or

c.      intended to incur, or believed that it would incur, debts that would be beyond Aletheia's ability to pay such debts as they matured.

90.     Accordingly, the Trustee is entitled to avoid and recover the Two Year Transfers pursuant to Sections 548 and 550 of the Bankruptcy Code.

**FIFTH CLAIM FOR RELIEF**

**AVOIDANCE AND RECOVERY OF FRAUDULENT CONVEYANCES**

**PURSAUNT TO 11 U.S.C. §§ 544 and 550, AND**

**AND CAL. CIVIL CODE §§ 3439.04, 3439.05 and 3439.07**

[Against O'Melveny and Does 1 through 12]

91.     The Trustee realleges and incorporates paragraphs 1 through 73 as though set forth in full.

92.     The Trustee has the authority of an unsecured creditor pursuant to section 544(b) of the Bankruptcy Code.

93.     Upon information and belief, the persons and entities listed in the schedules of creditors that Aletheia filed in its Bankruptcy Case are unsecured creditors of Aletheia.

94.     Upon information and belief, during the four year period before the Petition Date, the following transfers, in addition to others that may be revealed through discovery, were made to or for the benefit of O'Melveny, totaling at least $9,707,726.02 (the "Four Year Transfers"), by or on behalf of Aletheia, on or about the indicated dates:

       a.     $50,000.00 on November 5, 2009;

       b.     $200,000.00 on January 20, 2010;

       c.     $300,000.00 on February 17, 2010;

       d.     $300,000.00 on April 29, 2010;

       e.     $380,000.00 on May 18, 2010;

       f.     $175,000.00 on June 8, 2010;

       g.     $300,000.00 on July 14, 2010;

       h.     $415,000.00 on July 16, 2010;

       i.     $275,000.00 on July 26, 2010;

       j.     $500,000.00 on August 4, 2010;

       k.     $510,000.00 on August 16, 2010;

       l.     $500,000.00 on September 30, 2010; and

       m.     The O'Melveny Two Year Transfers.

95.     The legal services provided by O'Melveny in consideration of the Four Year Transfers were infected by O'Melveny's conflict of interest and legal malpractice, and were of little or no value to Aletheia, as set forth herein.  Accordingly, Aletheia received less than reasonably equivalent value in exchange for the Four Year Transfers, in an amount according to proof.

96.     Upon information and belief, Aletheia:

       a.     was insolvent on the date each of the Four Year Transfers was made, or became insolvent as a result of each such transfer;

b.    was engaged in business or transactions, or was about to engage in a business or transaction, for which any property remaining with the Aletheia was an unreasonably small capital; or

c.    intended to incur, or believed, or reasonably believed, that it would incur, debts that would be beyond Aletheia's ability to pay such debts as they matured.

97.    Accordingly, the Trustee is entitled to avoid and recover the Four Year Transfers pursuant to Sections 544 and 550 of the Bankruptcy Code, and California Civil Code Sections 3439.04, 3439.05, and 3439.07.

[*Remainder of page intentionally left blank.*]

1174442

## **PRAYER FOR RELIEF**

**WHEREFORE**, The Trustee respectfully prays for judgment against the Defendants as follows:

1.      On the First Cause of Action, for Professional Negligence – Conflict of Interest, for compensatory and general damages according to proof, including, without limitation, disgorgement of all legal fees and costs;

2.      On the Second Cause of Action, for Breach of Fiduciary Duty, for compensatory and general damages according to proof, including, without limitation, disgorgement of all legal fees and costs;

3.      On the Third Cause of Action, for Avoidance and Recovery of Preferential Transfers, that the transfers totaling $2,623,068.78 to O'Melveny & Myers, and $38,000.00 to Taitelman, be avoided and recovered for the benefit of the estate;

4.      On the Fourth Cause of Action, for Avoidance and Recovery of Fraudulent Conveyances, that the Two Year Transfers be avoided and recovered for the benefit of the Debtor's estate in an amount of the Two Year Transfers, plus interest at the maximum legal rate from the date of each of these transfers, or such other amount as shall be shown by proof prior to judgment;

5.      On the Fifth Cause of Action, for Avoidance and Recovery of Fraudulent Conveyances, that the Four Year Transfers made to O'Melveny be avoided and recovered for the benefit of the Debtor's estate in an amount of the Four Year Transfers, plus interest at the maximum legal rate from the date of each of these transfers, or such other amount as shall be shown by proof prior to judgment;

6.      On all claims for relief, that the Trustee be awarded his fees and costs incurred in connection with this action; and

///

///

///

///

///

-26-

1174442

7.      For such other and further relief for the Plaintiff as this Court may deem just and proper.

Dated:   November 10, 2014                     Larry W. Gabriel
                                               Jerrold L. Bregman
                                               EZRA BRUTZKUS GUBNER LLP


                                               By:  */s/ Jerrold L. Bregman*
                                                    Jerrold L. Bregman
                                               Special Litigation Counsel for Plaintiff
                                               Jeffrey I. Golden, Chapter 7 Trustee

-27-

1174442