STEVEN T. GUBNER – Bar No. 156593
JERROLD L. BREGMAN – Bar No. 149896
JASON B. KOMORSKY – Bar No. 155677
BRUTZKUS GUBNER
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile: (818) 827-9099
Email:      sgubner@bg.law
            jbregman@bg.law
            jkomorsky@bg.law
*Special Litigation Counsel for Plaintiff*
*Jeffrey I. Golden, Chapter 7 Trustee*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY I. GOLDEN, Chapter 7 Trustee of Aletheia Research and Management, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> O'MELVENY & MYERS LLP; STEVEN J. OLSON, an individual; and J. JORGE DENEVE, an individual; and does 1 through 12, <br><br> Defendants. | **Adv. Pro. 2:14-cv-08725-CAS(AGRx)** (U.S. Dist. Ct., C.D.Cal.) <br><br> **TRUSTEE'S NOTICE OF MOTION AND MOTION TO VACATE FINAL ARBITRATION AWARD (9 U.S.C. §§ 10(a)(4), 12, *et seq.*); MEMORANDUM OF POINTS AND AUTHORITIES;** <br><br> [Filed concurrently with Declaration of Jerrold L. Bregman, Compendium of Trial Exhibits and Transcripts of Proceeding, and Application to File Certain Trial Exhibits under Seal w/accompanying Declaration] <br><br> Hearing: <br> Date:  October 21, 2019 <br> Time: 10:00 a.m. <br> Place: Courtroom No. 8D <br> Judge: Hon. Christina A. Snyder <br> 350 W. First Street <br> Courtroom 8D, 8th Floor <br> Los Angeles, CA  90012 |

2178163

**TO THE HONORABLE CHRISTINA A. SNYDER, AND ALL INTERESTED PARTIES**:

PLEASE TAKE NOTICE that on October 21, 2019, at 10:00 a.m., or as soon thereafter as this matter may be heard in the above-captioned Court, located at 350 West First Street, Courtroom 8D, Los Angeles, California 90012, the Honorable Christina A. Snyder presiding, plaintiff Jeffrey I. Golden (the "Trustee"), the duly appointed chapter 7 trustee in the above-captioned bankruptcy case of debtor Aletheia Research and Management, Inc. ("Aletheia"), whose bankruptcy case is pending before the United States Bankruptcy Court for the Central District of California as Case No 2:12-BK-47718-BR, will, and hereby does, move (the "Motion") for an order vacating an arbitration award issued in this above-captioned adversary proceeding, namely, the *FINAL AWARD (CORRECTED)*, dated June 21, 2019 but issued as corrected on August 22, 2019 (the "Final Award"), by the arbitrator, the Honorable Gary A. Feess, retired (the "Arbitrator"), in favor of defendants O'Melveny & Myers LLP ("O'Melveny"), Steven J. Olson ("Olson") and J. Jorge deNeve ("deNeve" and, collectively with O'Melveny and Olson, "Defendants").

PLEASE TAKE FURTHER NOTICE that this Motion is brought pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 10(a)(2), (4), and § 12, on the grounds that the Final Award enforces an illegal contract (O'Melveny's engagement agreements) in violation of an explicit, clearly applicable and well defined dominant public policy of California, because it would vindicate and enforce O'Melveny's illegal engagement agreements, wherein it undertook to jointly represent Aletheia and its officers accused of looting Aletheia and Directors accused of failing to redress the looting, in the very action in which such looting allegations were placed at issue, which gave rise to the material undisclosed and unwaived actual conflict of interests as between O'Melveny's joint clients.  In addition, the Final Award should be vacated for its manifest disregard of the governing law at issue, namely, Rule 3-310(C)(2) of California's Rules of Professional Conduct, which bars lawyers from jointly

representing clients with conflicting interests without informed written consent.  The Final Award thus manifestly disregards applicable law, which independently requires vacatur especially where, as here, the subject law that is disregarded itself embodies California's express public policy.  The Final Award also should be vacated because it is irrational in light of the law and uncontroverted facts and therefore resulted in the Arbitrator exceeding his authority.  Independently, the Final Award should be vacated because it is the product of the Arbitrator's partiality in favor of Defendants and antipathy against the Trustee that manifested itself after both O'Melveny and its counsel, Gibson Dunn & Crutcher, LLP ("Gibson"), barred the Arbitrator's son from employment while he was preparing on-campus interviews with both firms, blaming their decisions on the Trustee.

**PLEASE TAKE FURTHER NOTICE** that this Motion is based hereon and the accompanying Memorandum of Points and Authorities, the accompanying declaration of Jerrold L. Bregman (the "Bregman Decl."), the Compendium (the "Compendium") of Trial Exhibits accepted into evidence ("TE") at the evidentiary hearing in the arbitration, inclusive of the court reporters' transcripts (citations from which are designated herein by "Trans.") of the evidentiary hearing (which Compendium will be in two parts, the first of which contains the transcripts and TEs that are not filed under seal, and the second of which contains the four (4) confidential TEs (the "Confidential TEs") the Trustee will file under seal pursuant to the Order on Stipulation (defined below), all pleadings and papers on file in this action, and upon such oral and documentary evidence and argument as the Trustee's counsel may present at any hearing on this matter.  Further to the foregoing, respective counsel for the Trustee and the Defendants have entered into that certain *Stipulation Regarding Briefing Schedule For Competing Motions To Confirm / Vacate Arbitrator's Final Award, And Authorizing Filing of Documents Under Seal* (the "Stipulation") and accompanying proposed order approving same ("Order on Stipulation") which has

been so ordered by this Court and which authorizes, among other things, the Trustee's filing of the Confidential TEs under seal.

**PLEASE TAKE FURTHER NOTICE** that this Motion is made following a pre-filing conference of counsel pursuant to Central District Local Rule 7-3, which took place by telephone call on August 29, 2019, and the exchange of correspondence in connection therewith, and the parties' joint submission of the Stipulation to coordinate the briefing schedule for their competing motions (the Trustee's instant Motion and the Defendants' anticipated motion to confirm the Arbitration Award) and the filing of the Confidential TEs under seal.

DATED:  September 9, 2019          BRUTZKUS GUBNER

                                  By:_____
                                       Steven T. Gubner
                                       Jerrold L. Bregman
                                       Jason B. Komorsky
                                  *Special Litigation Counsel for Plaintiff*
                                  *Jeffrey I. Golden, Chapter 7 Trustee*

3

2178163

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ..........................................................................1

II.  STATEMENT OF FACTS ............................................................6

    A.   The Proctor Litigation..........................................................6

    B.   O'Melveny's Engagement Agreements Contained No Limitations .....8

III. ARGUMENT...............................................................................9

    A.   The Final Award Violates Public Policy .............................................9

        1.   Dominant Public Policy Prohibited O'Melveny From Jointly Representing Aletheia, the Co-Founders and the Other Directors ..................................................................10

        2.   A Conflicted Representation, Impermissible Under Applicable State Law, Cannot Be Blessed by an Arbitrator or Court ..................................................................14

    B.   The Final Award Must Be Vacated For Its Manifest Disregard of California Law on Conflicts of Interest and Disclosure Obligations..16

    C.   The Final Award Must Be Vacated Because It Is Irrational...............21

    D.   The Final Award Must Be Vacated Because Of Arbitrator Bias........23

IV.  CONCLUSION .........................................................................25

i

2178163

# TABLE OF AUTHORITIES

Page

## CASES

*Am. Postal Workers Union AFL-CIO v. U.S Postal Serv.*,
    682 F.2d 1280 (9th Cir. 1982)................................................................9, 21

*Anderson v. Eaton*,
    211 Cal. 113 (1930) ..............................................................................20

*Aramark Facility Servs. v. Serv. Emps. Int'l Union, Local 1877*,
    530 F.3d 817 (9th Cir. 2008)...........................................................1, 9, 10

*Bader v. Anderson*,
    179 Cal.App.4th 775, 801 (2009)..........................................................13

*Berg & Berg Enterprises v. Boyle*,
    178 Cal.App.4th 1020 (2009)................................................................19

*Biller v. Toyota Motor Corp.*,
    668 F.3d 655 (9th Cir. 2012)................................................................16

*Blanton v. Womancare, Inc.*,
    38 Cal.3d 396 (1985) ..........................................................................19

*Blecher & Collins, P.C. v. Northwest Airlines, Inc.*,
    858 F.Supp. 1442 (C.D. CA 1994) ......................................................19

*Campbell v. Clark*,
    159 Cal.App.2d 432 (1958)........................................................2, 13, 18

*City of Alturas v. Adkins Consulting Engineers, Inc.*,
    2014 WL 1255848 (E.D. Cal. Mar. 26, 2014) ........................................9, 10

*Coldren v. Hart, King & Coldren, Inc.*,
    239 Cal.App.4th 237 (2015)...........................................................11, 17

*Collins v. D.R. Horton, Inc.*,
    505 F.3d 874 (9th Cir. 2007)................................................................17

*Comedy Club, Inc. v. Improv West Associates*,
    553 F.3d 1277 (9th Cir. 2009)........................................................17, 21

*Commonwealth Coatings Corp. v. Continental Casualty Co.*,
    393 U.S. 145 (1968)..............................................................................25

*Consol. Coal Co. v. Local 1643, United Mine Workers of Am.*,
    48 F.3d 125 (4th Cir. 1995)..................................................................23

*Coutee v. Barington Capital Group, LP*,
    336 F. 3d 1128 (9th Cir. 2003).....................................................16, 17, 21

*D'ull v. Kaye*,
    2014 WL 4808827 (Cal. App. Sept. 29, 2014) ......................................22

ii

# TABLE OF AUTHORITIES (cont'd)

Page

## CASES

*Flatt v. Sup. Ct.*,
  9 Cal.4th 275 (1994) ..................................................................... 14

*Gong v. RFG Oil, Inc*,
  166 Cal.App.4th 209 (2018).................................................. *passim*

*Havasu Lakeshore Investments, LLC v. Fleming*,
  217 Cal.App.4th 770 (2013).......................................... 3, 11, 12, 17

*Immersion Corporation v. Sony Computer Entertainment America LLC*,
  188 F.Supp.3d 960 (N.D. Cal. 2016)............................................ 10

*Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers*,
  834 F.2d 1424 (8th Cir. 1987).................................................... 10

*Kyocera Corp. v. Prudential-Bache*,
  341 F.3d 987 (9th Cir. 2003)....................................................... 21

*La Jolla Cove Motel and Hotel Apartments, Inc.* v. *Superior Ct.*,
  121 Cal.App.4th 773 (2004).................................................... 3, 12

*Lagstein v. Certain Underwriters at Lloyd's of London*,
  607 F.3d 634 (9th Cir. 2010)....................................................... 16

*Loving & Evans v. Blick*,
  33 Cal.2d 603 (1949) .................................................................... 4

*M'Guinness v. Johnson*,
  243 Cal.App.4th 602 (2015)............................................ 3, 11, 17

*Matthews v. National Football League Management Council*,
  688 F.3d 1107 (9th Cir. 2012)............................................. 1, 9, 10

*Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.*,
  36 Cal.App.4th 1832 (1995)..................................................... 3, 12

*Morelite Const. Corp. v. New York City Dist. Council Carpenters Ben. Funds*,
  748 F.2d 79 (2d Cir. 1984)............................................................ 23

*Neel v. Magana, Olney, Levy, Cathcart and Gelfand*,
  6 Cal.3rd 176 (1971).................................................. 5, 13, 19, 20

*New United Motor Mfg., Inc. v. United Auto Workers Local 2244*,
  2008 WL 2540702 (N.D. Cal., June 19, 2008) .......................... 17

*Ontiveros v. Constable*,
  245 Cal.App.4th 686 (2016)....................................................... 15

*Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*,
  991 F.2d 141 (4th Cir. 1993)....................................................... 23

iii

## TABLE OF AUTHORITIES (cont'd)

Page

**CASES**

*Poweragent Inc. v. Electronic Data Sys. Corp.,*
    358 F. 3d 1187 (9th Cir. 2004) ........................................................... 16, 21

*Romero v. CitiBank USA Nat'l Assoc.,*
    551 F.Supp. 2d 1010 (E.D.Cal. 2008) ...........................................17

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Company, Inc.,*
    6 Cal.5th 59 (2018) ................................................................*passim*

*Sprewell v. Golden State Warriors,*
    266 F.3d 979 (9th Cir. 2001) .......................................................9

*State Comp. Ins. Fund v. Drobot,*
    192 F.Supp.3d 1080 (C.D. Cal. 2016) ...........................................16

*State Farm Mutual Automobile Ins. Co. v. Federal Ins. Co.,*
    72 Cal.App.4th 1422 (1999) .......................................................14

*Stead Motors v. Auto Machinists Lodge No. 1173,*
    886 F.2d 1200 (9th Cir. 1989) ...................................................1, 9

*Stewart v. Preston Pipeline, Inc,*
    134 Cal.App.4th 1565 (2005) .....................................................18

*Titan Tire Corp. of Freeport, Inc. v. United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Service Workers Intern.,*
    734 F.3d 708 (7th Cir. 2013) .....................................................10

*United Paperworkers Int'l v. Misco, Inc.,*
    484 U.S. 29 (1987) ...................................................................10

*W.R. Grace v. Rubber Workers,*
    461 U.S. 757 (1983) .................................................................10

*Wilko v. Swan,*
    346 U.S. 427 (1953) overruled on other grounds by
    *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
    490 U.S. 477 (1989) .................................................................16

*Woods v. Saturn Distribution Corp.,*
    78 F. 3d 424 (9th Cir. 1996) .....................................................25

**STATUTES**

9 U.S.C § 1, et seq
    Federal Arbitration Act ........................................................*passim*

9 U.S.C.
    § 10(a)(2) .............................................................................23

iv

## **TABLE OF AUTHORITIES (cont'd)**

<u>Page</u>

## **STATUTES**

9 U.S.C.
    § 10(a)(4) .................................................................16

## **RULES**

California Business & Professions Code,
    Secton 6068(m) ..........................................................13

California Rules of Professional Conduct,
    Rule 3-310(C) ....................................................*passim*
    Rule 3-310(C)(2) ..............................................*passim*

California Rules of Professional Conduct,
    Rule 3-500 ...................................................................13

## **TREATISES**

ABA Model Code of Prof. Responsibility,
    Canon 7, Ethical Considerations ................................20

Vapnek, *et al.* Cal. Prof. Guide: Professional Responsibility
    (Rutter Guide September 2017)
    Chapter 3-D ..............................................................19
    Chapter 4-B ..............................................................12

Friedman, Cal. Practice Guide: Corporations
    (Rutter Guide 2019)
    Corporations § 6:601b................................................13

v

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The Trustee comes before this Court knowing that vacating an arbitrator's award is the rare exception to the general rule under the FAA.  In support of the Motion, the Trustee submits that this case presents the unique situation where vacatur is mandated, and enforcement of the arbitrator's Final Award impermissible, because the Final Award enforces an illegal contract in violation of an explicit, clearly applicable and well-defined dominant public policy.  *See Matthews v. National Football League Management Council*, 688 F.3d 1107, 1111 (9th Cir. 2012) ("'[A] court need not, **in fact cannot, enforce an award which violates public policy**.'") (emphasis added) quoting *Aramark Facility Servs. v. Serv. Emps. Int'l Union, Local 1877*, 530 F.3d 817, 823 (9th Cir. 2008), quoting *Stead Motors v. Auto Machinists Lodge No. 1173*, 886 F.2d 1200, 1209 (9th Cir. 1989).[1]

The illegal contracts at issue are O'Melveny's various engagement agreements (the "Engagement Agreements"), which were enforced and vindicated by the Final Award but are illegal under applicable law for their violation of Rule 3-310(C)(2) of California's Rules of Professional Conduct ("Rule 310(C)(2)").  *See Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Company, Inc.*, 6 Cal.5th 59, 74 (2018) ("*Sheppard Mullin*") ("an attorney contract that has as its object conduct constituting a violation of the Rules of Professional Conduct is contrary to the public policy of this state and is therefore unenforceable").

O'Melveny's Engagement Agreements violated Rule 310(C)(2) insofar as O'Melveny undertook to jointly represent Aletheia and its two co-founders, Peter J. Eichler, Jr., its Executive Chairman and majority shareholder ("Eichler"), and Roger B. Peikin, its co-founder and Chief Legal Officer ("Peikin") (Peikin and Eichler, the "Co-Founders"), in defending claims asserted by Proctor Investment Managers, LLC, a 10% minority shareholder of Aletheia ("Proctor") (the "Proctor Litigation").  Proctor

---

[1] Terms not otherwise defined have the meanings ascribed to them in the Motion.

alleged, among other things, that the Co-Founders had breached their fiduciary duties by taking tens of millions of dollars in excessive compensation from Aletheia.[2] O'Melveny doubled-down on this conflicted representation by adding Aletheia directors Patricia Barnes ("Barnes") and Bruce Lee ("Lee") (Lee and Barnes together, the "Other Directors") to its stable of jointly-represented clients in the Proctor Litigation after Proctor added them as defendants for failing to rein in the looting or seek to recover the looted monies, and alleged corporate governance improprieties.

Specifically, Proctor's pleadings alleged with facts and in detail how the Co-Founders had, among other things, wrongly siphoned off for their personal benefit virtually all of Aletheia's 2008 profits.  Proctor alleged the Co-Founders attempted to conceal their corporate fleecing by depriving Proctor of its contractual right to a board seat and illegally refusing to provide Proctor with financial information, all to the detriment of Proctor and the other minority shareholders (collectively, the "Proctor Looting Allegations").  Proctor then claimed that the Other Directors abdicated their fiduciary duties by failing to take any action whatsoever to redress the looting.

Thus, O'Melveny undertook to represent the alleged looters (the Co-Founders), the complicit Other Directors, and the alleged victim[3] of such looting in the very action in which the looting allegations were raised and placed at issue by a minority shareholder who also included challenges to corporate control.  Under settled law, the allegations of corporate malfeasance and looting by the Co-Founders, standing alone, created an actual conflict of interest as between Aletheia and the Co-Founders.  Proctor's additional allegations of inaction by the Other Directors, and its contestation of the Board makeup, likewise, created a conflict amongst *all* of O'Melveny's clients.

While O'Melveny's joint clients shared an interest in defeating Proctor's claims, they nevertheless harbored conflicting interests that were not and could not be served

---

[2]  O'Melveny coined the term "looting" [TE 29, 31, 38, 170, 337, 1088], and quantified the non-board approved [Trans. 2124-25] looting as exceeding $47 million. TE 222, p.463.

[3]  O'Melveny knew that the corporation, not individual shareholders, is deemed the victim of excess compensation claims.  TE 170, p.410-11 citing *Campbell v. Clark*, 159 Cal.App.2d 432, 436 (1958).

(let alone unilaterally reconciled) by O'Melveny.  The Co-Founders had an interest in retaining the ill-gotten gains; Aletheia had a countervailing interest in investigating whether its Co-Founders had looted or were looting the corporate coffers, whether to seek to recover the looted funds, and to ensure good corporate governance; and the Other Directors had fiduciary duties to the entire shareholder body to investigate the Co-Founders, comply with California law and follow corporate formalities.

Under an established body of California case law conceived specifically to address lawsuits brought by shareholders against corporations and their officers/ directors/shareholders (hereinafter "Insiders")—regardless of whether such lawsuits are brought derivatively or directly—California courts have identified two distinct sets of allegations that create an actual conflict of interest between the corporation and its Insiders prohibiting counsel from jointly representing both:

> [1] [W]here a shareholder has filed an action questioning [the corporation's] management or the actions of individual officers or directors, . . . or  [2] . . . controversies or factional differences among shareholders as to control of the corporation ....

*Havasu Lakeshore Investments, LLC v. Fleming*, 217 Cal.App.4th 770, 778 (2013) (direct action) quoting *La Jolla Cove Motel and Hotel Apartments, Inc.* v. *Sup. Ct.*, 121 Cal.App.4th 773, 785 (2004) and *Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.*, 36 Cal.App.4th 1832, 1842 (1995); *M'Guinness v. Johnson*, 243 Cal.App.4th 602, 623(2015) (direct action); *Gong v. RFG Oil, Inc*, 166 Cal.App.4th 209, 215 (2018) (same).  *All* modern cases universally apply this framework, which the Final Award disregarded.  Proctor's pleadings indisputably contained both sets of debilitating allegations, looting and mismanagement by the Co-Founders and Other Directors and challenges to control of the corporation, which constituted a conflict *per se*.

The Final Award abrogates the law and California's public policy by disregarding the Proctor Looting Allegations and, instead, focusing only on the fact Proctor sought damages only for itself.  *Gong* specifically rejected this myopic view as

having only "superficial appeal," finding a conflict despite that the plaintiff "has not yet filed a derivative claim *seeking damages on behalf of the corporation*." 166 Cal.App.4th at 215-16 (emphasis added).  Highlighting the absurdity of the Arbitrator's ruling, O'Melveny recognized both (1) that Aletheia's rights against Eichler would survive even if Proctor lost [TE 222, p.462], and (2) if Proctor prevailed, the recovered monies would flow back first to Aletheia. TE 212, p.451; TE 222, p.462.

The affected public policy is the lawyers' duty of undivided loyalty, enshrined in Rule 3-310(C), which bars undisclosed/unwaived conflicts of interest.  *Sheppard Mullin*, 6 Cal.5th at 67, citing *Loving & Evans v. Blick*, 33 Cal.2d 603 (1949).

The existence of the undisclosed actual conflict prevented O'Melveny from providing guidance to protect Aletheia's interests.  It was undisputed that by the time Aletheia filed for bankruptcy less than a year after O'Melveny withdrew from its two-year representation, the statute of limitations had run on Aletheia's claims against Peikin, and Eichler was uncollectable having squandered the tens of millions he had looted from Aletheia.  O'Melveny never obtained a tolling agreement from Peikin or advised Aletheia it could seek recovery from Eichler when he had resources.  The undisclosed conflict, placing O'Melveny in the position of protecting the Co-Founders to the detriment of Aletheia, left Aletheia insolvent and bankrupt with over $77 million in claims (Bregman Decl. ¶18) and no recourse against the Co-Founders.

This Motion does not call upon this Court to conduct any fact finding or weigh the credibility of witnesses or expert testimony.  This was, and is, a legal question calling for the application of well-settled authority to the Proctor Looting Allegations in the context of O'Melveny's Engagement Agreements.[4]

---

[4]  Olson and deNeve were tainted by the same conflict that infected the entirety of O'Melveny's representation when they took senior legal positions in-house at Aletheia after having worked on the matter while at O'Melveny.  They were incapable of providing Aletheia with undivided loyalty even though as Aletheia's senior-most legal officers Aletheia, not Eichler, was their exclusive client. DeNeve edited and approved a legal analysis stating: "Proctor will <u>probably be able to show</u> that a substantial amount of Aletheia's 'questionable' expenditures were in fact improper [and] <u>it is likely that</u> the Aletheia Directors will be found liable for those amounts based on their failure to adequately and competently govern Aletheia." TE 251, p. 540 (deNeve edits underlined in original).

Rather than showing fidelity to California public policy by acknowledging the conflict evident on the face of the pleadings, the Final Award reflects that the Arbitrator donned the role of advocate, not umpire, and (i) adopted from whole cloth the Defendants' novel and unsupported legal framework (which violates settled California Supreme Court authority) that O'Melveny itself, without client consultation, could properly determine that Aletheia would not take any action against the Co-Founders to recover the looted funds and, thus, eliminate both the conflict and O'Melveny's disclosure obligation, and (ii) turned a blind eye to the Proctor Looting Allegations, which O'Melveny itself argued "are at core assertions of harm to Aletheia and its entire body of shareholders, not just Proctor" [TE 170, p.411, fn. 3]— the predicate for the ethical bar preventing O'Melveny from representing both Aletheia and the alleged looters in the same action.[5]  Thus, the Final Award ignores and violates the public policy embedded in Rule 3-310(C) as it has been universally interpreted and enforced in California, including in *Sheppard Mullin*.

Separately, the Final Award should be vacated for its manifest disregard of the law.  The governing law at issue, Rule 310(C)(2), is well defined, explicit, and clearly applicable where, as here, the Proctor Looting Allegations alleged that one group of jointly represented clients (the Co-Founders) had looted the other jointly represented client (Aletheia) and other jointly represented group of clients (the Other Directors) failed to act despite their fiduciary obligation to do so.  Here the Final Award not only disregards Rule 310(C)(2), but also settled California law that the client, not the attorney, is the master of all substantive determinations, mandating O'Melveny to make full disclosure of material information—such as Aletheia's rights to recoup the excess compensation—with its failure to do so tantamount to constructive fraud. *Neel v. Magana, Olney, Levy, Cathcart and Gelfand*, 6 Cal.3rd 176, 189 (1971).

Finally and separately, the Final Award should be vacated for the Arbitrator's

---

[5] Twice the Trustee attempted to truncate the lengthy and costly arbitration proceedings by bringing two separate motions for summary adjudication of the existence of the conflict, but both times was rebuffed by the Arbitrator.  Bregman Decl., ¶¶10-11, 16, Exhs. 4-7, 24-25.

bias against the Trustee.  The Arbitrator made up his mind against the Trustee's case on the basis of bias after O'Melveny and its counsel, Gibson Dunn & Crutcher, LLP ("Gibson"), barred the Arbitrator's son from employment while he was preparing on-campus interviews with both firms, blaming their decisions on the Trustee.  *See* Bregman Decl. at ¶ 13.  The Arbitrator took affirmative action throughout the Arbitration to curry favor with Defendants and its counsel (who was rewarded with new business from Gibson before the Arbitrator issued his award, *see* Bregman Decl. at ¶ 17).  The Arbitrator should have recused himself in July 2017, rather than deny the Trustee's request that he do so.  S*ee* Bregman Decl. at ¶ 13).  The Arbitrator's bias is manifested in the irrationality of his finding there was no conflict despite uniform authority and voluminous allegations sounding in harm to Aletheia.

## II.    STATEMENT OF FACTS

### A.    *The Proctor Litigation*

On February 4, 2010, Aletheia filed a complaint against Proctor in the Los Angeles Superior Court ("LASC") through its then counsel, Loeb & Loeb LLP ("Loeb"), thereby commencing the Proctor Litigation ("California Action").  TE 3. The Co-Founders were not parties.  The complaint sought a declaration of the parties' rights under various agreements pursuant to which Proctor had paid $16 million to the Co-Founders and others for 10% ownership of Aletheia [TE 117] and secured various shareholder protections in return—including a cap on compensation [TE 11].

The Proctor Looting Allegations, which were among the primary substantive claims, were pled on February 16, 2010, when Proctor filed its suit in New York state court against Aletheia and the Co-Founders (the "New York Action").  In its complaint (TE 4), Proctor asserted various breach causes of action against Aletheia and, dispositively, asserted the Proctor Looting Allegations solely against the Co-Founders.  *Id.* at ¶¶ 103-108.  Proctor specifically alleged, among other things:

As part of their effort to deprive Proctor IM ***and other non-employee minority Shareholders of the economic benefits*** of their

6

ownership interest in Aletheia Management, *Eichler and Peikin have paid themselves excessive compensation*…. Eichler and Peikin have also breached their fiduciary duties …. *they refused to appoint an independent director … in an effort to shield their misconduct from scrutiny.* Eichler, Peikin and Aletheia Management further tried to *conceal their misconduct by refusing to comply with their legal obligation to provide financial information* to Proctor …which was readily available

\* \* \*

In 2008, Aletheia Management had its most successful year …, generating revenues of approximately $78 million.  Yet Aletheia Management's net income in 2008 remained about the same as it had been in 2007 at $5.9 million because its employee compensation ballooned to over $56 million (more than 70% of its revenues). . . . . *Aletheia Management did not pay its shareholders any distributions while Eichler and Peikin paid themselves and other Aletheia employees $56 million in "compensation," much of which was likely paid to Eichler* ….

TE 4, ¶¶ 1, 6 (emphasis added).  By February 2010, O'Melveny represented Aletheia and Co-Founders in the New York Action and replaced Loeb in the California Action.

In July 2010, Proctor brought a second suit challenging Eichler's unilateral appointment of Lee to the Board to replace Proctor's director who had resigned (the "Independent Director Lawsuit"). TE 9. O'Melveny took on the joint representation of the Other Directors [TE 138] despite expanded allegations of harm to Aletheia:

… *this action will also benefit all other minority shareholders* of Aletheia and protect them from Eichler's refusal to follow proper corporate formalities and good corporate governance practices …. For years, Eichler … has i*gnored the rights of minority*

7

*shareholders* and has treated Aletheia as if it existed solely for his own personal benefit.  Eichler has done so, in part (and by way of example only), by *paying himself excessive compensation, wasting corporate assets* ... and *denying the other non-employee, minority shareholders of Aletheia any economic benefit from Aletheia's growth and success* ….

TE 9, at ¶¶ 3, 25-33 (emphasis added).  The LASC judge described Proctor's Independent Director Lawsuit allegations as sounding in harm to Aletheia's other minority shareholders as well as Proctor, as follows:

Proctor contends that in the absence of a fourth and independent director there was no check on Eichler's domination and control of Aletheia.  *This is alleged to have damaged minority shareholders to the benefit of Eichler's personal enrichment*.  Proctor thus alleges that Eichler paid himself … while *preventing the entity from distributing any significant dividends*, distributions, or other monies *to the minority shareholders*.

TE 2115 (LASC ruling on submitted matter), at p.668-669 (emphasis added).

On January 18, 2011, Proctor filed a cross-complaint in the California Action again asserting the Proctor Looting Allegations only against Eichler and Peikin and not against Aletheia.  TE 27.  On March 10, 2011, Proctor filed its First Amended Cross-Complaint in the California Action, which added the Other Directors as defendants for their failure to protect Aletheia from the Co-Founders.  TE 71.

The fiduciary breaches Proctor alleged against the Other Directors were for their doing nothing to investigate or address Eichler's looting despite their legal obligation to do so.  *See* TE 71 at ¶¶ 6,11 79, 82, 86-87.

**B.**     ***O'Melveny's Engagement Agreements Contained No Limitations***

O'Melveny provided Aletheia with three engagement agreements to represent joint clients in the Proctor Litigation, all signed by Eichler alone on Aletheia's behalf,

one dated April 13, 2010 (Aletheia and the Co-Founders in the Proctor Litigation), one dated July 13, 2010 (Other Directors in the Independent Director Lawsuit), and one dated April 14, 2011 (Other Directors in the Proctor Litigation).  TE 109, 138, and 70.  O'Melveny's Engagement Agreements defined the scope of its Proctor Litigation representation as follows, without any limitations (other than the third, which had limitations concerning Peikin who was by then a former client):

> 2. *Aletheia Research & Management, Inc. v.* Proctor Investment
> Managers, UC, et al., Case No. SC106700, … and any related
> litigation, including Proctor Investment Managers, LLC, et al., v.
> Aletheia Research & Management, Inc., Case No. 1 0600397, filed
> in the New York Supreme Court (the "Proctor Litigation").

TE 109.  O'Melveny disavowed any conflict: "Based upon the information available to us at this time, ***we do not believe that representing these parties involves an actual conflict of interest***."  TE 109, p.345; TE 138, p.361; TE 70, p.259 (emphasis added).

## III.    ARGUMENT

### A.    *The Final Award Violates Public Policy*

Where, as here, the enforcement of the Final Award would result in the violation of an explicit, clearly applicable and well defined public policy which militates against the relief embedded therein, the award shall be vacated.  *See City of Alturas v. Adkins Consulting Engineers, Inc*., 2014 WL 1255848, *6 (E.D. Cal. Mar. 26, 2014) ("Ninth Circuit recognizes a narrow exception to enforcement of arbitration awards under the FAA when an award is contrary to public policy."), citing *Matthews*; *Aramark*, 530 F.3d at 823; *and Stead*, 886 F.2d at 1212–13); *Sprewell v. Golden State Warriors,* 266 F.3d 979, 986 (9th Cir. 2001) ("vacatur of an arbitration award under section is warranted... when the award runs counter to public policy"); *Am. Postal Workers Union AFL-CIO v. U.S Postal Serv.,* 682 F.2d 1280, 1286 (9th Cir. 1982).  Thus, a court "in fact cannot[] enforce an award which violates public policy."  *Matthews*, 688 F.3d at 1111 (citations omitted); *and United Paperworkers Int'l v.*

9

*Misco, Inc.,* 484 U.S. 29, 42-44 (1987) ("A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy");

The determination of public policy is for this Court, not the Arbitrator. "Once [a] public policy question is raised, we must answer it by taking the facts as found by the arbitrator, but reviewing [the arbitrator's] conclusions *de novo*." *Titan Tire Corp. of Freeport, Inc. v. United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Service Workers Intern.*, 734 F.3d 708, 717 (7th Cir. 2013). Indeed, "the question of public policy is ultimately one for resolution by the courts." *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983); *see Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers*, 834 F.2d 1424, 1427 (8th Cir. 1987). Accordingly, this Court is to determine the presented public policy question without regard to the Arbitrator's determination thereof, if any, to which no deference is due. *See Sheppard Mullin*, 6 Cal.5th at 75 ("A party seeking confirmation cannot be permitted to rely upon the arbitrator's conclusion of legality for the reason that paramount considerations of public policy require that this vital issue be committed to the court's determination whenever judicial aid is sought.").

An FAA arbitration award is to be vacated on public policy grounds if the court finds that enforcement would violate (1) an "explicit, well defined and dominant public policy" that (2) "specifically militates against the relief ordered by the arbitrator." *Immersion Corporation v. Sony Computer Entertainment America LLC*, 188 F.Supp.3d 960, 969 (N.D. Cal. 2016), *citing City of Alturas*, 2014 WL 1255848, at *6 (*citing Aramark*, 530 F.3d at 823). Both prongs are satisfied here.

### 1. Dominant Public Policy Prohibited O'Melveny From Jointly Representing Aletheia, the Co-Founders and the Other Directors

*No* California court has sanctioned the joint representation of a corporation and its Insiders in the same litigation where, as here, they are accused of self-dealing,

malfeasance, and mismanagement. The first prong is satisfied because under California law, "an attorney contract that has as its object conduct constituting a violation of the Rules of Professional Conduct is contrary to the public policy of this state and is therefore unenforceable." *Sheppard Mullin*, 6 Cal.5th at 75. This is especially true where there is a violation of Rule 310(C), which "embodies a core aspect of the duty of loyalty." *Id.*, at 84. The central purpose of O'Melveny's Engagement Agreements violated Rule 310(C)(2) insofar as it facilitated O'Melveny's concurrent representation of the alleged looters, complicit directors, and the alleged victim in the very action in which the Proctor Looting Allegations were at issue.

The *per se* adversity between Aletheia, the Co-Founders, and the Other Directors falls squarely within well-settled authority applicable to this very context—lawsuits brought by minority shareholders against corporations and their Insiders—that prohibit joint representation where (i) "a shareholder has filed an action questioning [the corporation's] management or the actions of individual officers or directors" <u>or</u> (ii) where issues relating to "control of the corporation" are at issue. *Havasu*, 217 Cal.App.4th at 778. The *Havasu* court applied this analytical framework to direct claims brought by a shareholder to recover damages for itself and not by way of a derivative action. In *M'Guinness*, the court, citing *Gong*, reviewed the operative pleadings and found that plaintiff "alleged claims of breach of fiduciary duty against Johnson that involved alleged self-dealing, diversion of corporate opportunities, and wasting of corporate assets that harmed TLC," creating a conflict precluding joint representation of corporation and Johnson in a direct action.

Subsequent case law uniformly reaffirms that the derivative analysis applies with equal force in direct actions where the shareholder makes factual allegations of harm to the corporation while seeking damages only for itself. *See Coldren v. Hart, King & Coldren, Inc.*, 239 Cal.App.4th 237, 251 (2015) ("*Gong* should be read for the narrow proposition that where a ***plaintiff's allegations*** are essentially derivative in nature, the failure to label them as such ***may still prohibit dual representation*** of the

11

corporation and defendant shareholder") (emphasis added); *Havasu*, 217 Cal.App.4th at 781 (applying proper analytical framework and searching pleadings for allegations of harm to the company; finding none, court concluded that the allegations did "not involve a derivative suit [] *or its substantive equivalent* []. . .") (emphasis added).

The uniform analysis applied by California courts ignores the form of the action—*i.e.,* whether claims seek a remedy on behalf of the corporation—and focus exclusively on whether the minority shareholder has *alleged* that the Insiders have harmed the corporation [referred to in shorthand as "derivative in nature" allegations]:

> **[4:93.1] Claims derivative in nature**: Even if no derivative lawsuit was filed, joint representation may be prohibited where the shareholder's claim is derivative in nature—***e.g., harm to the corporation is alleged***. [*Gong [...]*—joint representation of majority shareholder and corporation barred in minority shareholder's action alleging personal use of corporate funds, fraud and mismanagement].

Vapnek, *et al.*, Cal. Prof. Guide: Professional Responsibility (Rutter Guide September 2017), Chap. 4-B, at 4:93-1 (emphasis added).

Applying the *La Jolla* and *Metro* analysis, the conflict was obvious on the face of the operative pleadings, which contained Proctor's allegations of misconduct by the Co-Founders and, subsequently, the Other Directors, giving rise to the jointly represented parties' disparate interests distinct from Aletheia's interests as the victim.

It is indisputable that the Proctor Looting Allegations alleged harm to Aletheia, as the corporation is considered the true victim in claims of excess compensation.[6]

---

[6] O'Melveny's admissions in the Proctor Litigation and the LASC's findings, ignored by the Arbitrator, foreclosed the possibility of a finding that the Proctor Looting Allegations did not sound in harm to Aletheia: *See* TE 103, p.340 ". . . I suspect they [the Co-Founders] did not pay distributions to shareholder but paid themselves performance based comp that Proctor will argue is a disguised dividend"); TE 1050 (the "alleged excessive compensation" supported claims that could be brought derivatively); TE 337, p.555 ("Given Proctor's litigation allegations that Peikin and Eichler were committing waste and looting Aletheia's assets …."); TE 1088 ("we must address the allegations that Peter overpaid himself and others and mismanaged/looted the company …."); TE 29 ("It seems to me that Aletheia received a performance bonus from an investor, and Peter [Eichler] and Roger [Peikin] decided that it would be just for them. Proctor is going to argue that his is exactly the type of looting that they were afraid of."); TE 38, p.256 ("Part of Proctor's damages is going to be

*See Campbell*, 159 Cal.App.2d at 436-437 (1958); *Bader v. Anderson*, 179 Cal.App.4th 775, 801 (2009) (allegedly improper bonus plan for executives harmed the corporation); Friedman, Cal. Prac. Guide: Corporations (Rutter Group) § 6:601b ("[e]xcessive officer compensation is a classic example of a corporate harm…."). Moreover, there clearly was a ripe dispute over the control of the corporation and whether Lee was properly appointed as a director. *See e.g.* TE 9, 2115.

O'Melveny's failure to obtain informed written consent is amplified by its subsequent failure to advise the client of its rights when Aletheia desperately needed the money. This was a loyalty conflict because any advice that Aletheia had rights or that Eichler had violated duties would have been directly adverse to Eichler.[7] O'Melveny could not advise either of its clients regarding the fiduciary breach claim without being disloyal to the other. In addition, any attempt to do so would have obligated O'Melveny to keep secret from Aletheia its communications to and from Eichler, and *vice versa*, which violated its duty of full disclosure to each client. *See,* Cal. R. Prof. Cond., Rule 3-500; Cal. Bus & Prof. C. § 6068(m); *Beel Bank v. Arter & Hadden, LLP*, 42 Cal.4th 503, 514 (2007). O'Melveny would have had the duty to advise each of its clients about the implications of the Proctor Looting Allegations even if the scope of O'Melveny engagement agreement with Aletheia and Eichler could be said to have been so narrow as to include only some claims but not others alleged therein. *See Neel*, 6 Cal. 3rd at 188-89 (lawyers are obligated to volunteer information the lawyer reasonably should know to be material to the client's interests, even if outside the scope of the representation).

Reviewing Proctor's allegations in the light of O'Melveny's Engagement

---

Peter's alleged looting from the company."); TE 168, p.378 (O'Melveny brief to the LASC: "the claim that a company paid excessive compensation … is based inherently on the notion that the corporation and all its shareholder suffered injury"); *see id.*, p.377, 379; TE 170, p.409, 411 fn. 3; TE 169, p.395-396 (LASC found that at least some of Proctor's allegations were derivative in nature); TE 173, p.436 (LASC found obvious conflict in O'Melveny's joint representation in the Proctor Litigation: "[t]here is no question but that there is a current conflict of interest in this matter".

[7] O'Melveny also breached its fiduciary duty of disclosure by withholding material developments related to its representation. *See* Cal. Bus. & Prof. Code § 6068(m); *Neel*, 6 Cal.3d at 188-89.

Agreements leads *a priori* to the legal conclusion, under California law, that O'Melveny's joint representation violated California public policy embodied in Rule 310(C)(2) and was a *per se* breach of O'Melveny's duty of loyalty to Aletheia.

### 2.   A Conflicted Representation, Impermissible Under Applicable State Law, Cannot Be Blessed by an Arbitrator or Court

The second prong is satisfied here because the particular ethical rule in question—Rule 310(C)(2) – is the embodiment of lawyers' sacrosanct duty of undivided loyalty to each client, which is a cornerstone of the attorney-client relationship.  The joint representation of multiple clients with an actual conflict (in light of their conflicting interests) is proscribed by Rule 310(C)(2) and constitutes a *per se* breach of the attorney's undivided duty of loyalty.  *See Gong*, 166 Cal.App.4th at 216 (where there are conflicting interests, an attorney "cannot satisfy its undivided duty of loyalty to both [clients]."); *see also Strickland v. Washington¸* 466 U.S. 668, 692 (1984) ("when counsel is burdened by an actual conflict of interest. . . counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties"); *see State Farm Mutual Automobile Ins. Co. v. Federal Ins. Co*., 72 Cal.App.4th 1422, 1431 (1999); *and Flatt v. Sup. Ct.*, 9 Cal.4th 275, 289 (1994) (simultaneous representation of clients with conflicting interests is an automatic ethics violation in California).

Even if the conflict at issue were waivable by informed written consent, none of the Engagement Agreements disclosed to Aletheia *a single* material fact regarding its rights or options with respect to the other defendants and, thus, any Aletheia consent was never informed.  O'Melveny should have provided a fulsome disclosure, such as:

> We must advise you that there is a conflict between you and our other clients.  The breach of fiduciary duty allegations of excess compensation, malfeasance/nonfeasance constitute harm to you and the entire shareholder body, giving rise to claims not dependent on the outcome of the Proctor Litigation.  You may have rights as against our other clients and an obligation to your

14

shareholders to investigate or take other action.  Further, as counsel for Aletheia we cannot take sides in a dispute between shareholders or between directors.  You should seek independent counsel advice as to whether to proceed with joint representation.[8]

Independently, Eichler could not provide informed written consent on behalf of Aletheia, as his disparate interests created the conflict.  *See Ontiveros v. Constable*, 245 Cal.App.4th 686, 697-98 (2016) (Rule 3-600(E) prohibits majority shareholder from consenting to conflicted joint representation on behalf of the corporation); *and Gong*, 166 Cal. App. 4th at 216 (director's "purported waiver of the conflict is ineffective" in light of conflict).  Here, only Eichler signed the Engagement Agreements for Aletheia [TE 70, 109, 138], and Defendants do not contend O'Melveny ever sought or Aletheia provided informed written consent to any conflict.

The conflict taints the entirety of O'Melveny's representation because it goes to the duty of loyalty.  *See Sheppard Mullin*, 6 Cal.5th at 80 ("It is only when 'the illegality taints the entire contract' that courts may declare 'the entire transaction is illegal and unenforceable.") quoting *Keene v. Harling* 61 Cal.2d 318, 321 (1964).  In *Sheppard Mullin*, the conflict which rendered the engagement agreement illegal involved unrelated matters, namely, *de minimis* corporate work on behalf of the same client who was adverse to the firm's client in a *qui tam* action.  *See Sheppard Mullin*, 6 Cal.5th at 87 ("…violation of a Rule of Professional Conduct in the formation of a contract can render the contract unenforceable as against public policy.  That is what happened here when Sheppard Mullin agreed to represent J-M in the *qui tam* action, while also representing South Tahoe on other matters, without obtaining J-M's informed consent").  While the conflict in *Sheppard Mullin* could have been waived with disclosure, here the conflict of interest in the very same matter was unwaivable. *State Comp. Ins. Fund v. Drobot*, 192 F.Supp.3d 1080, 1095 (C.D. Cal. 2016).

---

[8]  As *Sheppard Mullin* instructs, "[t]o be informed, the client's consent to dual representation must be based on disclosure of all material facts the attorney knows and can reveal."  6 Cal.5th at 84.

The California Supreme Court has spoken with respect to conflicted representations; they are illegal and unenforceable. *Sheppard Mullin* remanded to the court, not the arbitrator, to determine whether *Sheppard Mullin* can demonstrate the right to keep any of the fees it was paid; that was not an inquiry for the arbitrator. *Sheppard Mullin* noted that there are some violations of the rules of ethics that are so egregious that all fees may be ordered disgorged and where damages may be appropriate.  Again, this is for a later determination by this Court.  California's public policy [Rule 310(C)(2)] prohibiting undisclosed and unwaivable/unwaived conflicts of interest militates against the relief adjudged by the Final Award, which allows O'Melveny to retain all of its fees from or on behalf of Aletheia for the Proctor Litigation, and rejects claims for O'Melveny's *per se* breach of the duty of loyalty arising from its conflicted representation based on the fallacious finding of no conflict.

## B.   *The Final Award Must Be Vacated For Its Manifest Disregard of California Law on Conflicts of Interest and Disclosure Obligations*

The US Supreme Court also has recognized the ground of "manifest disregard of the law" as a basis for vacating arbitration awards (*see Wilko v. Swan*, 346 U.S. 427, 436-37 (1953), overruled on other grounds by *Rodriguez de Quijas v. Shearson/ Am. Express, Inc.*, 490 U.S. 477 (1989)), which of course applies here.  *See, e.g., Lagstein v. Certain Underwriters at Lloyd's of London*,  607 F.3d 634, 641 & fn. 5 (9th Cir. 2010) ("The standard to be applied is whether the arbitrator understands and correctly states the law, and then boldly proceeds to disregard it in fashioning the award.").  Section 10 of title 9 provides that the court may make an order vacating an arbitration award "where the arbitrators exceeded their powers." (Subdiv. (a)(4); *see Biller v. Toyota Motor Corp.*, 668 F.3d 655, 665 (9th Cir. 2012)); *Poweragent Inc. v. Electronic Data Sys. Corp.,* 358 F. 3d 1187, 1193 (9th Cir. 2004) (the District Court may vacate a procedurally proper arbitration award when that award constitutes "manifest disregard of the law."); *Coutee v. Barington Capital Group, LP,* 336 F. 3d 1128, 1133 (9th Cir. 2003); *Romero v. CitiBank USA Nat'l Assoc*., 551 F.Supp. 2d

16

1010, 1013 (E.D.Cal. 2008); *New United Motor Mfg., Inc. v. United Auto Workers Local 2244*, 2008 WL 2540702 (N.D. Cal., June 19, 2008).  Here, the Arbitrator manifestly disregarded the law then exceeded his powers by the Final Award.  *See Comedy Club, Inc. v. Improv West Associates,* 553 F.3d 1277, 1290 (9th Cir. 2009) (arbitrator manifestly disregarded the law where he was made aware of applicable law but interpreted it in a "fundamentally incorrect" manner that amounted to an intentional decision to ignore it); *and Collins v. D.R. Horton, Inc*., 505 F.3d 874, 879-880 (9th Cir. 2007).

Here, the Arbitrator recognized the applicable law that a conflict of interest requires disclosure and, if subject to waiver, informed written consent, but ignored that law.  The Final Award itself demonstrates that the Arbitrator understood the applicable law before disregarding it, as follows:

> According to the Trustee, Havasu Lakeshore identifies "two sets of ***allegations*** that create adversity and, thus, an actual conflict of interest . . . ."  CB, at 15:7-8 (Emphasis added.)  In his view, Havasu Lakeshore establishes that a shareholder's suit may be "derivative in nature" even if it doesn't bear the derivative label.  E.g., CB 16:3-5.  The Trustee is correct that labels don't matter,
> but the substance of the claims does as the case law makes clear.

Final Award at 66:19-25 (emphasis in original).  The Arbitrator went on to distinguish the cases cited by the Trustee by then ignoring this settled authority, disregarding the factual allegations made by Proctor (the substance) and focusing exclusively on the relief sought by Proctor, concluding that the Proctor Looting Allegations did not give rise to a conflict (or even a disclosure obligation) because Proctor pursued recovery only for itself despite its allegations of harm to Aletheia.  Final Award at pp. 67-69.

This analysis, dismissed as "superficial" in *Gong*, swallows the rule confirmed by *Gong*, *Havasu*, *Coldren*, and *M'Guinness*, which all held that the proscriptions applicable in derivative actions apply with equal force in shareholder direct actions

17

that contain allegations that are derivative in nature, and, as *Gong* made clear, even when the relief sought is not on behalf of the corporation. 166 Cal.App.4th at 215.[9] Instead of focusing on the substance of the allegations (harm to the corporation at the hands of the Insiders), the Arbitrator improperly focused on the form of the action (direct), thus limiting conflicts solely to derivative claims denominated as such and rendering the allegations irrelevant in contravention of settled law.

The Arbitrator's fallacious analysis is undermined by his own recognition that the Proctor Looting Allegations could have supported a derivative action if one had been brought. Final Award at 70:4-6 ("In *Campbell*, the defendants, like Aletheia, demurred to a complaint that would have supported a derivative claim which the plaintiff expressly refused to assert."). Without a hint of irony, the Final Award notes that the demurrer had been successful in *Campbell*, and inexplicably argues that O'Melveny's advocacy to the LASC, that the "gravamen" Proctor's claims sounded in harm to Aletheia, actually serves to "undermine the Trustee's position" (caption title at Final Award p. 69). Thus, the Final Award concludes in violation of applicable law that there is no conflict presented despite the Proctor Looting Allegations, the gravamen of which allege harm to Aletheia.

The Final Award also abrogated and disregarded a second fiduciary duty owed by lawyer to client, the lawyer's duty of disclosure, by finding that the lawyer himself (O'Melveny's Aronson) could reconcile Aletheia's competing interests in protecting its company and its relationship with its Co-Founders, on the one hand, and on the other, its interests in recovering looted funds and putting systems in place to protect the company from future looting. The lawyer's duty is to provide the advice required in the circumstances about the strengths and weaknesses of the client's proposed action, and the reasonably available alternatives and their pros and cons. *See Stewart v. Preston Pipeline, Inc.*, 134 Cal.App.4th 1565, 1581-85 (2005) (collecting cases).

---

[9] The Proctor Litigation tracked the dynamics of *Gong* insofar as Eichler used Aletheia as a litigation "pawn" to cudgel Proctor with claims to advance Eichler's interests. TE 5.

18

The decision as to whether to investigate the looting, and what actions if any to take, lies with Aletheia's directors (at least those not accused of looting). Indeed, in order to invoke the business judgment rule, Barnes and Lee needed to be informed by counsel and themselves act in good faith. *Berg & Berg Enterprises v. Boyle*, 178 Cal.App.4th 1020, 1045 (2009).[10] It is beyond the lawyer's authority to make such a decision on the client's behalf without the client's informed consent. In *Blecher & Collins, P.C.* v. *Northwest Airlines, Inc.*, 858 F.Supp. 1442 (C.D. CA 1994), the District Court confirmed the rule that a lawyer who represents multiple clients in a particular matter may not make substantive decisions affecting the clients' respective claims under the guise of making a "tactical decision." "[A]n attorney cannot make such a choice himself without breaching his ethical duties. The client must be the master of his own case." *Id*. at 1461. Aletheia, not Aronson, was entitled to determine its substantive rights, including whether to seek return of the looted monies. O'Melveny's obligation was to disclose to Aletheia its panoply of options [*see, e.g.*, Trans. 2274-79]; its failure to do so is constructive fraud. *Neel*, 6 Cal.3d at 189.

California law holds that a lawyer may not make substantive decisions on behalf of the client. *Blanton v. Womancare, Inc.*, 38 Cal.3d 396, 404-05 (1985) ("An attorney is not authorized … to 'impair the client's substantial rights or the cause of action itself.'"); Cal. Prac. Guide: Prof. Responsibility, Chapter 3-D, at 3:132-3:133 ("the client retains the right to make ultimate decisions affecting the outcome of the case (i.e., matters affecting the client's 'substantive rights') [citations omitted]…. When such matters arise, the *lawyer has a duty to advise the client and suggest particular courses of action, but the ultimate decision is the client's to make*. [citations omitted]") (emphasis added). Especially where substantive decisions are based on non-legal factors (such as the "headline risk" of seeking recovery from Eichler), the client, not counsel, must be The Decider:

---

[10] Lee, the supposed "independent" director, testified under oath that O'Melveny never made material disclosures insofar as he knew nothing of Proctor's claim that dividends were owing or the fight over an independent director, as he had *never* seen the Side Letter Agreement. TE 1299, 11.

> the lawyer should always remember that the decision whether to
> forego legally available objectives or methods because of non-legal
> factors is ultimately for the client and not for himself.

ABA Model Code of Prof. Responsibility, Canon 7, Ethical Considerations at 7-8.

Because Proctor's Looting Allegations were material, O'Melveny was duty-bound to disclose to Aletheia its rights and interests *vis-à-vis* the Co-Founders among others. *See Neel*, 6 Cal. 3rd at 189.[11] Admittedly, O'Melveny did not provide that disclosure. *See e.g.,* Trans. 680:24-681:2 ("Q….Did O'Melveny ever advise the company to obtain a third party to evaluate claims that could be brought against Mr. Eichler?…. A [Aronson]: I don't believe so.").

The Final Award erroneously, and in derogation of California law, relies on the opinion of Defendants' expert (Marshall, a professor who teaches general ethics law rather than California's specific ethics rules), who presented the preposterous contention that the disclosure obligation does not arise if the lawyer himself determines the client would not take action based on the disclosure.[12] *See* Final Award at 95:1-10. The Final Award thereby sanctions an analysis founded in the very conduct the California Supreme Court held is prohibited—O'Melveny's unilateral "attempt to reconcile conflicting interests." *Anderson v. Eaton*, 211 Cal. 113, 116 (1930). There is not a single case saying that is the law, O'Melveny produced no contemporaneous

---

[11] Proctor's Looting Allegations were admitted to be "material" by Defendants "ethics" expert. *See* Trans. 2714:13-15 ("Q: Was $47.2 million material to Aletheia in 2010? A: [Marshall] I think it was"). Their expert, John Spiegel, attempted to conflate the duty of care and a lawyer's fiduciary duties (loyalty and disclosure) without identifying a single case where custom and practice played any role in determining the existence of a conflict [*id.*, 2115-16] or non-board approved excess compensation [*id.* 2271], but admitted that the amount taken was significant [*id.*, 2154] and Aletheia would have an interest in investigating the looting allegations. *Id.*, at 2278 ("Q: … Aletheia might have an interest in determining whether that was, in fact, occurring [that officers were "paying themselves without board approval"]; correct? …. A: [Spiegel] Yes."); *see also id.*, at p. 2279.

[12] Trans. 2751:9-15 ("Q: … it's your testimony that they [O'Melveny] didn't even have to tell them [Aletheia] about their rights because it's your testimony that they wouldn't have acted on those rights even short of filing a lawsuit by requesting the money back [?]. A [Marshall]: That was not reasonably foreseeable that the client would have acted on that, yes."). Marshall opined that O'Melveny's unilateral determination that Aletheia's only option was to align itself with Eichler [Trans. 2696:5-8] eliminated O'Melveny's disclosure obligation to Aletheia. Trans. 2640:16-22, 2654:23-2655:1, 2739:17-23.

20

evidence that it relied on that theory, and Marshall could not identify even a single authority from any jurisdiction supporting his theory.[13]   The Final Award is a "frolic and detour" that spends the weight of its pages on garden variety malpractice considerations concerning duty of care, which was not the case the Trustee presented, and was premised on the incorrect foundation of no conflict, and thus fails to address O'Melveny's breaches of its twin fiduciary duties of disclosure and loyalty flowing from the fact the Proctor Looting Allegations sounded in harm to Aletheia.

## C.   The Final Award Must Be Vacated Because It Is Irrational

The District Court may vacate an arbitration award that is "completely irrational." *Comedy Club,* 514 F. 3d at 846; *Poweragent,* 358 F.3d at 1193. Arbitrators "exceed their powers" under the FAA where the award is completely irrational or exhibits a manifest disregard of the law.  *Kyocera Corp. v. Prudential-Bache*, 341 F.3d 987, 997 (9th Cir. 2003) (*en banc*).

A federal court should vacate an arbitration award that is legally irreconcilable with the undisputed facts.  *See Coutee*, 336 F.3d at 1133; *American Postal*, 682 F.2d at 1284-86.  In some circumstances, such as the instant case, legally dispositive facts are so firmly established that an arbitrator cannot fail to recognize them without manifestly disregarding the law.  *See id.*, at 1284-86; *Coutee*, 336 F.3d at 1133 ("*American Postal* stands for the unexceptional proposition that a federal court will not confirm an arbitration award that is legally irreconcilable with the undisputed facts.").

Here, the Trustee introduced incontrovertible evidence (in the form of Proctor's pleadings and O'Melveny's Engagement Agreements) establishing that Proctor alleged harm to Aletheia and that O'Melveny jointly represented the alleged victim and culprit in the same action, in the same courts where the looting was at issue.  The Arbitrator's ruling regarding the absence of malpractice, built on a faulty construct of no conflict,

---

[13]   Trans. 2754:12-18 (Q: … you can't identify a case where an attorney knew of rights that a client had where the attorney could determine that the client would never act on those rights, and therefore had no duty to disclose, correct?  A:  As I said, I did not come here armed with specific precedent to share with you.").

21

was thus a foregone conclusion once he refused to acknowledge the obvious conflict and disclosure obligations. The Final Award cannot stand up to scrutiny in light of the *per se* conflict. *D'ull v. Kaye*, 2014 WL 4808827 *9 (Cal. App. Sept. 29, 2014).

Unnecessary to prove the existence of a conflict, but important to demonstrate the obviousness of the conflict and the resulting irrationality of the Final Award in light of the facts, is the mountain of evidence of O'Melveny's recognition of the actual conflict. *See* fn. 5, above.[14]  Perhaps most damning was O'Melveny's internal damages analysis memorandum, which was provided solely to Olson and deNeve (O'Melveny lawyers who left O'Melveny to briefly work at Aletheia before returning to O'Melveny).  TE 222.  In that analysis, O'Melveny quantified the amount of excess compensation at $47.2 million and, further, laid bare why Proctor's allegations created a conflict—that Aletheia had rights against Eichler, *et al.*, based on those allegations, *and* that those rights would exist even if O'Melveny defeated Proctor's claims:

> . . . Eichler could be personally liable for $14 million to Proctor *and other Aletheia shareholders*.  Because these **breach of fiduciary duty claims are not dependent on the agreements between Proctor and Aletheia**, Eichler faces this exposure even if Aletheia can prevail on its claims against Proctor.

TE 222, pp.459-60 (emphasis added); *see also id.*, p.463, 469-70.  This candid assessment only gains further significance when juxtaposed against O'Melveny's recognition that Eichler's defense was a sham and Proctor was likely to succeed on the merits. TE 212, p.450 ("it's a lot of fire and brimstone, but at the end of the day, we don't have a ton of evidence.  Proctor's evidence is rock solid.").  O'Melveny gave no weight to Proctor's direct remedy, recognizing that Aletheia would be entitled to the return of the looted monies: ***"[e]ven if Proctor can win its claims, most of the money***

---

[14] Notably, O'Melveny ***never*** performed a conflicts check identifying that it would represent any party other than Aletheia in the Proctor Litigation [TEs 101, 102, 107], never ran a conflicts check for either the Co-Founders or the Other Directors in the Proctor Litigation [Trans. 2405, 2430-35], and did not update its deficient conflicts check despite internal mandatory guidelines requiring it to do so [TEs 5b, p.14]. This suggests the transgressions were willful.

*at issue will be paid back to the company, not to Proctor." Id.*, p.451 (emphasis added); TE 222, p.462.

Thus, the Arbitrator ignored public policy, controlling law, the Proctor Looting Allegations, O'Melveny's admissions, the LASC's finding and O'Melveny's motive for taking on Eichler's bidding to the detriment of Aletheia—that Eichler controlled Aletheia's purse strings and paid O'Melveny in excess of *$9 million* [TE 1183, 1184] at full rates [Trans., 1522-23] over a 2-year period when O'Melveny was struggling financially and routinely discounting its hourly rates [TE 4B].  The Arbitrator therefore exceeded his powers by issuing the Final Award that is irreconcilable, completely irrational, arbitrary and capricious, and in manifest disregard of the law.

### D.   The Final Award Must Be Vacated Because Of Arbitrator Bias

A court may vacate an arbitration award "where there was evident partiality or corruption in the arbitrators, or either of them."  9 U.S.C. § 10(a)(2). "Evident partiality" will be found where a reasonable person would conclude that arbitrator was partial to one party.  *Morelite Const. Corp. v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 84 (2d Cir. 1984).  In order to demonstrate evident partiality under the FAA, there must be proof "that a reasonable person would have to conclude that an arbitrator was partial to the other party to the arbitration." *Consol. Coal Co. v. Local 1643, United Mine Workers of Am.*, 48 F.3d 125, 129 (4th Cir. 1995), citing *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 146 (4th Cir. 1993).  Vacating an award is appropriate where alleged partiality is "'direct, definite, and capable of demonstration rather than remote, uncertain or speculative.'" *Peoples*, 991 F.2d at 146 (internal citation omitted).

Judge Feess was employed as arbitrator in this matter in August 2015.  The instances of evident bias are numerous and include, without limitation (in light of space restrictions) the following:

➤   During the course of the Trustee's initial summary judgment motion, the Arbitrator's son was actively seeking employment with both O'Melveny and Gibson.

When the Trustee protested and sought the Arbitrator's recusal, O'Melveny and Gibson advised the Arbitrator they would never extend an offer to his son blaming the Trustee for his son's loss of employment.  In turn, the Arbitrator refused to recuse himself.  Bregman Decl., ¶13, Exhs. 11-16.

➢  The Arbitrator evidenced advocacy in favor of the Defendants by creating from whole cloth an argument to characterize a ruling by the LASC, Judge Lefkowitz, who had found the existence of conflict as between O'Melveny's then jointly represented clients (Aletheia, Eichler, and the Other Directors).  The Arbitrator's decision advocated that Judge Lefkowitz was referring only to a conflict as among the officers themselves exclusive of Aletheia (Order of Nov. 22, 2016, at pp. 6-7), which evidences advocacy because that was never argued by any of the parties in the underlying proceedings nor identified by the LASC judge (whose analysis tracked the parties' arguments), nor was that argument made by the Defendants in this action.  Bregman Decl., ¶ 12, Exhs. 8-10.

➢  The Arbitrator granted Defendants' requested Rule 56(d) delay to consideration of the Trustee's summary disposition motion which: (i) ignored that the Defendants relied solely on legal argument, which could and should have been made in opposition to the motion; (ii) accepted the erroneous proposition that Defendants had not had an opportunity to investigate their own conduct (*see* Order of April 11, 2017, attached as Exhibit 7 to the Bregman Dec., pp. 6-7); (iii) suggested there was a different legal standard for determining the existence of a conflict evident on the face of the pleadings depending on when the conflict is raised, and whether a party actually files a disqualification motion, rather than when the conflict arose (*id.*); (iv) deferred consideration of the motion to allow for expert discovery despite that no case has required expert testimony to discern a conflict evident on the face of the pleadings (*id.* p. 5); and (v) speculated that Defendants would have documents which ameliorate the plain import of the numerous O'Melveny emails the Trustee submitted, which the order characterizes as an "incomplete sampling" despite that Defendants made no

24

such showing even though they would have been in possession of their own controverting documents if any existed. (*id.*).

> Additional evidence of bias occurred when Mr. Aronson unilaterally terminated O'Melveny's corporate designee deposition after four hours despite that the Trustee was entitled to seven hours of testimony.  After being compelled to sit for the remaining three hours, Mr. Aronson testified for the first time that he thought Loeb had committed malpractice, which O'Melveny had not disclosed to Aletheia. ***Two days later***, the Trustee amended his discovery response to include O'Melveny's failure to advise Aletheia of its ostensible claim against prior counsel.  Defendants objected on timeliness grounds though they had caused the delay.  Though a party should not benefit from its intransigence, the Arbitrator granted Defendants' motion. Bregman Decl., ¶¶ 14, 15, Exhs. 17-23.

> Gibson (Defendants' counsel) hired the Arbitrator on a new $20 million litigation matter after closing arguments were made in the instant case and while the Arbitrator was deliberating.  Bregman Dec., ¶17, Exhs. 26-27.

The above is a compendium (although not exhaustive) of specific facts that a reasonable person would conclude show the Arbitrator was partial to Defendants and biased against the Trustee.  *Woods v. Saturn Distribution Corp.,* 78 F. 3d 424, 427 (9th Cir. 1996) (a "reasonable impression of partiality" is sufficient to vacate the award); *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 149 (1968)).  Thus, bias provides an independent basis to vacate the Final Award.

## IV.   CONCLUSION

For the foregoing reasons, the Trustee requests that the Court vacate the Final Award and grant the Trustee such other relief as the Court determines is appropriate.

DATED:  September 9, 2019          BRUTZKUS GUBNER

By: _____
      Jason B. Komorsky
      *Special Litigation Counsel for Plaintiff*
      *Jeffrey I. Golden, Chapter 7 Trustee*

25