EXHIBIT 2

STEVEN T. GUBNER – Bar No. 156593
LARRY W. GABRIEL – Bar No. 68329
JERROLD L. BREGMAN – Bar No. 149896
JASON B. KOMORSKY – Bar No. 155677
EZRA BRUTZKUS GUBNER LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile:  (818) 827-9099
Email:      sgubner@ebg-law.com
            lgabriel@ebg-law.com
            jbregman@ebg-law.com
            jkomorsky@ebg-law.com
*Special Litigation Counsel for Plaintiff
Jeffrey I. Golden, Chapter 7 Trustee*

**ARBITRATION BEFORE PHILLIPS ADR**

In re:

ALETHEIA RESEARCH AND
MANAGEMENT, INC.,

    Debtor.
_____

JEFFREY I. GOLDEN, Chapter 7 Trustee of
Aletheia Research and Management, Inc.,

    Claimant,

    vs.

O'MELVENY & MYERS LLP; STEVEN J.
OLSON, an individual; and J. JORGE
DENEVE, an individual,

    Respondents.

Chapter 7 Case  No. 2:12-bk-47718 BR
(U.S. Bankr. Ct., C.D.Cal.)

**Adv. Pro. 2:14-cv-08725-CAS(AGRx)**
(U.S. Dist. Ct., C.D.Cal.)

**CLAIMANT'S STATEMENT OF CLAIMS**

Arbitrator:  Hon. Gary A. Feess

1396729

**TO THE HONORABLE GARY A. FEESS:**

Claimant, Jeffrey I. Golden, in his capacity as the duly appointed and serving chapter 7 Trustee ("Claimant") of Aletheia Research and Management, Inc., the debtor in the above-captioned chapter 7 case ("Aletheia" or "Company"), in support of Claimant's above-captioned adversary proceeding ("Adversary Proceeding") against the identified Respondents for the benefit of Aletheia's bankruptcy estate ("Estate"), hereby alleges as follows:[1]

## I.

## __INTRODUCTION__

1.    At its core, the action brought by Claimant against O'Melveny & Myers LLP ("O'Melveny" or "Firm"), Steven J. Olson ("Olson"), and J. Jorge deNeve ("deNeve") (collectively, "Respondents") has its foundation in a clear and intentional violation of Rule 3-310 of the California Rules of Professional Conduct.  Rule 3-310 prohibits the concurrent representation of more than one client in a matter where the interests of the clients conflict.  This ethical rule requires scrupulous disclosure of potential conflicts; certain conflicts of interest are so substantial they may not be waived even if disclosed.  *Flatt v. Superior Ct.*, 9 Cal. 4th 275, 289 (1994) ("[i]ndeed, in all but a few instances, the rule of disqualification in simultaneous representation cases is a *per se* or 'automatic' one").

2.    In this vein, the case law is clear that an attorney may not concurrently represent a majority shareholder and the corporation in an action by a minority shareholder alleging mismanagement and other direct harm to the corporation by officers, directors or other shareholders, even if the action is not styled as a shareholder derivative action.

> Thus, where a shareholder has <u>filed an action questioning its management or the actions of individual officers or directors</u>, such as in a shareholder derivative or the instant dissolution action, corporate counsel <u>cannot represent both the corporation and the officers</u>, directors or shareholders with which the corporation has a conflict of interest.

---

[1]  Claimant has settled the Estate's claims against the other defendants named in the Adversary Proceeding (not shown in the caption for Arbitration), the law firm of Freedman + Taitelman LLP, who succeeded O'Melveny as counsel to the Company and others in the Proctor Litigation (as defined below).

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

1 | *La Jolla Cove Motel and Hotel Apartments v. The Superior Court*, 17 Cal.Rptr.3d 467, 787 (Aug. 16,

2 | 2004) (citations omitted) (emphasis added); *and see Gong v. RFG Oil Inc.*, 166 Cal.App.4th 209,

3 | 214 (2008) ("A corporation's legal advisor must abstain from taking part in controversies among the

4 | corporation's directors and shareholders 'to avoid placing the … practitioner in a position where he

5 | may be required to choose between conflicting duties or attempts to reconcile conflicting interests',"

6 | finding that allegations of personal use of corporate funds by majority shareholder creates actual

7 | conflict with company regardless of whether the claim is styled as "derivative").

8 |       3.    Despite this absolute prohibition, in litigation against the Company and its controlling

9 | shareholders ("Proctor Litigation") brought by a ten percent (10%) minority shareholder of the

10 | Company ("Proctor"), Respondents undertook to concurrently represent in the Proctor Litigation the

11 | Company as well as those accused of having looted, and continuing to loot, the Company, including

12 | Peter J. Eichler, Jr. ("Eichler"), the Company's founder, CEO, Chairman, and controlling

13 | shareholder, and Roger Peikin, the Company's co-founder, former Chief Financial Officer, and a

14 | substantial shareholder ("Peikin").  True and correct copies of Proctor's New York complaint, and its

15 | cross-complaint in the California action described below, are attached hereto as **Exhibit A** and

16 | **Exhibit B**, respectively.

17 |       4.    It is apparent on the face of the relevant underlying pleadings filed by Proctor that a

18 | non-waivable conflict existed from the outset of the Proctor Litigation:[2]

19
20
21 |         53 … Instead, Eichler and Peikin paid themselves the bulk of the company's revenues and gave the non-employee minority shareholders nothing in direct contravention of the fiduciary and contractual obligations to Proctor IM and Aletheia's other non-employee minority shareholders.

22
23
24 |         54.  This is a classic case of the majority, controlling employee shareholders using their fiduciary positions to enrich themselves while leaving the non-employee minority shareholders with an empty investment in violation of fiduciary and contractual obligations.

25

26
27
28 | [2]  Not only did O'Melveny take on this patently conflicted representation, but it provided a retainer agreement that advised the clients that no conflict existed, as quoted at length below.  Thus, even assuming a waivable conflict, which it was not, O'Melveny neither disclosed such conflict nor sought nor received informed written consent purporting to waive it.

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

**Exhibit A**, at ¶¶ 53-54; *see also* **Exhibit B**, at ¶¶ 62-63 (identical to the quoted language).  This conflict was debilitating and prohibited O'Melveny from simultaneously representing both the Company and those accused of fleecing the Company, namely, Eichler and Peikin.

  5. O'Melveny was not ignorant of the conflict.  For the avoidance of any doubt, in its own words O'Melveny's confessed its awareness of the conflict and demonstrated O'Melveny's contempt for the Company, one of its clients, in deference to Eichler and Peikin, O'Melveny's favored concurrent clients.  O'Melveny's legal analysis of the claims that the Company had against the controlling shareholders, especially Eichler, is contained in a June 22, 2011, memorandum that it essentially wrote to itself (*i.e.*, the memo was addressed solely to its former partners, Olson and deNeve, after they became officers of the Company) ("O'Melveny's June 22 Memo").  A true and correct copy of O'Melveny's June 22 Memo, with highlighting of unknown origin, is hereto attached as **Exhibit C**.[3]

  6. Critically, O'Melveny's June 22 Memo chronicled the extensive looting carried out by Eichler and Peikin in violation of the then-in-place limitations on compensation, and concluded that such claims belonged, in substantial part, to the Company.  O'Melveny analyzed the claims in the light of an agreement prescribing the Company's compensation limitation in conjunction with a board of director's resolution (discussed more fully below), which were in effect at the time, and, alternatively, assuming that it could prevail on its attempt to rescind the agreement.  Under both scenarios, O'Melveny concluded that the Company was nevertheless harmed by the conduct of Eichler and Peikin, as follows:

> Aletheia's argument that Proctor defrauded Aletheia and breached its own selling obligations to Aletheia would not defeat Eichler's personal liability under this claim.  <u>In other words, this potential liability [of Eichler to Aletheia] exists even if Aletheia prevails on its claims against Proctor</u>.

---

[3]  Olson and deNeve face exposure not only for their conduct at O'Melveny in representing these conflicted interests, but in their subsequent roles as President and General Counsel, respectively, of the Company.  Having arrived at the Company tainted by the then-existing conflict of interest, and hand-picked by Eichler, Olson and deNeve proceeded to take no action on behalf of the Company when presented with O'Melveny's June 22 Memo detailing the Company's claims against Eichler evidencing the conflicted role of its attorneys.  By any measure, Olson's and deNeve's conduct breached their duties of loyalty and fell below the duty of care they owed as officers to the Company.

1396729

**Exhibit C,** at p.10 (emphasis added).   Thus, O'Melveny rightfully concluded that the interests of the Company and its other clients were not aligned vis-à-vis the allegations leveled by Proctor.

7.     O'Melveny's analysis contained multiple references to the claims of its clients against each other, of the Company against Eichler, which was evident on the face of the pleadings in the Proctor Litigation.  In this regard, among numerous other instances, O'Melveny's June 22 Memo includes a stand-alone section entitled, "***Potential Exposure in Future Derivative Litigation.***"  In this section, O'Melveny provided a candid assessment of the then-existing claims belonging to one of its clients against the other, including "excessive compensation" claims against Eichler and Peikin, which belonged to the Company, which O'Melveny's own expert quantified as exceeding $47 million, as follows:

> Any finding in this litigation that Aletheia paid excessive compensation could have preclusive effect in future litigation, including derivative litigation.  Assuming excessive compensation of $47,220,000 as calculated by F&M …. [t]o estimate potential additional derivative exposure, we apportion these amounts to all Aletheia shareholders ….

**Exhibit C,** at p.5 (emphasis added).  Indeed, O'Melveny's June 22 Memo identified and analyzed several theories and causes of action belonging to the Company, as against Eichler and others including, for example, an analysis admitting that the Company's records show that millions of dollars of payments characterized as "bonuses" were in fact dividends made to the controlling shareholders in direct proportion to their stock holding percentage rather than based on any performance metrics.

8.     O'Melveny's own expert calculated the looting, as identified by Proctor, to include excessive compensation totaling more than $47 million, and corporate waste of more than $19 million.  Despite the quantification of the Company's staggering injury at the hands of Eichler and others, O'Melveny continued in its prohibited concurrent representation of adverse interests and, in that capacity, championed the majority shareholders' position to the detriment of the Company such that these once valuable claims are now time barred or uncollectible, as described below. Ultimately, the Company was left with inadequate liquidity resulting in its inability to pay taxes and

**CLAIMANT'S STATEMENT OF CLAIMS**

1   other essential expenses, leading to its filing of a voluntary petition for relief commencing the above-

2   captioned bankruptcy.

3      9. Moreover, O'Melveny's June 22 Memo reveals that O'Melveny's orientation in the

4   Proctor Litigation was determined by its implicit assumption that the interests of the Company

5   should be subordinated and sacrificed to advance Eichler's personal interests.  One example is its

6   implicit assumption that the Company would pay any damages for which Eichler may be personally

7   liable before Eichler would pay them, including as follows:

8       Proctor's breach of fiduciary duty claim is asserted against Eichler ….
       <u>To the extent that damages</u> for alleged excessive compensation and/or

9       alleged corporate waste <u>are recovered in the claims brought directly</u>
       <u>against Aletheia,</u> Proctor will not be able to obtain double recovery

10      against the individual defendants.

11  **Exhibit C,** at p.3, fn.3 (emphasis added).

12     10. O'Melveny failed to decline this conflicted representation at the outset, recuse itself

13  after it fulsomely documented the conflict, or advise the Company to seek independent counsel after

14  a court found that a concurrent conflict existed.  More importantly, O'Melveny never sought any

15  redress on behalf of the Company *vis-à-vis* its claims against Eichler and others for excessive

16  compensation, or performed any act on behalf of the Company to protect the Company's interests in

17  its claims against the controlling shareholders.  O'Melveny's conduct thereby exhibited the

18  presumed disloyalty that forms the foundation of Rule 3-310's absolute prohibition against

19  concurrent adverse representations.  Simply stated, because of the conflict presented on the face of

20  the pleadings themselves, O'Melveny was never in a position to advocate in the Company's best

21  interests, which would have required that O'Melveny cross-claim against Eichler and others or, at a

22  minimum, preserve these claims for the Company.  The California Supreme Court has recognized

23  the fundamental infirmity created when, as here, counsel concurrently represents clients with

24  conflicting interests and, thus, the need for an absolute prohibition of such representations:

25      *By virtue of this rule an attorney is precluded from assuming any*
       *relation which would prevent him from devoting his entire energies to*

26      *his client's interests.*  Nor does it matter that the intention and
       motives of the attorney are honest. The rule is designed not alone to prevent the

27      dishonest practitioner from fraudulent conduct, but as well to preclude
       the honest practitioner from putting himself in a position where he

28      may be required to choose between conflicting duties, or be led to

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

1          attempt to reconcile conflicting interests, rather than to enforce to their
           full extent the rights of the interest which he should alone represent.

2   Flatt, 9 Cal. 4th at 289 (emphasis in original) *quoting Anderson v. Eaton*, 211 Cal. 113, 116 (1930).

3          11.    O'Melveny allowed the looting to continue on its watch unabated and unaddressed.

4   O'Melveny's actions, and its failures to act, prove the rationale for the rule of absolute prohibition:

5   It simply is not possible for a lawyer to faithfully serve two masters with conflicting interests.  More

6   to the point, mirroring the improper relationship and fact pattern identified in the *Gong* case cited

7   above (joint counsel to the company and controlling shareholder disqualified for using the company

8   as a pawn in attacking the minority shareholder for fraud and similar claims), in the instant case

9   Respondents facilitated Eichler's scheme by using the Company as the aggressor in the Proctor

10  Litigation, by filing a First Amended Complaint in the California action that sought rescission of,

11  among other things, the then-in-place compensation restrictions years **after** Eichler and others

12  already had trampled upon these limitations with impunity.

13         12.    Claimant hereby seeks redress for Respondents' disloyal conduct and flagrant

14  violation of Rule 3-310 and the resulting damages actually and proximately caused by Respondents'

15  breach of fiduciary duty, including the loss of claims totaling more than $47 million for excessive

16  compensation paid to Eichler and others.  The loss of this claim resulted from the running of the

17  statute of limitations and/or Eichler's having dissipated his assets since the time that the Company

18  would have prosecuted the claim had the Company been represented by conflict-free counsel, at

19  which time, on information and belief, such claims against Eichler would have been collectable.

20  Eichler is now in his own chapter 7 bankruptcy case and claims to have dissipated his assets,

21  including the entirety of the more than $31 million he received as his bonus for 2008 alone, which is

22  part of the more than $47 million total excessive compensation according to O'Melveny's legal

23  analysis of F&M's numerical analysis.  *See* **Exhibit C,** at p.9.

24         13.    Claimant also seeks the disgorgement of a minimum of $4.1 million for legal fees and

25  costs paid to O'Melveny for its legal work in the Proctor Litigation, as well as the balance of the

26  $9.1 million that O'Melveny received for all matters after it undertook the Proctor Litigation

27  notwithstanding its disabling conflict of interest.  O'Melveny's retention of fees and costs it received

28  by and on behalf of the Company, after undertaking the conflicted representation, constitutes unjust

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

enrichment.  Likewise, Olson's and deNeve's retention of the salaries the Company paid them as officers of the Company also constitutes unjust enrichment where, as here, both remained tainted by the debilitating conflict of interest under which they had labored while lawyers at O'Melveny as evidenced by their failure to take any action to protect the Company's interests in the claims, or to protect the Company from additional looting by the majority shareholders, identified in O'Melveny's June 22 Memo that was addressed only to Olson and deNeve.

14.    Moreover, Claimant seeks damages from Respondents resulting from the substantial and improper role Respondents played in Eichler's continued looting of the Company after the time that Eichler would have been dispossessed of the power and opportunity to do so had the Company been represented by conflict-free counsel.  For 2010 and 2011, during the period O'Melveny was serving as the Company's counsel (from March 2010 to January 2012), Eichler received millions of dollars of excessive compensation, including more than $5.8 million in "bonuses" alone.  For 2011, during much of which time both Olson and deNeve were officers of the Company (with duties of loyalty and care running to the Company, not the controlling shareholders), the Company "loaned" Eichler more than $1.4 million.  In 2010, Eichler incurred more than a half a million dollars in credit card charges paid for by Aletheia.  The Company also paid for Eichler's divorce proceedings and Eichler's family vacation travel to Europe aboard the Company's plane, and other personal expenses disguised as corporate expenditures.  F&M calculated that such excessive travel and entertainment, and professional fees, when measured against 2007 as a base year, were excessive by more than $19 million.  (*See* **Exhibit C,** at p.5.)  Appropriate action by non-conflicted legal counsel for the Company also would have mitigated Proctor's claim against the Company for legal fees, which O'Melveny estimated at $8 to $10 million.  (*See* **Exhibit C,** at ¶ 4 on p.9.)

15.    Claimant's legal malpractice claim seeks similar damages as its breach of fiduciary duty claim, except it does not include the disgorgement of legal fees and costs which, in addition to the actual harm suffered, are recoverable for Claimant's breach of fiduciary duty.  Brought in the alternative, O'Melveny's failure to pursue or preserve these claims (even assuming no conflict of interest) at a minimum constitutes a breach of its duty of care to the Company.  This claim is largely academic given O'Melveny's unwaivable conflict and breach of the duty of loyalty, which led to the

**CLAIMANT'S STATEMENT OF CLAIMS**

forfeiture of the Company's claims, and the fact that the breach of the duty of care does not yield additional damages.

16.     Despite the fact that O'Melveny rightfully concluded in O'Melveny's June 22 Memo that Proctor's allegations against the majority shareholders provided the Company with viable claims even if Proctor's individual claims were defeated, O'Melveny is likely to attempt to revisit in this Arbitration the merits of its claim that the agreement that sets forth the compensation limitations (and other agreements) were subject to rescission. The equitable remedy of rescission, sought by O'Melveny for the first time in 2010 based on alleged facts and arguments known to the Company no later than 2007, was frivolous when first raised and will gain no vitality by repetition here. For one, it was untimely as a matter of law. *See* Cal. Civ. Code § 1691 (a party rescinding must do so promptly on discovering the facts which entitle him to rescind and must restore, or offer to restore, everything of value received under the contract); *Estrada v. Alvarez*, 38 Cal. 2d 386, 391 (1952) (finding waiver of rescission as a matter of law due to the passage of time, where claim for rescission for fraud was filed 20 months after the discovery of the alleged fraud and at least 15 months after discovery of the right to rescind); *Neet v. Holmes*, 25 Cal. 2d 447, 457 (1944); *see also Sogg v. Harvey*, 134 Cal. App. 2d 116, 121 (Cal. App. 1955) ("The requirement of prompt rescission is mandatory …."). Here, as documented in correspondence between the Company and Proctor, the alleged basis for rescission was known no later than late-2007 (and, in fact, the Company was on inquiry notice in 2006). Here, the basis for the remedy was identified by the Company in late-2007, at least 28 months before the right was exercised. It is, therefore, untimely as a matter of law.

17.     Moreover, because rescission is an equitable remedy, it may not be granted in favor of one with unclean hands. *Farahani v. San Diego Community College Dist.*, 175 Cal. App. 4th 1486, 1495 (2009) (the doctrine of unclean hands rests on the maxim that "he who comes into equity must come with clean hands"). "The doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." *Kendall–Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (1999). O'Melveny's June 22 Memo provides ample indisputable evidence that the controlling shareholders were looting the company in contravention of

CLAIMANT'S STATEMENT OF CLAIMS

1396729

the agreement setting forth the compensation limitations in 2007, 2008, and 2009, *years before* ever seeking rescission (and despite knowledge of the alleged basis for rescission,  failure to return the $16 million Proctor paid for its stock holdings in the Company, and failure to maintain the status quo)—eliminating Eichler's and Peikin's ability to demonstrate the clean hands necessary to seek this remedy.  *See Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 986 (9th Cir.2010) (explaining that the doctrine of unclean hands bars relief to a plaintiff who has violated good faith or other equitable principles in the transaction at issue).

18.     There are, in fact, additional predicate flaws with O'Melveny's rescission claim revolving around the element of justifiable reliance (discussed more fully below) for the simple fact that the agreement in question, the Side Letter (defined below), makes clear that the compensation limitations were in no way predicated on the alleged representations identified by O'Melveny that relate to an altogether different agreement, and the latter agreement was not the predicate for the compensation limits in the first instance.  Thus, while it is true that O'Melveny would like to make this case about whether, or if, it can prove that Proctor committed fraud in its attempt to have the agreement relating to compensation deemed void *ab initio*, it simply will not be able to demonstrate that such fraud is relevant or avoid, in the first instance, the substantial predicate legal hurdles to raising such a defense.

19.     Indeed, Respondents' assertion of the rescission claims in the Proctor Litigation is an indelible mark of the conflict between O'Melveny's clients, and indicator of O'Melveny's own malice; there never was, and there is not now, any recognized legal basis for rescission.  As evidenced by their actions, Eichler and Peikin chose simply to ignore the compensation limitations imposed by the relevant agreement and a related board resolution rather than to seek to have them set aside or otherwise rescinded first.  It is indisputable (and is documented in O'Melveny's June 22 Memo) that Eichler and Peikin employed a "loot first" strategy by violating repeatedly the then-in-place compensation limitations, seeking after the fact to have O'Melveny justify their wrongful conduct with a belated claim of rescission.  It is clear that O'Melveny did so wrongfully and in a patent attempt to validate Eichler and Peikin's longstanding illegal conduct.

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

20.     Regardless of its motivations, O'Melveny and other Respondents are indebted to Claimant, for the benefit of the bankruptcy Estate, for the harm Respondents are deemed to have caused as a matter of law by depriving the Company of conflict-free counsel, in violation of their fiduciary duty, and for their failure to properly prosecute or preserve the Company's claims against Eichler, which claims O'Melveny admittedly was well aware of at the time when it was in a conflicted representation.  For the foregoing reasons, as more fully addressed below, Respondents are indebted to the Claimant in an amount set forth in the prayers for relief below.

## II.

## PARTIES

21.     Claimant, Jeffrey I. Golden, is the duly appointed chapter 7 trustee in Aletheia's bankruptcy pending in the United States Bankruptcy Court for the Central District of California ("Bankruptcy Court") as Case No 2:12-BK-47718-BR ("Bankruptcy Case").

22.     Respondent, O'Melveny, is a limited liability law partnership, organized and existing under the laws of the State of California.  During all relevant times, O'Melveny was and now is doing business in the County of Los Angeles, State of California.

23.     Respondent, Steven J. Olson ("Olson"), is a resident of the County of Los Angeles, State of California.  At the relevant times, Olson was either employed by O'Melveny as a partner with the Firm or employed by the Company as its President (while Eichler continued to serve as the Company's CEO).

24.     Respondent, J. Jorge deNeve ("deNeve"), is a resident of the County of Los Angeles, State of California.  At the relevant times, deNeve was employed by O'Melveny either as a counsel with the Firm or employed by the Company as its General Counsel.

## III.

## FACTUAL OVERVIEW

25.     O'Melveny is an international law firm with approximately 750 professionals. Among other specialties, O'Melveny advises companies and corporate directors in connection with complex and sensitive internal investigations concerning, among other issues, allegations of

10

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

corruption and conflicts of interest.  Respondents Olson and deNeve practiced within O'Melveny's "white-collar defense and corporate investigations" practice group.

26.     Aletheia was a Los Angeles based boutique investment advisory firm founded in 1997 by Eichler and Peikin.  Within 10 years of its founding, Aletheia had billions of dollars under management.  Aletheia's target clients were high net worth individuals and institutional investors.

**Proctor's Purchase of 10% of the Stock, the Side Letter, and the Selling Agreement**

27.     The Company's stockholders, including Eichler, sought a liquidity event for some of their shares.  By agreements dated November 3, 2006, Eichler and certain other of the Company's shareholders sold 10% of the Company's stock to Proctor for $16 million in cash pursuant to a stock purchase agreement ("Stock Purchase Agreement").  A true and correct copy of each of the Stock Purchase Agreement, the Side Letter (as defined below), and the Selling Agreement (as defined below) are attached hereto, respectively, as **Exhibit D** (Stock Purchase Agreement), **Exhibit E** (Side Letter), and **Exhibit F** (Selling Agreement).  The $16 million purchase price for the 10% stake was the only consideration payable by Proctor pursuant to the Stock Purchase Agreement.  The purchase price was based on a valuation of the Company at $160 million, which was 10 times the Company's 12-month projected EBITDA (earnings before interest, taxes, depreciation, and amortization) of $16 million, with no discount in valuation for the minority interest Proctor purchased.  As Aletheia's largest shareholder and a seller of shares to Proctor, Eichler received more than $6 million from Proctor's purchase while retaining the controlling interest in Aletheia.

28.     The Stock Purchase Agreement, to which the Company was not a party, contains no mention of the Selling Agreement.  Indeed, the Stock Purchase Agreement contains an integration clause which disavows that either party was induced by any promises not contained in the Stock Purchase Agreement itself:

> Entire Agreement.  This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and supersedes all prior and collateral agreements, understandings, statements, and negotiations of the parties, oral or written. Each of the parties acknowledges that no representations, inducements, promises or agreements, oral or written, with reference to the subject matter hereof, have been made other than as expressly set forth herein.

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

**Exhibit D**, at § 5.4 (emphasis added).  Moreover, the fully integrated Stock Purchase Agreement contains both recitals and representations and warranties, by both parties, which defeat any allegations of any material representations extrinsic and inconsistent with those contained in the Stock Purchase Agreement itself.

29.     As a condition to its obligations to purchase the stock, Proctor required the Company to enter into a side agreement with Proctor, also dated November 3, 2006 ("Side Letter").  *See* **Exhibit E**.  Only the Company was a party with Proctor to the Side Letter.  None of the sellers under the Stock Purchase Agreement was a party to the Side Letter.

30.     The Side Letter provided Proctor, not the Company, with various protections and assurances to safeguard its interests as a minority shareholder.  In other words, the Side Letter evidences consideration afforded by the Company to Proctor as an inducement and condition precedent to Proctor's obligation to consummate the Stock Purchase Agreement.  Such protections included, among other things, the requirements that (i) the Company's Board of Directors be expanded from three (3) to four (4) members, (ii) an "Independent Director" be appointed to the Board, (iii) financial information about the Company be provided to Proctor, and (iv) specified limitations be imposed on management compensation to prevent the controlling shareholders from denying Proctor of dividends, and other provisions.

31.     Specifically, the Side Letter required that an "Independent Director" be appointed to Aletheia's board of directors ("Board") who is: (i) a nominee of an Aletheia shareholder that owns less than 25% of the aggregate then outstanding Series A and Series B shares of the Company, and (ii) is not an employee or officer the Company or a member of the family of an employee or officer of the Company.  The Side Letter further allowed that should the independent director resign, Proctor retained the right to nominate the successor for the Independent Director position.  Based upon the foregoing, and in accordance with the Side Letter, Proctor closed on the Stock Purchase Agreement and upon doing so nominated its president, James Coley, to serve as the Independent Director.  Coley served on Aletheia's Board until his resignation in 2007.  The Side Letter further required Aletheia to "use its best efforts, consistent with its fiduciary duties, to cause and maintain

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

the election of the Independent Director to the Board of Directors" and to "take such action as is reasonably necessary" to elect the Independent Director.

32.     Significantly, the Side Letter also prohibited Aletheia from increasing the employee bonus pool above "35% of the pre-tax, pre-bonus income relating to all hedge fund partnerships (e.g., performance and management), and 20% of all other pre-tax, pre-bonus income (e.g., management, commission)" without the prior written consent of the Independent Director. Confirming that the Side Letter was consideration for Proctor's purchase of its 10% share, the Side Letter explicitly references the Stock Purchase Agreement and provides, among other things, that Proctor's obligation to purchase the stock pursuant to the Stock Purchase Agreement is "subject to the satisfaction of all of the following conditions, any one or more of which may be waived by Proctor." (at ¶ 1.)  Not surprisingly, while the Side Letter expressly identifies a myriad of representations made by the Company (*see* pp. 2-3 with such representations); it contains no representations from Proctor—let alone any relating to the Selling Agreement.

33.     The parties also contemplated the possibility of entering into a selling agreement, whereby Proctor would sell investment opportunities in the Company's proprietary funds to third parties, and the Side Letter gave Proctor the right to insist on entering into such a selling agreement as a condition to Proctor's obligation to close on its purchase of the stock from Eichler and others under the Stock Purchase Agreement.  However, the Side Letter also gave Proctor the explicit right to waive the condition of entering into any selling agreement with the Company.  Conversely, neither the Side Letter nor anything else gave the Company any right to insist on entering into any selling agreement with Proctor.

34.     Although O'Melveny would like to make this case about whether the Side Letter and the Stock Purchase Agreement can be rescinded (a legally frivolous argument O'Melveny caused the Company to pursue by the First Amended Complaint in the California action), any such argument would fly in the face of the relevant agreements and the representations and warranties made therein, the parol evidence rule, which bars introduction of prior or contemporaneous oral representations that contradict integrated terms of a written agreement, the principle of *inclusion unius est exclusion alterius* (the inclusion of one thing is necessarily the exclusion of another) insofar as the parties

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

expressly stated the predicate for each agreement and cannot now rewrite the Side Letter to suggest that it was predicated on representations relating to the Selling Agreement, and basic rescission law (including the application of waiver and unclean hands), all of which are discussed more fully herein.

35.     There had been no adjudication by any court invalidating the Stock Purchase Agreement (or any unilateral rescission by the Company), which therefore remained valid and enforceable during the period of time in which Eichler and others were looting the Company.

36.     There had been no adjudication by any court invalidating the Side Letter, or other rescission of the Side Letter, which therefore remained valid and enforceable during the period of time in which Eichler and others were breaching the compensation limits and other obligations stated therein with impunity.

37.     The parties entered into the Selling Agreement pursuant to which, among other things, Proctor agreed to market and sell certain of Aletheia's proprietary investment products, for which Procter was to receive specified fees as well as an option to purchase additional Aletheia stock based on the amount of new assets under management that Proctor brought to Aletheia.  In April 2007, the parties amended the 2006 agreement pursuant to which Proctor's sales force became Aletheia's selling agent, and another entity, Overture, became Proctor's registered broker-dealer solely for the purpose of marketing on behalf of Aletheia and Aletheia Index ("Selling Agreement"). *See* **Exhibit F**.

38.     The Selling Agreement entered into in April 2007 (**Exhibit F**) amended and restated the selling agreement dated November 3, 2006, of approximately five months earlier.  The Selling Agreement includes representations by Proctor; however, none of them specify any sales goals, or minimums, or quotas, or otherwise commit Proctor to achieving any sales metrics, and Proctor makes no representations therein relating to the amount of any sales it may have been hoping to achieve or the number of its employees who would be devoted to this purpose.  There is nothing in the Selling Agreement, which also contains an integration clause (see ¶ 11 (e) thereof), which purports to tie the parties' representations or performance thereunder to either party's performance of the Stock Purchase Agreement or the Side Letter.

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

**Separate Corporate Resolution Adjusts Bonuses and Provides for Revenue Share**

39.     In March 2007, approximately four months after Proctor purchased its 10% interest in the Company from certain of its shareholders for $16 million in cash, Aletheia's Board of Directors passed a resolution ("Revenue Share Resolution") which purported to lower the "dividend distribution minimum from 45-50% to 20-30%."  While lowering the range of minimum dividends, the Revenue Share Resolution granted Proctor the right to receive 1.8% of all Aletheia's management fees and commissions, which right was granted in explicit recognition of Proctor's generation of new business for the Company, as noted in the Revenue Share Resolution.  Attached as **Exhibit G** is a true and correct copy of the Revenue Share Resolution.  That resolution was adopted by the Board, including Mr. Coley the independent director Proctor had nominated.

40.     In or about November 2007, Coley resigned as Proctor's CEO and from Aletheia's Board.  In accordance with Section 6 of the Side Letter, Proctor thereafter requested that another Proctor representative be appointed to Aletheia's Board as the Independent Director.  Eichler rejected Proctor's nominee, and the Independent Director position was left vacant for more than two years, until a few months after O'Melveny began to represent the Company in the Proctor Litigation.

41.     To Claimant's knowledge, the Board has not to date revoked, rescinded, amended, or superseded the Revenue Share Resolution, which resolution therefore remained valid and binding during the period of time in which Eichler and others were looting the Company.

**Proctor and Aletheia Disputes**

42.     Over the course of 2007, the relationship between Proctor and Aletheia deteriorated.  Proctor maintained that Aletheia and Eichler purposely frustrated Proctor's substantial efforts and ability to effectively market and sell Aletheia investment products, refused to provide the agreed financial transparency, and refused to make required payments and distributions to Proctor.  Eichler, with Respondents' acquiescence if not instigation, caused Aletheia to assert the position that it was Proctor who was not performing under the Selling Agreement in that Proctor had purportedly failed to raise the billions of dollars it hoped to raise for Aletheia but which, as noted, was neither stated in, nor a material term of, the fully integrated Selling Agreement.

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

43.     In the course of negotiations between the Company and Proctor before the relevant Proctor Litigation was commenced, including a brief stand-still period during which the parties exchanged settlement proposals, it became evident that the Company had ceased to provide required financial information to Proctor.  It was also then evident that the Company could not establish that Proctor breached the Selling Agreement which contained no commitments, requirements or quotas that Proctor had not satisfied.

44.     In December 2007, on the eve of the start of what would be the Company's best year in terms of financial performance, the Company delivered to Proctor a notice of breach of the Selling Agreement based on Proctor's alleged failure to generate enough new investments.  By letter dated December 18, 2007, Aletheia notified Proctor that "[u]nder Section 9(a) of the Selling Agreement," it had "exercise[d] its right to terminate the Selling Agreement."  At that time, Aletheia claimed that Proctor had misrepresented its sales force and ability to sell on behalf of Aletheia.  What Aletheia did not do at that time was rescind the Selling Agreement, the Side Letter or the Stock Purchase Agreement.  By its letter dated January 4, 2008, Aletheia notified Proctor that the Selling Agreement "has been terminated."  That letter describes allegations that Proctor had not sufficiently disclosed in 2006 its relationship with Avatar Associates, who Aletheia claimed was one of its competitors, and alleged Proctor had misrepresented its intentions and abilities with respect to the Selling Agreement; however, again, Aletheia did not purport to rescind the Selling Agreement or, more importantly, the Side Letter.

45.     On January 16, 2008, Proctor submitted to Aletheia (Eichler) a written demand for permission to inspect Aletheia's books of account and records in accordance with the Stock Purchase Agreement, the Side Letter, and the Selling Agreement.  Eichler ignored that request.  At all times, Proctor claimed that it had performed the Selling Agreement in accordance with its terms except to the extent Aletheia's refusal to provide the requested financial information prevented Proctor from making sales.  Proctor claimed to have brought the Company at least $123.5 million of new assets under management for which it was not properly compensated, which the Company disputed.  (*See* **Exhibit C**, O'Melveny's June 22 Memo at p.8.)

1396729

46.    The parties exchanged multiple correspondence pointing fingers at each other.  In fact, the Company, admittedly fully aware in 2007 of the basis for the allegations that formed its claim for fraud and rescission against Proctor, merely reserved its right to seek rescission of other agreements based on Proctor's purported failure to sell and alleged failure to disclose a conflict of interest.  The Company ***did not*** perfect a rescission of any of the agreements at that time, and none of the sellers from whom Proctor bought its stock offered to return, or returned, any of the $16 million purchase price Proctor had paid them.

47.    In light of Eichler's conduct, in January 2008, Proctor filed a lawsuit against the Company.  Thereafter, the parties entered into a standstill agreement, whereby Proctor would dismiss its declaratory relief action for a minimum period of 40 days and during that period no party would initiate a litigation or proceeding.  The standstill agreement did not provide for the tolling of any statute of limitations or repose, and it provided both parties the unilateral right to rescind such standstill agreement.  After 40 days, the standstill agreement was cancellable by either party upon five days' notice.  The Company never terminated the standstill agreement (it was terminated by Proctor in January 2010).  Ostensibly, the purpose of the standstill was to provide the parties the opportunity to conduct a valuation of the Company for the purpose of determining the value of Proctor's stock for settlement discussions contemplating the Company, or certain of its shareholders, would buyout some or all of Proctor's shares.  Nevertheless, and despite the allegations leveled by Proctor in its dismissed complaint, and the fact that the parties were working towards a valuation the Company for settlement discussion purposes, the controlling shareholders repeatedly breached the terms of then still in force Side Letter during the standstill period, including in the manner set forth in O'Melveny's June 22 Memo.

17

1396729

**SEC Investigation; O'Melveny Represents Eichler Personally**

48.     On or about April 8, 2009, the SEC issued a subpoena to the Company that, among other things, notified the Company that the SEC had entered a formal order of investigation into its business activities and affairs ("SEC Investigation").  Eichler and Peikin engaged Loeb & Loeb LLP ("Loeb") to represent them and Aletheia in the SEC Investigation.

49.     In late 2009, on information and belief, Loeb advised Eichler and Peikin that it had identified a conflict of interest as to its jointly representing them and Aletheia in the SEC Investigation, and Loeb suggested that they each retain separate counsel.  Both did so.  Peikin retained Robert Friese of Shartsis Friese, LLP, and Eichler retained the Respondents.

50.     O'Melveny's retention by Eichler in the SEC Investigation is reflected in a letter agreement dated November 5, 2009, in which the Firm stated:

> We will represent only you in connection with the Subject Matter (SEC Investigation).… We will not be representing the Company or… or any of your or their respective officers, directors, investors, agents, partners or employees…. Accordingly, you agree that we will not be precluded from representing other existing clients or future clients in legal matters relating or adverse to the Company or other Related Persons, even if you have an indirect interest therein as a result of your relationships to them.

**Proctor Litigation in Los Angeles and New York, Scope of Representation is Expanded**

51.     In January 2010, Proctor notified the Company that it was terminating the standstill agreement.

52.     Although relieved in the SEC matter, Loeb continued to represent the Company in the Proctor dispute.  On February 4, 2010, Loeb filed a lawsuit solely on behalf of the Company against Proctor in the Los Angeles Superior Court, Case No. SC108700 (none of the shareholders who had sold stock to Proctor were included in the action).  By this lawsuit, Loeb, as Aletheia's counsel, sought merely a declaration of the Company's rights and remedies with respect to its agreements with Proctor.  Attached hereto as **Exhibit H** is a true and correct copy of the Company's February 4, 2010, complaint.  Two years from when the Company first notified Proctor that it *might* seek rescission, the complaint that Loeb filed, thereby commencing the Proctor Litigation, did not assert

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

1    any tort claims against Proctor, nor did it seek rescission of any of the agreements with Proctor;

2    rather, it merely sought a declaration regarding the parties' rights under the various agreements.

3         53.    On information and belief, Eichler had urged Loeb, and Loeb declined, to allege in

4    the lawsuit the Company filed on April 4, 2010, that Proctor had committed fraud in connection with

5    the Selling Agreement and the Stock Purchase Agreement.  On information and belief, Loeb

6    determined to not allege any causes of action sounding in tort, or to seek the rescission of the Selling

7    Agreement or of the Stock Purchase Agreement in the lawsuit it filed against Proctor because, after

8    diligence and analysis, Loeb determined there was no legal merit to such claims.

9         54.    Not surprisingly, Loeb treated the Stock Purchase Agreement and Side Letter as

10   related agreements and the Selling Agreement as separate.  It sought a determination as to whether

11   the Company was in breach of the Stock Purchase Agreement insofar as Proctor alleged that the

12   Company had not provided the financial disclosures required under the Side Letter.  Separately,

13   Loeb sought a declaration as to the parties' respective rights under the Selling Agreement, noting

14   that the Company sought a determination that it had properly terminated the Selling Agreement in

15   accordance with its terms, while Proctor believed it was owed commissions under the Selling

16   Agreement.

17        55.    A few days later, on February 16, 2010, Proctor filed suit in New York state court

18   against the Company as well as Eichler and Peikin personally ("New York Action").  In the New

19   York Action, Proctor alleged, among other things, that Eichler and Peikin had breached their

20   fiduciary duty owed to Proctor and other minority shareholders by denying them distributions and

21   other revenue to which they were entitled, by improperly refusing to appoint the Independent

22   Director, by paying themselves exorbitant sums, including amounts far in excess of the amounts

23   permitted by the Side Letter and the Revenue Share Resolution, and by refusing to furnish financial

24   information as required by the agreements.  Proctor specifically alleged in its complaint ("Proctor

25   New York Complaint"), among other things:

26            2008 was Aletheia Management's most successful year. . . . revenue in
             2008 more than doubled from the prior year, Aletheia Management did
27            not pay its shareholders a single penny of distributions while Eichler
             and Peikin, upon information and belief, paid themselves most of the
28

19

1396729

$56 million that they caused Aletheia Management to pay out in "compensation."

\*     \*     \*

In particular, Eichler and Peikin, individually and as agents of the Aletheia Respondents, have denied Proctor IM (as well as other non-employee shareholders of Aletheia Management) distributions and….paid themselves excessive compensation in violation of contractual requirements that ensure that non-employee minority shareholders like Proctor IM receive a share of the financial success of Aletheia Management.  Eichler and Peikin have also breached their fiduciary duties to Proctor IM.

\*     \*     \*

Eichler and Peikin have used their position as directors, officers and controlling shareholders, to funnel much of Aletheia Management's revenue to themselves as "compensation" in direct contravention of a contractual limitation on bonuses that was designed to ensure that Eichler and Peikin could not deprive nonemployee minority shareholders of the economic benefits of their investments by taking all the cash out of Aletheia Management and putting it into their own pockets, leaving nothing to distribute to non-employee minority investors.

Proctor New York Complaint (**Exhibit A** hereto) ¶¶ 1 and 2 (emphasis added).

**<u>O'Melveny Undertakes Conflicting Representations in the Proctor Litigation</u>**

56.     Within a few weeks after the filing of the complaints, O'Melveny was retained to represent Aletheia, Eichler, and Peikin in the New York Action.  On March 1, 2010, O'Melveny replaced Loeb as Aletheia's counsel in the California action.  On April 13, 2010, O'Melveny memorialized its retention in both the New York and California actions pursuant to an agreement stating there was no conflict of interest, among other things, as follows:

Based on the information available to us at this time, we do not believe that representing these parties [Aletheia, Eichler and Peikin (Peikin had a separate engagement letter of the same date)] involves an actual conflict of interest. . . . A conflict of interest may develop if the parties' interests become inconsistent or adverse.  If that occurs, we will promptly notify you about any such conflict.

\*     \*     \*

Although we do not presently see actual or reasonably foreseeable adverse effects of that shared responsibility, issues may arise that affect multiple clients in somewhat different ways.  For example, if one of our Common Clients asserts a claim against the other or if our Common Clients give us conflicting instructions, we may be required to withdraw from representing one, some, or all of them. Therefore, it is important to understand that our client responsibilities may directly or indirectly affect our ability to focus exclusively on one client's

20

1396729

interests and may be materially limited by our representation of the other Common Clients.

O'Melveny's April 13, 2010, engagement agreement, a true and correct copy of which is attached hereto as **Exhibit I**, at p.3.

57.     On April 16, 2010, O'Melveny filed the Company's First Amended Complaint in the California action which, among other things, abandoned the Company's declaratory relief claim, and for the first time asserted claims for fraud and seeking rescission of the agreements with Proctor. Attached as **Exhibit J** is a true and correct copy of the First Amended Complaint that O'Melveny filed ostensibly on behalf of the Company.  Notwithstanding that none of the sellers who sold Proctor its stock were plaintiffs in the California action or otherwise joined to the First Amended Complaint, O'Melveny's First Amended Complaint sought rescission of the Stock Purchase Agreement, the Side Letter, and the Selling Agreement, among other relief.  Thus, O'Melveny caused the Company to file an action for rescission more than three years after Proctor had purchased its 10% interest in the Company, and more than two years after the Company had purported to terminate the Selling Agreement in accordance with its terms rather than to seek its rescission. Thus, O'Melveny untimely sought rescission of the agreements despite the fact that (i) Eichler and others had serially violated and were then in breach of the covenants contained in the Side Letter, (ii) the Company had acknowledged the validity of the Stock Purchase Agreement, including by paying a modest dividend to Proctor for 2007, (iii) the Company would thereafter affirm the validity of the Side Letter, including by appointing Lee in accordance with its terms (as discussed below), (iv) the Company had acknowledged the validity of the Selling Agreement, including by purporting to terminate the Selling Agreement in accordance with its terms, (v) the Company had acknowledged the validity of Proctor's ownership of 10% the Company's stock, including by entering into the Standstill Agreement for the purpose of valuing such stock for settlement discussions purposes, and (vi) Eichler and the other sellers never offered to return to Proctor, nor did they return, the $16 million in cash that Proctor had paid for their stock, though they continued to retain the benefit of such cash, among other factors.

58.     In June of 2010, Eichler, in his capacity as majority shareholder of Aletheia, purportedly elected his long-time friend and college roommate, Bruce Lee ("Lee"), to Aletheia's

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

Board, to serve together with Eichler, Peikin, and Barnes.  The election was accomplished without a meeting and solely by Written Consent of Eichler, as majority shareholder, dated June 15, 2010 ("Written Consent").  The Written Consent was fashioned to comply with the Side Letter in several ways.  First, it acknowledged the vacancy of the fourth position on the Board, which fourth Board seat was created pursuant to the Side Letter.  Moreover, the Written Consent recites that Lee was nominated to the Board by the Sanders Partnership, which is identified in "Exhibit A" to the Stock Purchase Agreement in **Exhibit D** hereof, as owning 25 shares (less than 1%) of the 1,463 shares outstanding of the Company's Series B non-voting stock.

59.    On or about July 1, 2010, Proctor by and through its counsel, Daniels, Fine, Israel Schonbuch & Lebovits, LLP, filed suit in the Los Angeles Superior Court contesting Eichler's appointment of Lee to the Board, *In re Aletheia,* LASC Case  No. SC108574.  To date, no ruling on the merits of that action has been issued, as the Court stayed deciding the matter pending the outcome of the California action.

60.    On or about July 13, 2010, O'Melveny issued another (supplemental) retention letter, which recognized its expanded representation to include Proctor's lawsuit in California and any related litigation, and added Lee as a represented party, along with Aletheia, Eichler and Barnes. This letter again identified no actual conflict in O'Melveny's representation of both the Company and its controlling shareholders, and others, in the Proctor Litigation.

61.    On or about October 22, 2010, the New York state court granted Aletheia's motion to dismiss the New York Action on *forum non conveniens* grounds on the condition that Proctor be allowed to file its claims against the Aletheia parties in the Los Angeles action.   On or about January 19, 2011, Proctor filed a cross-complaint in the Los Angeles action against Aletheia, and Eichler and Peikin personally, alleging, *inter alia*, claims for breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and for declaratory relief.

62.    Like its New York complaint, Proctor's cross-complaint contained numerous allegations of malfeasance by Eichler and others that caused harm to the Company and all of its other shareholders, such as:

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

2.     Proctor brings this Cross-Complaint against the Aletheia Parties to redress the oppression of minority shareholder rights, breaches of fiduciary duty and the violation of contractual obligations. In particular, Eichler and Peikin, individually and as agents of the Aletheia Parties, have denied Proctor IM (as well as other non-employee shareholders of Aletheia) distributions and revenue sharing that Proctor IM is legally entitled to receive as an investor in Aletheia, all in violation of their legal obligations to Proctor IM and other minority shareholders of Aletheia.

3.     As part of their effort to deprive Proctor IM and other non-employee minority shareholders of the economic benefits of their ownership interest in Aletheia, Eichler and Peikin have paid themselves excessive compensation in violation of contractual requirements that are designed to ensure that non-employee minority shareholders like Proctor IM receive a share of the financial success of Aletheia. Eichler and Peikin have also breached their fiduciary duties to Proctor IM . Eichler, Peikin and Aletheia committed these improper acts at a time when Aletheia was legally required to have an independent director to prevent oppression of minority shareholders. However, they refused to appoint an independent director, despite a clear contractual requirement to have an independent director, in an effort to shield their misconduct from scrutiny. Eichler, Peikin and Aletheia further tried to conceal their misconduct by refusing to comply with their legal obligation to provide financial information to Proctor IM despite repeated requests for basic financial information which was readily available to Eichler, Peikin and Aletheia but which was withheld from Proctor IM. In this lawsuit, Proctor seeks damages for Cross-Defendants' breaches of fiduciary duty and contract and to compel Eichler, Peikin and Aletheia to restore good corporate governance protections (including, but not limited to, the appointment of an independent director) and required financial and other disclosure to prevent them from continuing to oppress Proctor IM and other non-employee minority shareholders.

Proctor Cross Complaint in the California action (**Exhibit B** hereto), at ¶¶ 2 and 3.

63.     At or about the same time, on or about January 18, 2011, O'Melveny filed a Second Amended Complaint in Los Angeles against Proctor.  O'Melveny caused the Company to assert additional claims for breach of contract and fraud, among other claims.  On March 10, 2011, Proctor filed its First Amended Cross-Complaint, in which it asserted essentially the same causes of action, adding Barnes and Lee as individual cross-defendants with Eichler and Peikin.  A true and correct copy of such First Amended Cross-Complaint is attached hereto as **Exhibit K**.

64.     On or about April 14, 2011, O'Melveny again updated its retention agreement, to cover its joint representation of Aletheia, Eichler, Barnes and Lee in the Proctor Litigation ("April 14, 2011, Agreement").  That letter provides, in relevant part:

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

1
2
3

> We will represent only the Company, Ms. Barnes, Mr. Eichler, and Mr. Lee in connection with the Subject Matter. . . . A conflict of interest may develop if the parties' interests become inconsistent or adverse. If that occurs, we will promptly notify you about any such conflict.

4

*        *        *

5
6
7

> Although we do not presently see actual or reasonably foreseeable adverse effects of that shared responsibility, issues may arise that affect multiple clients in somewhat different ways. For example, if one of our common clients asserts a claim against the other or if our common clients give us conflicting instructions, we may be required to withdraw from representing one, some, or all of them.

8   O'Melveny's April 14, 2011, Agreement, a true and correct copy of which is attached hereto as

9   **Exhibit L**.

10   **O'Melveny Not Only Recognized the Conflict, It Had an Expert Quantify Damages**

11
12      65.   Moreover, in its April 14, 2011, Agreement, O'Melveny disclosed that it had

13   consulted a third party law firm to advise O'Melveny about its ethical obligations in connection with

14   its prior representation of Peikin in the Proctor litigation. The letter recites that the clients agree to

15   the confidentiality of O'Melveny's communications with the third party law firm, which

16   communications were not disclosed to the clients. Upon information and belief, O'Melveny was

17   advised by such third party law firm concerning its conflict of interest in concurrently representing

18   the Company and Eichler in the Proctor Litigation. Respondents did not disclose this conflict of

19   interest to its clients.

20      66.   Eichler signed each of O'Melveny's retention letters on his own behalf and also on

21   behalf of the Company. No other person signed any of these agreements on behalf of the Company.

22      67.   On or about April 19, 2011, a few days after O'Melveny updated its retention letter,

23   both Olson and deNeve joined Aletheia as officers. Olson became Aletheia's President and Chief

24   Legal Officer, and deNeve became Aletheia's Senior Vice President and General Counsel. In that

25   capacity, Olson and deNeve owed fiduciary obligations of loyalty and care to the Company rather

26   than to its officers or shareholders personally.

27      68.   As noted above, O'Melveny's June 22 Memo was addressed solely to Olson and

28   deNeve, who at the time were officers of Aletheia having been handpicked by Eichler for these

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

positions. O'Melveny's June 22 Memo provided Olson and deNeve the following analysis, among others, of the claims asserted in the Proctor Litigation:

> This memorandum analyzes Aletheia and its directors' potential liability arising from the *Aletheia v. Proctor* litigation pending in the Los Angeles Superior Court.

> Substantially all of Aletheia's exposure in this case comes from four sources of alleged liability: (1) unpaid shareholder distributions and revenue sharing, <u>(2) excessive compensation of employees through bonus payments and the improper use of corporate funds for the personal expenditures of Peter J. Eichler, Jr.</u>, (3) unpaid selling commissions and other asserted damages arising from Aletheia's marketing agreements with Proctor, and (4) attorney's fee award against Aletheia should Proctor ultimately prevail in litigation.

> <u>Eichler may also have personal exposure from Proctor's direct claim of breach of fiduciary duty, or for a similar claim brought on a derivative basis on behalf of the company.</u>

> Although not fully articulated in Proctor's cross-complaint, this claim could expose Eichler to disgorgement of excess compensation received to the extent that a court determines that such compensation was disguised dividends. Based on the 2008 bonus amounts alone, Eichler could be personally liable for $14 million to Proctor and other Aletheia shareholders. <u>Because these breaches of fiduciary duty claims are not dependent on the agreements between Proctor and Aletheia, Eichler faces this exposure even if Aletheia can prevail on its claims against Proctor.</u>

**Exhibit C,** at pp.1-2 (emphasis added).

69.   O'Melveny not only concluded that Aletheia had viable and substantial causes of action for breach of fiduciary duty against Eichler arising from his actions and omissions during 2007 and thereafter, O'Melveny engaged F&M to quantify the damages associated with these claims, which analysis was attached to O'Melveny's June 22 Memo:

> Assuming excessive compensation of $47,220,000 as calculated by F&M, total additional distributions payable to all shareholders under the Side Letter Agreement would equal $23.6 million (50% of the excessive compensation) or $14.2 million under the Revenue Share Resolution (30% of the excessive compensation). To estimate potential additional derivative exposure, we apportion these amounts to all Aletheia shareholders, while subtracting out 10% for Proctor's share that it would have recovered as part of this direct litigation, 35.7% for Eichler's share that he was already paid in bonus, and 19.4% for Peikin's share that he was already paid in bonus. (These percentage ownership figures are taken from the Aletheia shareholder list dated December 31, 2009.) Under this formula, potential downstream exposure to Aletheia and/or its directors relating to the remaining 34.9% of Aletheia shares outstanding is approximately $8.24 million

25

1396729

1    under the Side Letter Agreement, or $4.94 million under the Revenue
     Share Resolution.

2    **Exhibit C**, at p.5 § 2.C.

3        70.    Although O'Melveny identified the Company's claims against the controlling

4    shareholders and directors, at no time did O'Melveny advise the Company of the conflict of interest

5    resulting from the Company's palpable derivative claims against Eichler, nor did O'Melveny advise

6    the Company to appoint an independent director and retain separate counsel to investigate and

7    prosecute, or preserve, such claims.  Instead, O'Melveny undertook, and continued, to represent both

8    the Company and Eichler in the Proctor Litigation notwithstanding the known conflict that existed

9    between their clients, while it allowed the statute of limitations on certain of these claims to lapse.

10   Olson and deNeve, though they breached their own fiduciary duties to the Company, did not relieve

11   O'Melveny of its role or duty of loyalty as the Company's counsel.

12       **Conflict of Interest Recognized by LASC and Argued by O'Melveny**

13       71.    In or around July 2011, the Los Angeles Superior Court held a hearing on Peikin's

14   motion to disqualify O'Melveny as counsel in the various matters in which it was representing the

15   Company in connection with the Proctor Litigation.  As presented to the Court, this was a question

16   of successive representations, as O'Melveny no longer represented Peikin.  O'Melveny presented

17   two arguments: first, that there was no conflict at the time that O'Melveny concurrently represented

18   the Company, Eichler and Peikin; and, second, that now that they no longer represented Peikin, he

19   did not have standing to challenge the conflict of interest.  The Court denied the motion primarily

20   based upon the Court's finding that Peikin was then represented by separate counsel and Peikin,

21   therefore, lacked standing, as a former client, to bring a disqualification motion regarding

22   O'Melveny's joint representation of the Company and Eichler.  Nevertheless, the Court's written

23   opinion found the existence of a conflict of interest among O'Melveny's then-existing clients, as

24   follows:

25           There is no question but that there is a conflict of interest in this
             matter.  The First Amended Cross Complaint filed by Proctor on 3-10-
26           11 asserts that the individual Cross-Respondents, Eichler, Peikin,
             Barnes, and Lee, have breached their fiduciary duties and the contracts
27           between Aletheia and Proctor. . . . These allegations may, indeed,
             involve a dispute between the cross-defendants as to alleged breaches
28           of fiduciary duty, if any by any one or more cross-defendants.

**CLAIMANT'S STATEMENT OF CLAIMS**

1  *Ruling on Submitted Matter:  Cross-Defendant's Motion to Disqualify O'Melveny Myers*, Case Nos.

2  SC108642; SC108674; BC441951; SC110372 (L.A. Super. Ct., July 12, 2011) at 17 (emphasis

3  added), a true and correct copy of which (with highlighting of unknown origin) is attached hereto as

4  **Exhibit M**.  Yet and still, O'Melveny continued to represent these conflicting interests, the

5  Company, Eichler, and others.

6         72.    In September 2011, the Los Angeles Superior Court issued its order of August 30,

7  2011, on the demurrer filed as to the Proctor action by Peikin, Barnes and Lee.  The Court denied the

8  motion as to certain claims but recognized that to the extent Proctor sought redress for payment of

9  excessive compensation to Eichler and others, such claims were derivative in nature and belonged to

10  the Company.  The Court's memorandum decision provides in this regard, *inter alia*, as follows:

11          In light of the directors' role in the operation of the business affairs of

12          the corporation, where conduct, including mismanagement by corporate officers, causes damage to the corporation, it is the entity

13          that must bring the suit….

14  *Ruling on Submitted Matters:  Cross-Respondents' Demurrers to the First Amended Cross*

15  *Complaint of Proctor Investment Managers, LLC,* Case Nos. SC108642; SC108674; BC441951;

16  BC450058; BC462946; SC110372 (L.A. Super. Ct., Aug. 30, 2011) at 7-8 (emphasis added), a true

17  and correct copy of which (with highlighting of unknown origin) is attached hereto as **Exhibit N**.

18  Notwithstanding the foregoing, O'Melveny continued its joint representation of Aletheia and

19  Eichler, and others, in the Proctor Litigation, in derogation of the Company's legal rights and best

20  interests and to the Company's detriment.

21         73.    O'Melveny recognized that the central claims Proctor was asserting were, at their

22  core, claims which belonged to the Company.  O'Melveny summarized Proctor's claims against the

23  Company for "corporate looting allegations", which were "at core assertions of harm to Aletheia," as

24  follows (quoting Proctor's allegations):

25          'The Aletheia Directors, in dereliction of their fiduciary duties, have

26          refused to institute and follow the most basic good corporate governance practices to oversee or control Eichler, in his capacity as

27          CEO of Aletheia, or any other Aletheia employees and ensure that Aletheia is run for the benefit of its shareholders and not solely for the

28          benefit of Eichler.'  FACC. 79 (emphasis added);

27

**CLAIMANT'S STATEMENT OF CLAIMS**

'Eichler and Peikin paid themselves the bulk of the company's revenues and gave the non-employee minority shareholders nothing in direct contravention of their fiduciary ... obligations to Proctor 1M and Aletheia's other nonemployee shareholders. .... Meanwhile, although Barnes is a director of Aletheia with fiduciary duties to its minority shareholders (as is true of Lee since his purported election to Aletheia's board), neither of them did anything to stop Eichler from paying himself and Peikin ....excessive compensation.' Id. 86-87 (emphasis added);

'[D]espite the fact that Aletheia's revenues in 2008 more than doubled, Aletheia did not pay its shareholders any distributions while Eichler and Peikin paid themselves and other Aletheia employees $56 million in 'compensation.' Id., at 11;

'Eichler and Peikin ... caused Aletheia to use most of its revenues to pay themselves excessive compensation in violation of the Side Letter Agreement and in direct contravention of their fiduciary duties to Proctor IM and Aletheia's other non-employee minority shareholders while Barnes (and Lee since his purported election to Aletheia's Board of Directors) sat back and did nothing despite a legal obligation to exercise independent oversight and control over Eichler's self-interested conduct in paying himself (and others at Aletheia) virtually all of Aletheia's revenues ... and distributing nothing to Aletheia's shareholders.' Id. (emphasis added).

O'Melveny's *Memorandum of Points and Authorities in Support of Cross-Defendants' Patricia Barnes's and Bruce Lee's Demurrer to Proctor's Frist Amended Cross-Complaint*, at true and correct copy of which is attached hereto as **Exhibit O**, at p.6.

74.     On or about January 5, 2012, Olson resigned his positions as Aletheia's President and Chief Legal Officer, and rejoined O'Melveny on or about August 1, 2013, as a partner.

75.     Soon thereafter, on January 18, 2012, O'Melveny withdrew from representing Aletheia, Eichler, and other Aletheia employees in the Proctor Litigation.

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

**The Company Runs Out of Cash and Files Bankruptcy; Converted from 11 to 7**

76.     In June 2012, the California State Franchise Tax Board ("FTB") filed a notice of lien against Aletheia with the Los Angeles County Recorder's Office due to unpaid state income taxes, asserting an amount due of more than $2 million for income taxes owing from the tax year 2008, and penalties for the tax years 2010, 2011 and 2012 for late filed returns, according to the Omnibus Declaration of Peter J. Eichler, Jr. in Support of First Day Motions that Aletheia filed its Bankruptcy Case ("First Day Declaration") [Bankruptcy ECF No. 8.] (at ¶ 12).

77.     On or about September 17, 2012, deNeve resigned his positions as Aletheia's Vice President and General Counsel, and immediately rejoined O'Melveny as a counsel.

78.     During October 2012, the FTB suspended Aletheia's corporate status.  As a result, the Proctor Litigation was stayed.

79.     The Company's bankruptcy Petition Date coincided with the ending of the reprieve from the Proctor and Peikin litigation matters.

80.     Over the course of the approximately 22 months, from March 2010 to January 2012, an actual conflict existed, O'Melveny billed and collected from Aletheia more than $9.1 million of which more than $4.1 million was for its fees and costs in connection with representing Aletheia, Eichler, Barnes, and Lee in the Proctor Litigation.

81.     The Bankruptcy Case was commenced by the Company's filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code on November 11, 2012.  According to Aletheia's schedules filed in the Bankruptcy Case, Aletheia had unsecured liquidated debts of approximately $14 million which, significantly, did not include any amount in respect of the claims asserted by Proctor or Peikin (who by this time was also in litigation with the Company and Eichler). Upon information and belief, Aletheia was indebted to one or more creditors at all relevant times.

82.     In the Bankruptcy Case, Eichler attributed Aletheia's financial collapse to the weight of litigation matters, and specifically, the Proctor litigation. In his First Day Declaration, Eichler testified that the "litigation matters have decimated the firm – assets under management have declined approximately 75% in the last year.  Of these, the principal case involves Proctor Investment Managers, LLC ('Proctor'), a 10% shareholder in Aletheia."  (First Day Declaration ¶7.)

CLAIMANT'S STATEMENT OF CLAIMS

1396729

83.     On March 29, 2013, the Bankruptcy Court converted the Bankruptcy Case to a case
under chapter 7 of the Bankruptcy Code, and the Bankruptcy Court appointed Claimant as Trustee in
the chapter 7 case by order dated April 5, 2013.

**Claimant, as Trustee, Settles with Proctor**

84.     Based on his review of the voluminous records and documents pertaining to the
Proctor Litigation, the Claimant, in his capacity as Trustee, concluded it was highly likely that
Proctor could prove the Company had violated Proctor's right to dividends as a stockholder,
breached the Side Letter, and breached the Selling Agreement.  Claimant concluded that Proctor was
likely to obtain an allowed claim in the Company's bankruptcy case, in an amount exceeding $45
million, as follows:

   a.     Approximately $27 million owing pursuant to the Revenue Share Resolution;

   b.     Approximately $9 million owing pursuant to the Side Letter;

   c.     Approximately $2.7 million owing for commissions pursuant to the Selling
          Agreement; and

   d.     More than $8 million owing for reimbursement of attorneys' fees.  (Both the
          Selling Agreement and the Side Letter provide that the successful party in any
          dispute shall be entitled to recover its attorneys' fees in addition to damages.)

Claimant's Motion to Approve Proctor Settlement (Bankruptcy Case Dkt. 383), a true and correct
copy of which is attached hereto as **Exhibit P**, at p.25.

85.     In addition, Claimant anticipated Proctor's claim could be allowed in the Bankruptcy
Case in an even higher amount in respect of the following:  (i) damages representing Proctor's
expenses in establishing its sales force and attempting to sell the Company's products pursuant to the
Selling Agreement; (ii) claims by Proctor for "lost commissions" due to Aletheia's well documented
refusal to enable Proctor to perform the Selling Agreement, by refusing to provide financial
information and by claiming prior contact with Proctor's connections; and (iii) punitive damages
based on Eichler's behavior, and the frivolous nature of the claims that Eichler and O'Melveny
caused the Company to assert, including, without limitation, the claims for rescission asserted by
O'Melveny's first amended complaint in the California action despite that none of the parties who
sold Proctor the stock were parties or joined to that complaint.

1396729

86.     Based upon the foregoing, the Trustee concluded it was in the best interests of the Estate to compromise the Proctor Litigation on the terms set forth in the settlement agreement between the parties.  By that settlement, among other things, Proctor's claim was allowed as a general unsecured claim in the Bankruptcy Case in an amount equal to the greater of $21,775,000.00 or 60% of the total pool of non-subordinated, non-priority, general unsecured claims finally allowed in the Bankruptcy Case.  The Bankruptcy Court, having determined that the Proctor Settlement was reasonable and in the best interest of the Estate's creditors, approved the settlement by order entered May 5, 2014.

## IV.

### FIRST CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY

[Against All Respondents]

87.     Claimant realleges and incorporates herein by this reference paragraphs 1 through 86 as though set forth in full.

88.     By virtue of the attorney-client relationship that existed between the Company and Respondents, Respondents at all relevant times owed the Company fiduciary obligations, including an unwavering commitment to loyalty, candor, and full disclosure.  As such, Respondents were bound to act in the highest good faith and with the highest regard for Aletheia's best interests, placing Aletheia's best interests above their own, in regard to Respondents' representation of the Company in connection with the Proctor Litigation.

89.     The allegations of corporate wrongdoing against Eichler in Proctor's New York action, and its cross-claim in the California action, gave rise to an actual conflict of interest.  The conflict of interest presented by the claims asserted in the Proctor Litigation was not subject to waiver.

> A corporation's legal advisor <u>must abstain</u> from taking part in controversies among the corporation's directors and shareholders "to avoid placing the … practitioner in a position where he <u>may</u> be required to choose between conflicting duties or attempts to reconcile conflicting interests."[Citation omitted.]

*Gong v. RFG Oil Inc.*, 166 Cal.App.4[th] 209, 214 (2008) (emphasis added).

31

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

90.     By reason of the acts and omissions set forth herein, Respondents breached their fiduciary obligations to the Company, including breaching their duty to: (1) avoid multiple representations that created actual conflicts of interest; (2) act in the Company's best interests instead of protecting and enabling Eichler's wrongful conduct to the Company's detriment; (3) place the Company's interests in being represented by attorneys with undivided loyalty to the Company above Respondents' interests in billing and collecting fees; and, (4) protect and preserve the Company's interests above all others.

91.     O'Melveny undertook to represent concurrently in the Proctor Litigation clients with adverse positions in violation of Ethical Rule 3-310.  The conflict was not waivable and constitutes a *per se* serious violation of the California Rules of Professional Conduct.  O'Melveny cannot reasonably contest that it failed to advise the Company of this conflict at the time that it took on this representation.  Moreover, and even assuming that this was a waivable conflict (and it was not), O'Melveny did not obtain the Company's "informed written consent" consenting to its jointly representing the Company and Eichler (among others) in the Proctor Litigation, as would otherwise be required by Rule 3-310.  They did not obtain the Company's written waiver of any conflict of interest to allow O'Melveny to simultaneously represent both Eichler and the Company where Proctor (a minority shareholder), credibly accused Eichler of breach of fiduciary duty, including by paying himself and others excessive compensation through bonuses, taking personal loans and paying personal expenses with the Company's cash.  Informed written consent required "informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client…."  (Ethical Rule 3-310(A)(1).)  Respondents did not so inform the Company.

92.     Even if the conflict had been disclosed, which it was not, it was not waivable by Eichler even if it were otherwise waivable by the Company.  Indeed, only Eichler signed O'Melveny's various engagement agreements for the Company while, in each case, he was also signing for himself thereby disqualifying him from signing any waiver on the Company's behalf.  The requirement of a separate signatory for the company who is to be jointly represented is set forth in Ethical Rule 3-600(E) which provides, in this regard, as follows: where "the organization's

32

1396729

1   consent to the dual representation is required by rule 3-310, the consent <u>shall be given by an</u>

2   <u>appropriate constituent of the organization other than the individual or constituent who is to be</u>

3   <u>[jointly] represented</u>….” (Emphasis added.)

4        93.    The ethical rules barred Respondents' joint representation of clients with conflicting

5   interests under the circumstances here presented.  The case law is clear that an attorney may not

6   concurrently represent a majority shareholder and the corporation at the same time in an action by a

7   minority shareholder that alleges mismanagement and other direct harm to the corporation.

8        94.    Respondents violated their undivided duty of loyalty to both the Company and to

9   Eichler and others.  The facts demonstrate that the interests of Eichler and the Company diverged

10  concerning the substantive matters presented in the Proctor Litigation.  Specifically, among other

11  instances, the interests of the Company and Eichler diverged in light of Proctor's allegations of

12  corporate looting and waste alleged in the Proctor Litigation, and which F&M quantified and

13  O'Melveny analyzed in O'Melveny's June 22 Memo.  Thus, the allegations themselves – without

14  regard to their truth – created the conflict of interest and invoked the duty of loyalty, which

15  Respondents breached and abandoned in their zealous representation of Eichler in derogation of their

16  duty of loyalty to the Company.

17       95.    Lawyers are not entitled to recover any legal fees for services performed after a serious

18  violation of ethical rules resulting from a conflict of interest.  *See Cal Pak Delivery, Inc*., 52

19  Cal.App.4th 1, 15-16 (1997) (“an attorney who engages in conflicting representation without

20  obtaining informed consent is not entitled to compensation”). Not only was the Company harmed by

21  Respondents' breach of fiduciary duty, as described previously, Claimant is entitled to recover by

22  way of disgorgement from Respondents the more than $9.1 million of legal fees that Respondents

23  received from or on behalf of the Company since undertaking to jointly represent the Company and

24  Eichler, and others, in the Proctor Litigation, notwithstanding their disabling conflict of interest.  As

25  explained in *Giannini v. Superior Court*, 42 Cal.Rptr.2d 394 (Ordered Not Published):

26              “[P]recedent teaches that an attorney who has violated his or her duty
                not to engage in representation that <u>poses</u> a conflict of interest without
27              the client's informed consent is not entitled to a fee for his or her
                services. (*Jeffry v. Pounds*, supra, 67 Cal.App.3d 6, 136 Cal.Rptr.373
28              [other citations omitted].  . . . . If it is determined that the violation

33

1396729

occurred, however, <u>it is clear that the injury and damages are proven
by the amount of attorney's fees</u> paid for the problematic
representation."

*Id.* at 407 (emphasis added).

96.     The fact that an insurance company, rather than the Company itself, may have

provided some of the funding towards the approximately $4 million of payments to O'Melveny for

legal work in the Proctor Litigation, does not change the fact that O'Melveny must disgorge such

fees.  *See David Welch Co. v. Erskine & Tulley* (1988) 203 Cal.App.3d 888, 894 (attorney found to

have breached the ethical rules by accepting employment adverse to a client or former client, ordered

to disgorge his earnings from other client; the trial court "did not abuse its discretion in ordering the

constructive trust and directing that defendants disgorge their gains).

97.     Respondents' retention of any of the payments they received from or on behalf of the

Company constitutes unjust enrichment in light of the facts here presented.  *See American Master

Lease LLC v. Idanta Partners, Ltd.*, 225 Cal.App.4th 1451 (2 Dist., 2014, May 05, 2014).

98.     Short of advising the Company of the need for, and the appropriateness of, the

appointment of an independent person to the Company's Board to prosecute and protect the

Company's claims against Eichler, Respondents could have simply not undertaken to represent the

Company in the Proctor Litigation, and thereby avoided the conflict.  It chose not to forego the

representation for reasons that are neither apparent nor relevant.

99.     As a result of the conflict, O'Melveny failed to preserve or prosecute any of the

claims it recognized in O'Melveny's June 22 Memo, which the Company had against Eichler and

others, which existed at the time that O'Melveny assumed the representation of the Company,

Eichler and others in the Proctor Litigation.  For their part, Olson and deNeve compounded

O'Melveny's breach when, after they left O'Melvney and in their capacities as President and

General Counsel of the Company, respectively, they continued to ignore the harm caused by Eichler

and other against the Company and exhibited extreme disloyalty to the Company by continuing to

advance O'Melveny's and Eichler's agendas.

100.    As a direct, proximate, and substantial cause and result of the acts and conduct set

forth above, the Company further has suffered injuries and damages in an amount subject to proof at

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

Arbitration, for which Claimant is entitled to recover on behalf of the Estate, including, but not limited to:

      a.    Loss or diminution of $47 million claim for excessive compensation and corporate waste of more than $19 million, as documented by O'Melveny, and resulting from the running of the statute of limitations and/or Eichler's having dissipated his assets since the time that the Company would have prosecuted the claim, and recovered, had the Company been represented by conflict-free counsel;

      b.    Disgorgement of, at minimum, the $4 million for legal fees and costs paid to O'Melveny by or on behalf of the Company for O'Melveny's legal work in the Proctor Litigation, and, at maximum, the more than $9.1 million in total fees O'Melveny was paid by or on behalf of the Company since undertaking the conflicted representation, O'Melveny's retention of which constitutes unjust enrichment;

      c.    Disgorgement of the salaries received by Olson and deNeve while President and General Counsel, respectively, of Aletheia; and

      d.    Damages, according to proof, resulting from Eichler's continued looting of the Company after the time that Eichler would have been dispossessed of the power and opportunity to do so had the Company been represented by conflict-free counsel.

    101.    Separate and distinct from, but in addition to, the foregoing, on information and belief, Respondents acted with malice, oppression, or fraud, within the meaning of California Civil Code Section 3294, which exposed the Company to damages, as described herein, when they devised and implemented the wrongful scheme of alleging legally unsustainable causes of action for fraud and rescission in their April 14, 2010, complaint, filed on the Company's behalf against Proctor, and in vigorously prosecuting such claims thereafter.  On information and belief, Respondents prosecuted the legally unsustainable causes of action with the knowledge that such claims were legally unsustainable, for the wrongful purpose of hindering and delaying Proctor's prosecution of his claims in order to advance Eichler's interests in remaining in control of the Company, rather than be removed for his wrongful conduct, which provided him the opportunity to continue looting the Company, which he continued to do.  This wrongful conduct also benefited Respondents because Eichler was responsible for directing millions of dollars of legal fees to Respondents; the longer he remained in control of the Company the more legal fees the Company

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

would pay to Respondents. Respondents were motivated by this desire to help their favored client, and thereby maximize legal fees, at the expense of their other client, the Company, to the detriment of its creditors and shareholders. Eichler did in fact cause millions of dollars of legal fees to be paid to O'Melveny, and he also caused hundreds of thousands of dollars to be paid to Olson and deNeve personally.

102. As a result of the acts and conduct set forth in the immediately preceding paragraph ("Malicious Conduct"), Claimant, in addition to its actual damages which are recoverable without regard to any such Malicious Conduct, is entitled to recover damages for the Malicious Conduct, including for the sake of punishing Respondents, and in order to deter Respondents from similar future conduct, and in order to make an example of Respondents so that others may be deterred from similar conduct.

## SECOND CLAIM FOR RELIEF

### PROFESSIONAL NEGLIGENCE – MALPRACTICE

[Against the Respondents]

103. Claimant realleges and incorporates herein by this reference paragraphs 1 through 102 as though set forth in full.

104. By virtue of the attorney-client relationship that existed between the Company and Respondents, Respondents at all relevant times owed the Company fiduciary obligations, including an unwavering commitment of loyalty and care. As such, Respondents were bound to act in the highest good faith and with the highest regard for Aletheia's best interests, placing Aletheia's best interests above their own, in regard to Respondents' representation of the Company in connection with the Proctor Litigation

105. By reason of the acts and omissions set forth herein, Respondents committed professional negligence arising from their conflict of interest, including breaching their duty to: (1) competently represent the Company; (2) avoid multiple representations that posed or created conflicts of interest; (3) act in the Company's best interests instead of protecting and enabling Eichler's wrongful conduct to the Company's detriment; (4) place the Company's interests in being

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

represented by attorneys with undivided loyalty to the Company above Respondents' interests in billing and collecting fees; and, (5) protect and preserve the Company's interests above all others.

106. As the Company's counsel, O'Melveny breached its duty of care which required that it take appropriate action to prosecute or preserve the significant claims it recognized the Company, its client, had against Eichler and others.  The loss of these claims resulted from O'Melveny's misconduct, which allowed for the running of the statute of limitations and/or Eichler's having dissipated his assets since the time that the Company would have prosecuted the claim had the Company been represented by conflict-free counsel, at which time, on information and belief, such claims against Eichler would have been collectable.

107. The Company would have prevailed against Eichler and others in an action to recover the monies looted by them because the corporate agreements in place at the time expressly prohibited the payments made by them, and there was no valid defense for their conduct.  As a matter of law, rescission (so as to justify post hoc Eichler's breaches) was not and is not available.

108. On information and belief, had O'Melveny brought these claims in April 2010, when it took on its conflicted representation of the Company and Eichler and others, the claim would have been collectible.

109. As a direct, proximate, and substantial cause and result of the acts and conduct set forth above, the Company has suffered injuries and damages in an amount subject to proof at Arbitration, for which Claimant is entitled to recover on behalf of the Estate, including, but not limited to:

    a.    Loss or diminution of $47 million claim for excessive compensation and corporate waste of more than $19 million, as documented by O'Melveny, and resulting from the running of the statute of limitations and/or Eichler's having dissipated his assets since the time that the Company would have prosecuted the claim, and recovered, had the Company been represented by conflict-free counsel; and

    b.    Damages, according to proof, resulting from Eichler's continued looting of the Company after the time that Eichler would have been dispossessed of the power and opportunity to do so had the Company been represented by conflict-free counsel.

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729

V.

**PRAYER FOR RELIEF**

**WHEREFORE**, The Trustee respectfully prays for judgment against the Respondents as follows:

1.     On the First Claim for Relief for Breach of Fiduciary Duty, for compensatory and general damages according to proof, including, without limitation, the following:

      a.     Loss or diminution of $47 million claim for excessive compensation and corporate waste of more than $19 million, as documented by O'Melveny, and resulting from the running of the statute of limitations and/or Eichler's having dissipated his assets since the time that the Company would have prosecuted the claim, and recovered, had the Company been represented by conflict-free counsel;

      b.     Disgorgement of, at minimum, the $4 million for legal fees and costs paid to O'Melveny by or on behalf of the Company for O'Melveny's legal work in the Proctor Litigation, and, at maximum, the approximately $9.1 million in total fees O'Melveny was paid by or on behalf of the Company since undertaking the conflicted representation, O'Melveny's retention of which constitutes unjust enrichment;

      c.     Disgorgement of the salaries received by Olson and deNeve while President and General Counsel, respectively, of Aletheia, the retention of which constitutes unjust enrichment;

      d.     Damages, according to proof, resulting from Eichler's continued looting of the Company after the time that Eichler would have been dispossessed of the power and opportunity to do so had the Company been represented by conflict-free counsel;

      e.     And, separate and distinct from, but in addition to, the foregoing, punitive damages for the Malicious Conduct, including for the sake of punishing Respondents, and in order to deter Respondents from similar future conduct, and in order to make an example of Respondents so that others may be deterred from similar conduct.

2.     On the Second Claim for Relief for Professional Negligence – Malpractice,  for compensatory and general damages according to proof, including, without limitation, the following:

      a.     Loss or diminution of $47 million claim for excessive compensation and corporate waste of more than $19 million, as documented by O'Melveny, and resulting from the running of the statute of limitations and/or Eichler's having dissipated his assets since the time that the Company would have prosecuted

38

1396729

1    the claim, and recovered, had the Company been represented by conflict-free counsel; and

2

       b.    Damages, according to proof, resulting from Eichler's continued looting of the

3    Company after the time that Eichler would have been dispossessed of the power and opportunity to do so had the Company been represented by

4    conflict-free counsel.

5    3.    For its cost of suit; and

6    4.    For such other and further relief as the Arbitrator may award.

7

8  Respectfully submitted, September 25, 2015

9                           **EZRA BRUTKUS GUBNER LLP**

10

11                            By:

12                                      Steven T. Gubner
                                      Larry W. Gabriel

13                                      Jerrold L. Bregman
                                      Jason B. Komorsky

14                         Special Litigation Counsel for Claimant
                         Jeffrey I. Golden, Chapter 7 Trustee

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLAIMANT'S STATEMENT OF CLAIMS**

1396729