# EXHIBIT 3

**ARBITRATION BEFORE PHILLIPS ADR**

| | |
|---|---|
| In re:<br>ALETHEIA RESEARCH AND<br>MANAGEMENT, INC.,<br><br>Debtor.<br>―――――――――――――――<br>JEFFREY I. GOLDEN, Chapter 7<br>Trustee of Aletheia Research and<br>Management, Inc.,<br><br>Claimant,<br><br>vs.<br><br>O'MELVENY & MYERS LLP;<br>STEVEN J. OLSON, an individual; and<br>J. JORGE DENEVE, an individual,<br><br>Respondents. | Chapter 7 Case  No. 2:12-bk-47718 BR<br>(U.S. Bankr. Ct., C.D. Cal.)<br><br>**Adv. Pro. 2:14-cv-08725-CAS (AGRx)**<br>(U.S. Dist. Ct., C.D. Cal.)<br><br>**FINAL AWARD (CORRECTED)**<br><br>Arbitrator:  Hon. Gary A. Feess |

**FINAL AWARD**

On June 15, 2015, Hon. Christina A. Snyder ordered that Claimant's First and Second Causes of Action be arbitrated pursuant to a series of Retainer Agreements between O'Melveny & Myers LLP and Aletheia Research and Management, Inc. and related parties, each of which contained an identical arbitration provision.  Pursuant to those agreements and the Court's order, the arbitration has now concluded, and the matter submitted to the Arbitrator for determination.  Having examined the testimony, documents, briefing and final arguments of the parties, the Arbitrator now issues this Final Award.

**COUNSEL:**

Steven T. Gubner
Jerrold L. Bregman
Jason B. Komorsky
Brutzkus Gubner Rozansky Seror Weber LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Attorneys for Claimant

Kevin S. Rosen
Matthew S. Kahn
Blake Shinoda
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-6635
Attorneys for Respondents

**ARBITRATOR:**

Hon. Gary A. Feess (Ret.)
Phillips ADR Enterprises
2101 East Coast Highway, Suite 250
Corona del Mar, CA 92625

**PLACE OF ARBITRATION:**

Corona del Mar, California and Los Angeles, California

**DATE OF AWARD:** June 21, 2019.

**PROCEDURAL STATEMENT**

    A.    <u>**The Parties**</u>

       The Claimant in this matter is Jeffrey I. Golden ("the Trustee" or "Claimant") who is the Chapter 7 Trustee of Aletheia Research and Management, Inc. ("Aletheia").  He brings claims in Aletheia's name against the Respondents.

2

FINAL AWARD (CORRECTED)

Respondents are O'Melveny & Myers, LLP, Aletheia's former counsel, and Steven J. Olson ("Olson") and J. Jorge deNeve ("deNeve") (jointly referenced with the firm as "O'Melveny" or "Respondents") who are currently attorneys at O'Melveny and who during a period in 2011 and 2012 served as officers of Aletheia.

### B.   The Operative Pleadings and Arbitrability

The issues raised in arbitration arise out of the Aletheia bankruptcy filed in the Central District of California on or about  November 11, 2012.  The present dispute is an adversary proceeding filed by the Trustee in *Golden v. O'Melveny & Myers, LLP, et al.*, CV 14-8725-CAS on or about November 10, 2014.  The suit stated five claims: (1) professional negligence/conflict of interest; (2) breach of fiduciary duty; (3) avoidance and recovery of preferential transfers under 11 U.S.C. Secs. 548 & 550;  (4) avoidance and recovery of fraudulent conveyances under 11 U.S.C. Secs. 548 & 550 (two-year transfers); and (5) avoidance and recovery of fraudulent conveyances under 11 U.S.C. Secs. 544 & 550 (four-year transfers) and relevant sections of the California Civil Code.

Respondents' moved to compel arbitration of claims one, two and five. Respondents relied on an arbitration provision that was included in Retainer Agreements between OMM, Aletheia and Eichler.  (Exs. 64, 67, 109.)  That provision reads in pertinent part:

> **Arbitration of All Disputes, Claims or Controversies**. As a material part of our agreement, you and we agree that any and all disputes, claims or controversies arising out of or relating to this agreement, our relationship, or the services performed, will be determined exclusively by confidential, final and binding arbitration, in accordance with the then existing Comprehensive Arbitration Rules and Procedures of JAMS, in the City of Los Angeles. Disputes, claims and controversies subject to final and binding arbitration include, without limitation, all those that otherwise could be tried in court to a judge or jury in the absence of this agreement to arbitrate. Such disputes, claims and controversies include, without limitation, claims of

3

professional malpractice or other disputes over the quality of our services, claims relating to or arising out of your or our performance under these Terms, and disputes over fees or other charges, costs or expenses (except as covered by the next paragraph or prohibited by law) and any other claims arising out of any alleged act or omission by you or us. By agreeing to submit all such disputes, claims and controversies to binding arbitration, you and we expressly waive any rights to have such matters heard or tried in court before a judge or jury or in another tribunal. Any award will be final, binding and conclusive upon the parties, subject only to judicial review provided by statute, and a judgment rendered on the arbitration award can be entered in any state or federal court having jurisdiction thereof.

(Ex. 67.)

### C.    The Order Compelling Arbitration

On June 15, 2015, the trial court granted the motion with respect to claims one and two.  The Court stayed further proceedings on Claims three through five pending the outcome of the present arbitration proceeding.

### D.    The Statement of Claim and Answer

The claims presented in this matter are set forth in the "Claimant's Statement of Claim" submitted on or about September 25, 2015.[1]  The Statement of Claim asserts two causes of action: breach of fiduciary duty and professional negligence-malpractice.  Claimant also asserts that individual Respondents deNeve and Olson breached their fiduciary duties to Aletheia in their capacities as corporate officers.

Respondents have answered and deny that any conduct constituted malpractice or a breach of any fiduciary duty.

---

[1] The Statement of Claim is a revision of an earlier document.  Accordingly, where it is referenced in the text, it is identified as Revised Statement of Claims or RSOC.

4

FINAL AWARD (CORRECTED)

**E.** **Appointment of the Arbitrator and Pre-Hearing Proceedings**

After the June 15, 2015, order compelling arbitration of claims one and two, the parties conferred and, on or about August 17, 2015, selected the Hon. Gary A. Feess (Ret.) as the arbitrator.  Thereafter, the parties engaged in extensive discovery and pre-hearing motion practice, including the presentation and consideration of dispositive motions.  A Final Pre-Hearing Conference was held on October 18, 2018; the Hearing commenced on November 5, 2018 and was conducted on 12 days concluding on November 29, 2019.  Closing arguments were presented on March 20, 2019, at which time the matter was submitted for determination.  The Arbitrator's Findings and Conclusions and Final Award are set forth below.

**F.** **The Record**

The evidentiary record in this matter consists of the following:

1.     The Reporter's Transcript of Proceedings on November 5-9, 12-15, and 27-29.  Citations to the Reporter's Transcript are abbreviated as follows: RT [page]:[lines].

2.     The exhibits contained in the 80-page numerical Exhibit List attached hereto.  All exhibits are admitted except for the following:  Ex. 131; 805; 806; 824; 827; 828; 830; 1283; 1284 except right hand column on page 2 (list of AUM) is admitted; 1285 except right hand column on page 2 (list of AUM) is admitted; 3005; 3014.

Exhibits 2323-2328, 2336-2344 (discovery responses) are admitted for all purposes.

Exhibits 3017-3020 are admitted for impeachment purposes only and not for the substance of the matters contained therein.

Citations to trial exhibits are abbreviated as follows:  Ex. [number]; if a page is indicated the cite is Ex. [number], at [page].

FINAL AWARD (CORRECTED)

3.      Excerpts of the following depositions:  Seth Aronson; Robert Silvers; Katie Mercer; Anna Fabish; Peter Selvin; Charlene Podlippna; Jeffrey Golden; and Brue Lee.

NOTE 1: Lee's excerpts were marked as an exhibit and identified as Exhibit 1299. Golden's excerpts were marked as exhibits and identified as Exhibits 2458 and 2459. Whether or not the excerpts were marked as an exhibit, they are a part of the hearing record in this case.

NOTE 2:  Some of the excerpts included objections either in the text or in the margins.  Those objections are overruled.  The Arbitrator has read and considered all of the designated text.

Citations to deposition excerpts are abbreviated as follows:  [Name] Depo., at [page]:[lines].

4.      Closing Briefs have been read and considered.  Citations to those briefs are abbreviated as follows:

Claimant's Opening Brief:  CB, at [page]

Claimant's Reply to Respondent's Closing Brief: CRB, at [page]

Respondent's Closing Brief: RB, at [page]

Respondent's Reply to Claimant's Closing Brief: RRB., at  [page].

FINAL AWARD (CORRECTED)

# FINDING AND CONCLUSIONS

## I.

## INTRODUCTION

In the present lawsuit, Aletheia's Trustee in bankruptcy sues O'Melveny and two of its attorneys for alleged malpractice and breach of fiduciary duty in their performance of legal services for Aletheia.  The Trustee contends that O'Melveny breached its duty of loyalty to Aletheia by jointly representing Aletheia and its principal founder and majority shareholder, Peter Eichler, in the defense of claims brought against them by Proctor Investment Managers ("Proctor").  Proctor's claims arose out of a series of agreements between the two companies, and its lawsuit allegedly put the interests of Eichler and Aletheia in an unwaivable conflict that Respondents recognized but deliberately ignored.  According to the Trustee, Respondents undertook the joint representation despite this conflict to curry favor with Eichler who sought to consolidate unfettered control over all aspects of Aletheia's operations.  The Trustee argues that Respondents were willing partners in Eichler's treachery out of their own corrupt interest in extracting a large fee to help offset two years of reduced revenues during the Great Recession.  The Trustee alleges that, after two years of work, and the collection of millions of dollars in fees from Aletheia, O'Melveny fled the scene for greener pastures and left Aletheia to collapse into bankruptcy and ruin.

The Trustee's portrayal of events would make a compelling tale if it were supported by persuasive evidence, but it is not.  The Arbitrator finds that Aletheia and Eichler's interests were aligned in the dispute with Proctor (and in all other respects material to the present lawsuit), and Respondents acted properly in pursuing their clients' aligned interests in that lawsuit.  At the same time, O'Melveny mitigated the substantial risk facing both Aletheia and Eichler in a contemporaneous investigation conducted by the SEC.  When that threat had passed, Respondents participated in a major overhaul of Aletheia's governance and compliance practices, which reduced,

7

not increased, Eichler's control over firm operations.  In the meantime, Respondents stayed the course in the Proctor litigation during which O'Melveny made repeated efforts to settle the dispute.  O'Melveny withdrew only when it became clear that the Proctor litigation could not be settled and only because Aletheia wanted to proceed with less expensive counsel.

Not only did Respondents conduct themselves properly and in compliance with their ethical obligations throughout their representation of Aletheia and Eichler, the Trustee concedes that he has no evidence that different counsel, representing Aletheia only, would have acted differently or would have achieved a better result.  In other words, the Trustee has no evidence that anything O'Melveny did or failed to do caused any injury to Aletheia.  Thus, while this Final Award presents an extended discussion of a lengthy record, it concludes that the Trustee has failed to carry his burden of proof on any of his claims against any of the Respondents.

## II.

## OVERVIEW

### A.    Before O'Melveny's Retention

In late 2009, O'Melveny first became involved with the principals in the underlying dispute that forms the basis for this case.  At that time, Aletheia and its two founders, Peter J. Eichler ("Eichler") and Roger B. Peikin ("Peikin") were co-defendants or targets in several matters.

First, Aletheia, Eichler and Peikin were the subject of an SEC investigation, which then included an inquiry into whether Aletheia had engaged in fraudulent conduct by representing model returns on some of its products as actual returns.  This investigation required immediate attention by counsel as a fraud finding could have put Aletheia out of business and barred Eichler and Peikin from the industry.

Second, Aletheia, Eichler and Peikin were defending a hotly contested wrongful termination claim brought by Joseph Boskovich and his son (referenced as the "Boskovich litigation"), two former Aletheia salesmen who were represented by

FINAL AWARD (CORRECTED)

extremely able plaintiffs' counsel.  With a trial date on the horizon, the case was viewed as posing serious risk of a substantial adverse judgment against the company, Eichler and Peikin.

Third, Aletheia was embroiled in a serious and long-standing dispute with Proctor.  In a complex transaction that generated three separate but connected agreements, Proctor had acquired a 10% interest in Aletheia on the strength of its representations that it could enhance the marketing of Aletheia's products and increase Aletheia's already robust sales.  When those sales did not materialize and Aletheia's principal contact with Proctor resigned, Aletheia gave notice that Proctor was in breach of the Selling Agreement, and when the breach was not cured, terminated Proctor as its selling agent.  The relationship dissolved into a bitter dispute that could not be resolved and blossomed into an acrimonious lawsuit ("the Proctor litigation") initiated by O'Melveny's predecessor counsel, Loeb & Loeb ("Loeb").

In these matters, Loeb, with Peter Selvin ("Selvin") in charge, represented Aletheia, Eichler, Peikin and others from late 2007, when Aletheia first sought to terminate Proctor as its selling agent, to late 2009.  At that point, when a potential conflict between Peikin and Eichler was identified in the SEC investigation, O'Melveny was brought in to represent only Eichler and only in the SEC investigation.  For reasons discussed in more detail below, O'Melveny's role expanded to include the representation of Aletheia and other directors and managers on January 26, 2010, and by February, O'Melveny was also representing Aletheia and Eichler in the Proctor and Boskovich lawsuits.

## B.  After O'Melveny's Retention

The Arbitrator finds that O'Melveny obtained favorable results for its clients in the SEC investigation where it quickly persuaded the SEC to abandon the fraud component of the investigation and persuaded the SEC to abandon its fraud inquiry and instead to focus on corporate governance issues.  In 2011, two O'Melveny attorneys, Respondents Steven Olson and Jorge deNeve, left the firm to assume

FINAL AWARD (CORRECTED)

management positions at Aletheia to help steer it through this difficult period.  With their assistance, the substantial efforts of FTI, a highly regarded consulting firm, and input from O'Melveny from time to time on specific issues, Aletheia negotiated a favorable settlement that reflected extensive governance and compliance reforms while acknowledging that work remained to be done in the future.

Likewise, O'Melveny became deeply involved in the Boskovich case with Olson taking a leading role.  The record demonstrates that O'Melveny was able to posture the case for settlement negotiations.  By late 2010, the case was resolved after intense discussions with opposing counsel and the insurance carriers.  The case settled with a payment to the plaintiffs funded primarily with insurance proceeds.  The Proctor litigation was another story.

In February 2010, when settlement efforts with Proctor failed, Loeb on behalf of Aletheia filed a declaratory relief action in Los Angeles Superior Court.  Proctor responded by filing its own complaint in New York Supreme Court  asserting multiple contract-based claims against Aletheia, and a breach of fiduciary duty claim against Eichler and Peikin.  At that point, Aletheia and Eichler substituted O'Melveny in as counsel, with Peikin separately represented.  With a deadline looming and marching orders to make every effort to keep the litigation in California, O'Melveny rapidly conducted a substantial investigation of the Proctor dispute, prepared a detailed amended complaint that was filed in California and succeeded in obtaining a dismissal of the New York case.  Courtroom success notwithstanding, lead partner, Seth Aronson, immediately and continuously pressed for a settlement of the dispute.  There were multiple periods of serious negotiation, culminating with sessions in late November 2011 when it appeared that a deal had been struck.  In the end, those efforts failed and in early 2012, a new, less expensive, firm took over the litigation on behalf of Aletheia and Eichler.  Within a year, Aletheia filed for bankruptcy.

FINAL AWARD (CORRECTED)

### C.   Bankruptcy Proceedings

On or about November 11, 2012, Aletheia filed a voluntary petition in bankruptcy under Chapter 11 in the Central District of California.  Golden was appointed Trustee in December 2012, and in February 2013 moved to convert the petition to a proceeding under Chapter 7.  The Proctor litigation was stayed.  Standing in the shoes of Aletheia, the Trustee might have been expected to pursue Aletheia's claims against Proctor.  He did not.  Instead the Trustee negotiated a settlement with Proctor's counsel in which the Trustee abandoned all of Aletheia's claims and defenses and agreed to give Proctor a substantial recovery - "an allowed, non-subordinated, non-priority, general unsecured claim against the Aletheia estate in an amount equal to *the greater of* $21,775,000 or 60% of the total pool of non-subordinated, non-priority, general unsecured claims finally allowed . . . ."  (Ex. 574, at 19.) (Emphasis added.)

The settlement was approved based on a motion that, so far as can be determined from the present record, contained no supporting evidentiary material.  (See generally Ex. 574.)  The Trustee justified the proposed settlement by asserting the validity of Proctor's claims, portraying Eichler as having behaved dishonestly and in bad faith in his dealings with Proctor, and generally denigrating the claims and defenses that O'Melveny developed and pursued on Aletheia's behalf.  (*Id.*)  This allowed the Trustee to avoid the fight with Proctor, which had proved a tenacious adversary over the years, and opened a path to a potentially deeper pocket – O'Melveny & Myers – through the present action for malpractice and breach of fiduciary duty.  In sum, the Trustee contends that O'Melveny launched a meritless scorched earth litigation effort against Proctor, which was exacerbated by jointly representing Aletheia and Eichler whose interests were in conflict, and then abandoned the case and the client after extracting a large fee.  The Trustee contends that these actions resulted in damages in excess of $54 million and seeks recovery in the present proceeding.

FINAL AWARD (CORRECTED)

Because the Proctor litigation has been the central focus of this litigation since the filing of the operative Statement of Claim, the discussion below commences with an evidence-based examination of the factual background leading to the Aletheia-Proctor agreements and the circumstances that led to the Proctor litigation.  The bankruptcy settlement notwithstanding, a careful review of the facts leading to the Proctor litigation establishes that: (1) O'Melveny's factual and legal investigation into Aletheia's claims and defenses was conducted in good faith and readily satisfied the firm's obligations under Rule 11, Fed.R.Civ.P, and (2) on the defense side, O'Melveny correctly analyzed the claims brought by Proctor against Aletheia and Eichler as direct and not derivative and correctly concluded that its joint representation of Aletheia and its principal founder, Peter Eichler, in defending against those claims was proper and consistent with its fiduciary duty to both clients.

For these reasons and others discussed at length below, the Trustee's assertion that O'Melveny acted in its own interests at the expense of its clients fails.[2]

### D.   Summary of the Arbitrator's Rulings

As described in detail below, the Arbitrator finds and concludes as follows that Respondents representation of Aletheia and Eichler conformed to the applicable standard of care and that there was no conflict of interest in O'Melveny's joint representation of Aletheia, Eichler and other individual defendants in the Proctor litigation or any other matter.  Further, Respondents met their duty to alert Aletheia as to potential claims against Eichler and Peikin.  Likewise, the Trustee failed to show that any act or omission of the Respondents caused any injury to Aletheia and failed to show any other basis for a recovery against Respondents either as counsel, or in the case of Olson and deNeve, as officers of Aletheia.

---

[2]Because witness credibility is central to the resolution of the dispute, this award includes an Appendix addressing credibility of the percipient witnesses who testified: Peikin, Seth Aronson, Steven Olson and Jorge DeNeve.  Issues of credibility are also addressed in specific contexts throughout this document.

FINAL AWARD (CORRECTED)

Because the Trustee failed to prove any of his claims against Respondents or prove that any of his claims caused injury and damage, the Arbitrator need not and does not reach issue of collectability and disgorgement.  Likewise, to the extent that the Trustee contemplated any other claims against O'Melveny and the other respondents that may be the subject of this arbitration, he has offered no evidence in support of such claims which are therefore not addressed in this Final Award and are deemed abandoned.

Accordingly, the Arbitrator finds and concludes that the Trustee take nothing by virtue of the claims presented in this arbitration.

## III.

## FACTS

### A.   Aletheia's Genesis and Success

In the 1990s, Peter Eichler was an experienced salesman and asset manager working at Bear Stearns.  In about 1995, Eichler met a family law attorney, Roger Peikin, whose girlfriend was acquainted with Eichler's second wife.  (R.T., 80-82.) Eventually Peikin developed a professional relationship with Eichler and took him on as a client in connection with issues involving Eichler's first wife and their four children.  (*Id.*, 83-84.)

In due course, as their friendship developed, Eichler advised Peikin that he wanted to leave Bear Stearns "to start his own money management company . . . and he asked me if I wanted to do it with him as a partner."  (*Id.*, 85.)  After giving the matter some thought, Peikin agreed.  (*Id.*)  The two of them formed Aletheia on July 23, 1997 (Ex. 1001) with Eichler initially owning 550 of the 1,000 shares issued and Peikin the other 450.  (Ex. 2003).  The corporation's articles and by-laws (Ex. 140), were prepared by the firm of Barger and Wolen.  (R.T. 87.)  The initial directors were Eichler, Peikin, Jesse Felder, and Patricia Barnes who worked with Eichler as a sales assistant at Bear Stearns.  (R.T. 89.)  Barnes held several securities licenses that

FINAL AWARD (CORRECTED)

1   allowed her to trade options, bonds and equities for Aletheia.  (*Id.*)  The firm launched
2   with this team in place.

3        At its founding, Aletheia had only a few clients, but they were enough to supply
4   the firm with "seed clients and seed capital."  (*Id.* 88.)  Primarily due to Eichler's sales
5   acumen and efforts,[3] the firm's assets under management (AUM) grew -- slowly at
6   first and then more rapidly.  (E.g., Ex. 1285.)  On December 21, 2000, the firm had
7   $99 million in AUM.  (*Id.*)  The firm's growth took off in 2005 when it went from
8   $188M in AUM at the end of 2004 to $581 million in AUM as of December 31, 2005.
9   (*Id.*)  The growth became explosive in 2006.  By the end of the year Aletheia had
10  added many new portfolios and increased its AUM to more than $3.2 billion.  (*Id.*)

11       Aletheia's success did not go unnoticed.  In late 2005 and early 2006 a suitor
12  looking for a piece of the action came calling.

13       **B.   Proctor Seeks an Investment in Aletheia**

14       How Proctor came to be involved with Aletheia and its objectives in doing so
15  are important to an understanding of why Aletheia reasonably viewed itself as the
16  truly aggrieved party in the dispute that erupted in late 2007.

17       Through Peikin, the Trustee contends that the Proctor transaction resulted from
18  Eichler's efforts to "monetize" a portion of his Aletheia stock.  CB, at 7:13-14; RT
19  105.)[4]  In fact, the record shows that the transaction resulted, not from Eichler's desire

20

21  [3] No one disputes the critical role Eichler played in the success of Aletheia.  Even Peikin, who
    repeatedly sought to vilify Eichler and those associated with him, grudgingly acknowledge that "I
22  don't know what percent, but he was responsible for the super majority of asset raising.  He was an
    extremely good salesman."  (R.T., at 102:21-23.)  And, "there's no question that Eichler was the best
23  rainmaker of the firm."  (R.T., at 103:1-2.)  In documents filed in bankruptcy court, the  Trustee
    concurred that Eichler's marketing skills were a critical factor in Aletheia's success.  (Ex. 574, at 3.)
24  However, Eichler's value is perhaps most clearly evidenced in the "Side Letter Agreement"
    discussed below which mandated that Aletheia maintain $16 million (the amount of Proctor's
25  investment in Aletheia) in "key man" insurance on Eichler with Proctor as beneficiary.  (Ex. 757,
    Para. 1.(d).)  This provision implicitly recognized that, without Eichler, there would be no Aletheia.
26  That fact is of obvious importance in addressing how an attorney or officer should evaluate suing its
    chief (and virtually only) rain maker.
27  [4] With respect to Mr. Peikin's assertion that Eichler was seeking "a liquidity event," it is worth
28  noting that the Trustee could have called as a witness either Eichler or Scalzo who were intimately

to sell stock, but from Proctor's desire to obtain an equity position in Aletheia.  It is noteworthy that, in a sworn declaration filed in the Proctor New York action more than eight years ago,  Peikin contradicted his current testimony and acknowledged that Proctor, not Eichler initiated contact with Aletheia.  (Ex. 2070.)  Peikin's 2010 declaration is entirely consistent with the documentary record discussed below, which convincingly demonstrates that Proctor pressed a reluctant Eichler to make a deal that Eichler never sought.  The history of the negotiations informs the remainder of the story, which in turn has an important bearing on the analysis of O'Melveny's actions as Aletheia's counsel.  (See generally RT 736-750.)

In early 2006, with the assistance of Mark Scalzo, who at the time was with Putnam Lovell NBF, Proctor sought a deal in which it would purportedly act as Aletheia's selling agent.  (E.g., Ex. 2009.)   Scalzo's contemporary records show that Eichler was resistant to doing a deal with Proctor, and that Proctor was pushing hard to sell its capabilities as a marketing partner.  On February 21, 2006, Mona Aboelnaga, Proctor's President, wrote to Eichler following a lunch the week before and observed:

> You clearly have been able to deliver compelling returns to your clients - a direct benefit of your dedication to quality bottom-up research.  With such a team and track record, your firm is poised for significant future growth.  The challenge is to create and execute on a marketing plan which maximizes your time and resources while approaching distribution with a long-term strategic view that is best for the firm.  ***To that end, we strongly believe that we at Proctor can help you achieve that growth in a manner which allows you to focus on managing money, while reaping the benefits of a greater and more diversified asset base.***

(Ex. 2009.) (Emphasis added.)

---

involved in the transaction but called neither after representing that Eichler would be a witness.  (RT 193:21-24.) Without their testimony, the contemporaneous documentary record thoroughly refutes any contention that the Proctor transaction was a product of Eichler's search for a "liquidity event."

FINAL AWARD (CORRECTED)

Jim Coley followed up with Scalzo indicating a serious interest in "trying to find a way to work with Aletheia " (*id.*) but indicating that Proctor was interested in becoming more than a marketing partner.  After indicating an interest in working with Aletheia, Coley wrote that "[W]e need a couple of things" including company financials and information "on what percent equity we could buy today, and what percent he would sell us at a later and higher point."  (*Id.*)

A week later, Scalzo emailed Coley and Mona Aboelnaga advising that "As I have said before, rightly or wrongly, ***Peter needs to be 'sold' on partnering with anyone."*** (*Id.*)  (Emphasis added.)  As to the equity component, Scalzo suggested that they propose an option to acquire at least a portion of an equity interest to "send[] a message to Peter – you are confident in your ability to add value."  (*Id.*)  In other words, before Eichler would do any deal with an equity component, he would have to be persuaded that Proctor could enhance Aletheia's sales capacity.  Thus, the Arbitrator finds that this exchange in February 2006 plainly demonstrates that it was Proctor who was the suitor, not Eichler or Aletheia, which bears directly on how Respondents assessed Aletheia's affirmative claims and Proctor's portrayal of itself as the aggrieved party when the relationship fell apart.

In early March, Scalzo spoke to Eichler and then reported on those conversations to Coley and Aboelnaga.  (Ex. 2010.)  Scalzo reiterated that Peter "wants to slow things down a bit" and that while a meeting could be arranged, it will "likely center around Aletheia's investment process ***and your sales capabilities . . . ."*** (*Id.*) (Emphasis added.)  A meeting did occur in early April, and, as anticipated, focused on Proctor's marketing capacity rather than its interest in acquiring an equity position in Aletheia.  (E.g., Ex. 129.)  Coley followed up in late April when he wrote to Eichler to repeat his pitch:

> We are excited about the opportunity ***to partner with you and your team at Aletheia.***  We believe that our sales and marketing expertise can greatly enhance the rapid growth trajectory that you have already achieved through increased

FINAL AWARD (CORRECTED)

> client penetration in both the institutional and intermediary channels along with a more concerted and focused consultant strategy.  Equally important is our strategic focus on client retention and servicing.

(Ex. 124.) (Emphasis added.)

A month later, after the parties had met, Coley continued to press his case in an email to Eichler to remind him that "[a]s I commented during our meeting last month in Santa Monica, you are faced with an enormous opportunity given your excellent performance and in my mind, can either (1) build (and more importantly, manage) a distribution system yourself *or (2) partner with a firm like ours."*  (Ex. 2012.) (Emphasis added.)  Pressing for the latter alternative, Coley argued that distribution costs "even for a boutique . . . can be daunting," (*Id.*), and again touted the capabilities of Proctor's sales force:

> We are in the final phases of significantly bulking up our core sales team.  The latest new hires will bring us to 5 professionals in the direct institutional channel and four professionals focusing on the intermediary channel.  In addition, we employ research and product specialists to support the sale and marketing effort. . . .  This is the team that we will bring to bear to leverage your impressive track record.

(Ex. 2012.)

After several months of peppering Eichler with promises that it could deliver sophisticated assistance and superior results, Proctor finally persuaded Eichler that the addition of Proctor as a partner would benefit Aletheia, and by the middle of the year negotiations on the terms of an agreement began in earnest.  (See, e.g.., Exs. 125, 520, 1007, 1242.)  Although no agreement had been concluded by September, Coley proposed that his sales team meet with Eichler in October to become familiar with Aletheia's sales strategy.  (Ex. 1008.)  Meanwhile, negotiations continued into the late fall and ultimately resulted in a transaction among Proctor, Aletheia, and the Aletheia shareholders.

17

FINAL AWARD (CORRECTED)

## C.   **The Proctor Transaction**

The final transaction consisted of several separate but related agreements.  First, as contemplated in the extended correspondence and negotiation between Aletheia and Proctor during the prior ten months, Aletheia and its affiliates entered into a "Selling Agreement" with Proctor.  (Ex. 119.)  Pursuant to this agreement, Proctor was retained to use its "commercially reasonable efforts" as Seller of Aletheia's investment products to targeted individuals and entities.  (*Id.*, at 1.)  For its efforts, Proctor would receive fees as provided in Paragraph 3 and Schedule A, subject to carve outs for existing Aletheia clients.  (*Id.*)

Second, Proctor achieved its objective of getting an equity interest in Aletheia.  It entered into a contract with Aletheia's shareholders to acquire, on a pro rata basis, a 10% equity interest in Aletheia for $16 million ($49,245.92/share)  (Ex. 117.)

Third, Aletheia and Proctor entered into a "Side Letter Agreement" that contained terms and conditions not set forth in either the Selling Agreement or the Stock Purchase agreement.  (Ex. 757.)  Terms of significance to this lawsuit included the following:

      a.      Aletheia agreed to increase the size of the board of directors to four to include an "Independent Director" as defined in the agreement.  (*Id.*, Para. 1.e.) The Independent Director was to be a nominee of a shareholder holding less than 25% of the company stock, who was not an employee or officer of Aletheia, or one of their relatives.  (*Id.*, Para. 6.)  Upon the director's resignation, his replacement was to be designated by the shareholder who first nominated the departing director.  (*Id.*)

      b.      The agreement placed a cap on the employee bonus pool of 35% of the pre-tax pre-bonus income relating to hedge fund partnership performance and management and 20% of all other pre-tax pre-bonus income such as management fees and commissions.  (*Id.*, Para. 9(d).)

FINAL AWARD (CORRECTED)

1         c.    The agreement contained a distribution provision that at least 45-

2    50% of pre-tax, post-bonus pool earnings after the payment of all quarterly business

3    expenses should be paid to shareholders on a pro rata basis.  (*Id.*, Para. 10.)[5]

4    Upon the closing of the transaction, the size of the board of directors was expanded to

5    4 (Ex. 141), and Proctor's designee, its CEO Jim Coley, was elected as the

6    independent director.  (E.g., Ex. 121.)

7         **D.**    **Internal Strife at Proctor**

8         During Proctor's courtship of Aletheia, it represented itself as a successful,

9    experienced, efficient and effective provider of management and marketing services.

10   The record demonstrates that those representations were for external consumption and

11   masked that Proctor was in turmoil.  On December 5, 2006, a month after the deal

12   with Aletheia closed, Coley sent Aboelnaga an email with the subject line "call me at

13   home asap on this."  (Ex. 2019.)  The email contains the text of a private

14   communication prepared by an unidentified subordinate sharing with colleagues his

15   extremely critical opinions of Coley and Aboelnaga as managers and expressing

16   concerns about Proctor's prospects.  (*Id.*)  It included the following comments:

17       -  "Senior Management," [identified throughout as Coley and Aboelnaga], has

18          "20 minutes of asset management experience";

19       -  "To the point of managing the sales effort – Jim AND Mona are clueless.

20          Totally clueless."

21

22

23   ───────────────

[5] The Trustee argues, based on Peikin's testimony, that the terms of the Side Letter Agreement were

24   originally in the Stock Purchase Agreement but were removed because Eichler wanted to hide the
     terms from the other shareholders.  CB, at 8, citing RT 120, 123.)  There is no doubt that the terms

25   were removed from the stock purchase agreement (e.g., Ex. 1242), but Peikin's allegation is not
     credible.  (RT 123:6-9.)  The argument ignores that the shareholders, who were parties to the

26   purchase agreement, were essentially incapable of performing on promises involving the day-to-day
     management of the business.  It made sense that Aletheia would undertake these responsibilities

27   because it could deliver on the promises.  The contention that the terms were moved for a nefarious
     purpose is unsupported, but it is representative of Peikin's repeated efforts to attribute a duplicitous

28   motive to Eichler.

FINAL AWARD (CORRECTED)

- "Point in case is the mania that we are looking to hire more institutional sales people rather than staffing the areas that HAVE something to sell – retirement and managed account . . . ."

- "WE HAVE TO HAVE ACCESS AND INPUT INTO WHAT IS COMMUNICATED TO THE BOARD. *Absent that we are all being set up to fail.* It will be some combination of us that will walk the gang plank a year from now when we don't meet JIM'S projections."[6]

- '[O]ur comp and the conditions of how we were hired *were disingenuous at best and or an outright fraud.*"

- "We actually are this firm, we are collectively the reasons the partners we have are in fact our partners. *We leave – which it must sound like I'm first mate on the Bounty – PIM is gone*."

(Ex. 2019.) (All caps in original; italicized emphasis added.)  The document concludes with the expectation that "I trust all of you with the discretion to keep the ongoing conversation to ourselves." (*Id.*)  Discretion was not observed; the communication was disclosed to Coley who forwarded it to Aboelnaga for immediate discussion.

The author's observation that "we are all being set up to fail" proved depressingly prescient.  In an historically strong bull market, Proctor added no significant value to Aletheia's sales efforts, not because Eichler or anyone else at Aletheia got in the way, but because Proctor, as the record indicates, lacked the capacity to deliver what it promised.  But no one at Proctor, not even Coley who sat on Aletheia's board with fiduciary duties to Aletheia, revealed anything to Aletheia about the turmoil within Proctor.  Coley maintained his silence throughout his tenure on the Aletheia board.

---

[6] The Arbitrator notes that this comment is more than a little ironic because, in the end, Coley was among those who were gone less than a year later. .

FINAL AWARD (CORRECTED)

### E.   Coley Conceals Events from Eichler

It is not clear what occurred internally when Coley and Aboelnaga came into possession of the email discussed above, but the record reflects subsequent discord between Coley and Aboelnaga (Ex. 2021) and Coley's dissatisfaction to the point that he was contemplating leaving Proctor in February 2007.  (Ex. 2023.)  At the same time, he wanted his possible departure kept from Eichler who he had pressed for months to partner with Proctor.  In an email exchange with Scalzo in which Coley disclosed that he would either resolve his problems with Proctor or "leave and do something else," it is noteworthy that Coley asked, "On latter I assume Peter knows nothing – correct?"  (*Id.*)  Scalzo replied assuring him that he had not discussed it with Eichler. (*Id.*)  Coley replied that "I assume that if I left he would be really pissed . . . but it would not be my fault."  (*Id.*)  Thus, in February 2007, Coley was already considering leaving Proctor, recognized that his departure from Proctor would be important to Eichler and significant to Aletheia, and wanted (and obtained) assurances that Eichler was unaware of Coley's thinking.

In the meantime, while considering his own career options, Coley, as an Aletheia board member, proposed an alteration to the Aletheia compensation structure at a March 2007 board meeting.  (Ex. 121.)  His proposal, which was adopted and incorporated in a board resolution, contained the following key elements:

- 15% of quarterly management and performance fees would be paid to "key management and marketing personnel directly responsible for its significant growth and increase in its assets";
- Quarterly dividend distributions would be targeted at 20-30%;
- Proctor's compensation under the terms of the Resolution, adjusted for the terms of the Side Letter Agreement would "effectively be 12% of all said management fees and commissions" as long as it was a 10% shareholder.

(*Id.*)  In addition, Coley negotiated an amended and restated Selling Agreement that was executed on or about April 1, 2007, (Ex. 373), and in late April was introducing

FINAL AWARD (CORRECTED)

1   Eichler to new salespeople who were hired to pursue institutional clients.  (Ex. 1011.)[7]

2   There is no indication that, in any of these discussions, he disclosed any information

3   regarding Proctor's business challenges.

4        The foregoing evidence thoroughly undermines the Trustee's contention that

5   Eichler took steps to subvert Proctor's sales efforts before the ink was dry on the

6   agreements and had never intended to honor Proctor's rights as a minority

7   shareholder.  See CB, at 8; Ex. 574.[8]   The record reflects that Eichler wasn't even

8   interested in a deal at all except for Proctor's capability of adding sales capacity.  It

9   was only after Scalzo told Coley to soft pedal the equity purchase and emphasize

10   Proctor's marketing skills that Proctor gained any traction with Eichler.  Once the deal

11   was done, Coley's active participation in the board meetings, his focus on

12   compensation issues, his negotiation of an amended selling agreement,  and his

13   documented communication with Eichler on performance matters plainly demonstrate

14   that Eichler viewed Proctor as part of the team.  During this entire period Coley, who

15   sat on Aletheia's board and had a direct line to Eichler, gave no  contemporaneous

16   indication of any dissatisfaction with Eichler or Aletheia.  If Coley was unhappy with

17   anything, it was with Proctor's internal turmoil and its impact on him and his team's

18

19   [7] The Trustee concedes that payments were made to Proctor pursuant to the amended agreement.

20   CB, at 8:22-24, citing Ex. 1258.
    [8] The Trustee relies on Peikin (RT 156-164), and Exhibits 88, 133, 134, 1249, as evidence that

21   Proctor's efforts were subverted.  CB, at 9:7-11.  A close reading proves otherwise.  As discussed
    throughout this Section III, the documentary record simply does not support Peikin's current version

22   of events.  If Eichler truly prevented Proctor from selling Aletheia's products, it is inconceivable that
    his effort would not be reflected in the contemporaneous documentary record.  But the exhibits cited

23   by the Trustee show the absence of any real evidence that Proctor's failures could properly be
    blamed on Eichler.  Exhibit 88 is an internal O'Melveny document regarding a conflict check;

24   Exhibit 133 is a routine request for information directed to Peikin (not Eichler) and Exhibit 134
    reflects a conversation that Eichler and Coley about issues unrelated to marketing.  Exhibit 1249 is

25   an email to Eichler from his then-counsel (Selvin) prepared in response to a request for advice *after*

26   Proctor's failures had become apparent.  None of the documents support the argument that Eichler
    sought to subvert Proctor's ability to sell Aletheia's products.  The Arbitrator has independently

27   reviewed the record, including the excerpts of the Trustee's deposition testimony,  in search of
    evidence that would support the contention that Eichler caused Proctor to fail.  If there is such

28   evidence, it is not in this record.

FINAL AWARD (CORRECTED)

performance.  But on those topics, which impacted Aletheia's business interests, Coley remained mum.

### F.   Coley Resigns and Sales Efforts Cease

#### 1.   *The Resignation*

Coley's situation never improved, and by early September 2007, the die was cast on his resignation.  Coley wrote to Greg Meredith, his upstream superior, insisting that Meredith prepare a "transition plan" to effectuate Coley's resignation, and indicating the need to develop a strategy for meeting with Aletheia to deal with the independent director issue.  (Ex. 2025.)  It is apparent from the email that the parties had met earlier that week and that Coley's resignation had been in the works for some time.

Rumors of serious problems were circulating within Proctor but were not known to Eichler and Aletheia.  On September 15, John Crittenden, VP of Intermediate Marketing at Proctor, wrote to Aboelnaga asking for candid insight into the status of both the firm and his position within the firm, including the status of his equity award.  (Ex. 2035.)  Aboelnaga wrote back the next day saying "[n]othing has changed with respect to Proctor IM's funding through year end" and that the equity program documents were awaiting board approval.  (*Id.*)[9]

While Aboelnaga sought to put Crittenden off the scent by reassuring him that all was well, to her superiors she expressed serious concern over Proctor's status.  In an email sent just four days after she told Crittenden that his worries were overblown, she wrote to Greg Meredith and Collette Rabbat at Proctor NBF Capital Partners expressing her concern "that our ability to dictate the direction and timing of events at

---

[9]This communication was not shared with anyone at Aletheia in September 2007.  It came to light when Crittenden forwarded the email exchange to Peikin in January 2008 with this comment:

> This e-mail chain is from mid-September.  In the 60 days that follow this e-mail, ***Jim Coley, Rob Rosner, me, Tony Kinsley etc. all gone and told the firm no longer had enough money to support the positions.***

(Ex. 2035.) (Emphasis added.)

FINAL AWARD (CORRECTED)

Proctor IM is quickly diminishing." (Ex. 2026.) She acknowledged that "[e]veryone at the firm is now aware that Jim [Coley] is leaving" and warned that "[p]eople are completely distracted from business out of fear/assumption that the firm is being shut down." (*Id.*) She also worried that they would not be able to keep the information from their partners and the public: "Given the real potential for leaks, I am concerned that our internal issues may soon hit industry rags to the detriment of our value, our managers ***and more specifically our impending conversation with Peter Eichler as [redacted.]***" (*Id.*) (Emphasis added; redaction indicated in original exhibit.) As if the immediate concerns were not enough to grapple with, she concluded the email with the following:

> Of course, there remain far broader, strategic and budgetary issues we need to discuss, but I want to reiterate our need to move forward quickly on the above points in order to maximize the value of our investments, reputations and relationships.

(*Id.*) Thus, as of late September 2007, Aboelnaga clearly understood that the disarray at Proctor would be a serious concern to Eichler but did nothing at that point to inform him regarding these significant internal events. Thus, Aletheia was still uninformed that Proctor was in turmoil and that its future was in doubt.

### 2.   *Proctor's Sales Effort Collapses*

Without such information, Aletheia was left with only the substantial circumstantial evidence that something was amiss – primarily Proctor's failure to show meaningful results as Aletheia's marketing partner. The documentary evidence shows that, by September 2007, Proctor hadn't made good on its promise to add significant value to Aletheia's sales effort in the form of substantial increases in AUM. Thus, while Proctor provided monthly reports of its purported sales efforts through the middle of the year, (e.g., Exs. 1015 -17), those efforts yielded relatively few sales. In July, Proctor reported total sales of $123.5 million only $9.5 million of which had closed. (Exs. 122, 1277, 2077.) $56 million in sales had been scheduled to

FINAL AWARD (CORRECTED)

close before July but hadn't, and the remainder was projected to close on or before

August 16, 2007.  Assuming all sales eventually closed, it would have meant that, of

the $5.7 billion in AUM increase in 2007, Proctor's sales accounted for only slightly

more than 2% of the increase.

Even the Trustee has not argued, let alone presented evidence, that Proctor

made significant sales prior to Aletheia's termination of the relationship.  In his

motion requesting court approval of his settlement of the Proctor claim, the Trustee

conceded that Proctor's sales efforts were disappointing but then immediately pivoted

to blame Proctor's failures on Eichler.  (Ex. 574, at 6.)  The evidence presents a

different picture, however, revealing an unstable, rudderless firm that was unable to

mount a credible sales effort even in an historically strong bull market.  Indeed, from

mid-2007 on and particularly after August 2007, Proctor made few if any sales

because its sales efforts had nearly ceased.  (E.g., Ex. 224, at 3-4.)   This evidence

indicates that Proctor's cessation of work on Aletheia's behalf coincided with Coley's

resignation and the termination of other sales personnel.  That conclusion is

corroborated by Crittenden's email to Peikin, described in footnote 9 above, where he

reported that he was told that Coley and other sales personnel were let go because "the

firm no longer had enough money to support the positions."  (Ex. 2035; see also Ex.

50, Selvin letter noting the inadequacy of Proctor's sales staff and the departure of

five of the original eight staff members.)

The truth began to emerge in October 2007 when Coley's resignation became

public knowledge.  On October 16, 2007, Coley emailed Eichler and Peikin:

> As you are probably aware, today was my last day at Proctor
> IM. ***I wanted to personally thank the both of you for the
> opportunity to work with you and your team.  I thoroughly
> enjoyed it.***

(Ex. 2497.) (Emphasis added.)  A month later, he formally resigned from his position

on the board of directors.  (Ex. 2496.)  Notably absent from either of these documents,

FINAL AWARD (CORRECTED)

both written during a period when Proctor was doing nothing to market Aletheia's products, is any hint of the advocate's portrait later painted first by Proctor and then by the Trustee -- that Aletheia and Eichler were difficult to work with, had attempted to subvert Proctor's sales efforts, deprived Proctor of necessary information, or were otherwise responsible for Proctor's failures.

## G.   **The Proctor Dispute**

Once the problems at Proctor became apparent, it was only a matter of time before the parties, who just a year earlier signed up to be marketing partners, became adversaries.

### 1.   *Aletheia's Termination of the Selling Agreement*

Within a week of Coley's resignation from the Aletheia board, Greg Meredith, writing in his capacity as a member of Proctor's board, nominated Aboelnaga to replace Coley as an independent director on the Aletheia board.  (Ex. 2028.)  At that point, having reason to question Proctor's candor and Aboelnaga's trustworthiness, Eichler and Peikin retained Loeb and sought legal advice.  (E.g., Exs. 2159, 2162.) The initial discussions involved Eichler and Peikin's desire to terminate the agreement with Proctor, (*id.*), and resulted in Aletheia giving notice on December 3, 2007, that Proctor was in breach of the selling agreement.  (Ex. 50.)  On Proctor's behalf, Schulte Roth responded in a letter contesting the claims made by Selvin, but not proposing any specific action on Proctor's part.  (Ex. 94.)  Accordingly, on December 18, 2007, Aletheia gave notice that because the breaches had not been cured within the period provided by contract, it was exercising its right under the contract to terminate the Selling Agreement.  (Ex. 51.)  Proctor's counsel took the position that the termination was ineffective.  (Ex. 96.)  Aletheia disagreed but provided a second notice on January 4, 2008, in which it included additional facts in support of the termination.  (See Ex. 97 (commenting on collapse of sales staff that is down to two with one of them having a foot out the door.))  Proctor took no action in response other than to contest Aletheia's contentions.  (Ex. 99.)  The dispute was underway.

FINAL AWARD (CORRECTED)

In the meantime, Aletheia ended the year having increased AUM from approximately $3.2 billion to $8.9 billion.  (Ex. 1285.)  Of the $5.7 billion increase, Proctor's vaunted sales force made a minimal contribution.  (Ex. 1277.)  Thereafter, Proctor did nothing to sell Aletheia's products.

### 2.    *Aletheia Receives Additional Information*

After the battle lines had become clearly established, Peikin received an email from John Crittenden, a former Proctor salesman, apparently in response to Peikin's request for information about Proctor.  Crittenden identified Rob Rosner as someone who could provide information and asserted that "Rob and I were the only channel that raised any AUM for any of Proctors [sic] partners."  (Ex. 2030.)  By way of background, he observed:

> Rob had been with the 'Jim and Mona' show for nearly five years and has seen the entire program.  He was a shareholder in Proctor's predecessor Overture Securities and was in at the beginning of Proctor.  ***He shares my experience of being over promised and under delivered on a whole host of Proctor issues.***

(*Id.*) (Emphasis added.)

Scalzo also weighed in during early February 2008 in a letter to Greg Meredith in which Scalzo relinquished any rights he had in Proctor's return on its agreements with Aletheia.  (Ex. 2043.)  As the person who introduced Proctor to Aletheia and pressed Eichler to find a marketing partner, Scalzo expressed dismay at Proctor's performance:

> Since the transaction was concluded in late 2006, Proctor has been a disappointment – continuous employee turnover and instability (culminating in the recent departure of its CEO and founder, Jim Coley) and an inability to deliver AUM during a period of continued investment out performance (even as Aletheia added billions with its own home grown, "rookie" sales force.)  In my view, without getting into the "why" of it all, Aletheia lived up to its end of the bargain (delivering

FINAL AWARD (CORRECTED)

1   exceptional investment performance) and Proctor did not (no
2   AUM).  The results, or lack thereof, speak for themselves.

3   (*Id.*)  He expressed hope that the parties could resolve the dispute amicably.  (*Id.*)
4   Instead, the parties each threatened litigation.

5   **H.    2008-09:  Hostilities Do Not Abate and New Threats Appear**

6   *1.    The Proctor Dispute Confounds Efforts to Settle*

7   By January 2008, Selvin had delivered a revised and expanded notice of default
8   to Proctor (Ex. 94.) and had drafted a complaint alleging several causes of action
9   including breach of contract, fraud, breach of fiduciary duty, and rescission.  (Ex.
10  511.)  It was early in January that Proctor's counsel first fronted the "it was Aletheia's
11  fault" rationale for the failure of Proctor's sales force, which became a recurring
12  theme in the litigation and in the Trustee's version of events.  (Exs. 99; 574.)  From
13  that point, the parties' relationship became increasingly acrimonious as they sought
14  but failed to settle their dispute.

15  Over the next two years, while Loeb and Selvin were representing Aletheia, the
16  record shows no discord between Eichler and Peikin and reflects that they were in
17  lock step in dealing with Proctor.  At their direction, Selvin, who jointly represented
18  Aletheia, Eichler and Peikin, continued to investigate and advise Aletheia (primarily
19  through Peikin) on potential claims and possible settlement issues while engaging
20  with Proctor's counsel on issues of breach, misrepresentation and termination. (E.g.,
21  Exs. 53, 98, 99, 404, 1020, 1021, 2040.)  In the meantime, in late January 2008,
22  Proctor fired the first shot by filing suit against Aletheia in New York Supreme Court.
23  (Ex. 2041.)   To avoid full blown litigation, the parties entered into a standstill
24  agreement, which included dismissal of the New York lawsuit and an agreement to
25  obtain a third-party firm to prepare a valuation of Aletheia stock as a prelude to
26  discussions on a business resolution of the dispute.  (Ex, 1023.)

27  Between January and June 2008, there was substantial back and forth between
28  the parties attempting to establish a framework for settlement.  (Exs. 1025, 2176,

FINAL AWARD (CORRECTED)

2206.)  However, in response to Proctor's proposed resolution that would have involved Aletheia buying back half of Proctor's shares for $20 million and a continued relationship with Aletheia, Peikin notified Selvin that the proposal was unacceptable.  (Ex. 2206.)  Negotiations continued throughout the rest of the year without a resolution of hostilities.  (Ex. 1256.)

In the meantime, Peikin continued to work with Selvin in his efforts to negotiate a resolution.  (E.g., Ex. 2048.)  The Proctor negotiations stalled in July 2009 when the parties became embroiled in a dispute over whether Selvin had provided certain financial information that Proctor had demanded.  (Exs. 1028-30.)   When those negotiations appeared to be going nowhere, Selvin sent a draft declaratory relief complaint to Peikin asking for permission to file it.  (Ex. 2304.)  It was filed on July 21, but apparently not served and may have been withdrawn as there is no indication in the record that Proctor reacted in any way to the filing. (Compare Ex. 1032 with Ex. 3.)  Throughout 2009, the parties continued to spar over the exchange of financial information.  (E.g., Ex. 2185.)

## 2.    *The Boskovich Litigation*

The Proctor dispute was a problem, but Aletheia's legal situation was becoming much more complicated.  In September 2008, Joseph Boskovich, a former Aletheia salesman, sued Aletheia, Eichler and Peikin for wrongful termination alleging a pretextual termination to deprive him of the fair market value of his Aletheia stock.  (Ex. 337, Para. 16.)  Aletheia counterclaimed against Boskovich and several other former employees for theft of trade secrets that were being used in Boskovich's competing asset management business.  (*Id.*)  Loeb jointly represented Aletheia, Eichler and Peikin in this lawsuit.  (*Id.*, see also Ex  2047.)

## 3.    *The SEC Investigation*

As the Boskovich litigation was gearing up, Aletheia received another blow in February 2009 when the SEC commenced an investigation into Aletheia, Eichler and Peikin.  (Ex. 337, Para. 6; see also Ex. 660.)  The SEC sought to determine whether

FINAL AWARD (CORRECTED)

Aletheia, Eichler and Peikin had violated the Investment Advisors Act.  (*Id.*)  During the early stages of that investigation, Loeb represented all three targets.  (*Id.*)

### 4.    O'Melveny's Engagements

O'Melveny first became involved in Aletheia's affairs in November 2009 when it undertook the representation of Eichler in the SEC investigation only, and not in any other matters.  (Exs. 64; 337, Para. 7.)  Because of a possible conflict between Eichler and Peikin involving a Chinese currency transaction, (See Exs. 54, Para.20 (Peikin's allegations re: dispute with Eichler); 3003 (referencing Chinese Yuan transaction) they retained separate counsel.  Peikin  retained Robert Friese of the Shartsis Friese law firm, who represented him from 2009 through mid-2011.  (E.g.,  Exs. 165; 337, Para. 7; 1041.)

Once O'Melveny became involved on Eichler's behalf, O'Melveny and Eichler coordinated with Friese and Peikin regarding responses to the SEC.  (E.g., Ex. 3003.)  From late 2009 into 2010, Aronson and Friese were in regular contact regarding the SEC investigation.  (Ex. 337, Para. 9; see also Ex. 3002.)  In early 2010, O'Melveny's role expanded to include the representation of Aletheia, Patricia Barnes and other high-level management personnel.  (Ex. 66 & 67.)  That representation, discussed in greater detail below, involved all aspects of the SEC investigation including issues of regulatory compliance and self-governance.  (*Id.*)

In the meantime, settlement negotiations had broken down in the Proctor litigation, and on February 4, 2010, Loeb (not O'Melveny) initiated litigation against Proctor by filing a declaratory relief action in Los Angeles County Superior Court.  (Ex. 3.)  The declaratory relief action was intended by Selvin to "get a foothold in California."  (Selvin Depo., 57:13.)  Proctor countered with a vengeance by filing a lengthy complaint against Aletheia in New York Supreme Court alleging breach of various contractual agreements and naming Peikin and Eichler as defendants in a breach of fiduciary duty claim.  (Ex. 4.)  The dueling complaints put the issue of

FINAL AWARD (CORRECTED)

1   venue front and center, and O'Melveny was asked to undertake Aletheia and Eichler's

2   representation in the Proctor litigation.

3       This lengthy factual recitation brings the matter to the time period when the

4   Trustee claims that O'Melveny engaged in acts of malpractice and conduct that

5   allegedly breached its fiduciary duty to Aletheia.  Additional facts will be discussed in

6   connection with the legal analysis.

## IV.

## DISCUSSION AND ANALYSIS

With respect to the Proctor litigation, which is central to his claims, the Trustee attacks O'Melveny's investigation into the facts and law in the preparation of the amended complaint asserting fraud, rescission and other claims against Proctor.

### A.   **Malpractice**

Legal malpractice is a species of professional negligence.  "In civil malpractice cases, the elements of a cause of action for professional negligence are: (1) the duty of the attorney to use such skill, prudence and diligence as members of the profession commonly possess; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage."  *Blanks v. Seyfarth Shaw LLP,* 171 Cal.App.4th 336, 356-57 (2009) (citations omitted.)  Plaintiff bears the burden of proof, which requires persuasive evidence that "the plaintiff would have obtained a more favorable judgement or settlement" in the action where the malpractice occurred.  *Id.*, at 357; see also Section IV.C. below.

To meet his burden, a plaintiff must ordinarily establish an attorney's negligence through a standard of care expert.  *E.g., Dawson v. Toledano,* 109 Cal.App.4th 387, 397 (2003); *Greenberg Traurig, LLP v. Gale Corp.*, 2009 WL 2390533, at *4 (E.D. Cal. Aug. 4, 2009); see also CACI, Instruction No. 600.  Here the Trustee did not present a standard of care expert and relies on *Stanley v. Richmond,* 35 Cal.App.4th 1070, 1093 (1995), apparently for the proposition that

FINAL AWARD (CORRECTED)

1  egregious examples of negligence do not require an expert.  *See also Greenberg*

2  *Traurig*, 2009 WL 2390533, at *4 (negligence must be "so clear that a trier of fact

3  may find professional negligence unassisted by expert testimony").  Recent cases have

4  refused to expand *Stanley's* holding, some preferring to view it as limited to situations

5  where there was a complete abdication of an obvious obligation.  *Rickey v. Lally,* 2014

6  WL 7336347, at *2 (Cal.App.Ct., Dec. 23, 2014) (failure to conduct research on

7  central issue).  This case hardly presents such a situation, which even the Trustee

8  conceded in his discovery responses.  (See Ex. 2328, at 7, claiming discovery request

9  is premature because "the duty of care, and perhaps the duty of loyalty, and the duty

10  of competence, will require expert testimony . . . .")

11  In these circumstances, the Trustee's failure to call a standard of care expert is

12  dispositive.  Nevertheless, a detailed malpractice analysis is set forth in the sections

13  and follow.  The failure to call a standard of care expert is discussed in more detail in

14  Section IV.C. below which addresses the Trustee's failure to prove causation.

15  ### 1.      *The Conflict Check*

16  The Trustee contends that O'Melveny's wrongdoing began with its conflict

17  check, CB, at 25-27, and that the handling of the check establishes that "the conflicted

18  representation was willful, not inadvertent."  CB, at 25.  The Trustee points

19  specifically to Olson, who prepared the conflict forms, and argues that he did so

20  incorrectly.  (Exs. 101;107.)  In the present context, this argument is beside the point.

21  Whether or not the conflict check was properly run is not the issue.  This is not a case

22  where the alleged conflict arose because of a failure to identify a prior representation

23  or client.  Here there was no doubt at any time about who O'Melveny was

24  representing in the Proctor litigation or the nature of their relationships.  The question

25  for decision here is whether O'Melveny correctly conducted a conflicts analysis –

26  whether there was a conflict of interest in the joint representation of Aletheia and

27  Eichler in 2010, or in the addition of Barnes and Lee later in the California litigation.

28

FINAL AWARD (CORRECTED)

The analysis was performed by Aronson who was the partner in charge of the representation (Ex. 107) and who was clearly aware of the identity of the possibly conflicted parties and the allegations made against them.  (RT 717:20-721:16; see also RT 2681:11-2682:12.)  Because Aronson knew the names and relationships that needed to be considered in conducting his conflict analysis, the manner in which the conflict forms were filled out is not a critical issue.  (See RT 2683:17-2684:10.)  The Arbitrator concludes that no further analysis is required regarding O'Melveny's internal conflict policies and procedures.[10]

### 2.    O'Melveny's Investigation and Preparation of the First Amended Complaint Met Legal Standards

The Trustee contends that O'Melveny's factual and legal investigation into the Proctor dispute was deficient and resulted in the filing of an amended complaint that did not meet Rule 11 pleading standards.  CB, at 27-30.[11]  The Trustee argues that Aletheia ignored those requirements in order to prepare a first amended complaint that benefitted Eichler, but not Aletheia, by defeating the compensation limits of the Side Letter Agreement.  *Id.*, at 27.  O'Melveny's alleged headlong rush into what the Trustee describes as a provocative but unsupportable lawsuit was, according to the Trustee, motivated by O'Melveny's desire to enrich itself at Aletheia's expense by serving only Eichler's interests. *Id.*, at 6.  The argument lacks both legal and factual support.

---

[10] The Trustee's citation to Exhibit 332, Para. 9 in which an O'Melveny lawyer, Matt Close, suggests that more should have been done regarding joint representation, is misleading.  CB, at 26:14.  The comment is made in the context of Peikin's motion to disqualify O'Melveny in the Proctor litigation, **which was denied.**  It appears that Close is lamenting the fact that O'Melveny agreed to represent Peikin (at Peikin's request) after seeing indications that Peikin's personal relationship with Eichler was deteriorating. It says nothing about Aronson's conflict analysis with respect to Aletheia and Eichler.

[11] See also CB, at 2:20 (failure to give advice regarding "potential negative impact of filing a meritless fraud complaint"); CB, at 4:7-9 ("using Aletheia as a cudgel in Eichler's fight with Proctor by causing Aletheia to file a meritless fraud claim against Proctor, which sought a frivolous remedy of 'partial rescission' . . . which caused a conflagration of the Proctor Litigation.")

FINAL AWARD (CORRECTED)

a.   <u>The Legal Standard</u>

An attorney signing a complaint must certify that the claims are warranted by existing law or a nonfrivolous argument for extending or modifying existing law or establishing new law and that the factual contentions have factual support or will likely have such support after a reasonable opportunity for investigation and discovery.  Fed.R.Civ.P., Rule 11(b).  Where a complaint is the primary focus,  the responsible tribunal "must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually 'baseless' from an objective perspective, and (2) whether the attorney has conducted 'a reasonable and competent inquiry' before signing and filing it."  *Christian v. Mattel, Inc.,* 286 F.3d 1118, 1127 (9th Cir. 2002).

Whether a pleading meets the Rule 11 test is not to be determined by the ultimate success of the claims.  The notes to the 1983 Amendment state:

> The rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories. The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted. Thus, what constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper; whether the pleading, motion, or other paper was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar.

This concept was reiterated in comments to the 1993 Amendments to the rule:

> The certification is that there is (or likely will be) "evidentiary support" for the allegation, not that the party will prevail with respect to its contention regarding the fact. That summary judgment is rendered against a party does not necessarily mean, for purposes of this certification, that it had no evidentiary support for its position. On the other

34

1
2
3

> hand, if a party has evidence with respect to a contention
> that would suffice to defeat a motion for summary judgment
> based thereon, it would have sufficient "evidentiary support"
> for purposes of Rule 11.

4

5   Succinctly stated, the standard for determining whether a pleading is well grounded in

6   fact and law "is 'reasonableness under the circumstances.' The Court should not

7   indulge in hindsight but should test the signor's conduct 'by inquiring what was

8   reasonable to believe at the time the pleading' was submitted." *Hillsborough County*

9   *v. A & E Road Oiling Service, Inc.*, 160 F.R.D. 655, 659 (M.D.Fla. 1995).

10      Application of these principals establishes that O'Melveny met its obligations

11   under this rule, or any other good faith requirement that might apply.

12              b.      The Loeb Draft and Selvin's Comments

13   `       The Trustee leads his attack on O'Melveny's work by referencing Selvin's

14   alleged rejection of Aletheia's claims against Proctor.  CB, at 27:14-21.  A closer look

15   shows why: (1) nothing in the Loeb file "indicated there was no viable fraud claim

16   against Proctor"; and (2) there is good reason to question Selvin's 2018 version of the

17   events of 2008 to 2010.

18      Starting first with Selvin's deposition testimony, there is no doubt that Selvin,

19   who lost the representation of Aletheia and Eichler to O'Melveny, characterized the

20   "more elaborate" version of his declaratory relief complaint as based on "Peter's wild

21   theories" which, he testified, he needed more time to analyze.  (Selvin Depos., 58:5-

22   6.)  This revised view of the situation surrounding the preparation of the fraud claims

23   does not square with the documentary record of events in 2007 and 2008 after Selvin

24   had been retained to represent Aletheia in its dispute with Proctor.

25      In late 2007 and early 2008, when Proctor's failure to perform became apparent

26   to Aletheia, Selvin was retained as counsel to advise regarding the termination of the

27   relationship.  (E.g., Ex. 1249.)  Selvin worked closely with both Eichler and Peikin in

28   the letter writing campaign between the parties.  (E.g., Ex. 2299 forwarding draft and

FINAL AWARD (CORRECTED)

1  seeking additional information; Ex. 2230 (revisions to letter; 1235 (same).)  The drafts
2  of these letters contain assertions regarding Proctor's fraud and conflict of interest that
3  appeared in a Loeb draft complaint and eventually were included in modified form in
4  O'Melveny's amended complaint.  In none of the email correspondence with his client
5  did Selvin even hint that he questioned those allegations let alone characterize them as
6  a product of Eichler's wild imagination.

7  Rather, after going back and forth for more than a week with Eichler and Peikin
8  refining correspondence directed at Proctor, Selvin delivered the final product to
9  Proctor's counsel.  (Ex. 97.) The letter included a laundry list of complaints regarding
10  Proctor's conduct including: (1) the absence of any sales effort on Aletheia's behalf;
11  (2) Proctor's ownership interest in Avatar and Proctor's resulting conflict of interest;
12  (3) the inability of Proctor to carry out its obligations under the Selling Agreement
13  due to the conflict; and (4) the instructions to Proctor sales personnel not to devote
14  time to promoting Aletheia's products.  (Ex. 97.)  The letter asserted that "Aletheia
15  was induced to offer Proctor Managers an equity investment based upon numerous
16  and repeated representations by Proctor Managers about its capacity, willingness and
17  competency to market and promote Aletheia's investment products.  These
18  representations were evidently false." (*Id*.)  The discussion involving the preparation
19  of this important letter shows a careful lawyer going through multiple iterations of the
20  document before signing off and sending it.  Given the substantial detail of the letter
21  and its serious allegations, it is implausible that Selvin, who in 2018 presents himself
22  as a bulwark against Eichler's impulses, acted as a mere cipher in 2008.

23  In the meantime, on January 11, 2008, Selvin, who was working on a detailed
24  fraud complaint, emailed Eichler and Peikin reporting that he was "making progress
25  on the complaint" and would like some time to meet with them "to fill in some gaps."
26  (Ex. 2164.)  On January 18, 2008, he emailed both a draft fraud complaint indicating
27  "let's try to finalize by early next week."  (Ex. 404.) Nothing in his correspondence
28  with Proctor's counsel or his internal communications with Eichler and Peikin reflect

FINAL AWARD (CORRECTED)

1   any degree of hesitancy or concern regarding the filing of a fraud complaint against

2   Proctor.  But just as Selvin was on the brink of filing suit, Proctor stole a march on

3   Aletheia by filing against Aletheia, Eichler, Peikin and other entities in New York.

4   (Ex. 2041.)  At that point, with proceedings pending in New York, Loeb negotiated a

5   litigation standstill.  (Ex. 2042.)

6           Without more, this evidence of Selvin's conduct before he had lost the Aletheia

7   business shows that he was ready willing and able to draft and file a detailed

8   complaint containing fraud and other tort claims before Proctor beat him to the punch.

9   His 10 years after-the-fact view that the fraud allegations were just "crazy theories"

10  doesn't hold up on this record.  Moreover, Selvin's bias toward his former clients and

11  their new lawyer is obvious as he now attributes the loss of Aletheia's business to

12  Eichler and O'Melveny, and the loss of that business to the termination of his

13  partnership at Loeb.  (See Selvin Depo., at 50-55.)  In short, Selvin's testimony

14  provides no credible evidence to support an argument that O'Melveny failed to

15  conduct a proper investigation into the relevant facts and law underpinning the

16  amended complaint.

17          But even if one assumes that Selvin had reason to question whether Eichler's

18  views of Proctor's motives and conduct was rooted in fact, O'Melveny had an

19  independent obligation to conduct its own investigation and determine what, if any,

20  claims could be brought against Proctor.  O'Melveny fulfilled that obligation.

21                    c.       O'Melveny Conducted a Proper Factual Investigation

22          The Trustee contends that O'Melveny's factual investigation was inadequate

23  essentially because its attorneys relied solely on Eichler and Peikin who were

24  themselves "targets of Proctor's looting allegations."  CB, at 28.  There is no doubt

25  that Aronson spoke at length with both of them, but he did not accept their word

26  without considering all of the other evidence they reviewed.  (RT 860:2-16.)  Rather,

27  the record reflects that the O'Melveny team conducted a comprehensive review of

28  available materials before the amended complaint was filed.

Aronson credibly described the Respondents' thorough factual investigation undertaken before drafting the amended complaint, including reviewing numerous documents and interviewing relevant witnesses. (Tr. at 723:18-724:13.)  This effort included meeting with prior counsel, receiving and reviewing documents from prior counsel, and reviewing client files.  (*Id.*)  Once the Loeb materials had been collected, O'Melveny associate, Robert Silvers, was tasked with preparing a detailed outline of interview topics and questions to be used in conducting witness interviews.  (Ex. 111.)  The outline was sent to Close and Aronson for use in their meetings at Aletheia.  (*Id.*)  Silvers' outline was sufficiently detailed that it became useful throughout the factual investigation.  (Tr. at 728:24-729:9.)

At the initial fact-gathering meeting at Aletheia on March 11, 2010, which lasted roughly six hours, O'Melveny partners Aronson and Matt Close met at length with Peikin, Eichler, Scalzo, Santos, Reyna Chavez and Barnes. (RT at 725:16-726:9; 851:20-24.)  Aronson noted:

> Critical to this was Mark Scalzo.  Scalzo was a senior managing director at Aletheia.  He put his – Proctor in touch with Aletheia.  He was there at the beginning.  A critical witness to have.  He wasn't even at Aletheia at the time . . . . .  But we met extensively with Scalzo, with Arvin Santos and others . . . .

(RT 723:25-724:6; see also 726:20-23 [importance of Scalzo to understanding the negotiations].)[12]

Aronson specifically questioned witnesses regarding Proctor's allegations regarding compensation:

---

[12] The Trustee argued that John Spiegel, Respondents' standard of care expert, "admitted there was no evidence that any such interview took place." CB 6:11-12.  That argument is erroneous.  Spiegel agreed that the interview was not documented in a separate memorandum, but he noted that Aronson testified in detail regarding the fact of the interview, as noted in the text.  Likewise, the very detailed amended complaint and declarations filed in various matters indicate that Scalzo and other material witnesses were interviewed early on.

FINAL AWARD (CORRECTED)

> Q: And those were issues that you were discussing with the various people you identified?
>
> A: Well, just about everyone. We needed to know from the senior people what was going on here, and then from others within Aletheia, okay, get us – you know, get us the document, get us the proof, show us physically the financial records as to how this happened. So, this was a top-to-bottom inquiry that we were making . . . .

(RT 728:22-729:9.) Further specifically with respect to excess compensation (Ex. 111, Topic IV.F.), Aronson testified that the subject was discussed at length with Eichler and Peikin and that he also sought input from Scalzo, Santos and others. (RT 729:24-731:13.) Thus, no topic was off limits, even Proctor's most serious allegation of misconduct directed at Peikin and Eichler.

As with most large law firms, this work was performed with substantial assistance from its associates who conducted document reviews and analysis. (E.g., Mercer Depo., at 27:9-13; 49:19-51:5; Silvers Depo., at 57:2-59:5.) Even the Boskovich file was investigated to determine whether transcripts of witness testimony contained any information potentially relevant to Proctor's claims. (Ex. 2346, at OMM_00031821.) The associate team also conducted substantial legal research into several topics including available causes of action under California law, generally available remedies and specific remedies for breach of fiduciary duty, elements of various causes of action including breach of fiduciary duty, fines available under California Business & Professions Code Sec.17500, and recovery of attorneys' fees, along with issues of venue and personal jurisdiction as O'Melveny contemplated seeking dismissal of the New York action in favor of the California forum. (*Id.*, at OMM_31818- 20.) Thus, O'Melveny's substantial investment of time in pursuing the factual investigation, conducting legal research and drafting the first amended complaint is confirmed in O'Melveny's time records, which reflect that O'Melveny attorneys worked over 250 hours on the Proctor Litigation in March and April 2010,

FINAL AWARD (CORRECTED)

most of which was spent investigating and preparing the first amended complaint. (E.g., Ex. 2346: OMM_00031810 - 00031834.)

To minimize, to the extent possible, the chance that the proposed complaint might contain errors, O'Melveny urged Eichler and Peikin to review it.  (Ex. 2066.) O'Melveny's covering email said:

> Peter & Roger: Please take a hard look at the factual allegations in the draft complaint.  We definitely want (and need) you to tell us if we are missing something – good or bad – or if we have misunderstood something.  ***It is important that we start with an accurate factual foundation.***

(*Id.*) (Emphasis added.)  Peikin admitted that he reviewed the first amended complaint and reported no disagreement or discomfort with anything included in the document. (RT 439:22-440:4.)

When neither Peikin nor Eichler proposed any changes or corrections, O'Melveny, believing it to be accurate in all material respects, filed the first amended complaint the following day.  (Ex. 5.)  However, as O'Melveny continued its due diligence into the documentary record, it found an error: Peikin had indicated that Proctor had made no sales at all, but O'Melveny later discovered documentation showing "that Proctor had made a handful of small sales."  (RT 638:19-639:7.)  The error was voluntarily corrected through the filing of a Second Amended Complaint. (Ex. 376; RT 639:4-6.)

The only expert to testify on the adequacy of this investigation, Respondents' standard of care expert, John Spiegel, reviewed the information regarding O'Melveny's investigation and opined that the factual investigation conducted in this case met the standard of care.  (RT 2094: 7-14.)  That opinion is buttressed by the first amended complaint itself.  (Ex. 5.)  That document is lengthy, fact intensive, and reflects substantial investigation over a relatively short period of time into the Proctor-Aletheia relationship.  And it is consistent with Loeb's findings, which were

FINAL AWARD (CORRECTED)

developed immediately after the relevant events had occurred.  The record therefore refutes any contention that O'Melveny's investigation was inadequate in the circumstances in which it occurred.

       d.    <u>The Trustee Fails to Provide Persuasive Evidence That O'Melveny's Pre-Filing Investigation Was Inadequate</u>

The Trustee's challenge to the adequacy of O'Melveny's work is based on a mistaken view of the record.  Commencing with a citation to Exhibit 111, the Silvers multi-page interview outline, the Trustee compliments Silvers' effort, but asserts that "his diligence was all but ignored."  CB, at 28.  He also argues that Aronson and his team relied solely on interviews with Peikin and Eichler as the basis for the allegations in the first amended complaint.  CB 28-29.  The Trustee's implausible contention -- that Aronson and his team would direct the preparation of the Silvers outline, insist that it be ready for the March 11 all-day meeting at Aletheia, and then spend six hours at Aletheia without using it or interviewing important witnesses like Scalzo, Santos and Barnes – is not supported by logic or the evidentiary record.

For example, the Trustee cites Ex. 1260, an email from Olson to Peikin seeking to set up a meeting between Close and Peikin to discuss the amended complaint.  That document supposedly supports the argument that only Peikin and Eichler were interviewed.  But it is hardly surprising that the meeting at Aletheia was arranged through Peikin, one of the co-founders, and not the employee witnesses.  Likewise, the Trustee relies on Ex. 1173 in support of his claim that O'Melveny undertook a very limited factual investigation.  But Exhibit 1173 includes the following entries:

Close – Prepare for and attend client meeting; emails regarding follow-up litigation strategy;

Olson – Communication with client regarding Proctor facts, strategy and amended complaint;

Aronson – Meeting at client regarding background facts, strategy;

FINAL AWARD (CORRECTED)

1   Silvers – Review  email summary of client meeting; review agreements, work

2   with paralegal to flag Boskovich deposition for references to Proctor.

3   Those entries are completely consistent with and corroborate Aronson's testimony that

4   he and Close met all day at Aletheia conducting interviews and investigating the

5   factual background of the Proctor dispute.  Nothing suggests that they limited their

6   interviews to Eichler and Peikin.  Moreover, the Silvers entry regarding the Boskovich

7   transcripts shows an expansive inquiry into all potentially relevant evidence and belies

8   the contention that the factual investigation was deliberately and inappropriately

9   narrow.

10   Fairly construed, the time entries reflect typical lawyer shorthand for a long days'

11   work.  That they do not recite chapter and verse as to what specific tasks were

12   undertaken, and that they do not contain a list of interviewees, cannot reasonably be

13   interpreted to mean that nothing was done, and no one was interviewed.  Even Eichler

14   and Peikin's names, two witnesses who the Trustee acknowledges were interviewed,

15   don't appear in the time records.

16   But even more indicative of the lack of merit in the Trustee's attack on

17   O'Melveny's work is the use of language out of context to create the misleading

18   impression that not much was done on March 11.  For that purpose, the Trustee claims

19   that the first meeting was superficial because Aronson and Close did not do a "deep

20   dive" at the March 11 meeting.  CB, at 28 citing RT 862-63; Ex. 114.  In fact,

21   Aronson testified only that, at that first meeting, he did not get to every item on

22   Silvers lengthy outline (RT 862:8-13), and Close wrote that the "meeting was a bit

23   hectic" and that "we did not have a chance to do a deep dive ***with everyone on all***

24   ***issues.***"  (Ex. 114.) (Emphasis added.)  The entirety of Close's comment shows that

25   the team worked long and hard, got as deep into the weeds as a one-day meeting

26   would permit, but finished the day with work to be done.  And work was done, as the

27   discussion above indicates.  (See also Ex. 2346.)

28

42

1    As the party bearing the burden of proof, it was the Trustee's obligation to

2  provide persuasive evidence that O'Melveny's conducted an inadequate pre-filing

3  investigation.  But the Trustee called no witnesses, including Scalzo and Santos who

4  were under his control, (Exs. 608, 609), to challenge Aronson's description of the

5  relevant events.  The Trustee's workaround was to infer that Scalzo either hadn't been

6  interviewed or refused to support O'Melveny's investigation based on the content of a

7  declaration filed in Proctor's 709 case seeking to overturn Lee's election to Aletheia's

8  board.  CB, at 28 citing Exs. 2107; 3015.  The Trustee argued that edits to the draft

9  declaration, which deleted a few details not material to that lawsuit, prove that Scalzo

10  was "unwilling to support Eichler's 'wild exaggerations' regarding Proctor's alleged

11  fraud."  *Id.*  However, the Trustee has offered no evidence as to why the changes were

12  made, whether the changes were based on strategic or tactical considerations, or even

13  whether they were made at the suggestion of counsel or Scalzo.  Moreover, the

14  declaration incorporates Scalzo's February 1, 2008 letter, which affirms Scalzo's view

15  that Proctor's failure to deliver increased AUM to Aletheia showed that Proctor had

16  over promised and under delivered.  (*Id.*; see Ex. 2043.)[13]  Not a word in either the

17  draft or final version hints, suggests or supports an inference that Aronson did not

18  interview Scalzo in March 2010.

19    In short, the Trustee presented no persuasive evidence to rebut the testimony of

20  O'Melveny's witnesses or otherwise to support of his claim that O'Melveny's pre-

21  filing investigation was inadequate.

22

23

---

24  [13] The Trustee also cites Exhibit 1090, an email chain, regarding what should be included in Scalzo's
declaration in the 709 litigation.  Silvers and Mercer, who were in that chain, were not present on

25  March 11 when Close and Aronson interviewed Scalzo and others and seem to be unaware of what
Scalzo told Close and Aronson.  Close, who was copied on the emails, intervened in the discussion

26  to say that he wanted to use Scalzo as a witness "because he will make Proctor nervous, ***given all***

27  ***that he knows, even if we use him in a more limited fashion now."***  (*Id.*) (Emphasis added.)  This
comment makes clear that Close, who was present on March 11, already knew what Scalzo could

28  say.  This alone demonstrates that Silvers' and Mercer's comments in Exhibit 1090 do not support
an argument that, as of July 2010, Scalzo had not been interviewed.

FINAL AWARD (CORRECTED)

### 3.   The First Amended Complaint Met the Rule 11 Standard

The Trustee argues that O'Melveny caused Aletheia to pursue claims against Proctor even though O'Melveny knew of Eichler's allegedly improper payments to himself.  CB, at 27.  According to the Trustee, this was done to negate Proctor's rights as a minority shareholder and therefore relieve Eichler of any obligation with respect to the excessive compensation allegations.  *Id.*  The argument ignores that Proctor's failures injured Aletheia and its shareholders by obtaining an equity interest on the pretense of adding value, and then using related contract-based rights as a sword in litigation against Aletheia.[14]  Thus, both Aletheia and Eichler had strategic and tactical reasons for pursuing claims against Proctor.  Moreover, the suggestion that the litigation strategy was designed solely for Eichler's benefit ignores that Aletheia's claims were initially contemplated in 2008, ***before Proctor had made any allegations against Eichler.***  In any event, Prof. Kehr, the Trustee's own ethics expert, testified that the pursuit of a valid claim to achieve a client's tactical or strategic objective is an example of proper vigorous advocacy.  (RT 1583:9-12.)  And Aronson gave a detailed explanation of his strategic thinking at the time, which included the preparation of the amended complaint as part of a settlement strategy.  (RT 722:18-723:12; 751:9-752:17.)  But in the end, motivation is beside the point because the claims met the Rule 11 standard.

---

[14] This was not merely an inference from materials available in March 2010.  Discovery turned up more evidence that Proctor saw Aletheia as an equity target with selling as, at best, a secondary component.  Silvers reported on a review of a critical document on that point:

> What I really like about this document is that on the list of seven bulleted "Investment Opportunities," not one refers to Proctor's upside from earning selling fees.  It's all focused on projections for the return Proctor will get from their equity investment (which, incredibly, they predict to be 108% IRR over five years on "low" (i.e. conservative) estimates).

> Another big selling point for Proctor is that the transaction "can significantly increase the ability of Proctor IM to attract other high quality managers as well as employees and investors for future growth."  This suggests to me that passive equity ownership in Aletheia was enough of a prize for Proctor, and that they didn't feel that making a significant selling effort was a major part of the package for them.

(Ex. 2119.)

FINAL AWARD (CORRECTED)

1    Under Rule 11, once it is established that a party has conducted a "reasonable

2   and competent" inquiry, a hurdle that was cleared in this case, the remaining question

3   is whether the suit is "legally or factually baseless from an objective perspective."

4   *Christian,* 286 F.3d at 1127 (citation omitted.)  Here, based on the Trustee's

5   argument, the arbitrator must assess whether the fraud claim, the Avatar allegations

6   and the pleading of the rescission remedy meet that test.

7    Fraud:  As to fraud, context is particularly important.  Aletheia was a very

8   successful asset management firm that already had nearly $2 billion under

9   management and was not seeking a partner.  (E.g., Exs. 2009; 2070, Paras. 21-22.)

10   Contrary to the Trustee's assertion that the impetus for the deal came from Eichler as

11   a means of "monetizing" some of his Aletheia stock, Eichler was reluctant and needed

12   "to be 'sold' on partnering with anyone" so that anyone trying to make a deal with

13   him had to "send[] a message to Peter – you are confident in your ability to add

14   value."  (Ex. 2009; see generally Sec.III.A.-F., above.)   And when Eichler sought to

15   slow the process down (Ex. 2010), Proctor ratcheted up its pitch, repeatedly touting its

16   ability to substantially enhance Aletheia's sales capacity and diversify its asset base to

17   induce a reluctant Eichler to enter into the deal.  (E.g., Exs. 124; 2009; 2010; 2012.)

18   Proctor's perseverance and its promise of much bigger and better things for Aletheia

19   ultimately won the day resulting in the completion of a deal in November 2006.

20    Proctor's promises proved illusory as it failed to deliver results notwithstanding

21   Aletheia's desirable products and an historically strong bull market.  As Aletheia's

22   counsel, O'Melveny was justified in concluding at the very least that Proctor's failure

23   to deliver on its promises supported an inference that the promises were knowingly

24   false or made in reckless disregard of Proctor's ability to perform.  In sum and

25   substance, that is what the operative complaint alleged.  (Ex. 5, Paras. 31 et seq.; see

26   also Ex. 376.)  Under California law, those claims state a viable fraud theory.  *E.g.,*

27   *Hineseley v. Oakshade Town Center*, 37 Cal.Rptr.3d 364, 367 (2005) (fraud in the

28

FINAL AWARD (CORRECTED)

inducement as a species of fraud); *Lazar v. Superior Court,* 12 Cal.4th 631, 638 (1996) (promise made with no intention of performing).

By bringing this claim, O'Melveny did not and need not promise victory.  As O'Melveny's standard of care expert testified, competent counsel acting within the standard of care are not constrained to bring only those claims certain to win. (RT 2101:12-2103:14.)  This is reflected in the commentary to Rule 11 and the cases cited above that make it plain Rule 11 is not intended to curtail creativity or to allow claims to be tested in 20-20 hindsight.  (See also CACI, Instruction No. 602.)  Rather, the only question is whether there was a good faith belief to pursue the claim at the time of filing, and that standard was met here.

In sum, the record demonstrates that Aletheia and its counsel had reason to believe that it had been tricked into entering into an agreement that it never sought in the first place and that ended up serving only Proctor's purposes.[15]

Avatar:  The operative complaint contained allegations that Proctor had not adequately disclosed the extent of its relationship with a competitor of Aletheia, Avatar, to Aletheia's disadvantage. (E.g., Ex. 5, Para. 36.)  The Trustee argues that O'Melveny had not conducted "basic due diligence" regarding this allegation which created questions regarding the propriety of the fraud allegations.  CB, at 29 citing Ex. 201.

---

[15] The Trustee cites to Ex. 212, an email string, as evidence that O'Melveny's attorneys had no reasonable belief in the fraud allegations.  CB, at 29.  But the email string was written in June 2011, more than a year after the complaint was filed and after some discovery had been completed.  It does not and could not speak to the reasonableness of conduct in April 2010.  Moreover, the author presents a simplistic view of a complex litigation landscape.  Proctor's case was no doubt easier to articulate because Proctor could play the role of mere shareholder, cite to the Side Letter Agreement, and argue "we didn't get that to which we were entitled."  But the superficial comment in Exhibit 212 by a junior lawyer on the team overlooks that Proctor became a shareholder only by aggressively touting its prowess as a top tier marketing organization that would have materially increased Aletheia's billions of dollars in sales.  Had Proctor not made that promise, it wouldn't have been a shareholder in the first place.  So, while it is true that, by assuming the role of nothing more than a disgruntled minority shareholder, Proctor created what on the surface could be described as a simple case against Aletheia, the discussion herein makes clear that there was much more to the dispute.  Exhibit 212 does not change that fact.

46

1   Context, once again, is critical.  Exhibit 201 on which the Trustee relies is an

2   email string in which Close writes to Silvers, Aronson and others:

3           I just stumbled onto the Proctor and Avatar offices.  They
            split a floor with Boies Schiller at 575 Lex.  Both
4           Proctor's and Avatar's names are on the same glass door.
            Should I get a photo?
5

6   (Ex. 201.)  Silvers responds:

7           It would be worth getting.  Part of me does worry,
            though, that if their relationship is that public and
8           obvious the fraud claim looks more like a complete
            failure on our part to conduct basic due diligence.
9

10  (*Id.*)  But it isn't clear why Close's observation would cause any worry at all or why

11  Silvers thought it bore on due diligence in March 2010.

12  The operative complaint specifically alleges that one of the facts not disclosed

13  by Proctor was that it shared office space, personnel and infrastructure with Avatar.

14  (E.g., Ex. 5, Paras. 8, 36.)  So, when Close reported on August 26, 2010, that he

15  stumbled on their shared office space, it was old news.  (*Id.*, Para. 36.)  Moreover, to

16  the extent that Silvers meant that he was worried that the relationship was open and

17  public in 2006 and that O'Melveny should have known that before drafting the

18  complaint, the worry was unfounded.  The record regarding the negotiations leading to

19  the November 3, 2006 agreements indicates that Aletheia's representatives would not

20  have known about Proctor's office arrangements because: (1) all negotiations were

21  conducted in Los Angeles (Ex. 2070, Paras. 24, 26, 27); and (2) Proctor's move to the

22  575 Lexington address mentioned in Exhibit 201 appears to have occurred in 2007.

23  (See Ex. 1277 indicating, below the signature line, a new address at 575 Lexington).

24  What Exhibit 1277 does not show, and what Coley who was a member of the Aletheia

25  board failed to disclose, was that Proctor had begun sharing that space with Avatar

26  and what that meant about Proctor's relationship with Avatar.  Thus, there was no

27  reason to believe that any amount of "due diligence" on O'Melveny's part would have

28  revealed something that Eichler and Peikin did not and could not have known in 2006.

FINAL AWARD (CORRECTED)

What the evidence shows that Eichler and Peikin believed in 2006, and what the amended complaint alleged, was that Proctor had a relationship with Avatar similar to the arrangement it negotiated with Aletheia.  Aletheia received a press release regarding Avatar that described a "strategic investment" into the business in which Proctor would assist Avatar in achieving two business goals – adding "ETF-based portfolio solutions" for Avatar's client base, and solutions aimed at the "defined benefit market."  (Ex. 1002.)  Similarly, in an April 2006 presentation, Proctor described its Avatar role as focusing in the area of exchange traded funds and assisting in expanding opportunities with existing clients.  (E.g., Ex. 129 at OMM_00035326.)

Proctor's descriptions of the Avatar relationship did not reveal either that Avatar was a competitor or Proctor's level of commitment to Avatar.  The Aronson-led investigation established that the Proctor-Avatar relationship was more extensive than had been disclosed to either Eichler or Peikin.  (RT 727:3-9; 855:13-20; 859:25-860:7.)  The record includes documentation from Proctor's predecessor in interest (Overture Asset Management or OAM) that discloses that Proctor had a controlling interest in Avatar and a relationship unlike that portrayed in the materials supplied to Eichler and Peikin.  (Ex. 2006.)  Exhibit 2006 expressly refers to "OAM Avatar LLC" as an affiliate and indicates that "OAM Avatar is currently 100% owned by Overture." (*Id.*)  None of these facts were disclosed in either the January press release (Ex. 1002), or the slide presentation to Eichler in April 2006 (Ex. 129, at OMM_00035326.)  Even Selvin, two years earlier, noted Proctor's failure to disclose these facts to Aletheia. (Ex. 97.)

Thus, O'Melveny's allegations regarding Proctor's undisclosed role in Avatar was warranted by the evidence it developed in March and April 2010.  This evidence further buttressed the fraud allegations discussed above.  This was yet another important fact that was concealed during Proctor's concerted effort to persuade Eichler to convince his shareholders to sell 10% of their holdings to Proctor in a deal

48

that was supposed to dramatically increase Aletheia's AUM and its revenue stream.[16]
The record therefore reflects that O'Melveny had a good faith basis for including the
allegations in the amended complaint.

Rescission: The Trustee saves most of his ammunition for Aletheia's rescission
claim, which he describes as "partial rescission," CB, at 29.  The Trustee contends that
the assertion of this remedy was indicative of O'Melveny's use of "Aletheia as a pawn
in the dispute with Proctor by pursuing claims in Eichler's best interest that were not
in Aletheia's best interests."  CB, at 30.  The Trustee does not explain why rescission
of the Side Letter, which would be consistent with Aletheia's fraud theory and its
desire to defeat Proctor's contract claims, was contrary to Aletheia's interests.  But as
noted above, the propriety of a claim or theory is not determined by counsel's
motivation but rather by its adequacy under the Rule 11 test.

There is no doubt that the Proctor transaction documents created a complex
puzzle that impacted on the analysis of the rescission claim.  The Stock Purchase
agreement was between Proctor and Aletheia's shareholders; the Selling Agreement
and the Side Letter Agreement were between Proctor and Aletheia; and Aletheia had
already terminated the Selling Agreement by early 2008.  Accordingly, O'Melveny
drafted the complaint to seek rescission of the Side Letter Agreement, which would
not require joining the shareholders as parties in the litigation.  Whether this was
achievable was unclear because the three agreements were negotiated as part of a
single overarching transaction.

---

[16] As implied above, as the fourth director on Aletheia's board, Coley owed Aletheia and its
shareholders a fiduciary duty of undivided loyalty.  Although Aletheia and other plaintiffs alleged
breach of fiduciary duty against Proctor, (Ex. 5 (Seventh Cause of Action); Ex. 376 (Fifth Cause of
Action), it did not assert such claims against Coley despite the fact that Coley was well aware of
Proctor's internal problems, no doubt understood the reasons for those problems, and considered and
ultimately did resign because of those problems.  Coley knew or should have known that the
problems that led to his resignation would have been material to Aletheia's management, but he
never once during his tenure as an Aletheia board member disclosed any of that information to
Eichler, Peikin or anyone else at Aletheia.

FINAL AWARD (CORRECTED)

1   The Trustee correctly notes that the rescission remedy was the topic of internal

2   discussions at O'Melveny.  Commenting on a letter from Proctor's counsel, Silvers

3   wrote:

> Harry [Davis of Schulte Roth] raises the very thorny question of how we can claim rescission/voidness of the Side Letter, but not of the underlying stock sale to Proctor.  In other words, if we want to cancel the side letter, don't we have to unwind the entire agreement and give Proctor it's [sic] $16 mm back in return [sic] for a return of the shares?  I know this is an outcome we want to avo*id*.  Perhaps some research into partial rescission is in order.

(Ex. 147.)  To be sure the question was "thorny," but Silvers is describing the issue,

not asserting the impropriety of seeking rescission.  His comment raises the question

of whether rescission of the Side Letter agreement should properly be characterized as

partial rescission and how one should view rescission in a multi-party, multi-

agreement context.  Neither Harry Davis at the time, nor the Trustee who bears the

burden of proof, cited a decision that would preclude rescission of one contract

because it was part of a transaction involving other contracts.

   But the more important and pertinent point here is that O'Melveny investigated

and considered how to deal with this complex issue.  The time records show

substantial work done by O'Melveny attorneys conducting research into plausible

claims and remedies.  (Ex. 2346.)  And Silvers, who authored Exhibit 147, later

emailed Aronson regarding "research on rescission and excuse from performance for

fraud."  (Ex. 148.)  In that follow up email, Silvers opines, "I think we have good

arguments for rescission of just the Side Letter and Selling Agreement . . . ." (*Id.*)  He

noted that the Stock Purchase Agreement had been fully performed, but the "Selling

Agreement and Side Letter, on the other hand, impose continuing obligations." (*Id.*)

This email traffic reflects that O'Melveny's attorneys continued to review and analyze

50

FINAL AWARD (CORRECTED)

1   the question during discovery, which is entirely consistent with their duty to

2   vigorously represent their clients' interests.[17]

3        Finally, to the extent that the Trustee argues that O'Melveny acted improperly

4   because it sought a remedy of partial rescission in violation of California law, the

5   argument is incorrect.  Even if the issue is properly framed as a question of partial

6   rescission, there is authority that a court in equity can impose such a remedy.  *Persson*

7   *v. Smart inventions, Inc.,* 125 Cal.App.4th 1141, 1153-54 (2005), held that courts have

8   equitable power to enforce part of a contract while setting aside unconscionable,

9   illegal or fraudulently procured contractual provisions.  (*Id.*, at 1154.)  This analysis

10  would readily support an argument asking the Court to use its equitable powers to

11  rescind the Side Letter Agreement based on the alleged fraudulent conduct that

12  induced it.  *Persson*'s analysis thus supports an argument that the Selling and Side

13  Letter agreements could be unwound without altering the relationship between the

14  stockholders under the Stock Purchase Agreement.  Viewed in that light, even if the

15  assertion of the rescission remedy in these circumstances is considered an extension of

16  the law, it is "a nonfrivolous argument for extending . . . existing law or for

17  establishing new law."  Fed.R.Civ.P., Rule 11(b)(2). The rescission allegations

18  therefore meet the Rule 11 test.

19

20

21

22

---

23  [17] The Trustee contends that O'Melveny questioned the viability of the rescission remedy a year

24  later, CB, at 29:19 citing Ex. 225, at 3.  That document, which reflects ongoing research and
    analysis, raises the question of whether Aletheia could argue that it was excused from performing

25  under the Side Letter Agreement based on Proctor's failure to meet its obligations under the Selling
    Agreement.  (Ex. 225, at 3.)  O'Melveny targeted this as a matter for further research, but that hardly

26  shows that an assertion of the rescission remedy was inappropriate.  It is well understood that the
    preparation of claims for trial is an iterative process involving an ongoing review of claims and

27  defenses as the factual record is developed through discovery.  Exhibit 225 exemplifies that process,
    which says nothing about the adequacy of O'Melveny's initial investigation or the adequacy of the

28  amended complaint.

FINAL AWARD (CORRECTED)

1
2

### 4.    *O'Melveny Properly Conducted the Defense of Proctor's Claims Against Aletheia and Eichler*

3   Once the amended complaint was filed and then corrected, the litigation

4   proceeded on the usual track.  O'Melveny had much success in many of the

5   skirmishes.

6                    a.    Motion Practice

7   Between March 2010 and December 2011, O'Melveny dealt with a number of

8   law and motion matters with significant success.

9   Venue/Jurisdiction Motions:  Proctor fought to keep the lawsuit in New York

10  and to stay the California action; O'Melveny attempted to keep it venued in

11  California.  On June 10, 2010, Los Angeles Superior Court Judge Lefkowitz ruled in

12  favor of Aletheia and denied the motion to stay.  (Ex. 2081.)  In New York,

13  O'Melveny prevailed on its motion to dismiss the New York action.  (Ex. 2121;

14  2122.)  The case then proceeded in California, which Aletheia viewed as a more

15  favorable forum.

16  Rule 709 Lawsuits:  After Peikin and Eichler became estranged and Peikin left

17  Aletheia in mid-2010, Peikin filed a lawsuit, pursuant to California Corporations Code

18  Sec. 709, challenging the election of Bruce Lee to Aletheia's board.  (Ex. 10.)  That

19  suit was filed on June 30, 2010.  Proctor followed on or about July 6, 2010, with its

20  own suit challenging Lee's election to the board.  (Ex. 9.)  O'Melveny successfully

21  opposed their efforts by obtaining, on August 18,2010, an order from Judge Lefkowitz

22  staying the 709 actions pending the outcome of the Proctor litigation.  (Ex. 2115.)

23  Proctor's Demurrer to First Amended Complaint:  O'Melveny succeeded in

24  defeating Proctor's demurrer to the first amended complaint with the exception only

25  of the third and fourth causes of action (a securities claim and unfair competition).

26  Judge Lefkowitz overruled all other demurrers including claims for constructive fraud

27  and breach of fiduciary duty.  (Ex. 2118.)

28

FINAL AWARD (CORRECTED)

Demurrers to the Second Amended Complaint:  Proctor did not demur to the second amended complaint, but others in its parent organization did.  O'Melveny opposed.  Judge Lefkowitz overruled the demurrers and allowed the fraud claim to go forward against those defendants.  (Ex. 2160.)

Motion to Disqualify:  As the discussion regarding the SEC investigation indicates, Peikin and Eichler became estranged, Peikin left the firm and challenged O'Melveny's representation of Aletheia and Eichler in a motion to disqualify.  On July 18, 2011, Judge Lefkowitz denied the motion.  (Ex. 173.)

Barnes/Lee Demurrer:  This motion is discussed in detail in Section IV.B.4.c. below.

An attorney need not be successful to meet the standard of care, but here O'Melveny had substantial courtroom success.[18]

### b.    Settlement Efforts

In the meantime, on the Proctor litigation front, O'Melveny continued with the usual tasks of managing discovery, conducting further and more detailed investigation into the facts, and conducting further analysis of those facts in light of applicable law.  (E.g., Ex. 148; 2077; 2119; 2123; 2449; 2491.)  At the same time, Aronson recognized that Aletheia would best be served by resolving its dispute with Proctor and began

---

[18] O'Melveny's successes were not limited to courtroom wins in the Proctor litigation.  As noted below, O'Melveny achieved excellent results for Aletheia in dealing with the SEC, Section IV.A. below, and achieved a favorable settlement in the ongoing Boskovich suit with Olson taking the lead.  Olson immediately sat in on a mock jury session that predicted very negative results for Aletheia, Eichler and Peikin.  (Ex.108.)  The situation confronting Olson was challenging: the trial date was looming, and Boskovich had very able counsel who was up to speed on "a big file." (RT 957:25.)  To buy time, Olson succeeded in moving the court to reopen discovery, which resulted in a continuance of the trial date.  (RT 957: 21-958:1.)  At that point, Plaintiffs' counsel approached to discuss settlement; negotiations followed between plaintiffs' counsel and Mr. Olson.  (RT 958.)  The parties agreed to mediate the dispute, which brought Aletheia's insurers into the discussion.  (RT 959-60.)  After several months of intense negotiation, the case settled with the settlement funded primarily with insurance proceeds. (RT 959:9-962:7; Ex. 705.)  Peikin and his counsel actively participated (e.g., Ex. 339, Paras. 5-10), and when Peikin was informed of the resolution, he "was very pleased" with the outcome.  (RT 962:6-7.)

FINAL AWARD (CORRECTED)

exploring settlement.[19]  At the first court appearance after O'Melveny had entered the case, Aronson raised the subject of settlement, and counsel met later that day in Century City.  (Ex. 2081; RT 753:8-754:20.)  Nothing came of that meeting, but later in 2010, Aronson met again with Proctor's counsel in New York.  (RT. 755:16-23; Ex. 2121.)  Proctor's counsel complained that he was not eager to talk because he had attempted to negotiate with Loeb and "got nowhere."  (RT 756:14-16.)  Although Aronson's efforts to re-engage in serious negotiations got no traction at that point, he continued to press Proctor's counsel to work toward a settlement.  At the same time, Aletheia engaged a third party to assist in finding a buyer for Proctor's interest in Aletheia, and Eichler was eager to alert Proctor to those activities.  (Ex. 1287.)

Aronson's efforts finally got a response in December 2010 when he asked for and received a summary of Proctor's counsel's last negotiations with Loeb.  (Ex. 506; RT 775:2-6.)  Aronson sought Aletheia's input on Proctor's summary and sent it to Eichler and Scalzo on December 13.  (Ex. 506.)  Within a month, a term sheet was prepared for delivery to Proctor while Aronson was attempting to slow down the litigation effort to allow settlement discussions to proceed.  (Ex. 2067; RT 777:18-24.)  Scalzo was put out front on the settlement discussions because he was respected by Proctor's representatives, because he understood Proctor's business and the original transaction, and because of concerns that there might be personal animus between Eichler and the Proctor representatives.  (RT 778:9-25.)  But despite Aronson's best efforts, settlement talks failed in early 2011 with Proctor's only counter to Aletheia's

---

[19] The Trustee's ethics expert, Prof. Kehr, testified that no lawyer representing all defendants in the Proctor litigation could have negotiated a settlement with Proctor (RT 1030:16-1031:2), but his assertion assumed the existence of a conflict.  As discussed in the text below, this reflects his incorrect assertion that neither the claims nor the defenses matter in view of the excess compensation allegation.  But in fact, Proctor sought the same contractually based recovery from all defendants – from Aletheia for not paying it, and from the individuals for not ensuring that it was paid.  Thus, there was no logical reason why Aronson could not negotiate a settlement for all defendants whose common interest was in defeating Proctor's claim to compensation pursuant to its contracts with Aletheia.

FINAL AWARD (CORRECTED)

1  proposal being the service of six sets of discovery on the Respondents, (RT 779:19-
2  23), and the service of a cross-complaint that essentially reiterated the claims that had
3  been presented in the New York Complaint.  (Ex. 27.)  Proctor chose to ratchet up the
4  litigation rather than engage in further efforts to compromise.  (RT 779-80.)

5         At that point, given Proctor's response, the record reflects that O'Melveny had
6  no choice but to engage with the opposition.  Even so, Aronson never abandoned
7  settlement as an objective and was searching for the next opportunity to re-engage
8  with Proctor.  (RT 783:8-11.)  By the summer of 2011, Aronson proposed making one
9  last effort to settle, and if that failed, to rethink whether O'Melveny should remain as
10  counsel.  (RT 783:12-18.)

11        The final push occurred in late 2011 when Aronson, Olson, deNeve, and Scalzo
12  met with Proctor's representatives in Los Angeles.  (RT 800:16-801:16.)  After it
13  appeared that the parties were near agreement, Proctor attempted to fold a settlement
14  of Peikin's lawsuit into the deal, "which was the final killer."  (RT 803:20-804:1.)
15  The proposal would have involved the creation of an LLC owned by Proctor and
16  Peikin that would have been entitled to a permanent revenue stream from Aletheia.
17  (Ex. 2215.)  Scalzo, Santos, Laney and Eichler all concluded that the proposal was
18  unacceptable because it made the deal "too rich."  (RT 803:25-804:1)  In response to
19  this view, Aronson advised that an imperfect deal was better than continued litigation
20  and that they should set aside the Peikin concerns and find a way to make it work.
21  (RT 804:8-17.)  But Scalzo, Santos and others were unwilling to do so and could not
22  be persuaded to continue with the negotiations. (RT 803:16-804:1; 804:20-22.)

23        When the case failed to settle, Aronson discussed the costs associated with
24  continuing with O'Melveny as litigation counsel and recommended that Aletheia and
25  Eichler obtain less expensive counsel.  (RT 805: 1-9.)  Aletheia and Eichler accepted
26  the recommendation and continued the lawsuit with Freedman + Taitelman jointly
27  representing them as litigation counsel.  Thus, the record reflects that O'Melveny
28

FINAL AWARD (CORRECTED)

1  withdrew from the representation only because its clients decided that they would

2  continue to pursue their claims with more affordable counsel.

3  **5.     *The Trustee Failed to Prove That O'Melveny Acted Improperly***

4  The wealth of evidence regarding O'Melveny's competent representation of

5  Aletheia and Eichler belies the Trustee's arguments that O'Melveny used Aletheia as

6  a "cudgel" to further Eichler's fight with Proctor, or that its litigation tactics trapped

7  Aletheia in meritless "scorched earth litigation" that destroyed the company.  CB, at

8  2:18; 4:7-9; 5:14-16.)  The preceding discussion demonstrates that O'Melveny

9  effectively represented Aletheia's interests throughout the litigation and repeatedly

10 sought to find a way to settle the dispute.  Nevertheless, the Trustee argues that

11 O'Melveny's narrative should be rejected, and its witnesses should not be believed

12 because their testimony is not corroborated by documents.  CB, at 5:17-23. (Emphasis

13 in original.)  See also CRB, at 7 et seq. ("Claimant's 'Star' Witness Was O'Melveny's

14 Documents, Which Respondents Did Not Refute or Explain Away with Different

15 Documents").

16 The foregoing discussion shows that in fact many documents corroborate the

17 testimony of O'Melveny witnesses and that most of the documents the Trustee cites

18 do not undermine the accuracy or credibility of their testimony.  As to the

19 documentary "star witnesses" referenced in the Trustee's reply, only one, Exhibit 408,

20 has even a plausible connection to O'Melveny's conduct as litigation counsel.  That

21 Exhibit, Eichler's Omnibus Declaration in Aletheia's bankruptcy proceedings,

22 indicates that the Proctor and Peikin lawsuits played a substantial role in undermining

23 the firm's ability to operate profitably.  (Ex. 408, Paras. 7-11.)  But that is hardly

24 news; litigation often drives businesses, even large ones, into bankruptcy.  That fact is

25 not relevant here because O'Melveny met its obligations to its clients; the litigation

26 continued when O'Melveny's clients rejected Aronson's advice that an unsatisfactory

27 settlement was preferable to expensive and uncertain litigation.  (RT 804:8-17.)

28 Counsel cannot be held liable for the parties' preference for mutually assured

FINAL AWARD (CORRECTED)

destruction over rational compromise.  As to the remaining "star documents," they deal with Eichler's net worth, Aletheia's asset growth, the engagement letters, and issues pertaining to Bruce Lee's role as director (discussed in the text below).  They add nothing to the discussion regarding O'Melveny's performance.

Moreover, the Trustee offered no testimony from a standard of care expert to support his arguments regarding O'Melveny's litigation performance.  As noted, Respondents, on the other hand, called John Spiegel to testify on the subject.  Spiegel described his more than 30 years as a litigator handling complex securities and corporate disputes, including claims brought against companies and their officers and directors.  (RT 2045-49; 2056-60; Ex. 2331.)  His background reflects substantial breadth and depth of relevant experience which he brought to bear in his analysis of O'Melveny's conduct in the Proctor litigation.  Spiegel opined that O'Melveny's conduct, commencing with the filing of the amended complaint, readily met the standard of care for a practitioner in the field.  (RT 2093-94.)  He likewise testified that O'Melveny's handling of the venue issue (RT 2096), pursuit of the fraudulent inducement claim.  (RT 2094-96), inclusion of the remedy of rescission (*Id.*), and the general conduct of the litigation throughout (RT 2101-03; 2107-09) readily met the standard of care.  With respect to settlement, Spiegel opined that O'Melveny's settlement efforts on behalf of its clients "reflected more effort and diligence . . . than would be expected for the standard of care in this area."  (RT 2107:12-14.)  The Trustee offered nothing to rebut his testimony.

### 6.    *Conclusion:  O'Melveny's Conduct as Litigation Counsel Met the Standard of Care*

The evidence discussed in the statement of facts, Section III, above, which provides the proper context for analyzing Respondents' performance, demonstrates that: (1) Aletheia had viable defenses to Proctor's claims and valid affirmative claims arising out of Proctor's negotiation and post-negotiation conduct;  (2) O'Melveny effectively pressed those claims and defenses; and (3) O'Melveny aggressively sought

FINAL AWARD (CORRECTED)

an exit strategy, which in hindsight may have saved the business if the parties more clearly appreciated the benefits of a resolution over continued litigation.  As the discussion indicates, even though success isn't required, O'Melveny had significant success in court: it won its motion to dismiss; defeated Proctor's motion to stay; defeated most of Proctor's demurrers; precluded Proctor and Peikin from pressing their 709 claims; and defeated Peikin's motion to disqualify O'Melveny from representing defendants in the Proctor suit.  All of this was done while negotiating with a regulatory agency with the power to terminate Aletheia's very existence while another law firm, Jones Day, was fending off Peikin's wrongful termination lawsuit. The Arbitrator finds that O'Melveny's witnesses, Aronson, Olson and deNeve, all of whom were percipient to some or all of the foregoing events, testified professionally, credibly and persuasively.

Having concluded that the Trustee failed to meet his burden of showing that O'Melveny's representation of Aletheia fell below the standard of care, it is necessary to turn next to the claim that O'Melveny's joint representation of Aletheia and Eichler in the Proctor litigation was infected with a conflict of interest and therefore resulted in a breach of Respondents' fiduciary duty of loyalty to Aletheia.

## **B.    Breach of Fiduciary Duty**

The central focus of the fiduciary duty claim is the Trustee's assertion that Respondents breached their duty of loyalty by jointly representing both Eichler and Aletheia in the Proctor litigation.[20]  The Trustee claims that there was an actual or undisclosed potential conflict of interest based on his principal contention that Proctor was pursuing a claim that was derivative, or derivative in nature, against Aletheia and Eichler.

---

[20] The reference to the joint representation of Aletheia and Eichler will be used throughout as shorthand to include the joint representation of additional defendants when Proctor amended its complaint to add Lee and Barnes as defendants.

FINAL AWARD (CORRECTED)

As discussed below, Proctor's claims were neither derivate nor derivative in nature; they were direct claims that Proctor pursued *against* Aletheia for its own benefit.  None of the many arguments offered by the Trustee, or the testimony of his ethics expert, who claimed that the conflict existed regardless of the nature of the claims, alters the analysis.  The record reflects that, properly applied, California law supports a conclusion that there was neither an actual nor potential conflict in O'Melveny's joint representation of Aletheia and Eichler.

### 1.   *The Legal Framework*

#### a.   The Elements of the Claim

To prove a breach of fiduciary duty, the Trustee must show: (1) the existence of a duty; (2) breach of the duty; and (3) damages proximately caused by the breach. *Stanley v. Richmond,* 35 Cal.App.4th 1070, 1086 (1995).  The existence of a breach is a question of fact the determination of which may be informed by expert testimony. *Id.*  Among an attorney's duties is the duty of loyalty which requires that an attorney devote "his entire energies to his client's interests."  *Flatt v. Superior Court,* 9 Cal.4th 275, 289 (1994).  This duty precludes joint representation of conflicting interests without the informed written consent of the parties.  *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.*, 6 Cal.5th 59, 84 (2018) citing to Rule of Professional Conduct 3-310(c) (member shall not "[a]ccept or continue representation of more than one client in a matter in which the interests of the clients *actually conflict*.")  *Anderson v. Eaton*, 211 Cal. 113, 116 (1930), cited by the Trustee, states the unremarkable proposition that an attorney is barred from undertaking the representation of a client in any circumstance when he cannot devote his entire energies to his client's interests.  *Id.*  Thus, a conflict exists "when a lawyer's duty on behalf of one client *obligates* the lawyer to take action prejudicial to the interests of another client . . . ."  *Coldren v. Hart, King & Coldren, Inc.*, 239 Cal.App. 4th 237, 248 (2015) (emphasis added).  Stated slightly differently, *Spindle v. Chubb Pacific Indem. Grp.*, 89 Cal.App. 3d 706, 713 (1979) explained that a conflict exists when the

FINAL AWARD (CORRECTED)

"common lawyer's representation of one [client] is rendered less effective by reason of his representation of the other." *See also Blue Water Sunset, LLC v. Markowitz,* 192 Cal. App. 4th 477, 489 (2011).

### b.   Determining the Existence of a Conflict

In the litigation context, the question of whether a conflict of interest exists begins with an assessment of the scope of the attorney's obligations which are defined by the agreement between the parties. *E.g.,* *Piscitelli v. Friedenberg,* 97 Cal. App. 4th 953, 983 (2001).  In *Piscitelli* the court noted that the attorney's potential liability for malpractice "depend[ed] on not only the existence of an attorney-client relationship, but also ***the scope of the duties assumed by the lawyer.***"  Id., at 983.  (Emphasis added.) Likewise, in *Nichols v. Keller*, 15 Cal. App. 4th 1672 (1993) the court observed that the existence of a legal duty is fact specific and tied to the engagement. *Id.*, at 1682.  The Court observed that, in the worker's compensation field, where an attorney has been retained to seek recovery for injuries suffered, the relevant scholarly literature describes the attorney's duty to include providing advice on recovery against third parties.  *Id.,* at 1683.  Even so, the Court allowed  that the duty to advise could be circumscribed through limitations in the engagement letter.  *Id.; see also*; *Buehler v. Sbardellati*, 34 Cal.App.4th 1527, 1538-39 (1995) (approving joint representation of multiple clients and noting that attorney may restrict representation through engagement letter); RT 2701:12- 2702:11; RT 2638:11-2639:4.)

This approach is not unique to California.  In *Berggreen v. Gordon*, 1994 WL 700244, at *3 (N.D. Ill, Nov. 29, 1994) the court stated:

> By accepting employment to render legal services, the attorney impliedly agrees to use ordinary judgment, care, skill, and diligence in the performance of the legal tasks he undertakes. *See Nichols,* 19 Cal.Rptr. at 607. But the scope of legal tasks undertaken is not unlimited; a particular attorney-client relationship is always the creature of some form of contract. *Fox v. Pollack,* 226 Cal.Rptr. 532, 534

FINAL AWARD (CORRECTED)

1  (Cal.App. (1986.)  As a result, the professional duty
2  imposed on an attorney in a given factual situation is a
3  function of the employment contract between the attorney
   and the client.

4  *Id.,* at *3.

5  These cases establish the unsurprising rule that, in a relationship created by

6  contract, the parties are free to negotiate the scope of counsel's undertaking.  The

7  agreement and its scope, therefore, are essential components in determining counsel's

8  obligations to her client.  Accordingly, the first step in analyzing whether an actual

9  conflict existed is to review the engagement letters.

10            **2.      *The Engagement Letters***

11  The initial Retainer Agreement relevant to this inquiry was executed on January

12  26, 2010, and provided that O'Melveny would represent Aletheia and several officers,

13  directors and employees in connection with an investigation conducted by the SEC.

14  (Ex. 67, at 1.)  It further indicated that "[t]he Subject Matter also includes advising the

15  Company on compliance with the federal securities laws and regulations and the rules

16  of the self-regulatory organization to which the Company is a member." (*Id.*)  The

17  letter made it clear that the representation did not extend beyond the subject matter

18  identified in its opening paragraph, and went on to explain:

19            Any substantial expansion of our representation should be
20            evidenced by a written mutual understanding.  Unless
21            otherwise agreed in writing, the terms of this letter
22            agreement and the Terms will also apply to any additional
23            matters we agree to handle on the Company's or an
            individual's behalf.

24  (*Id.*, at 2.)  The retainer agreement further described the risks associated with joint

25  representation of clients and warned of the possibility that conflicts of interest could

26  arise although none had been identified.

27

28

FINAL AWARD (CORRECTED)

On April 13, 2010, O'Melveny expanded its representation and undertook the representation of Aletheia and Eichler in the following matters (collectively, the "Litigation matters"):

> 1. *Joseph M. Boskovich v. Aletheia Research & Management, Inc.*, Case No. BC398381 . . . .; and
> 2. *Aletheia Research & Management, Inc. v. Proctor Investment Managers, LLC*, et al., Case No. SC106700, filed in the Los Angeles Superior Court and any related litigation, including *Proctor Investment Managers, LLC, et al. v. Aletheia Research & Management, Inc.,* Case No. 10600397, filed in the New York Supreme Court (the "Proctor Litigation").

(Ex. 109, at 1-2.)  The April engagement letter "supplemented the engagement letter of January 26, 2010 [Ex. 67] including the standard Terms of engagement."  (Ex. 109, at 1.)

The scope of the agreements is not reasonably in dispute; they stated, in plain and unambiguous language:

> Our representation of you relates only to the Subject Matter. We have not been asked to represent the Company or the Individuals in other legal matters at this time, and our representation as to any matters not specified will be subject to resolution of any further conflict issues that may arise and our acceptance in writing at the time of a request from you for a particular undertaking.

(Ex. 67; see Ex. 109 adding the Proctor Litigation to the "Subject Matter" of the representation; see also Exs. 138, 164.)

The terms of the agreements therefore: (1) narrowly circumscribed the scope of work being undertaken; (2) did not include any undertaking to provide either general corporate or general litigation advice; and (3) mandated that any expansion of the O'Melveny's duties and obligations to any of the clients would require an additional written agreement and further conflicts analysis.  Accordingly, since the engagement expressly involved O'Melveny's obligation to represent joint clients in the Proctor

FINAL AWARD (CORRECTED)

litigation, the issue presented here is whether the clients' interests in that case were aligned or adverse. That requires a fact-specific inquiry that considers the circumstances of the particular case. *See, e.g., Havasu Lakeshore Investments, LLC v. Fleming*, 217 Cal.App.4th 770-778-79 (2013); *see also* Cal. State Bar Comm. Prof Resp., Formal Op. No. 1999-153 (describing the fact-specific nature of conflict of interest analysis.) The question here is whether there was something about the Proctor claims that created a conflict between Aletheia and Eichler in defending against those claims.

### 3. *The Proctor Claims*

In the Proctor litigation, Proctor alleged a series of contract related claims against Aletheia that allegedly arose under the agreements executed on November 3, 2006 and modified through later board action. (See Exs. 4, 27 and 377.) The various iterations of the complaints also included a breach of fiduciary duty claim against Eichler and Peikin in which Proctor sought a recovery based on their alleged failure to assure that the corporation complied with the obligations it owed Proctor under those agreements. (Exs. 4, 27, 377.)

Because the complaints also contained factual allegations referencing minority shareholder rights and Eichler and Peikin's alleged receipt of excessive compensation, the Trustee argued that the "gravamen of the lawsuit was harm to Aletheia and all of its minority shareholders." *Id.*, at 23:1-2. This is the key to the Trustee's argument that the case was "derivative in nature" and pitted the interests of the corporation against its founder, director and majority shareholder. This, according to the Trustee, created an actual conflict of interest between the co-defendants because it meant that O'Melveny was representing both the looters (Eichler and Peikin) and the looted (Aletheia).[21] E.g., CB, at 3:3; see also CB, at 23:12-13.

---

[21] The inclusion of Peikin in the argument is erroneous. At Peikin's request, O'Melveny briefly represented him in connection with motions to dismiss the New York action. (Ex. 337, Paras. 24-26.) However, when Peikin and Eichler became estranged, Peikin refused to execute a retainer

FINAL AWARD (CORRECTED)

The Trustee's argument requires consideration first of the impact of a derivative claim on the conflict analysis, and then a determination of whether Proctor's complaint pursued claims that were derivative or "derivative in nature."

**4.    *Derivative Litigation Creates a Conflict Because it Seeks a Recovery for the Corporation Against Indq2ividual Defendants***

a.    <u>The Nature of a Derivative Claim</u>

California law holds that a derivative claim, whether it is labeled as such, is a claim in which a shareholder seeks a recovery ***for the corporate entity***, and not directly for the shareholder even though the corporation is a nominal defendant along with the officers and directors accused of misconduct.  The precise nature of a derivative claim was discussed in *Patrick v. Alacer Corp.,* 167 Cal.App.4th 995 (2008), which explained why joint representation creates a problem when a shareholder proceeds derivatively:

> The issue arises from the basic nature of a shareholder derivative action. " 'The management [of a corporation] owes to the stockholders a duty to take proper steps to enforce all claims which the corporation may have. When it fails to perform this duty, the stockholders have a right to do so.' " [Citation.]"The shareholders may ... bring a derivative suit to enforce the corporation's rights and redress its injuries when the board of directors fails or refuses to do so." [Citation.] But "the particular stockholder who brings the suit is merely a nominal party plaintiff." [Citation.]  It is the corporation that "is the ultimate beneficiary of such a derivative suit." [Citation.] Thus, "[t]he corporation [is] the real party plaintiff in the action." [Citation.]

167. Cal.App. 4th at 1003-04.  Because the corporation is the ultimate beneficiary and because its rights are therefore being litigated, the corporation must be joined as a

---

agreement with O'Melveny.  (*Id.*, Para. 49.)  That was the extent of O'Melveny's representation of Peikin.  This episode was the subject of Peikin's motion to disqualify O'Melveny from participation in the Proctor litigation, which Judge Lefkowitz denied.  (Ex. 171.)

FINAL AWARD (CORRECTED)

nominal party-defendant to any proposed derivative claim.  *Id.*  Accordingly, in a derivative suit, a recovery is sought *for* the corporation *from* the alleged faithless officer co-defendants, which puts their interests in conflict even though both are named as defendants in the case.

California case law contains many examples where joint representation was barred in a derivative lawsuit.  For example, in *Blue Water Sunset, supra*,  Blue Water, a fifty percent owner of various LLCs, brought derivative and dissolution claims arising from the alleged malfeasance of Markowitz, the co-owner.  The LLCs were named as nominal defendants along with Markowitz, 192 Cal.App. 4th at 483, and they were jointly represented by counsel who demurred to certain claims brought by Blue Water.  However, because of the derivative nature of the litigation, the attorney was disqualified precisely because "the limited liability companies stood to benefit if Blue Water prevailed" against Markowitz.  192 Cal.App. 4th, at 489 (citing and quoting from *Patrick*.)  *See Flatt*, 9 Cal. 4th at 284.  In what has become a well understood approach to conflict claims in corporate disputes, where a shareholder plaintiff sues derivatively, joint representation of the corporation and officer/directors accused of malfeasance is barred because the corporation is necessarily seeking a recovery from those officer/directors.  *See also La Jolla Cove Motel and Hotel Apartments, Inc. v. Superior Court*, 121 Cal. App. 774, 785-86 (2004).

Numerous other cases have reached the same conclusion, all of which involved either an express derivative claim, a claim for dissolution, or both.  *Ontiveros v. Constable*, 245 Cal.App. 4th 686, 692  (2016) (minority shareholder asserting "direct and derivative claims" against majority shareholder and corporation); *La Jolla Cove Motel and Hotel,* 121 Cal.App. 4th, at 778 (multiple actions including dissolution and derivative actions filed in dispute over operation of family owned corporation); *Forrest v. Baeza*, 58 Cal.App. 4th 65, (1997) (disqualification granted where "the corporations are nominal defendants in a shareholder's derivative suit").  Several unpublished decisions apply the same analysis.  *D'Ull v. Kaye,* 2014 WL 4808827

FINAL AWARD (CORRECTED)

(Cal. Dist. Ct. of App., Sept. 28, 2014) (cross-complaint by corporation to dissolve and wind up its affairs); *Deitch v. Wizard Gaming Inc.,* 2010 WL 298386 (Dist. Ct. of App., Jan.27, 2010) (shareholder derivative action brought by minority shareholder); *Natomas Gardens Inv. Grp. LLC v. Sinadinos*, 2009 WL 3055213 (E.D. Cal., Sept. 14, 2009) (shareholder derivative suit).  These cases stand for the unremarkable proposition that parties whose interests are not in alignment cannot be jointly represented.

In this case, because Proctor did not expressly allege a derivative claim, the Trustee has sought refuge in an argument that the factual allegations were "derivative in nature" and therefore created a conflict between Aletheia and Eichler.  See generally CB, at 15-16; CRB, at 10-11.  A review of the facts and relevant cases finds no support for the Trustee's argument.

> b.   The Factual Allegations of a Complaint Do Not Control the Analysis

In support of his characterization of Proctor's claims as "derivative in nature," the Trustee contends that the factual allegations of the Proctor complaints control the analysis, that those allegations show that the Proctor alleged harm to the corporation, and that the interests of Aletheia and Eichler were therefore adverse.  The Trustee contends that a number of cases support this conclusion, most prominently *Havasu Lakeshore, supra.*  According to the Trustee, *Havasu Lakeshore* identifies "two sets of **allegations** that create adversity and, thus, an actual conflict of interest . . . ."  CB, at 15:7-8 (Emphasis added.)  In his view, *Havasu Lakeshore* establishes that a shareholder's suit may be "derivative in nature" even if it doesn't bear the derivative label.  E.g., CB 16:3-5.  The Trustee is correct that labels don't matter, but the substance of the claims does as the case law makes clear.

The Trustee' description of *Havasu Lakeshore*'s analysis and ruling is incorrect. The *Havasu Lakeshore* court stated only that counsel cannot represent a corporation

FINAL AWARD (CORRECTED)

and its management when "they have adverse conflicting interests."  217 Cal.App.4th at 778.  But that is merely a restatement of the general rule.  The court went on to say:

> "Thus, where a shareholder has filed an action questioning [the corporation's] management or the actions of individual officers or directors, ***such as in a shareholder derivative or ... dissolution action,*** corporate counsel cannot represent both the corporation and the officers, directors or shareholders with which the corporation has a conflict of interest."

*Id.* (quoting *La Jolla Cove, supra,* 121 Cal.App.4th at 785-86).  *Havasu Lakeshore* therefore simply reiterates the basic rule that the shareholder's ***claims*** control the analysis, and that where a claim is presented that puts the interests of the parties in conflict, the joint representation must cease.  It does not further the Trustee's argument.

Moreover, the Trustee has cited no other cases that describe a suit for a direct recovery against a corporation as "derivative in nature" or that otherwise support a finding of conflict in the present circumstances.  In fact, some bear no relationship at all to the dispute presented here.  *See State Comp. Ins. Fund v. Drobot*, 192 F.Supp.3d 1080, (C.D. Cal. 2016) (simultaneous representation of criminal and victim in same case); *People ex rel. Dept. of Corporations v. Speedee Oil Change System, Inc.,* 20 Cal.4th 1135 (1999) (law firm that received material confidential information from corporation precluded from representation of franchisees against corporation); see also RRB, at 2-3.  The only case that comes close is *Gong v. RFG Oil Co.*, 166 Cal. App. 4th 209, 215 (2008), but it is readily distinguishable.

*Gong* involved a motion to disqualify counsel in phase 2 of a case where the corporation and its majority shareholder were ***jointly represented*** in phase 1.  Because the court did not look to the pleadings at all until *after* the case had been partially tried, it does not support the proposition that adversity can be assessed on the basis of a complaint's factual allegations.  *Gong* likewise provides no support for the Trustee's

FINAL AWARD (CORRECTED)

argument because the shareholder plaintiff, unlike Proctor, sought dissolution of the corporation and expressly alleged damage to the corporation.  166 Cal.App. 4th, at 215.  *See also La Jolla Cove Motel & Hotel*, 121 Cal. App. 4th at 785-86 (2004) (no substantive distinction between dissolution and derivative claims for purposes of conflict analysis).  That the plaintiff sought relief for the corporation distinguishes *Gong* from the present dispute.

More recent cases, including *Coldren* and *Havasu Lakeshore,* have emphasized that *Gong* established a very narrow precedent.  In *Coldren,* a former partner sued his former law firm and one of its partners for damages allegedly arising out of the termination of his relationship with the firm.  The trial court concluded that the firm could not represent both defendants and granted a motion to disqualify; the appellate court, having conducted a thorough review of the record, reversed.  In words that could have been written for this case, the appellate court wrote:

> Coldren sued both Hart and HKC—directly, not derivatively—on essentially the same claims. He is seeking over $8 million in damages against both. Hart's interest is perfectly aligned with HKC's interest in seeing Coldren's claims defeated.

239 Cal.App.4th, at 241.  The court rejected the former partner's reliance on *Gong,* explaining that *Gong*'s holding was addressed to the narrow situation where the plaintiff's claim is substantively derivative.  *Id.*, at 251.

*Havasu Lakeshore,* 217 Cal. App. 4th 770 conducted a similar analysis and reached a similar result.  In that case, a law firm represented an LLC and its managing member (a partnership) in litigation brought by two of the  LLC's minority members.  The trial court granted the minority members' motion to disqualify, citing Rule 3-310(c) and *Gong*.  The appellate court, after analyzing the claims and the factual circumstances of the litigation, reversed.  It held that there was no actual conflict because, unlike *Gong*, the dispute did not involve a derivative claim, a dissolution

68

FINAL AWARD (CORRECTED)

1   claim, or their substantive equivalent.  *Id.*, at 781.[22]  The court also made a point of

2   saying that there was otherwise "no authority for the position that an attorney may

3   never jointly represent an entity and its management . . . ."  *Id.*

4       These cases demonstrate that the question of conflict is to be determined not

5   simply on a review of the factual allegations of the pleadings, but on the claims

6   presented and the relief sought.  The Trustee has cited no case to the contrary.

7           c.    The Barnes/Lee Demurrer and Judge Lefkowitz's Ruling
                  Undermine the Trustee's Position
8

9       The Trustee also seeks support for his "derivative in nature" argument by  citing

10  to the Barnes/Lee demurrer (Ex. 170) and Judge Lefkowitz's August 2011 ruling on

11  that demurrer.  (Ex. 210)  In doing so, the Trustee reprises an argument that the

12  Arbitrator has already rejected because those two documents in fact prove that

13  Proctor's claim was neither derivative nor "derivative in nature."

14      In 2011, Proctor amended its complaint to add Barnes and Lee as defendants in

15  its breach of fiduciary duty claim.  (Ex. 377.)  As noted above, in that amended

16  complaint, as in every other version of complaint, Proctor included the following

17  allegation:

18          82.  The injury that resulted from the breaches of fiduciary
19          duty committed by Eichler, Peikin, Barnes and Lee is to
            Proctor IM, not to Aletheia as a corporate entity.  As a
20          result, the breach of fiduciary duty claims asserted herein are
21          direct claims of Proctor IM and not derivative claims.

22  (*Id.*, Para. 82, at 30; see also Ex. 4, Para. 49; Ex. 27, Para. 58.)  Barnes and Lee,

23  represented by O'Melveny, demurred to the breach of  fiduciary duty claim on the

24  ───────────────

25  [22] Although the present discussion is focused on the existence of an actual conflict, it is worth noting
    that the *Havasu Lakeshore* court also observed that a hypothetical conflict would never be enough to
26  support disqualification of counsel.  *Id.*, at 779; *see also Fox v. Searchlight Pictures, Inc. v.
    Paladino*, 89 Cal.App. 4th 294, 302 (2001).  Thus, to the extent that one might argue that the
27  allegations here create the hypothetical possibility that a derivative claim could have been pursued,
    that would be insufficient to warrant disqualification of counsel.  See Discussion in Sec. IV.B.7.
28

FINAL AWARD (CORRECTED)

1   ground that Proctor sought only direct relief  through allegations that could only be,

2   *but were not*, pursued derivatively.  (Ex. 170, at  1, 4-6.)[23]  The argument was

3   consistent with controlling authority.  *E.g., Campbell v. Clark*, 159 Cal.App. 2d 432,

4   436-37 (1958).  In *Campbell*, the defendants, like Aletheia, demurred to a complaint

5   that would have supported a derivative claim which the plaintiff expressly refused to

6   assert.  *Id.*, at 437. The *Campbell* court  concluded that the claim could not be pursued

7   through direct action and dismissed the complaint.  That was O'Melveny's point in

8   the Proctor litigation – that *Campbell* and several other cases precluded individual

9   shareholders from seeking for themselves relief that could only be (but was not)

10  sought by or for the corporation.  *E.g., Avikian v. WTC Financial Corp*., 98 Cal.App.

11  4th 1108, 1111, 1116 (2002) (precluding claim for direct relief  for harm to

12  corporation).

13         In short, O'Melveny's objective was entirely clear:  it sought dismissal of the

14  breach of fiduciary duty claim brought against the individual directors because the

15  claim was defective.  It was not that certain allegations made by Proctor could never

16  support a derivative claim.  Rather, O'Melveny argued that such allegations could

17  only support a derivative claim, *but that Proctor had not pursued such a claim in*

18  *name or substance and had in fact disclaimed any intent to seek a recovery for*

19  *Aletheia.*  Thus, unless and until Proctor amended its complaint to state a derivative

20  claim and seek a recovery for the corporation, the interests of the corporation and its

21  individual directors remained in alignment.

22         Proctor's opposition to the demurrer supports this conclusion.  Just as its

23  complaint expressed an intention *not* to pursue claims for the corporate benefit,

24  Proctor's briefing and argument to both the New York and California courts reiterated

25

26

27  [23] That O'Melveny believed that no derivative claim had been stated in the Proctor litigation is
confirmed by a contemporaneous internal memorandum in which O'Melveny discussed "potential
28  exposure in future derivative litigation."  (Ex. 222, at 5.)  The memorandum was dated June 22,
2011, and the demurrer was served on June 30, 2011.  (See *Id.*, at 5; Ex. 207.)

FINAL AWARD (CORRECTED)

that it sought to vindicate only its rights and to recover only for itself.  (See generally Ex. 2177.)   Proctor cited authority for the proposition that it was entitled, as a shareholder, to bring *direct claims* against the directors for their dereliction of duty. (E.g., *Id.*, at 6-8.)   Proctor argued that, on the facts of its case, it had a legitimate basis for seeking recovery for itself against the directors on the ground that their failure to assure that Aletheia performed its contractual allegations *to Proctor* (and no one else) constituted a breach of their fiduciary duties as directors.  (*Id.*, at 8; Ex. 1147, at 7-9.)

Judge Lefkowitz had serious reservations about Proctor's approach to the dispute.  (See generally Ex. 1147, at 1 ["this complaint is somewhat confusing"]; at 3 ["it's all very muddy in this complaint"]; at 3-4 ["there are cases that appear to permit fiduciary claims to go forward under a contract theory"] .)  Judge Lefkowitz ultimately accepted that, while Proctor couldn't obtain for itself a recovery that belongs to the corporation, it might be able to cobble together a theory that would support direct relief arising from contract.  She said so at the hearing:

> [A]s long as there's anything that stands here in terms of a potential *contract claim against a particular individual, even albeit a director*, to the extent that there are cases that seem to support that, I don't think I could do anything other than let it go forward.  I suppose if you read it it's rather clear that I'm not following willingly into this nightmare. But I think there is enough there for them to go forward with their case.

(Ex.1147, at 5.) (Emphasis added.)  She echoed this point in her final order.  After indicating that she would have granted a demurrer if Proctor had sought a recovery based only on a general malfeasance theory, she wrote:

> However, it equally appears from the pleadings that Proctor has pleaded at least arguable claims for breach of fiduciary duty by alleging that [the directors] did not fulfill their obligations to ensure that Aletheia *honored contracts which the cross-complaint alleges granted Proctor particularized rights separate from the body of shareholders or the corporation.*

71

(Ex. 210, at 9-10.) (Emphasis added.)  On that basis she allowed the case to go forward, but only to the extent that Proctor was pursuing its own "particularized rights."

Judge Lefkowitz's conclusion is entirely consistent with Proctor's arguments that it was not pursuing any relief for Aletheia, and Respondents' arguments here that Proctor's claims were therefore neither derivative nor derivative in nature.

> d.   There Was No Actual Conflict Because Proctor's Claims Were Direct Not Derivative

The Trustee's contention that mere labeling does not control the analysis is correct but of no consequence on this record.  His argument that Proctor "nominally sought relief for its own benefit,"  CB, at 15:25-26, is belied by the discussion in the preceding section.  Proctor did not "nominally" seek relief for itself; it sought relief *only* for itself, to the tune of several million dollars, (See, e.g., Ex. 251), and certainly not for Aletheia or any other shareholder.  And it was not shy about saying so.  As the preceding section demonstrates, Proctor did not hesitate to announce to the world that it disavowed any intention of pursing claims for anyone but itself.  (Ex. 377, Para. 82; see also Ex. 4, Para. 49; Ex. 27, Para. 58; Ex. 1147, at 9-10.)   Proctor publicly and unambiguously acknowledged that its claims were "direct because we've always alleged harm to and a recovery for Proctor, not harm to the corporation and a recovery by the corporation."  (Ex. 1147., at 12.)

That its complaint contained allegations that another attorney could have asserted to plead a derivative case is beside the point.  As the master of its  complaint, Proctor could have sought either derivative or direct relief.  Instead of proceeding indirectly by suing *on behalf of* Aletheia which, if successful, would achieve benefits for both itself and other shareholders, it proceeded directly *against* Aletheia in the pursuit of its own recovery to the exclusion of others.  As *Havasu Lakeshore* and *Coldren* made clear, the pursuit of direct instead of derivative claims dramatically

FINAL AWARD (CORRECTED)

changed the conflict landscape by putting the interests of Aletheia and Eichler in

alignment and permitted joint representation of the corporate and individual

defendant.  As in *Coldren,* Proctor sued both Aletheia and Eichler – directly not

derivatively – on essentially the same contract claims seeking millions of dollars in

damages.  It follows that Eichler's interests were "perfectly aligned" with Aletheia's

in seeing that Proctor's claims were defeated.  239 Cal.App.4[th], at 241.

The record therefore reflects that there is neither factual nor legal support for

the Trustee's characterization of Proctor's direct claims as "derivative in nature."  It

follows that the Trustee's reliance on Proctor's allegations fails to show an actual

conflict in O'Melveny's joint representation of Aletheia and Eichler.

The Arbitrator therefore turns to the question of whether the joint representation

posed a potential conflict of interest.

### 5. *Proctor's Pleadings Alone Minimize the Reasonable Likelihood a Conflict of Interest Would Arise*

The foregoing discussion demonstrates that the claims Proctor pursued and the

specific relief it sought put the interests of Aletheia and Eichler (and later Barnes and

Lee) in alignment.  But an attorney must still consider whether the facts and

circumstances of the case create a ***potential*** conflict of interest.

The case law holds that a "potential conflict of interest" exists when there is "*a*

*reasonable likelihood an actual conflict will arise.*"  *Havasu Lakeshore,*  217

Ca.App.4[th] at 779.  (Emphasis in original.)   That requires " 'a *reasonably foreseeable*

set of circumstances which could impair the attorney's ability to fulfill his or her

professional obligations to each client in the proposed representation.'"  *Id.,* at 779.

(Emphasis in original.)  The court made it clear that the "reasonable foreseeability"

test distinguishes a mere hypothetical or theoretical conflict from a potential conflict.

*Id; accord Fox Searchlight Pictures, Inc. v. Paladino,* 89 Cal.App.4[th] 294, 302 (2001)

("A motion to disqualify will not be granted when only a hypothetical conflict

exists.")  *Fox Searchlight* also warned that courts should be alert to manipulation by

1   counsel to create a conflict where none existed.  *Id.*  By describing the test as one of

2   "reasonable foreseeability," the courts have created an objective rather than a

3   subjective test.  (See RT 2703:14-15.)

4          Prof. Marshall, the Respondents' ethics expert, expanded on the relevant

5   framework described in *Havasu Lakeshore*.  First, he explained that "potential" did

6   mean conceivably possible or theoretically possible, but rather that there is a

7   "reasonable likelihood of divergence of interest."  (2630:1-2.)  A lawyer who jointly

8   represents multiple parties must be mindful of and alert to that the possibility; if

9   something occurs that turns a theoretical possibility into something reasonably

10  foreseeable, the lawyer must consult with his clients. (RT 2630:3-5; 2631: 13-21; RT

11  2633:4-9.)  Ensuring that this obligation is met involves the application of judgment

12  and common sense in light of the engagement, which in this case "quite clearly, in my

13  view, did not envision a suit by Aletheia against Eichler.  That wasn't part of the

14  scope."  (RT 2643:11-13.)  Prof. Marshall rejected the opinion, expressed by the

15  Trustee's expert, that joint representation was, in essence, "presumptively conflict

16  ridden" because the opinion was based on an incorrect understanding of the

17  reasonable foreseeability test.  (RT 2631:4-21.)  When properly applied in this case,

18  according to Prof. Marshall, one would conclude that Aronson in February 2010

19  properly undertook the determination of whether an actual or potential conflict

20  existed, (RT 2636:12-2637:1), and correctly concluded that their interests were

21  aligned.  (RT 2637:17-2638:10.)

22         Here the pleadings themselves, viewed in light of the applicable legal

23  framework, diminished any reasonable foreseeability that the parties' interests would

24  become adverse.  One need not guess at Proctor's intentions because, as discussed

25  above, it made its purpose clear in its pleadings.  (See Exs. 4, Para. 49; Ex. 27, Para.

26  58; Ex. 71, Para. 82; see also Exs. 2177, 2122, 2330.)  Proctor maintained its position

27  through each version of its complaint; each emphasized that the breach of fiduciary

28  duty resulted in injury to Proctor, not Aletheia, and that "[a]s a result, the breach of

FINAL AWARD (CORRECTED)

1   fiduciary duty claims asserted herein are direct claims of Proctor IM and not

2   derivative claims." (E.g., Ex. 377, Para. 82.) Proctor further maintained this position

3   in arguments to Judge Lefkowitz, where Proctor's counsel told Judge Lefkowitz:

4          The distinction that the case law draws between a direct
5          claim and a derivative claim, as your honor notes . . . is who
           suffered the harm? Is it the corporation or the shareholder?
6          Who receives the benefit of the recovery? Is it the
7          corporation or the shareholder?
           . . . .
8          Proctor is not saying in its complaint anywhere the company
9          has suffered harm. Recover money into the company.
           Proctor is not saying there was excessive fees paid out and
10         compensation paid out, and that money should flow back
11         into Aletheia because Aletheia would be a stronger, better
           company.
12

13  (Ex. 1147, at 5-6.) This position never changed during the entirety of the litigation

14  which demonstrates that Proctor's claims were always direct, would foreseeably

15  remain direct, and that therefore Aletheia and Eichler's interests were, and would

16  remain, in alignment. In these circumstances, not only was there no actual conflict,

17  but there was also no reasonably foreseeable risk that Proctor would do anything to

18  create adversity between the joint defendants.

19         Proctor's counsel even took this position in correspondence with the Trustee

20  after Aletheia had filed for bankruptcy. In response to apparent discussions with the

21  Trustee, Proctor's counsel wrote, "As you know Proctor has asserted against Peter J.

22  Eichler, Jr., Roger Peikin [and others] . . . substantial breach of fiduciary duty claims

23  under California state law, arising out of damages suffered *distinctly by Proctor* . . . ."

24  (*Id.*, at 1-2.) (Emphasis added.) Proctor's counsel reiterated that the breach claims had

25  been prosecuted directly for Proctor's own benefit and that Proctor's attorneys

26  "disagree with the Trustee's initial view that such claims may belong to Aletheia."

27  (*Id.*, at 2.) In short, even after Aletheia's bankruptcy petition was filed, Proctor

28

FINAL AWARD (CORRECTED)

reiterated its intent to pursue direct claims regardless of arguments made to the contrary.

Here the pleadings and the litigation positions taken by Proctor bore directly on the question of whether there was a potential conflict lurking in O'Melveny's joint representation of Aletheia and Eichler.  Proctor's pleadings and legal arguments alone mitigated any such risk because Proctor made it clear that it intended to do nothing that would ever change its claims from direct to derivative

### 6. *There Were Additional Grounds for Concluding That There was No Actual or Potential Conflict*

The credible testimony of Aronson and experts Spiegel and Metzger further demonstrate multiple reasons why no conflict arose or was reasonably foreseeable in the context of this case.

Aronson, an experienced securities litigator with decades of experience in the field, conducted the analysis of the conflict of interest issues when O'Melveny undertook the joint representation of Aletheia and Eichler.  (RT 717:20-718:4.)  What he described was consistent with the controlling case law that requires consideration of all the facts and circumstances to determine whether an actual conflict exists, or whether those facts and circumstances made it reasonably foreseeable that a conflict would arise.

Aronson, first analyzed the claims against Aletheia and Eichler.  He considered the respective interests of the Aletheia and Eichler in view of the relief sought, noting that Proctor asserted only direct claims for relief, and "readily concluded that their interests were completely aligned."  (RT 718:19-23.)  His analysis considered: (1) that separate representation could create the appearance to opposing counsel of discord and disagreement among the defendants (RT 719:17-20); [24] (2) the practical

---

[24]Spiegel agreed that, in a direct claim case, even the presence of separate counsel would send the wrong signal to a plaintiff and could alert the plaintiff to the possibility of dissension between defendants and act as "a huge encouragement to the plaintiff."  (RT 2073:2-10.)

FINAL AWARD (CORRECTED)

considerations regarding the cost of providing multiple defense counsel (*Id.*, at 21-25); and (3) legal issues of vicarious liability and indemnification. (RT 720:6-721:3.)  All of this was assessed in light of the scope of the engagement to determine whether the joint representation was appropriate.  (RT 720:2-5.)  In sum, it was "very common to represent a company and its senior officer and directors when fighting a common opponent" as in the Proctor litigation.  (RT 719:1-3)

Spiegel confirmed Aronson's approach and noted that counsel in these circumstances would typically represent both the corporate and individual defendants because "the interests of the company and its executives were completely aligned on the direct claim and the benefits of joint representation are very significant."  (RT 2066:9-17.)  He explained that Proctor's claims against Aletheia were based on a variety of contract and contract related theories, and that the claim against Eichler involved his failure to ensure that Aletheia honored those contractual obligations. (See RT 2067:7- 25.)  Because Proctor's fiduciary duty claim was based on the predicate that there was a breach of contract, both Aletheia and Eichler had an interest in defeating the breach of contract claim.  (RT 2070:4-7.)  In these circumstances, if Aletheia had chosen to pursue a breach of fiduciary duty claim against Eichler, it would have necessarily conceded the merit of Proctor's claims against the corporation, which would have made no sense as a matter of litigation strategy.

There was an additional, practical reason why it was not in Aletheia's interest to pursue claims against Eichler, at least while the Proctor litigation was pending. Eichler was the company's principal founder, its CEO, its chief investment officer and its premier rainmaker.  Had Aletheia, whose revenues and reputation were intimately tied to Eichler, pursued claims against Eicher, it would have had a devastating impact on Aletheia in the marketplace.  Spiegel testified that an investment company's decision to sue its CEO would essentially end his tenure, which would have left Aletheia without the one person responsible for the company's success.  (RT 2071:21-2072:5.)  Metzger, an industry expert, concurred and indicated that such a suit would

FINAL AWARD (CORRECTED)

1  have sent a severe negative message to those in the asset management industry and

2  "would have inevitably led to the demise of Aletheia."  (RT 2478:5-6.)  Accordingly,

3  this is another reason that a competent practitioner in the field would not have sued

4  Eichler.  (RT 2071:21-2072:5.)

5          As to the alternatives now suggested by the Trustee of threatening suit, making

6  a demand for repayment, or negotiating a tolling agreement preserving the right to sue

7  the CEO, e.g., CB 13:5-13, those approaches carried their own set of risks.  It is

8  essential to remember that during most of 2010, Aletheia and its management were

9  dealing with an SEC investigation that included corporate governance issues.  Spiegel,

10  an expert in representing clients in SEC investigations, opined that, had Aletheia sued

11  Eichler, "probably you need to disclose to the regulator, in which case no hopes of a

12  benign settlement based on remedial measures and so forth.  It's probably out the

13  window."  (RT 2084:22-24.)  In such circumstances, the SEC would likely consider

14  imposing "a bar on the executive's participation in the industry which again is the

15  death knell of the company."  (RT 2084:25:2085:2; see also RT 2085:2086:8 [same

16  analysis for tolling agreement].)  Prof. Marshall also noted that bringing suit against

17  Peikin, even after he was gone from the company, could have had a significant

18  negative impact on the SEC investigation and the Proctor litigation.  (RT 2710:8-20.)

19  (same inquiry as in the case of Eichler "just a bit different facts".)  In short, no

20  competent practitioner would pursue such a course.[25]

21

22

23

_____

24  [25] Likewise, the assertion that Aletheia could have been saved from disaster if Respondents had only
reviewed the facts and entered into a "quick settlement with Proctor" (CB 13:7) is based on at least

25  three faulty premises: (1) that Aletheia's claims had no merit; (2) that Proctor's claims were
meritorious; and (3) that Proctor was open to a negotiated resolution that did not involve Aletheia's

26  capitulation.  The discussion in Section III., above, shows that there was evidentiary support for
Aletheia's claims and an evidentiary basis for doubting the merit of Proctor's claims, and Section

27  IV.A.4.b. reflects the substantial efforts made by Respondents to resolve the dispute through
settlement.  The Trustee offered no expert testimony to show that O'Melveny's conduct in pursuing

28  settlement fell below the standard of care.

FINAL AWARD (CORRECTED)

1   The evidence presented at the arbitration hearing corroborates Spiegel's opinion
2   that any course of action even hinting at possible litigation against a founder could
3   have exposed Aletheia to serious negative consequences.  After O'Melveny had
4   undertaken Eichler's representation in the SEC investigation, Peikin's lawyer, Robert
5   Friese, issued a warning to Aronson that "[y]ou should be aware that any hostile acts
6   toward Roger will likely result in active conflict, a much worse result for Peter, ***and
7   the probable demise of the company***."  (Ex. 1041.) (Emphasis added.)  This warning
8   suggests the vulnerability of the company to a dispute between the founders, not to
9   mention what could happen if the corporation itself turned on its primary source of
10  revenue.  Friese's warning, and his prediction of what could (and ultimately did)
11  happen, is completely consistent with and supports industry expert Metzger's
12  testimony that "a lawsuit  brought by Aletheia against Eichler would have likely –
13  would have inevitably resulted in the demise of Aletheia."  (RT 2478:3-6.)  Metzger
14  noted the obvious: institutional investors, whose business was responsible for the
15  enormous growth of Aletheia's AUM, were risk averse and would react extremely
16  negatively to any decision by Aletheia to pursue claims against Eichler.  (RT 2495:4-
17  2496:10.)[26]  It was therefore in all parties' interests for O'Melveny to tread lightly.

18  And as for the idea that Aletheia's counsel should have simply asked Eichler
19  and Peikin to return the money, Aronson's testimony demonstrates that such a request
20  was a complete non-starter.  Aronson confronted Eichler and Peikin on this subject:

> Q: And these issues were issues as well that you discussed
> with the various people at Aletheia?  Not including –
> including Mr. Eichler and Peikin but as well as the others?
> A: Yes. Top to bottom.  Mr. Eichler, Mr. Peikin expressed
> their views to me on these payments and we drilled down
> with others on . . . .
>
> . . . .

---

[26] Even Prof. Kehr, who opined regarding the risks associated with the termination *of Peikin* because
of what he knew about the business, (RT 1623:3-24), had to concede that the termination of Eichler
would likewise have created significant risks for the business.  (RT 1623:25-1627:5.)

FINAL AWARD (CORRECTED)

1
2
3
4
5
6
7
8
9
10
11
12
13

Q:  What about Mr. Scalzo and Mr. Santos?

A:  Yes, we did, we had discussion with each [of] them.  But I specifically remember conversations with Peikin and Eichler about the compensation.

Q:  What did Mr. Peikin tell you about that issue of compensation?

[Objection overruled.]

A:  Mr. Peikin said the payments to him and Mr. Eichler were fully justified for a variety of reasons.  And both of them were adamant that their compensation was well within the range of their peers.  And I'm familiar with bonuses on Wall Street and financial services.  And they each made a case as to why their compensation, given the performance of Aletheia at this time, was well earned.  Mr. Peikin was very strong in his insistence that he had earned this money. And we spoke with others as well.

14
15
16
17

(RT 729:24-731:3.)  So, the idea that the payments to Eichler and Peikin could have been recouped without litigation by asking nicely is a concept disconnected from evidentiary record.  If Aletheia, as an entity, wanted that money back, it would have had to fight for it.

18
19
20
21
22

The record therefore reflects that the facts and circumstances confronting O'Melveny during the Proctor litigation demonstrate practical reasons why Aletheia would not want to pursue claims against Eichler and therefore that it was not reasonably foreseeable that a conflict between Aletheia and Eichler (or any other individual defendant) would arise.

23
24

### 7.    *The Record Fails to Demonstrate a Viable Excessive Compensation Claim*

25
26
27
28

Even if the evidence demonstrated that counsel acting only for Aletheia would have sued Eichler and Peikin to recover their 2007-09 bonus compensation, the Trustee erroneously assumes that excessive compensation claims against Eichler and Peikin were certain winners that would have voided the bonuses and recovered the

FINAL AWARD (CORRECTED)

1   entirety of their compensation for the company.  On that crucial point, the Trustee

2   offered no evidence.  Instead, he misleadingly asserts that O'Melveny determined that

3   Aletheia "was damaged by the payment of the Excessive Compensation in the amount

4   of $47.2 million."  CB, at 41:12-18 citing Exhibits 222 (O'Melveny Memorandum

5   with report of the accounting firm of Freeman & Mills attached) and 251.  O'Melveny

6   did no such thing; nothing in the cited documents concedes that Aletheia had in fact

7   been damaged.  Rather Exhibit 222  analyzed the ***potential*** exposure if Proctor

8   prevailed – a standard "worst case scenario" exercise in the litigation world.

9   Moreover, its calculation of Proctor's potential recovery was far less than $47.2

10  million, which was the at-risk amount only if a derivative suit was ever filed in the

11  future, which never happened.  (Ex. 222, at 5-6.)  Proctor's potential recovery is

12  discussed in Exhibit 251,  which was prepared by Freedman + Taitelman rather than

13  O'Melveny and which concluded that the defendants' exposure in the Proctor

14  litigation was $5-6 million not including attorneys' fees.  (Ex. 251, at 10-11.)  Thus, a

15  careful reading of the cited exhibits refutes the Trustee's contention that O'Melveny

16  conceded that Proctor suffered damages in the sum of $47.2 million, or indeed in any

17  amount.

18      Moreover, regardless of the amount actually at stake, it is far from clear that a

19  suit to recover Eichler's (or Peikin's)  compensation would have been successful at all

20  or, if it were, what the net effect of any such suit would have been.  It is beyond

21  argument that Eichler and Peikin were entitled to compensation for services rendered.

22  (RT 2815:18-2816:2.)  Moreover, they were plainly entitled to substantial

23  compensation awards given the performance of Aletheia in 2007, when AUM went

24  from $3.2B to roughly $9B, with no meaningful help from Proctor, and in 2008-10,

25  when Aletheia maintained substantial AUM in the worst market decline in decades.

26  (Ex. 1285.)  When all markets were declining from late 2007 to early 2009 by more

27  than 50%, Aletheia, under Eichler's leadership (again with no assistance from Proctor)

28

FINAL AWARD (CORRECTED)

suffered less than 30% shrinkage in AUM in 2008 and then grew it again by more than 10% in 2009.  (Ex. 1285.)

The record therefore shows that, if Aletheia had sued to recover the founders' bonuses, Eichler and Peikin could have mounted a strong defense to that claim.  For example, Bishop testified, as a matter of corporate governance, that performance of extraordinary services entitles an officer or director to "extraordinary compensation." (RT 2814:15-2815:2.)  Spiegel described examples of excessive compensation litigation, which he opined are complicated and time consuming.  (See RT 2073:11-2080:2.)  Spiegel, who has experience in trying excessive compensation claims, explained that they are difficult to win because "it becomes a battle of experts" in factually unfamiliar and complex circumstances.  (RT 2075:6-14.)   Here Metzger, who was the only industry expert who testified, opined that Eichler's compensation was reasonable in the context of relevant industry standards.  (RT 2492-93.)[27]  And the foregoing discussion demonstrates that there is credible evidence to support that conclusion.

In response to such evidence, the Trustee contends first that Respondents' experts who testified on this topic should be disregarded because they did not address Proctor's contract rights.  CB, at 43:9-18.  But the question of contract rights (which formed the basis of Proctor's direct claims) is different from Aletheia's right to recover excessive compensation, which is the claim the Trustee contends could have been brought by Aletheia against Eichler and Peikin.  On that topic, which is the proper focus, the Respondents offered the testimony of Bishop and Spiegel who

_____

[27] The Trustee challenges the foundation of Metzger's testimony on several grounds.  CB, at 45-46. Although the argument takes some testimony out of context and ignores other evidence, Metzger's testimony is the only expert testimony on the subject.  But in the end, the actual value of Eichler's services need not be resolved in the present proceedings.  It is enough to say that Eichler had a defense to any claim for excessive compensation, that an effort to recoup that compensation would have involved a difficult and complex litigation, and that the record shows that, under his guidance from 2007 through 2009, Aletheia performed extraordinarily well, even when the market was collapsing.  That he was entitled to substantial bonus compensation is not up for debate.

FINAL AWARD (CORRECTED)

1   explained that both Eichler and Peikin would have had a defense to an excessive

2   compensation claim under California Corporations Code Sec. 310.  (RT 2135:1-9

3   (Spiegel); RT 2817:1-2818:3 (Bishop).)  That Section provides that a contract between

4   a corporation and a director (in this case Aletheia's compensation of Eichler in 2007,

5   2008 and 2009) is not void or voidable if it is approved as provided for in Subsections

6   310 (a)(1) or (2).  (See also RT 2817:1-18; Ex. 254, at 2.)   But even if it is not so

7   approved, the transaction may still stand if the interested director "sustains the burden

8   of proving that the contract or transaction was just and reasonable as to the

9   corporation at the time it was authorized approved or ratified."  Cal. Corp. Code Sec.

10   310(a)(3).

11       The Trustee, who offered no evidence on the reasonableness of the bonuses,

12   contests this straightforward reading of the statute because he contends that subsection

13   (3) applies only where there has been "shareholder or Board action approving or

14   ratifying the Excessive Compensation."  CB, at 44:6-7.  Because the board was

15   allegedly not involved in the decisions regarding Eichler's compensation, the Trustee

16   contends that there was no defense to the excessive compensation claim.   In support

17   of that interpretation of the statute, he cites *Sammis v. Stafford,* 48 Ca.App.4th 1935,

18   1943 (1996).  *Sammis* is not helpful because it does not address the situation where

19   there has been no board vote, with or without interested directors.  It correctly

20   determined that a transaction affirmed by a vote involving interested directors would

21   be covered by 310(a)(3), but it does not say that this is the only situation in which

22   (a)(3) would apply.  *Id*.  The text of the statute itself suggests otherwise.

23       The plain language of the statue provides that (a)(3) applies whenever the board

24   has not approved the transaction as prescribed in (a)(1) or (a)(2).  *See In re: Kelmoore*

25   *Inv. Co., Inc.*, 2010 WL 3909461, at *8 (N.D. Cal. Bankr., Sept. 30, 2010).  *Kelmoore*

26   involved a transaction (debt forgiveness) that the interested director unilaterally

27   approved with no board involvement.  The Trustee moved for summary judgment

28   voiding the transaction, but the court denied the motion because there were material

FINAL AWARD (CORRECTED)

facts as to whether the transaction was just and reasonable to the corporation at the time it was executed. *Id.* Thus, even where the board has not acted at all, Section (a)(3) permits the assertion of the "just and reasonable" defense. Respondents' corporate governance expert concurred in this interpretation of the law. (RT 2817:8-18; see also Ex. 254, Freedman + Taitelman analysis of Cal. Corp. Code Sec. 310.)[28]

In short, while the outcome of any suit to recover Eichler's bonus payments is an unknown, the record demonstrates that the Trustee's implicit assumption – that one need only need pursue the claim to succeed on the claim – is unwarranted.

### 8. *The Trustee's Expert Must Be Disregarded Because his Testimony Was Contrary to California Law*

The Trustee offered the testimony of Prof. Kehr, an ethics expert, who opined that O'Melveny was barred from jointly representing Aletheia and Eichler based on the factual allegations in the Proctor complaint. To the extent that he offered opinions relevant to this case, his opinions are in conflict with California law.

First, in support of his opinion, Prof. Kehr took the indefensible position that the conflict analysis is only remotely connected to the scope of an attorney's retention. In Prof. Kehr's view, an attorney who is retained to represent parties in a litigation matter has an obligation to provide advice that far exceeds the four corners of the litigation. (RT 1026:7-13; 1567:22-1568:13.) This position is inconsistent with the cases

---

[28] The discussion assumes that there was no board authorization, but that assumption might have proven inaccurate if the case had been litigated. Respondent notes that Eichler would have had a basis for arguing that he and Peikin had board approval for the transactions. (RB, at 9 n.2 citing to testimony of Peikin (RT 168:12-19) regarding the creation of a year-end catchall resolution during the relevant time period.) Whether or not there was board authorization is not material to the Arbitrator's conclusions herein.

FINAL AWARD (CORRECTED)

discussed in Section IV.B.1.b. above, which teach that the engagement letter is the necessary starting point for determining the existence of a conflict and the scope of counsel's duties.  Likewise, Section IV.E. below addresses the duties to advise and alert.  Here, consistent with California law, the engagement letter expressly limited O'Melveny's retention to the subject matter described in the engagement letter.

Second,  Prof Kehr's opinion that joint representation in the Proctor litigation suffered from a conflict of interest reflects his lack of any substantial or recent litigation experience.  (RT 1630:14-1631:6; see also RT 1721:5-25 [conceding that assessment of conflict requires counsel with litigation experience].)  But because he had no such experience, he mistakenly opined that the claims, as opposed to the complaint's factual allegations, are not relevant to the conflict of interest analysis. (RT 1647:16-18.)[29]  He asserted:

> my opinions don't depend on whether the New York complaint included breach of fiduciary duty to the corporation or whether it included breach of fiduciary duty to the other minority shareholders or only referred to Proctor itself.  All of my analysis would be exactly the same no matter how broad or narrow the breach of fiduciary allegation was.

(RT 1648: 14-21.)  He doubled down on this view by asserting that, because the Proctor complaint referred generally to the rights of minority shareholders, O'Melveny could not jointly represent Aletheia and Eichler even if they had a common defense to Proctor's claims.  (RT 1032:1-20.)  In his view, "a defense of the

---

[29] Prof. Kehr even contradicted Trustee's theory that Aletheia had a right to recover the alleged excessive compensation paid to Eichler and Peikin when he asserted that Aletheia had no interest in the compensation dispute, which he described as a dispute among shareholders.  (RT 1642:9-1643:22.)

FINAL AWARD (CORRECTED)

lawsuit is *irrelevant* because all of that same advice concerning additional looting, statute of limitations, obligation to the other 20 shareholders and so on still would apply." (RT 1039: 4-8; see also 1038:21-1039:4.) (Emphasis added.)[30] Thus, with no relevant experience to draw on, Prof. Kehr nevertheless opined that "any competent lawyer would have recognized simply by reading the allegations in the Proctor complaint" that there was an actual conflict of interest in the joint representation of Aletheia and Eichler. (RT 1652:2-8.)

Prof. Kehr's opinions find no support in California law or actual experience. The claims presented and relief sought bear directly on the respective interests of the parties as the discussion regarding direct and derivative claims makes clear. Moreover, there is no logic to the argument that co-defendants who have a common interest in defeating claims raised by their common opponent should be required to bear the extra expense of retaining separate counsel. Prof. Kehr himself agreed that joint representation had benefits, including the economic benefit of having a single attorney represent clients with aligned interests and the effectiveness of being able to speak with a single voice. (RT 994:9-22.) For those and other reasons, cases like *Havasu Lakeshore* and *Coldren*, discussed above, recognize the right to joint representation in direct claim cases. That 20 other shareholders, who were not then and never were O'Melveny's clients, might decide to bring claims of their own is beside the point. Prof. Kehr's opinions reflect that: (1) he mistakenly focused on the factual allegations rather than the relief sought; and (2) in doing so he misunderstood the substance of Proctor's contract-based claims, which were unique to Proctor and

---

[30] An example of how Prof. Kehr's approach led to an erroneous conclusion involved his testimony regarding the inclusion of Lee in the joint defense group. Prof. Kehr opined that Lee's position differed from Eichler and Peikin's because "he had not taken any compensation that was alleged to be in excess of proper limits." (RT 1615:4-5.) But the *claim* against each director was the same – that they had not acted to ensure that Aletheia honored its *contractual obligations* to Proctor. That was the true gravamen of the case, and on that issue all defendants were in the same legal position. Proctor was not seeking to recover excess compensation; it was seeking to recover that to which it claimed it was entitled under contract. An experienced litigator would have understood this.

FINAL AWARD (CORRECTED)

could be defended without taking any action that would limit the rights of Aletheia or any other shareholder to pursue their own clams in the future.

<u>Third</u>, Prof. Kehr reached his conclusion regarding the existence of a conflict based on his view that joint representation is almost always conflict-ridden, and that if an actual conflict did not yet exist, it was reasonably foreseeable that one would develop in the future. (RT 1612:20-613:11.)  In support of that view, Prof. Kehr indicated that there is a published opinion (not identified) that holds that there is always a conflict in joint representation in litigation and referenced an article written by a colleague, reaching the same conclusion.  (RT 984:7-12.)  This is an extreme position that may be popular among academics and theoreticians, but it is contrary to every-day experience and is not supported by the case law.  *Havasu Lakeshore*, 217 Cal.App.4th, at 782.  ("rule 3-310(c) does not bar an attorney from such joint representation under the current facts"); *Coldren*, 239 Cal.App.4th, at 241 (reversing trial court's disqualification of counsel because the plaintiff pursued direct, not derivative claims against the joint defendants whose interests were therefore "perfectly aligned" in their desire to defeat plaintiffs' claims).

The present record reflects that joint representation is common in cases like the Proctor litigation.  Loeb jointly represented all defendants in the Proctor litigation before O'Melveny was substituted as counsel (Ex. 2040); Loeb jointly represented Aletheia, Eichler and Peikin in the Boskovich litigation (Ex. 2047); O'Melveny later became engaged in the Boskovich litigation on behalf of all defendants  (Ex. 109); Mark Kemple, originally with Jones Day and then with Greenberg Traurig jointly represented all defendants in multiple lawsuits; (Exs. 59, 1251); and Freedman + Taitelman undertook the joint representation of all defendants in the Proctor litigation after O'Melveny withdrew.  The record here therefore reflects the reality that litigation in the real world very frequently involves joint representation of co-defendants in complex civil litigation where a plaintiff brings direct claims against the

FINAL AWARD (CORRECTED)

defendants.  Prof. Kehr's opinion that such representation is almost always conflict-ridden has not been adopted in the courts.

Fourth, Prof. Kehr's view of what constitutes a "potential conflict" essentially reads the "reasonable foreseeability" test out of the law.  In connection with his joint representation opinion discussed above, he opined that a potential conflict of interest almost always exists in joint representations because "no two clients are the same," (RT 984:14-15), because any two clients will have "different ages, different financial situations, different family situations, different willingness to accept risk," (RT 1612:25-1622:3), and because there is "always the *possibility*" that two clients will give different directions.  (RT 984:15-20.)  For these reasons, according to Prof. Kehr, it's "almost always predictable . . . foreseeable that a conflict of interest *could* arise in the future . . . ."  (Id., at 7-9.)  But he uses the words "possibility" and "could" in a way that improperly conflates them with "reasonable foreseeability."  Those words describe hypothetical conflicts that could arise in any joint representation, not a reasonably foreseeable conflict that has a probability of arising in a specific case.  Even a modestly experienced attorney can readily posit any number of possible scenarios that would put the interests of joint clients in conflict.  Indeed, O'Melveny's engagement letters point out the possibility that conflicts could arise and the related consequences.  (See e.g., Ex. 67, at 3; see also Section IV.B.2. above.)  But that which is "possible" differs from that which is "reasonably foreseeable" in any specific context.  Because he does not correctly articulate the proper test for determining the existence of a potential conflict of interest, his opinion as to the presence of such a conflict in this case is not entitled to substantial weight.

In sum, the Arbitrator finds that Prof. Kehr's opinions regarding the existence of an actual or potential conflict in O'Melveny's joint representation of Aletheia, Eichler and others, should be disregarded.

**9.   *Conclusion***

FINAL AWARD (CORRECTED)

1  Sections IV.A. and B. demonstrate that O'Melveny did not commit malpractice

2  in its representation of Aletheia and Eichler in the Proctor litigation, and that it did not

3  breach its fiduciary duty to its clients because the defendants' interests were aligned in

4  the Proctor litigation.  But even if the Trustee had managed to show that O'Melveny's

5  conduct in either instance fell below the legal standard, the Trustee would not be

6  entitled to recover because he failed to prove that anything that O'Melveny did, or did

7  not, do caused any harm to Aletheia.

8  ### C.   The Trustee Did Not Prove Causation

9  Even if the Trustee had met his burden of showing either professional

10  negligence or breach of fiduciary duty, his claim would fail because he has not proved

11  that anything O'Melveny did or failed to do caused damage to Aletheia.

12  To prevail in this case, the Trustee must prove both causation and damages.

13  *Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP,* 593 F.Supp.2ed 1153, 1164 (S.D.

14  Cal. 2008) (citing *Osornio v. Weingarten*, 124 Cal.App.4th 304 (2004) (elements of

15  malpractice claim); *Stanley v. Richmond,* 35 Cal.App.4th 1070 (1995) (elements of

16  breach of fiduciary duty claim).  The Trustee does not dispute this basic proposition,

17  but, citing *Knutson v. Foster,* 25 Cal. App. 5th 1075 (2018), he argues that the test for

18  causation differs with respect to the two causes of action.  According to the Trustee,

19  the "substantial factor" test applies in cases of breach of fiduciary duty in supposed

20  contrast to the "but for" test used in cases of legal malpractice.  He contends that this

21  difference eliminates the "trial within a trial" approach to proving causation that

22  applies in legal malpractice cases.  CB, at 42:2-4, 48-49 & n. 16.

23  The Trustee's argument is incorrect in several respects.  First, he must prove

24  cause in fact to prevail, that is, that O'Melveny's conduct caused Aletheia to suffer

25  injury.  Second, the Trustee erroneously argues that there is a difference between the

26  "substantial factor" and "but for" tests for causation where, as in this case, there was

27

28

FINAL AWARD (CORRECTED)

only a single alleged causative agent for the injury.[31]  Third, where a malpractice

claim and a breach of fiduciary duty arise from the same alleged error or misconduct,

such as the alleged mishandling of litigation in this case, the burden of proving

causation on each claim requires the same "trial within a trial" method of proof.

Fourth, the Trustee has offered no evidence to meet this burden.

### 1.      The Trustee Must Prove Cause in Fact to Prevail

To recover damages against another, one must prove a causal connection

between the alleged tortious conduct and the harm suffered by the plaintiff – that is,

that the defendant's conduct can be viewed as connected to and responsible for the

plaintiff's injury.  *See, e.g., Rutherford v. Owens-Illinois, Inc.*, 16 Cal.4th 953, 968-69

(1997).  The "substantial factor" test does not sever that connection but rather

mandates only that a defendant cannot escape liability for the harm suffered solely on

the ground that other factors may have contributed to the injury.  *See id.*, at 969.

A close analysis of the "substantial factor" test shows that the test does not

replace, but rather subsumes, the "but for" test of causation.  *See Owens-Illinois, Inc.*,

16 Cal.4th at 969 ("but for" test not replaced but modified to address cases of

independent concurrent causes in fact); *Mitchell v. Gonzales*, 54 Cal.3d 1041, 1052

(1991) (same); see also CACI Instruction 430.  It leaves in place the common-sense

concept that there must be a factual connection between the defendant's misconduct

and the harm suffered to be considered a causal factor.  *See Mitchell,* 54 Cal.3d at

---

[31] To be sure, there is some loose language in *Knutson* that suggests that proof of causation is judged on a different standard in a fraud-based claim than a negligence-based claim.  But this is directly contrary to California law, which is incorporated in the CACI Jury Instruction Manual.  Instruction 405, setting forth the elements of a **negligence** claim, and Instruction 4106, setting forth the causal standard in **breach of fiduciary duty** claims, state precisely the same causation standard – "substantial factor."  Whatever *Knutson* meant to say, it cannot be interpreted as establishing different causal standards for negligence, including claims of professional negligence, and breach of fiduciary duty.  And it does not excuse the Trustee, as discussed in the text, from proving "cause in fact" in his case.  Substantial factor is a "cause in fact" test and, in the absence of concurrent causal agents, does not differ from "but for" causation.  *Knutson* therefore does not add anything new to the causation analysis – it is the same test for both claims, and, as discussed in the text, requires proof of a more favorable outcome in the Claimant's counterfactual world.

FINAL AWARD (CORRECTED)

1052 (conduct having nothing to do with the injury cannot be said to be "a factor, let alone a substantial factor in the production of the injuries"); *Owens-Illinois,* 16 Cal.4th at 968-69 ("substantial factor" test has been adopted in California as the "cause-in-fact" test and "generally produces the same results as does the 'but for' rule of causation"); *Lineaweaver v. Plant Insulation Co.*, 31 Cal.App.4th 1409, 1415 (1995) ( same).  These authorities unambiguously mandate that a plaintiff has an obligation to prove a substantial factual connection between the alleged misconduct of the defendant and plaintiff's injury, and that the "but for" language may be used where no concurrent factors are present.  *Viner v. Sweet*, 30 Cal.4th 1232, 1240-41 (2003).

The same standard applies in both professional negligence and breach of fiduciary duty claims, *Slovensky v. Friedman,* 142 Cal.Appl.4th 1518, 1533-34 (2006)[32], and applies whether the misconduct at issue involved a transactional or litigation retention.  *See Viner,* 30 Cal.4th, at 1052-53 (rejecting plaintiffs' contention that a lesser test should be applied in transactional cases due to difficulty of proof); *see also Lazy Acres Mkt. Inc. v. Tseng,* 152 Cal.App.4th 1431, 1437 (2007).  Thus, whether the representation involved transactional or litigation work, and whether suit was brought as a malpractice or breach of fiduciary duty claim (or both), the plaintiff must show that, but for the malpractice or the breach of fiduciary duty, the plaintiff would have obtained a more favorable result.  *Blecher & Collins, PC v. Northwest Airlines, Inc.*, 858 F.Supp. 1442, 1457 (C.D. Cal. 1994) (breach of fiduciary duty claim); *Viner*, 30 Cal.4th, at 1241-42 (malpractice action); *Blanks*, supra, 171 Cal.App.4th, at 357.  The California Supreme Court explained the reasons for the "more favorable result" approach:

> The purpose of this requirement, which has been in use for more than 120 years, is to safeguard against speculative and conjectural claims. [Citation.] It serves the essential purpose of ensuring that damages awarded for the attorney's

---

[32] *Slovensky* also reached the obvious conclusion that a plaintiff who fails to prove damages is not entitled to disgorgement of the attorney's fees.  142 Cal.App.4th, at 1534-37.

FINAL AWARD (CORRECTED)

1
2

> malpractice actually have been caused by the malpractice.
> [Citation.]

3

*Viner*, 30 Cal. 4th, at 1241.  *Blanks* further explained:

4
5
6
7

> [A] determination of the underlying case is required. This
> method of presenting a legal malpractice lawsuit is
> commonly called a trial within a trial. It may be
> complicated, but it avoids speculative and conjectural
> claims. [Citations.]

8

171 Cal.App. 4th, at 357; s*ee also Namikas v. Miller*, 225 Cal.App.4th 1574, 1582

9

(2014) (reiterating "trial-within-a-trial" method for proving causation).

10

### 2.      *The Trustee Failed to Prove Cause in Fact*

11         Because this case presents no alleged concurrent or independent causes of

12    Aletheia's alleged injuries, only O'Melveny's conduct is at issue.  The Trustee bore

13    the burden of proving that it was more likely than not that, but for O'Melveny's acts

14    or omissions, Aletheia would have obtained a more favorable result in its disputes

15    with Proctor, or in its putative claims against Eichler and Peikin.  However, while the

16    Trustee attacks O'Melveny's conduct on many fronts, including some that are

17    immaterial to the core issues in this case, he offers no evidence of how an attorney

18    representing only Aletheia would have achieved a more favorable result in any of the

19    matters for which O'Melveny was retained.  The Trustee presented neither witnesses

20    nor documentation to show that such an attorney would have offered different advice

21    to Aletheia, pursued a different course of action on behalf of Aletheia (e.g., suing or

22    taking other adverse actions toward Eichler, Peikin and others), that Aletheia would

23    have agreed to such a course of action, or that a different course of action would have

24    achieved a better outcome in any respect, including recouping compensation paid to

25    Eichler and Peikin.

26         The Trustee got no help from his expert witnesses on this issue.  On the issue of

27    what an "independent board" would have done with the information available during

28    the relevant time period, Wertlieb testified only that, had an independent board

FINAL AWARD (CORRECTED)

1   existed, it should have considered and evaluated whether to bring a claim against

2   Eichler and Peikin.  (RT 1918:7-17.)  He offered no opinion on whether or not such a

3   board would have or should have initiated a lawsuit against either Eichler or Peikin.

4   (RT 1917:25-1918:17.)  Similarly, when asked about the risks associated with suing

5   Eichler, Prof. Kehr testified, "I never suggested that action be taken against Mr.

6   Eichler"  (RT 1625:4-5) and would not even say that Aletheia had a claim against

7   Eichler, merely that it had a "problem."  (RT 1040:18-19.)  Prof. Kehr further

8   remarked that "this is a delicate situation.  One shouldn't think in terms of suing Mr.

9   Eichler or Mr. Peikin."  (RT 1040:20-22; see also RT 1622:2-3 ("Aletheia was in an

10  extremely ticklish position").)

11          Without any evidence of how Aletheia might have been better off with its own

12  counsel, the Trustee's Closing Brief conceded that he has not made such a showing:

13              Here, Claimant is not asserting that O'Melveny should have
14              obtained a better result in the Proctor Litigation, or in the
                SEC Investigation, or in the corporate and operational
15              advice matters O'Melveny performed on behalf of Aletheia.
                Rather, Claimant's case is that O'Melveny could not take on
16              any of these matters (or continue in these matters) once a
                conflict arose between Aletheia and Eichler because from
17              that point forward O'Melveny was incapable of providing
18              Aletheia with the undivided loyalty and candor required
                under the law and to which it was entitled.  The foregoing
19              'trial-within-trial" methodology has not been applied to
20              breaches of fiduciary duty claims.

21

22  CB, at 48:19-26.

23      This argument amounts to saying that there is no obligation to prove causation at

24  all because undertaking a conflicted representation, without more, establishes a right

25  to damages.  But that is plainly contrary to the law.  E.g., CACI 4106.  The Trustee

26  had the burden of proving a causal connection between "tak[ing] on any of these

27  matters" and the alleged $50 million dollars in damages he claims Aletheia suffered.

28

93

FINAL AWARD (CORRECTED)

1   The Trustee simply cannot prove that connection without showing that different

2   counsel would have done better.

3        The only witnesses to testify on the proper conduct of O'Melveny's

4   representation of Aletheia – Aronson and Spiegel – proved the contrary point; that no

5   experienced litigator representing only Aletheia would have given materially different

6   advice or pursued a materially different course of action than O'Melveny.  Thus, the

7   record supports a finding that the Trustee has failed to prove causation as to either his

8   malpractice or breach of fiduciary duty claim.

9        **D.    <u>There Was No Breach of a Duty of Disclosure</u>**

10       The Trustee's closing argument speaks of a duty to disclose.  More specifically,

11  he argues that O'Melveny had a duty to disclose information bearing on the possible

12  claims against Eichler and Peikin.  In support, the Trustee cites *Neel v. Magana,*

13  *Olney, Levy, Cathcart & Gelfand,* 6 Cal.3d 176, 189-90 (1971). But the Trustee has

14  conflated the duty to disclose with the duties to advise and alert which are discussed

15  below.  The proper question before this tribunal is the scope of O'Melveny's duties to

16  advise or alert in respect to the tasks it was hired to undertake.  These are questions

17  that *Neel* does not address.

18       *Neel* involved a situation in which the client had failed to file a malpractice

19  claim against the law firm within the applicable statute of limitations because it had

20  not been aware of the firm's error within that period.  The trial court granted summary

21  judgment, but the California Supreme Court reversed.  The Supreme Court held that

22  the firm had a duty as a fiduciary to disclose its error to its client and that the failure to

23  disclose constituted a breach of that duty.  *Neel* did not address questions regarding

24  the scope of representation and the obligation to advise or alert.  *See also Day v.*

25  *Rosenthal,* 170 Cal.Ap.3d 1125, 1166 (1985) (breach of fiduciary duty "by failing to

26  disclose to the [clients] all the facts regarding his possible negligence which materially

27  affected their rights and interests".)

28

94

In the present lawsuit, the duty discussed in *Neel* would arguably have required disclosure if there existed a conflict of interest among Aletheia, Eichler and other individuals.  If there was a conflict, and if that fact was concealed by counsel, then counsel would have to live with the consequences when they were revealed.  As Prof. Marshall testified, where counsel was wrong about the existence of a conflict, the lawyer assumed the risk of being wrong and might have to answer for that mistake in damages.  (RT 2735:1-20.)  But in this case, as discussed above, the Arbitrator finds that the Trustee has not established that O'Melveny was barred from jointly representing Aletheia and Eichler, and therefore the *Magana Cathcart* risk did not materialize because there was nothing to disclose.

The issues raised by the Trustee are more properly analyzed under the duty to advise and the duty to alert.  The context for that analysis is defined by the scope of O'Melveny's retention.  As the discussion below indicates, Aletheia's board, its management, and many of its shareholders were well aware of the facts and circumstances involving the Proctor litigation, Aletheia's rights, and the potential consequences of the Proctor dispute, and that no material facts were concealed from them.

**E.**   **There Was No Breach of any Duty to Advise or Alert**

**1.**   ***The Duty to Advise/Alert***

The Trustee contends that O'Melveny should have raised and discussed with Aletheia the potential claims that it could pursue against Eichler and Peikin principally with respect to the purported excessive compensation payments in 2007, 2008 and 2009.  Because O'Melveny had not been retained when the payments were made (Loeb was Aletheia's counsel during that period), the Trustee contends that O'Melveny had a fiduciary duty to disclose facts regarding the payments and propose courses of action. E.g., CB 16:21-17:13 citing testimony of Prof. Kehr.  This amounts to an argument that O'Melveny had a duty to advise regarding the allegations that

FINAL AWARD (CORRECTED)

Eichler and Peikin paid themselves excessive compensation.  The evidence reflects that O'Melveny had no such obligation.

Prof. Marshall explained that there are two related but distinct duties that apply to the scope of an attorney's obligation to his clients – the duty to advise and the duty to alert.  (RT 2642:4-14.)

> The duty to alert is a duty simply to let the client know that there might be something that they want to pursue, not to go into detail, necessarily, not to explain the pros and cons, but simply to let the client know this is there and, you know, for you to deal with.  Duty to advise is a duty to provide a much more robust kind of communication where you are talking about pros and cons and the kinds of things that a lawyer would usually consult with a client on."  (RT 2642: 4-14.)

Whether the attorney has a duty to advise on a particular subject is tied to the scope of the attorney's engagement, which will be typically determined by the retainer agreement.  (RT 2642:21 – 2643:6; 2752:5-17.)  "If something is without the scope, outside the scope of the representation, but the lawyer sees it, nonetheless, then the duty is a duty to alert." (RT 2642:25-2643:2.)  Thus, to determine which, if either, of the duties applies, the engagement letter must be scrutinized to determine the scope of the representation and what, if anything, has been excluded.  (RT 2643:3-6.)

The scope of the engagement letters and relevant California case law describing the approach to be taken in assessing the scope of the representation has already been set forth in detail in Section IV.B.1.b. above and will only briefly be discussed here.

### 2.    *No Duty to Advise Based Due to Limited Scope of Engagement*

O'Melveny was retained to defend Aletheia and Eichler against claims brought by Proctor, and to pursue Aletheia's affirmative claims against Proctor.  (E.g., Exs. 67, 109.)  Proctor's claims were rooted in contract; it brought several contract-based claims against Aletheia, and it claimed that Eichler, Peikin and others breached their fiduciary obligation to ensure that Aletheia honored its contractual obligations.

FINAL AWARD (CORRECTED)

1  Proctor did not pursue derivative claims in the name of Aletheia, or pursue general

2  fiduciary duty claims on behalf of all shareholders.

3      Relying on his expert, the Trustee contends that, even though Proctor's claims

4  were limited to its alleged contract rights against Aletheia, O'Melveny had a fiduciary

5  obligation to advise Aletheia regarding the possible consequences of those allegations.

6  Prof. Kehr opined, contrary to California law, that the scope of the representation as

7  set forth in an engagement letter was immaterial to the scope of O'Melveny's duty to

8  provide legal advice:

9           It's an essential element of the duty of competent
10          representation to advise the client of everything that the
            client -- that lawyer knows or reasonably should know that
11          might be material to the client's protection of its own
12          interests. Doesn't make any difference whether an
            engagement agreement is narrowly written.
13

14  (RT 1026:7-13.)  Thus, Prof. Kehr, identified several investigative steps that he

15  contends should have been taken and advice to be given in the circumstances

16  confronting O'Melveny.  CB, at 16:21-17:14, citing to Prof. Kehr's testimony at RT

17  1023:15-1024:22; 1030:18-1031:2; 1031:4-15.  For example, Prof. Kehr opined that

18  O'Melveny, had it not been conflicted, had a duty to conduct a detailed inquiry into

19  the truth of the compensation claims, the circumstances under which the alleged

20  violation occurred, and what steps had been taken to prevent a reoccurrence, along

21  with an obligation to advise board members regarding personal liability and to

22  conduct an investigation into the applicable statute of limitations.  (RT 1023:1-

23  1024:25.)

24      But O'Melveny did not undertake to represent any of the defendants with

25  respect to these matters, and the engagement letters cannot reasonably be read to

26  include them.  Even so, as the discussion in Section IV.A. indicates, Aronson and his

27  team investigated a wide range of issues related to the Proctor litigation, including

28  various aspects of the compensation issue.  (See generally Ex. 111; see specifically

FINAL AWARD (CORRECTED)

Outline Sec. IV.F. relating to compensation.)  For example, the outline specifically references the Side Letter Agreement and limits described therein, requests information regarding the process for determining compensation and bonuses and called for detailed information regarding the payment of bonus compensation in 2008 due to specific allegations in the Proctor complaint.  (Id., Sec. IV. F.)  It isn't clear that Prof. Kehr ever saw this document.

Notwithstanding its thorough inquiry into the facts, O'Melveny's obligation was limited to asserting claims against Proctor and defending Aletheia and the individuals from Proctor's claims which, as discussed above, sought direct recovery from the defendants.  The engagement letters state in plain and unambiguous language:

> Our representation of you relates only to the Subject Matter. We have not been asked to represent the Company or the Individuals in other legal matters at this time, and our representation as to any matters not specified will be subject to resolution of any further conflict issues that may arise and our acceptance in writing at the time of a request from you for a particular undertaking.

(Ex. 67; see Ex. 109 adding the Proctor Litigation to the "Subject Matter" of the representation; see also Exs. 138, 164.)  Moreover, the retainer agreements spelled out in considerable detail the possibility that conflicts could arise and what could happen if they did.  In these circumstances O'Melveny had no duty to *advise* Aletheia regarding claims that could be brought against Eichler and Peikin, whether those claims should be brought, or how the representation would be affected if in fact Aletheia determined to bring such claims or on any other matters outside the scope of the retention.  (See, e.g., RT 2643:7-17 (engagement agreements did not envision representation by O'Melveny in suit by one of the common clients against another.))  But the evidence discussed below shows that Aletheia's senior management was

FINAL AWARD (CORRECTED)

1  nevertheless well aware of and had received advice regarding Aletheia's potential

2  claims against Eichler and Peikin.

3  ### 3.    *The Duty to Alert Was Met*

4      Where the scope of the engagement does not give rise to a duty to advise, an

5  attorney may still be obliged to alert the client to facts and issues of potential

6  importance to the client.  (RT 2641:24-2643:6.)  As in the determination of the

7  existence of a "potential conflict," whether the duty to alert is triggered is a matter of

8  whether it would be reasonably foreseeable that the client might want to take action

9  based on information that comes into counsel's possession. (RT 2647:2-2648:4.)  The

10 burden of determining when and under what circumstances to raise an issue under the

11 duty to alert rests in the first instance on counsel in the exercise of his best judgment

12 given the context in which he or she is operating.  (RT 2750:14-16; see also RT

13 2748:6-8.) ("The duty to alert presupposes some censoring that is happening to get the

14 wheat from the chaff, to divide those two.") And if counsel has reason to believe that

15 the client is already aware of the facts, then the duty to alert does not arise.  (RT

16 2656:6-16.)

17     In the present circumstances, it is not clear that a duty to alert had arisen.  Prof.

18 Marshall opined, based on testimony of Spiegel and Metzger, that no rational client in

19 Aletheia's position would contemplate bringing, let alone bring, a suit against its key

20 officers and directors and that O'Melveny therefore had no duty to alert Aletheia

21 regarding such claims.  (RT 2647:17-2649:25; 2652:3-23.)  However, it is not

22 necessary to reach this issue because Aletheia was in fact alerted to the existence of

23 the claims of excessive compensation and the potential consequences arising from

24 those claims.  Both documentary evidence and deNeve's testimony relating primarily

25 to the period when he served as Aletheia's General Counsel demonstrate that the

26 consequences of Proctor's allegations were known and understood by Aletheia's

27 management.

28

FINAL AWARD (CORRECTED)

First, the existence of a dispute between Aletheia and Proctor, which had been the subject of court filings and settlement discussions for two years, was common knowledge within the firm well before O'Melveny's involvement.  The dispute erupted into major litigation in early 2010 with Proctor's filing of its New York complaint that contained allegations that Eichler and Peikin had received excessive compensation in the prior three years.  (Ex. 4.)  As noted above, to educate itself on the issues in the case, O'Melveny prepared a detailed outline of subjects to be addressed with Aletheia's officers and senior managers.  (*E.g.,* Ex. 111[Para. IV.F. dealing with "Compensation Issues"].)  Aronson and Close interviewed Eichler, Peikin, Mark Scalzo, Arvin Santos, Reyna Chavez and Patricia Barnes, (RT 723:23-724:13; 725:22-726:6), and topics addressed included distributions and revenue sharing (RT 728:7-20), and alleged excess compensation paid to Eichler and Peikin. (RT 729:16-730:12.)  In short, if Aletheia's managers and directors weren't aware of the Aletheia-Proctor dispute and the allegations against Eichler and Peikin before O'Melveny's assumption of control over the litigation, O'Melveny's early interactions with Aletheia's management left no doubt about this aspect of the long-simmering dispute with Proctor.  But discussion on the subject did not stop in early 2010.

In August 2010, Lee requested, and Aronson and Olson provided, an update on Aletheia's various litigation matters. (Ex. 2259.)  Then in November 2010, Peikin filed his wrongful termination complaint naming Aletheia, Eichler, Barnes and Lee as defendants.  (Ex. 2480.) The documentary record reflects that Eichler received the complaint and forwarded it to Rina Echavez who, in turn, sent it to Bruce Lee, *a named defendant.*  (*Id.*)  Other Aletheia managers who received copies of the complaint included Michael Laney and Anne Marie Swanson (Ex. 2481), and plainly Barnes, as a named defendant, would also have been aware of the complaint.  Peikin's allegations echo a portion of the Proctor complaint by asserting that Eichler looted

FINAL AWARD (CORRECTED)

1   corporate assets through various means including paying himself millions of dollars in

2   excess compensation.[33]  But the complaint went beyond that allegation, stating:

3            A shareholder's derivative complaint presented to the
4            Aletheia Board concurrently with the filing of this
             Complaint, also seeks Board intervention to stop Eichler
5            from looting Company, restore sums squandered for
6            Eichler's personal benefit and compel the payment of
7            distributions to Aletheia's much aggrieved minority
             shareholders.
8
9   (Ex. 54, Para. 6.) [34]  Thus, the entire management team was alerted in detail to the

10  excessive compensation charge against Eichler, and to the possibility that the

11  corporation could, and was supposedly being asked to, intervene.

12       DeNeve, who was focused on the SEC investigation, had become aware of

13  Peikin's suit, which "received significant attention by Aletheia's board as well as

14  Aletheia's senior officers . . . ."  (RT 1410:22-23.)  DeNeve had also learned that

15  Peikin's suit was about to become the subject of an article in the New York Times

16  (RT 1410:24-25; 1411:18-21.)  At that point, the SEC investigation had been nearly

17  concluded, but now deNeve knew that he would need to discuss it with SEC counsel

18  "because there were allegations that would raise concerns."  (RT 1411:1-4.)  As part

19  of that process, deNeve discussed Peikin's claims – principally those involving

20  trading practices and looting – with Barnes, Santos, CCO Swanson and CFO Laney.

21  ─────────────

22  [33] In his complaint, Peikin contended that Eichler's compensation was a "bone of contention": between them.  (E.g., Ex. 2481, Para. 23.)  Given that Peikin himself received large performance bonuses and was himself a target of Proctor's excessive compensation allegations, his current

23  assertion that he opposed Eichler's bonus compensation is not credible.  More importantly, it is inconsistent with Aronson's testimony that both Eichler and Peikin, when questioned about Proctor's

24  compensation claim, rejected Proctor's assertion and insisted that they had earned the bonuses.

25  [34] No evidence was presented that Peikin actually delivered a draft derivative complaint to the Board, and Peikin even conceded at the hearing that he hadn't filed such a complaint on the advice

26  of his wrongful termination counsel.  (RT 244:20-245:10)  But Peikin's intent is not  the point: the allegations of Paragraphs 6 and 23 clearly put Aletheia on notice (if it wasn't already) that it had a

27  claim against Eichler.  These allegations, without more, showed the seriousness of the compensation issue and was sufficient, as Prof. Marshall opined, to satisfy any duty Respondents had to alert with

28  respect to the compensation issue. (RT 2663:16-24.)

(RT 1412:24-1414:14).  Swanson was particularly concerned about the allegations regarding "looting and excessive compensation" which she raised with Laney.  (RT 1414:24-1415:14.)   In several internal discussions, deNeve noted that Peikin was alleging that Eichler's compensation should be returned to Aletheia, but that his reasoning would apply with equal effect to payments that Peikin received.  (RT 1413:16-20;1416:2-8.)  DeNeve also discussed with senior management that a shareholder (like Peikin) could pursue a claim on behalf of Aletheia in a derivative action.  (RT 416:9-417:2,)  The internal discussions, and then the outreach to the SEC occurred by the first week of December 2010.  (RT 1411:22.)

Discussions regarding the excessive compensation claims, augmented by documentation, continued in 2011.  The record reflects that Lee read the amended cross-complaint that added Barnes and Lee as defendants and asked to discuss it with Aronson.  (Ex. 2268.)  Aronson explained that "Lee was not a lawyer.  He was looking to me as his lawyer to explain what this was."  (RT 781:18-82:4.)  Lee was also informed of damages issues arising from the cross-complaint.

In June 2011, O'Melveny, using computations developed by the accounting firm of Freeman & Mills and other relevant documents, prepared a memorandum, delivered to Olson and deNeve, analyzing the potential liability of Aletheia and its directors with respect to the claims set forth in Proctor's Los Angeles Superior Court cross-complaint.  (Ex. 222.)  Within that memorandum, O'Melveny also included an assessment of what could happen if a derivative claim were ever brought in the name of Aletheia.  (Ex. 222, at 5.)  DeNeve explained that he discussed the potential consequences of the excessive compensation claim with Lee, including at least one discussion involving the Freeman & Mills analysis.  (RT 1330:22-1331:2; 1444:11-18.)  Over time, deNeve and Lee had more detailed discussions regarding the compensation issue, how it could be pursued by Aletheia and the potential recovery compared with the costs of pursuing such a claim including the impact on the defenses to Proctor's direct claims, the problems with collecting a judgment, and the potential

FINAL AWARD (CORRECTED)

destruction of the business that would come from suing the company's chief investment officer.  (RT 1448:4-1449:16.)  In sum, deNeve made it clear when discussing Aletheia's excessive compensation claims that, if Proctor's allegations were proven to be true, Aletheia had a potential claim for recovery of Eichler's compensation.  (RT 1299:5-1300:8.)

The Proctor litigation and its potential consequences were also a topic of discussion at a firm retreat in late August 2011.  (See, Ex. 72 [referencing "litigation update"]; RT 1462: 1-1463:12.)  DeNeve told those attending that Proctor's allegations disclosed a basis to sue Eichler.  (RT 1462:15-18.)  The concept, if not met with outright ridicule, was received unfavorably with responses ranging from eye-rolling (RT 1462:19-21), to "you can't have Aletheia suing the chief investment officer" (RT 1463:11-12), to a general reaction that suing Eichler was not a good idea. (RT 1465:4-15.)

Against the wealth of evidence showing that Aletheia's directors and senior management team were well alerted to the possibility that Aletheia could pursue a claim against Eichler and Peikin, the Trustee argues that no specific information was put in writing to suggest that Aletheia was adequately alerted, and that deNeve's testimony should not be believed because of his lack of independence.  As to the first point, the case law cited above contains no mandate that an alert must be given in writing to be effective, a point that even Professor Kehr conceded. (RT 1643:24-1644:2.)  Moreover, there is no legal support for the suggestion that a witness's testimony that is not corroborated by a document or an "independent" witness is entitled to no weight.  E.g., CB, at 5:20-23.  Rather, witness testimony is to be given such weight as the trier of fact (in this case the Arbitrator) believes it is entitled taking into account those factors discussed in Appendix I hereto.  In this particular instance, deNeve testified credibly, consistent with the documentary record, that Proctor and Peikin's claims, which put the excessive compensation issue front and center, was repeatedly discussed with Aletheia's senior management, its directors including the

FINAL AWARD (CORRECTED)

outside director, and even with those shareholders who attended the retreat.  Finally, as discussed below, with Proctor and Peikin aggressively pursuing claims against Aletheia and Eichler, there was good reason to communicate without creating a documentary record that could have been the subject of discovery requests in those cases.

Considering the entirety of the record, the Arbitrator finds that Aletheia's senior management, its board members including the outside director, and at least some of its shareholders were aware of the excessive compensation allegations and understood Aletheia's available options with respect to those allegations.

### F.    The SEC Investigation and Corporate Governance Issues

#### 1.    *The Claim is Not Timely*

Throughout the course of this lawsuit, the Trustee has focused principally on the allegedly conflicted joint representation of Aletheia and Eichler in the Proctor litigation, which is the centerpiece of his claim.  (See generally RSOC, Paras. 70 et seq.)  However, in his post-hearing briefing, the Trustee argues that the joint representation of Aletheia, Eichler and others in connection with the SEC investigation also violated O'Melveny's fiduciary duty to Aletheia.  See CB, at 31-32. The Trustee contends that once O'Melveny learned of Proctor's allegations that Eichler had taken excessive compensation, O'Melveny was precluded from jointly representing Aletheia and Eicher in both the Proctor litigation and in the SEC investigation.

> This conflict infected O'Melveny's other representations of Aletheia where *the same issues* were presented and where O'Melveny's actions and omissions benefitted Eichler to Aletheia's detriment.  These related matters included corporate governance and compliance matters relating to the investigation by the SEC . . . .

FINAL AWARD (CORRECTED)

CB, at 3:17-20 (emphasis added); see also 4:10-11.  Moreover, according to the
Trustee, O'Melveny manipulated the response to the SEC investigation to serve
Eichler's interests.  CB, at 4:10-15; 31-32.  O'Melveny allegedly sought to weaken
the recommendations of the consulting firm, FTI, to insure Eichler's continued
dominance of Aletheia, CB, at 31:24-32:1, and schemed to have Bruce Lee elected as
a faux independent director and then made sure that he was unable to act
independently.  *Id.*, at 32:1-7.  Among other things, Lee was supposedly used to
rubber stamp O'Melveny's orchestration of Peikin's termination at Eichler's behest.
*Id.*, at 3:22; 4:15-18.  In the Trustee's view, O'Melveny's role in the election of Lee
and termination of Peikin were "manifestations of  O'Melveny's disloyalty to
Aletheia."  CB, at 32:21-22.  The Trustee even claims that "the most significant
impediment to compliance was O'Melveny itself because of the influence it was in a
position to wield but which it abdicated and resisted in furtherance of Eichler's
bidding."  CB, at 32:14-16.   However, to the extent that these arguments are intended
to state a claim as opposed to impugn Respondents' integrity, any such claim was not
timely raised.

     The Trustee's Statement of Claim focuses on the injury suffered as a result of
O'Melveny's allegedly improper joint representation of Aletheia and Eichler in the
Proctor litigation.  (RSOC Paras. 70 et seq.)  That claim was reiterated in the Trustee's
responses to contention interrogatories.  (See Ex. 2325, at 20 et seq.; Ex. 2328, at  7 et
seq.)[35]  At no time did the Trustee move to amend the Statement of Claim or to
supplement an interrogatory response indicating that O'Melveny's joint representation
of Aletheia and Eichler in the SEC investigation constituted a breach of duty.  (*Id.*)

---

[35] The only responses to contention interrogatories that have any connection to corporate governance
relate to Bruce Lee's appointment as a director, but not in respect to an alleged conflict in the SEC
investigation. In any event, the Bruce Lee issue is examined in the text below.

FINAL AWARD (CORRECTED)

The Trustee cannot claim that he did not understand the obligation to give pre-hearing notice of his claims because he in fact belatedly attempted to do so with respect to a different putative claim.  The Trustee amended his contention interrogatory responses to add an allegation that O'Melveny had failed to advise Aletheia regarding errors committed by its prior counsel.  (Ex. 2328, at 14 et seq.)  The timeliness of those allegations was raised in a pre-hearing motion; the Arbitrator ruled that the Trustee had not given adequate notice of that claim and precluded it from being added to the case at such a late date in these lengthy proceedings.  (Arbitrator's Order of May 7, 2018.)

Plainly the attempt to add claims during the hearing or in closing argument is even more prejudicial.  Delayed assertion of claims deprives the litigants of the opportunity to identify and depose material witnesses, obtain relevant documents, and seek advice and testimony from qualified experts on relevant topics.  For these reasons, among others, case law clearly precludes such dilatory conduct.  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000); *Diaz v. Kubler Corp.* 982 F.Supp.2d 1146, 1153 (S.D. Cal. 2013).  These cases are entirely consistent with the JAMS Rules, applicable in this proceeding, that provide in pertinent part, "[n]o claim . . . will be considered by the Arbitrator in the absence of such prior notice to the other Parties, (JAMS Comprehensive Arbitration Rules & Procedures, Rule 9(a).)   No such notice was given in this case.

This failure is dispositive and alone is a proper ground for finding for the Respondents on the alleged improper joint representation in the SEC investigation.  But the challenge to O'Melveny's handling of the SEC investigation also suffers from a failure of proof on the critical elements of the claim.

## 2.    *The Trustee Offered No Evidence of Breach, Causation and Injury*

The SEC claim, even had it been timely noticed, would fail due to a lack of proof that Respondents' conduct caused injury *to Aletheia*.  The Trustee presented no

FINAL AWARD (CORRECTED)

1    evidence of what a purported unconflicted attorney would have done differently, how

2    FTI and the SEC would have responded to a different approach, and how that would

3    have yielded a different and better result.  See RRB, at 17.  This would have required,

4    at the very least, a standard of care expert, but none testified for the Trustee on any

5    issue, let alone the SEC investigation.  As a result the record includes no evidence to

6    show how Aletheia could have possibly achieved any better outcome – as discussed

7    below O'Melveny quickly persuaded the SEC that it had no fraud case against

8    Aletheia, Eichler and Peikin, and ultimately engineered a settlement with the SEC in

9    the form of a cease and desist order that, under the circumstances, amounted to a

10   regulatory slap on the wrist.  (Ex. 2150.)

11       But even if considered on the merits, the Trustee has failed to prove that

12   O'Melveny's work on the SEC matters fell below the standard of care or breached the

13   duty of loyalty to Aletheia.

14              ***3.***       ***O'Melveny Successfully Neutralized a Putative Fraud Claim***

15       As described in the factual background above, the SEC initiated an

16   investigation into the conduct of Aletheia, Eichler and Peikin in early 2009.  When

17   O'Melveny initially became involved on behalf of Eichler, Aletheia and Peikin had

18   separate counsel.  Aletheia was represented by Loeb; Peikin was represented by

19   Robert Friese of Shartsis Friese.  (See, e.g., Ex. 1041; RT 223:10-13.)  At no time did

20   anyone suggest that Aletheia and Eichler's interest conflicted (RT 703:10-17; 1386:3-

21   10.)[36]  Nor could they.  Both were targets of the investigation and it was a near

22   certainty that a finding against one would have resulted in a finding against both.  (See

23   RT 703:10-17; 1370:5-1371:4; 1384:21 -1385:6.)  Aletheia could be charged for

24

25   _____

26   [36] The Trustee's contention that Loeb had concluded that Aletheia and Eichler's interests were in
     conflict is erroneous and based on an error made by an O'Melveny junior associate in connection
27   with Peikin's belated motion to disqualify O'Melveny in 2011.  (Ex. 343.)  But that same document
     reflects deNeve's declaration identifying a conflict between Eichler and Peikin only.  Other materials
28   in the record also reflect that the conflict identified in the SEC investigation was between Eichler
     and Peikin.  (E.g., Ex. 337, Para. 6.)

FINAL AWARD (CORRECTED)

Eichler's acts as Chief Investment Officer; Eichler risked being charged as a control person with respect to actions taken against Aletheia.  (RT 1384:21-1385:6.)

Even though it was representing only Eichler in the early weeks of its involvement, O'Melveny, with its substantial SEC experience, played a leading role in dealing with the SEC and quickly perceived that the investigation posed a serious threat to all targets as it had focused on "Aletheia's returns and how they were disclosed to the public."  (RT 705:6-8.)  The SEC questioned whether Aletheia was reporting actual returns or hypothetical "model" returns for its various funds, (RT 705: 6-18), and thus viewed the case as involving possible fraud.  DeNeve observed that the SEC's lead attorney on the case "thought he had a very juicy case involving model returns and it wasn't."  (RT 1369:21-22.)

Using their experience and expertise in the field, Olson and deNeve investigated the facts, reviewed documents, and discovered that Peikin and Loeb, who were dealing with the SEC, were operating under an erroneous assumption regarding return data. (RT 1367:9-1368:21; 1369:17-18.)  Respondents collected the documentation, put it together in a presentation, and brought it to the attention of the SEC lead attorney who, after several meetings was persuaded that he didn't have a fraud case.  (RT 1369:10-22.)  Once dissuaded from pursuing a fraud claim, the SEC turned its attention to a less threatening, but still important, books and records inquiry, which turned "an enterprise-threatening situation, potential, to a non-enterprising-threatening situation."  (RT 562:14-24)  The record therefore reflects that O'Melveny achieved a very favorable outcome  for all participants because Eichler and Peikin were otherwise facing a possible bar on participating in the business for some period, which in turn would have likely destroyed Aletheia's business.  (RT 1370:5-1371:4.)

### 4.  *O'Melveny' Helped Achieve Compliance and Corporate Governance Reform*

O'Melveny's success in turning the SEC away from its fraud inquiry led to its retention in connection with the SEC's compliance and governance inquiry.  (See RT

1384:6-16.)  Thus, in January 2010, O'Melveny was retained to represent Aletheia, Eichler and several other employees for the remainder of the investigation.  (Ex. 67.) The change in the investigation's focus did not alter the respective interests of the parties.  Unless and until the SEC concluded that the firm's corporate governance and compliance reforms met with its approval, the matter would not be resolved.  All parties had an interest in obtaining a resolution that would be satisfactory to the SEC, and the Trustee offered no evidence to the contrary.  (See RT 1690:13-1691:3; see also discussion at RT 1594:19-1596:13.)

To meet the anticipated demands of the SEC, O'Melveny was the one who recommended the retention of FTI Consulting, the highly respected third-party consulting firm mentioned above, to conduct an independent review and evaluation of Aletheia's corporate governance and compliance procedures.  (RT, at 1075:10-19; 1384:6-16.)  Considered the "gold standard" in the field, FTI was expected to collect and analyze information, develop recommendations, and prepare a comprehensive report with the objective of having the SEC accept the report's proposed remedial actions as meeting the agency's objectives in conducting its review of Aletheia's operations.  (RT 1077:1-11; , 1383:1-25, 1390:1-1391:1; 2110:12-23.)  Involving FTI in this process was particularly important because of its independence and its credibility with the SEC.  (RT 1383:17-25.)[37]  No limitations were placed on the scope of the FTI inquiry, and Eichler agreed to this approach.  (RT 1384:1-8; 1390:17-1391:2; see generally Exs. 500; 2155.)  As Spiegel noted, a competent practitioner in the field would be fully justified in relying on FTI to identify and recommend what issues needed to be addressed and how to resolve them. (RT, at 2110:7-2112:21). Peikin, who had not yet become completely estranged from Eichler, understood FTI's

---

[37] Loeb and Friese were pressing for a smaller, local firm to perform the work, which Respondents viewed as a potentially serious mistake because of the need for credibility in the SEC presentation. (RT 1383:9-25; 1390:17-1391:2.)  Eichler, with whom the alternatives were discussed, approved the use of FTI.  (RT 1383:1-5; 1384:6-16.)

FINAL AWARD (CORRECTED)

1   role and the overall strategy of having the targets of the investigation show the SEC

2   that its concerns were being addressed.  (RT 223:20-224:8.)  To that end, Peikin's

3   counsel gave both FTI and O'Melveny input on the relevant governance and

4   compliance issues.  (RT 224:14-25.)

5        FTI started work in early 2010 and spent several months conducting an

6   exhaustive examination of every aspect of Aletheia's operations.  (Exs. 1259; 500.)

7   FTI noted that, even before it had concluded its work, a number of improvements that

8   had already been implemented including the hiring of new personnel in senior

9   management positions such as CFO, CCO and COO (e.g., Exs. 500, at 5; 2155, at 3)

10  and the retention of independent firms to handle important data and accounting

11  functions.  (Ex. 500, at 5.)  Most critically, FTI prepared comprehensive findings and

12  recommendations which were completed in late July 2010.  (Ex. 500; see also 2155, at

13  2 et seq.)

14        By May 11, 2011, Aletheia had fully implemented some of the

15  recommendations, had made substantial progress on the remaining recommendations,

16  and provided FTI with a detailed report on its activities with respect to every

17  recommendation FTI had made.  (Ex. 2155, at 2-40.)  The document on its face

18  reflects that an enormous amount of time and effort were devoted to reforming

19  Aletheia's compliance and governance functions.  (*Id.*)  Of particular note, Aletheia

20  described the creation of a compliance committee that reported to the independent

21  director, (RT 1174:2-11) and advised that reporting obligations were restructured to

22  mandate that employees report to the senior officer in their respective functional areas

23  in lieu of reporting directly to Eichler.  RB, at 35 citing Ex. 2155; see also RT

24  1397:14-1398:16.  But these were only two of numerous changes in structure and

25  operation that reflected a dramatic change in corporate culture in response to the

26  SEC's investigation.

27

28

FINAL AWARD (CORRECTED)

The record reflects that the retention of FTI and the extensive work performed in 2010 and 2011 paid dividends.  Upon the conclusion of its investigation, the SEC specifically noted in its Cease and Desist Order:

> In determining to accept the Offers [of Settlement on behalf of Aletheia, Eichler and Peikin], the Commission considered remedial acts undertaken by Respondents and cooperation afforded the Commission staff. Specifically, during the Commission's staff investigation, Aletheia hired an independent consultant . . . to evaluate its compliance practices and procedures, and Aletheia is implementing its recommendations.

Ex. 2150, Para. 19.)[38]  Thus, the substantial changes that had been made along with those that would be addressed in the future, refute the Trustee's argument that O'Melveny somehow failed to pursue Aletheia's interests or achieve a more favorable outcome in dealing with the SEC's investigation.  It is not clear how any firm could have done better, and the Trustee certainly made no effort to prove that a better result could have been achieved.

### 5.       The Trustee's Attack on O'Melveny's Work

Instead of focusing on the objective of the compliance and governance investigation and the successful settlement with the SEC, the Trustee raises several points in support of his contention that O'Melveny impeded Aletheia's efforts to reform its governance and compliance practices.  The argument cannot be squared with the painstaking work done by FTI, the many changes made in governance and

---

[38] The Trustee argues that O'Melveny sought to modify recommendations that would reduce Eichler's control, citing Exhibits 1292 and 1293.  But these documents mainly reflect discussions regarding practical considerations bearing on the timing of the implementation of FTI's recommendations.  Nothing in those documents can reasonably be read as an effort to protect or enhance Eichler's control over the organization.  Moreover, the SEC's acceptance of the recommendations, and its recognition that "Aletheia is *implementing* [FTI's] recommendations" reflects that implementation was a process that would not be completed overnight.  At the same time, the progress that had been made and the reforms achieved satisfied the SEC that Aletheia had made substantive governance and compliance reforms that warranted terminating the proceedings.

FINAL AWARD (CORRECTED)

1  operational procedures, and the SEC's acceptance of Aletheia's settlement offer.  The

2  following sets forth a few examples of the defects in the Trustee's position.

3      <u>The Compliance Focus:</u>  The Trustee contends that Eichler was the focus of the

4  SEC investigation and FTI's review.  Why this is important at all is not made clear,

5  but the record demonstrates that the contention is in fact erroneous.  While Eichler's

6  role in the firm was obviously important, the Trustee's argument that the "crux of

7  FTI's initial findings was that too much power was centralized in Eichler . . ."  ignores

8  FTI's thorough review of Aletheia's entire operation.  Compare CB, at 31:9-10 with

9  Exs. 500, 1058, and 2155.  FTI's initial report (Ex. 500) was 25 pages in length,

10  contained 41 separate findings and made 85 separate recommendations; one finding

11  and two recommendations focus on the role of the CEO and the need to restructure

12  lines of reporting and the creation of clear description of job duties and

13  responsibilities.  (Ex. 500, at 7, Finding 2; Recommendations 6 & 7.)  The remainder

14  of the document addresses a multitude of other tasks and operations that bear on

15  governance and regulatory compliance.

16      <u>Eichler's Purported Interest:</u> The Trustee contends that O'Melveny could not

17  jointly represent Aletheia and Eichler because Aletheia's interests were not aligned

18  with "Eichler's interests, as he understood them, of retaining his autocratic control

19  which allowed him to ignore corporate formalities."  CB, at 31:12-14.  This is an odd

20  assertion because the Trustee offered no evidence regarding Eichler's "understanding

21  of his interests," and the contention is easily rebutted by the documentary record.

22  Aletheia gave FTI a green light to undertake whatever actions were needed to

23  investigate, make findings and recommendations, and to oversee implementation of

24  compliance and governance reforms.  Once the recommendations were developed,

25  Aletheia made a concerted effort to implement FTI's recommendations, which were

26  reflected and periodically updated in a "Tracking Chart for Implementing FTI

27  Consulting, Inc.'s Recommendations."  (See Exs. 1149, 2155, 2182, 2209, 2308.)

28  Among the many things accomplished were the creation of a formal compliance

FINAL AWARD (CORRECTED)

committee that reported to the outside director, the addition of senior officer positions to decentralize authority within the firm and restructuring lines of reporting. (*Id.*) These moves plainly reduced, rather than expanded, Eichler's authority.

Lee's Election to The Board: The Trustee contends that Lee was elected to the Board to serve Eichler's interests rather than Aletheia's. This is incorrect. As Respondents explained, Lee's election was in furtherance of Aletheia's interest in implementing FTI's recommendations and meeting the SEC's expectations on governance and compliance issues. RB, at 29; RT 1130. The election was held on the cusp of a meeting with the SEC to demonstrate that an independent director had been added to the board. (RT 1359; Exs. 135.) As deNeve explained, electing an independent board member was an easy way to show the SEC that steps were being taken to implement FTI's recommendations. (RT 1359:19-25.) Before submitting his name, deNeve considered Lee's friendship with Eichler and its impact on Lee's independence in light of "prevailing norms" to make sure there were no issues with FTI or the SEC. (RT 1181-82.) When Lee's name was reviewed both by FTI and the SEC, neither stated any objection to his election to the board. (RT 853:25-854:17; 1147:17-1148:6.)

To be sure, how Lee's election would be assessed in the Proctor litigation was an open question. In ordinary circumstances, the Side Letter Agreement gave Proctor the right to appoint a director to the board and to replace the board member when he or she resigned. (Ex. 757, Para. 6.) But circumstances were not normal in June 2010. The enforceability of the Side Letter Agreement was placed in issue when Aletheia found Proctor in breach of the Selling Agreement, terminated the Selling Agreement, and brought affirmative fraud claims against Proctor. (E.g., Sections III. G.; IV.A. above.) Indeed, almost two years before O'Melveny became involved with Aletheia, Selvin had advised Aletheia that replacing Coley with a Proctor nominee, given Proctor's duplicity in its dealings with Aletheia, might have been a breach of fiduciary duty. (Ex. 2046.) Likewise, Respondents' governance expert, Keith Bishop, testified

1    that it was contrary to Aletheia's interests to have a Proctor nominee on the board

2    during the pendency of the Proctor litigation.  (RT 2599:10-2600:8; see also 735:1

3    [Aronson testimony].)[39]

4         Lee's Performance of his Duties:  There was ample evidence that Lee

5    conscientiously performed his duties as a board member.  These included: (1)

6    participating in board of directors' meetings (e.g., Ex. 2179); (2) conferring with

7    deNeve and others regarding the legal issues facing Aletheia including: a discussion of

8    the O'Melveny damages memo with deNeve (RT 943); receiving and reviewing

9    Peikin's wrongful termination complaint (Exs. 2480, 2481); dealing with Peikin's

10   litigation demands (Ex. 1143); receiving litigation updates from deNeve (e.g., Ex. 73);

11   receiving litigation updates from Olson and Aronson (Ex. 2259); (3) attending

12   shareholder meetings (e.g., Ex. 271); (4) moderating Aletheia's management retreat in

13   August 2011, which included a litigation update (Ex. 74); and (5) preparing a list of

14   actions items for follow up after the retreat including a request for a "bare bones"

15   litigation budget.  (Ex. 2246.)  DeNeve was impressed with Lee's performance as a

16   member of the board, noting that he provided substantial assistance and support in the

17   implementation of corporate governance reforms and general enhancements of

18   management processes.  (RT 1441:18-21.)  His performance is significant because

19   Prof. Kehr opined that, if Lee understood his fiduciary obligations as a director "and

20   O'Melveny knew or reasonably should have known that he understood and accepted

21   those duties, then, yes, he – it could communicate [with Aletheia] through him . . . ."

22

23

24   [39] The parties spill much ink in what can best be described as a tangential debate regarding how the
     votes were counted in Lee's election, and whether Aletheia's by-laws mandated a shareholder "head
25   count" vote or the customary "number of shares" vote.  The Trustee made the head count argument
     as a basis for claiming that Lee's election based on Eichler's written consent as majority shareholder
26   was invalid.  But the Trustee's own expert admitted that he had never seen a head counting provision
     (RT 1848-49), and it appears that any such provision would violate California's one share, one vote
27   rule.  Cal. Corp. Code. Sec. 700(a).  Thus, even if the by-laws mandated a head count method for
     electing directors, and the better view is that they don't, the provision would be unenforceable under
28   the California Corporations Code.  (See RT 2581:16-2582:8.)

FINAL AWARD (CORRECTED)

(RT 1695:14-22.)  To be sure, Prof. Kehr said that "it's hard for me to picture that those conditions existed," (RT 1695:23-24), but the evidence introduced at the hearing demonstrated that Lee took his obligations as an Aletheia board member seriously and performed them diligently.

Lee's Compliance Committee Oversight:  The Trustee contends that Lee could not properly oversee the Compliance Committee because he was not provided with minutes "in some cases, over a year after the meetings occurred."  CB, at 32:6.  But his argument is based on the incorrect assumption that deNeve was responsible for providing Lee with Compliance Committee minutes.  Exhibit 1155, cited by the Trustee, provides no support for that assumption. That document reflects deNeve's delivery to Lee of documents, including Compliance Committee minutes, that had been collected *for an Executive Committee meeting in 2012.*  It has nothing to do with the routine submission of Compliance Committee notes to Lee, which was an obligation of the committee's chair, Ms. Swanson.  (RT 1512-15.)  Because it was Ms. Swanson's responsibility,  deNeve was unable to say one way or another whether the minutes were timely delivered.  (*Id.*)  Ms. Swanson did not testify and there is no evidence suggesting that she failed to perform her duties.  Thus, neither Exhibit 1155 nor deNeve's testimony on this point proves that Lee was not receiving Compliance Committee Minutes on a timely basis.

DeNeve's Documentation of Communications:  The Trustee contends that "a lack of any documentary evidence" indicates that important information such as C'deBaca's resignation letter, Eichler's personal relationship with Lee, and the existence of the 709 actions and Peikin's lawsuit were never disclosed to the SEC. CB, at 31:26-32:4; 37 n.12.  First, Exhibit 1266, at 3 n. 3, reflects disclosure of C'deBaca's resignation and notes his demand for a tripling of his compensation.[40]

---

[40] It also should be noted that C'deBaca's resignation letter (see Ex. 1102), which fails to mention his compensation demand, was delivered after he had been provided with a draft of FTI's proposed report, which reflected the importance of compliance reforms.  (Ex. 1058.)

FINAL AWARD (CORRECTED)

Second, the assertion that deNeve, himself a former SEC attorney, would withhold information from the SEC during the pendency of an investigation, particularly regarding publicly filed lawsuits, is not believable.  Such an argument ignores deNeve's substantial credible testimony regarding his interactions with both FTI and the SEC on these issues.  In any event, the Trustee fails to show how any such action resulted in unfavorable treatment *of Aletheia* by the SEC.

Moreover,  deNeve stated that his practice is to avoid creating a written record, particularly in the circumstances in which he was working, to avoid creating a discoverable, written record of advice in both the SEC Investigation and the Proctor litigation.  (RT, at 1361:16-1362:22.)  DeNeve explained that regulated businesses like Aletheia generally attempt to be as forthcoming as possible during an SEC investigation, and third-party civil litigants, like Proctor, typically will seek evidence of those disclosures for use in pursuing claims against the entity.  (RT, at 1362:10-25.)  By communicating orally rather than in writing, deNeve kept Aletheia's profile low and minimized the risk that Aletheia's concessions to the SEC would work to Aletheia's disadvantage in the Proctor litigation.  Likewise, deNeve limited distribution of O'Melveny's damages memorandum because of attorney-client privilege and confidentiality concerns, including the belief that Peikin had a mole at Aletheia.  (RT, at 1332:4-14, 1444:22-1445:8.)  Given Peikin's hostility toward Aletheia, the inflammatory allegations against Eichler in Peikin's wrongful termination suit, and Proctor's aggressive litigation tactics, deNeve was completely justified in these concerns.[41]

---

[41]   The Trustee also claims to find evidence that Respondents sought to defeat FTI's efforts by pointing to a 2015 judgment regarding an alleged "cherry-picking" scheme.  (Ex. 1205.)  But that judgment was part of a consent arrangement in which Eichler settled a dispute with the SEC without admitting the truth of the allegations.  Neither Exhibit 1199 nor 1205 reflect any details regarding the allegations, and it says nothing about the efforts of O'Melveny and FTI to promote Aletheia's governance and compliance reforms.

116

1    Peikin's Termination as CFO:  The Trustee contends that Lee was placed on the

2    board as part of an effort to engineer Peikin's removal as CFO.  CB, 3:22; 4:15-18.

3    Even assuming this was true, it would not seem to have any bearing on O'Melveny's

4    ability to represent *Aletheia's* interests, particularly since Peikin, like Eichler, was an

5    alleged "looter," and his performance as an officer was a governance and compliance

6    problem for Aletheia.  (See RT 168:9-21 [no board or shareholder meetings]; RT. at

7    333:12-334:21 [no board meeting notices]; RT 337:2-338:8 [no board meetings]; RT

8    329:2-10 [no compliance experience]; RT 444:21-24 [no compliance committee].)

9    Peikin's removal as CFO, which was originally the idea of his own lawyer in

10   the SEC investigation, was in the works more than six months before Lee was elected

11   to the board.  (Ex. 3002; 339, Para. 12; RT 1346-47.)  The subject was the topic of

12   discussion among Friese, Olson and Aronson.  (Ex. 339, Para. 12 [Olson]; RT 558:5-

13   559:25 [Aronson].)  Friese told Aronson that he considered the CCO and CFO

14   positions to be "an albatross around Mr. Peikin's neck and a target on his back" while

15   the SEC was conducting its investigation.  (RT 559:2-3.)  Thus, with Friese's blessing,

16   Peikin was formally removed as CCO in February 2010 but retained his CFO title for

17   the time being.  (Ex. 337, Para. 29.)

18   The CFO issue came to a head in March 2010 when FTI recommended that

19   Peikin be removed as CFO because of his failure to perform "the most basic tasks of a

20   CFO."  (Ex. 337, Para. 39.)  A formal recommendation was made in April at a

21   meeting attended by both Peikin and his counsel, and neither of them raised any

22   objection.  (*Id.*, Paras. 40-41; see also RT 1347:22-1348:6.)  It was anticipated that

23   Peikin would remain as General Counsel (RT 1346:2), but between April and June the

24   relationship between Peikin and Eichler deteriorated, and in June O'Melveny had

25   heard that Peikin might not voluntarily resign his CFO position.  (Ex. 337, Para. 42-

26   44; RT 1176:2-4.)  In June, Peikin and his counsel, for the first time, balked at his

27   removal as CFO claiming that it would be a breach of an employment agreement put

28   in place in 2006 at Proctor's insistence.  (Ex. 337, Para. 45; see also Ex. 2074, at 3.)

117

This dispute was never resolved and, three days after Lee was elected to the board by written consent of the majority shareholder (Ex. 26), the board adopted a resolution terminating Peikin as CFO.  (Ex. 2083.)  Thus, the record simply will not support the contention that Peikin was the victim of a coup when he and his counsel had agreed to the arrangement, and FTI had concluded that his removal as CFO served Aletheia's interests in dealing with the SEC.

### 6. *Conclusion*

The record readily demonstrates that, even if the Trustee had timely raised a claim involving O'Melveny's work in connection with the SEC investigation, his evidence shows no breach of any duty to Aletheia and no harm to Aletheia resulting from anything O'Melveny did or did not do in connection with its work.

### G. <u>Neither Olson nor deNeve Breached Any Duty Either as Attorneys or Officers of Aletheia</u>

The Trustee contends that because of their involvement in the Proctor litigation and the various SEC matters, Olson and deNeve breached their fiduciary duties to Aletheia when they joined Aletheia and assumed legal duties on its behalf.  CB, at 37, et seq.  The Trustee argues that, because they owed fiduciary duties to Eichler and Peikin, their former clients, Olson and deNeve  were ethically prohibited from taking any action against either of them relating to the Proctor matters, and thus "were hopelessly and horribly conflicted."  CB, at 38:9. Accordingly, the claim here is that Olson and deNeve had a successive conflict in undertaking a representation that was adverse to the interests of their former clients and that they were therefore barred from giving Aletheia advice with respect to either Eichler or Peikin.  The argument does not withstand scrutiny.

### 1. *The Legal Standard*

*Flatt v. Superior Court*, supra, 9 Cal.4th , at 283 provides that a successive conflict exists where counsel is taking a position adverse to a former client and the current representation is either:  (1) substantially related to the attorney's prior

FINAL AWARD (CORRECTED)

1  representation; or (2) the attorney in the prior representation obtained confidential

2  information relevant to the current representation.  *Forrest v. Baeza*, supra, explained

3  that:

4          Where an attorney's conflict arises from successive

5          representation of clients with potentially adverse interests,

           "the chief fiduciary value jeopardized is that of client

6          *confidentiality*." The initial question in such cases is whether

7          there is a "substantial relationship" between the subjects of

8          the former and current representations. "If a substantial

           relationship exists, courts will presume that confidences

9          were disclosed during the former representation which may

10         have value in the current relationship."

11  58 Cal.App.4th, at 73-74 (citations omitted.)  Neither deNeve nor Olson breached any

12  duty to Aletheia under the "successive conflict" standard.

13      ### 2.    *DeNeve Did Not Represent Eichler, Peikin or Aletheia in the
14          Proctor Litigation*

15         With respect to deNeve, the Trustee's contention that he ever represented

16  Eichler in the Proctor litigation is incorrect.  DeNeve testified that he did not work on

17  the Proctor matter (RT 1292:15-21), and he was corroborated by Olson (RT, at 947:6-

18  8) and Aronson.  (RT 717:13-18.)  The Trustee counters with evidence from

19  O'Melveny's billing records that some small amount of deNeve's time was allocated

20  to the Proctor matter.  CB, at 37:12-16.  But a close review of the documents cited,

21  exhibits 1173, 1174 and 1178, corroborates deNeve's testimony.  They show that a

22  total of approximately 25 hours of deNeve's time over an 18-month period was

23  allocated to the Proctor litigation file.  (Compare Ex. 1173 [Proctor file] with 1174

24  [SEC Investigation: January 2010-126.5 hours; February 2010-106.30 hours; March

25  2010-113.70 hours; April 2010-102.20 hours; May 2010-125.60 hours.)  Those entries

26  reflect that deNeve's work intersected with the Proctor case involving issues such as

27  e-discovery protocols, document collection, insurance tenders, and the like.  But it is

28  clear that he had no material advisory, tactical or strategic role in that case.

119

DeNeve explained it this way:

> Generally, one of the things I try to do in terms of allocating
> my time -- and I viewed myself as responsible for the SEC
> matter. So, I wanted to make sure that what we billed on the
> SEC matter showed that we were being efficient because I
> believe we were being efficient.
> And so, you know, a lot of times I would get some -- I
> would be getting information involving Proctor which I
> thought might be relevant to the SEC matter, but I wouldn't
> have had to deal with that,  but for Proctor. And so,
> therefore, I thought, "Well, let me allocate that to Proctor."
> Q By "information," you're referring to complaints?
> A Like complaints, for example. I would, you know, receive
> a complaint, need to take a look at it and see whether we
> should send it to the SEC and what I needed to be aware of
> in the complaint when I sent it to the SEC. So that type of
> thing.
> Q That ties back to the public information that might be out
> there that you wanted to alert the SEC about; is that right?
> [Objection.]
> THE WITNESS: That's correct. And then there would be
> other -- the other aspect that came up is, I mean, part of
> being efficient and helpful to the client, the SEC case had
> generated a database. We collected a lot of information from
> Aletheia. And so there were numerous discussions that
> would come up where other matters, whether it be Proctor or
> potentially Boskovich or whatever, would want to know
> what we had in our SEC database because if we already had
> it, there was no need to go back to the client to ask for it, and
> I was very familiar with the information we had collected
> for the SEC matter. So, in some of those instances, again, I
> felt this is not really an SEC -- well, this is not driven by
> something I need to do in the SEC. So, I'm going to allocate
> it to a different matter.
> BY MR. ROSEN:
> Q What about, for example, any time that may have been
> incurred in connection with the declaration in Mr. Peikin's
> disqualification motion, as an example?
> A Right. And I viewed that as I am be asked to provide my -
> - being asked to be a percipient witness of, you know, things
> that happened and, again, I didn't view that as necessarily

FINAL AWARD (CORRECTED)

1    SEC related and I was being asked to be a witness and I, you
2    know, allocated that to Proctor.

3    (RT 1483:12-1485:13.)  The fact that deNeve determined that the few hours spent on

4    these tasks would more appropriately be charged to the Proctor file rather than the

5    SEC investigation file falls far short of proving that deNeve represented ***Eichler*** as

6    litigation counsel.

7          As to the SEC investigation, deNeve in fact represented Eichler, but that

8    investigation was not "substantially related" to the Proctor litigation as it was focused

9    on corporate compliance and governance matters, and not on the respective contract

10   rights and obligations that were at issue in the Proctor litigation.  (E.g., Ex. 500.)

11   Both Aronson (RT 561:20- 562:5) and deNeve (RT 1368:22-1369:4) explained that

12   the SEC investigation was focused on governance and compliance (a "books and

13   records" based investigation) that had no bearing on the Proctor relationship.  The

14   Trustee offered no persuasive evidence to the contrary.

15         Accordingly, the Trustee's effort to show that deNeve had any role in the

16   Proctor litigation fails.  Because he had no attorney-client relationship with Eichler in

17   that matter, the substantial relationship test cannot be met.

18   ### *3.  Olson Delegated Responsibility for the Proctor Litigation to deNeve*
19

20         After Olson and deNeve left O'Melveny to take positions at Aletheia, deNeve

21   as the Aletheia general counsel, was given responsibility for the Proctor litigation.

22   (RT 1309.)  As noted, deNeve's representation of Aletheia raised no successive

23   conflict issues.  But even if Olson had not delegated this responsibility to deNeve, the

24   apparently aggrieved party would be Eichler, not Aletheia.  In such circumstances, the

25   Trustee, as Aletheia's surrogate, would have no standing to complain because

26   Aletheia has no cognizable interest in counsel's duties to Eichler.  *E.g.*, *Coldren*, 239

27   Cal.App.4th, at 2425, 248; *Great Lakes Constr. Inc. v. Burman,* 186 Cal.App.4th 1347,

28   1358-59 (2010).  To circumvent the standing requirement, the Trustee asserts that the

duties owed to Eichler "handcuffed" Olson and deNeve and made it impossible for them to give legal advice that might injure Eichler.  (See e.g., RT 1823:23.)  (Wertlieb opinion.)

The Trustee relied heavily on Wertlieb in support of his theory.  E.g., CB, at 38:8-19.  In Wertlieb's words, Olson and deNeve were "hopelessly and horribly conflicted" and once at Aletheia, "they could not act adverse to Mr. Eichler."  (*Id.*) But an examination of the Trustee's specific allegations demonstrates that Wertlieb's testimony is contrary to the credible evidence presented at trial.

First, the Trustee contends that Olson and deNeve, as a result of the alleged conflict, failed to advise Aletheia of the merits of Proctor's allegations and Aletheia's recourse.  However, the detailed discussion set forth in Section IV.E.3 above shows that deNeve, as Olson's designee, provided Aletheia's board members, its senior managers, and some minority shareholders with a detailed analysis of the Proctor dispute and the litigants' respective positions and arguments in that case.  (E.g., Exs. 72, 73, 74, 224, 225, 226, 2191, 2192, 2200.)  Lee and others were specifically alerted to the nature of Proctor's claims against Eichler and the possibility that Aletheia could pursue its own claim challenging his compensation.  (Sec. IV.E.3.)

The Trustee also complains that O'Melveny's damages memorandum (Ex. 222) was not shown to Lee or generally circulated within the firm.  CB 39:12 et seq. However, as Respondents note, that was a privileged and highly sensitive document, and deNeve explained that he was concerned that there was a mole within the organization feeding information to Peikin, who had aligned himself with Proctor. (RT 1332;11-14; 1444:19-1445:8.)  In these circumstances, circulating a highly sensitive legal memorandum on the topic of damages would have been ill advised.  In any event, as discussed in detail in Section IV.E.3. above, deNeve discussed the substance of the damages memorandum with Lee.  (*Id.*)  Thus, the Trustee's citation to exhibits that collected deNeve's emails to show that they contain no references to

1  the damages memorandum is entirely consistent with deNeve's testimony that he did

2  not deliver it to Lee.

3       The Trustee, who bore the burden of proving that Lee was never aware of the

4  content of the damages memorandum, offered excerpts of the 2012 deposition

5  testimony of Lee.  CB, at 39:13-17.  But the cited testimony did not deal with the

6  damages memorandum but rather with whether Lee had seen the Side Letter

7  Agreement or discussed it **with Eichler.**  (Ex. 1299.)  The excerpts say nothing about

8  whether deNeve and Lee discussed the Side Letter Agreement, whether it was linked

9  to the damages analysis in Exhibit 222, or what deNeve might have told Lee about it.

10 It falls far short of showing that deNeve should not be believed or that Lee was not

11 adequately informed on the subject of damages.

12      Second, the Trustee argues that deNeve and Olson's conflict prevented them

13 from advising Aletheia that "most" of Proctor's recovery would go to Aletheia.  CB,

14 at 38:23.  In fact, no such advice was given because it would have been wrong.  The

15 argument is apparently based on a June 2011 email string between O'Melveny

16 associates.  (Ex. 212.)  In describing arguments to be made to Proctor's counsel to

17 encourage settlement, the author wrote, "Even if Proctor can win its claim, most of the

18 money at issue will be paid back to the company, not to Proctor.  And Proctor will still

19 be choking on those shares."  (*Id.*)  One could take a charitable view and construe the

20 statement as suggesting that Proctor's recovery would be limited to its rights under

21 contract and that it hadn't sought and couldn't recover the full value of the alleged

22 excessive compensation in its direct action.  That would be consistent, for example,

23 with the law, with the demurrer filed on behalf of Barnes and Lee, with the analysis in

24 Exhibits 222 and 251, and with Freedman + Taitelman's conclusion that the damages

25 exposure as to Proctor's claims was in the $5 to 6 million range.  (Exs. 251, 252.)  But

26 if the author actually meant that **Aletheia** would receive a recovery in the Proctor

27 litigation as a result of a judgment in favor of Proctor, he was wrong.  Proctor could

28 not collect anything for Aletheia without pursuing a derivative claim, which it never

1   did.  Proctor's counsel, in his argument to Judge Lefkowitz in August 2011, clearly

2   and unambiguously disavowed any intention of recovering for Aletheia.  (Ex. 1147, at

3   10-12.)  Proctor's counsel knew that Proctor's case would involve no recovery for

4   Aletheia because Proctor sought no such recovery.  Thus, had Olson and deNeve

5   advised Aletheia's managers that Proctor's litigation success would have resulted in

6   an award to Aletheia, they would have been wrong.  (See Sec.IV.B. above.)

7        Third, the Trustee contends that deNeve and Olson gave inadequate advice

8   regarding the implementation of corporate governance reforms, including that Lee

9   was not an independent director.[42]  These issues were discussed in detail above and

10  will not be revisited.  That evidence readily demonstrates that detailed corporate

11  governance and compliance reforms were developed and implemented primarily

12  through deNeve both as outside counsel and later as Aletheia's general counsel.

---

[42] On the question of independence, the Trustee suggests that deNeve did not believe that Lee qualified as an independent director.  He bases the argument on deNeve's review of a Freedman + Taitelman, report to insurance carriers that expressed the view that, at trial, Proctor would probably be able to show that Lee was not independent. (Ex. 251.)  But deNeve never indicated at the time or in his testimony that he concurred in this assessment.  In fact, he testified that he disagreed with that view.  (RT 1232-33.)  Moreover, the document containing Freedman + Taitelman's assessment was contained in a report to insurance carriers asking for their participation in settlement proceedings:

> We are currently exploring potential alternative dispute resolution procedures to help facilitate a settlement in this matter.  Given the potential exposure to our clients coupled with burning limits insurance policies and the cost of defending this matter . . ., we believe that it is prudent to exhaust all possible opportunities to settle this matter as soon as possible . . . .

> As the likely exposure in this matter will certainly exceed the remaining policy limits of the primary Houston Casualty policy, both Houston Casualty, as the primary insurer, and Axis, as the excess insurer will be required to participate in the settlement process . . . .  [T]he following is intended to serve as a litigation and settlement conference report pursuant to Houston Casualty's litigation guidelines.

(Ex. 251.)  Spiegel explained that, in attempting to obtain a settlement contribution from insurance carriers, it is particularly important to present "the risks that the litigation will be lost, the risks of an adverse verdict."  (RT 2105:7-9.)  In short, it would not be unusual for counsel, in dealing with insurers, to emphasize the risks associated with further litigation when seeking to motivate them to fund the costs of settlement.

FINAL AWARD (CORRECTED)

Finally, the Trustee argues that Olson and deNeve were in no position to emphasize the desirability of settling with Proctor and how that would serve Aletheia's best interests. CB 38:25. The evidence discussed in detail above thoroughly belies this argument. The record shows that concerted efforts were repeatedly made to settle the dispute with very difficult adversaries. O'Melveny even recommended that the case be settled on terms considered undesirable by Aletheia's management without success. The suggestion that Olson, deNeve, or anyone at O'Melveny stood in the way of settling the dispute due to conflicted loyalties doesn't survive even modest scrutiny. (See Section IV.A.4.b. above.)

### 4.    *No Breach of Any Duty as Officers of Aletheia*

Although the Trustee presented some testimony on Olson and deNeve's duties as officers of Aletheia, he makes virtually no argument on the subject. It is therefore unclear whether he is pursuing such a claim, but in the interests of completeness, the relevant testimony on the subject will be briefly reviewed.

The two experts who addressed the subject were Wertlieb for the Trustee and Bishop for the Respondents. Wertlieb asserted that Olson and deNeve should have "investigated the potential claims that Proctor made or may have made derivatively or Aletheia may have made directly against" Eichler and Peikin. (RT 1839:3-5.) Likewise, he opined that they should have hired independent counsel to investigate those claims and advise the board (RT 1839: 6-10), and they should have "insisted that there be a committee of independent directors that they could report to on these issues," (*Id.*, at 1839:12-16), or a committee of the independent directors be given authority to act on Aletheia's behalf with respect to such claims. (*Id.*, at 16-20.) According to Wertlieb, they could do none of these things because "they walked in the door with an impossible conflict situation." (RT 1840:15-16.) Wertlieb did not explain on what authority Olson or deNeve, or indeed any other corporate officer, could have demanded that such steps be taken. Moreover, since the one outside board member and all senior managers knew of the potential claims against Eichler and

FINAL AWARD (CORRECTED)

Peikin, Wertlieb does not explain what authority Olson and deNeve had to order the constitution of a new group of people to act as a committee to take action on Aletheia's behalf.  Neither has the Trustee.

In fact, as Bishop explained, the officers' obligation was to inform the board of information material to the performance of their duties.  (RT 2803:15-19.)  He explained that the duty could be satisfied through any means of communication, that it needn't be done in writing or at a formal board meeting, and that he had reviewed the testimony of Olson and deNeve both in deposition and at the hearing and concluded that Olson and deNeve had fulfilled their obligations to the board.  (RT 2803-04; 2806:2-24.)  Specifically, with respect to their obligation regarding possible claims that a corporation might pursue, Bishop opined that

> their duty was to inform the board of the facts that they know.  The
> California General Corporation Law in Section 300 vests the board
> with management and control of the corporation, so it's up to the
> board to decide what to do with the information that is conveyed to
> them.

(RT 2810:10-15.)  In other words, as the group with the ultimate authority to manage the corporation, the board had the right to be informed, at which point it was for the board to give directions (or not) to be carried out by Olson and deNeve.

As to Wertlieb's assertion that Olson and deNeve should have demanded that the board create a special litigation committee, or a sub-committee of the outside directors to consider pursuing a claim and Eichler and Peikin, Bishop explained that they would have no such duty unless the board asked them to do so or sought their advice on the subject.  (RT 2811:14-2812:7.)  If such advice had been sought, then they would have been obliged to consider the context in which the advice was given taking context into account:  the effect on the SEC, the impact on Aletheia's relationship with Eichler, the cost of such litigation and the likelihood of success.

FINAL AWARD (CORRECTED)

1  (*Id.*)  Since such advice was not requested, it was for the board and not Olson and

2  deNeve to determine what course to pursue.

3       Wertlieb took a different view of the factors that a board should consider.  He

4  asserted that the potential loss of Eicher's services resulting from board action was not

5  a relevant consideration by a board of independent directors, even if it meant the

6  destruction of Aletheia.  (RT 1922:25-1923:3.)   Bishop vigorously disagreed (RT

7  2813-14), as did Prof. Kehr. (RT 1626:11-1627:5.)  Bishop explained that the board

8  bears a fiduciary duty to "to look after the best interests of the corporation and the

9  shareholders, and for them to ignore an action that could result in a destruction or the

10  dissolution of the corporation I would view it as inappropriate for them to ignore that

11  factor."  (RT 2813:23-2814:2; see also Prof. Kehr testimony, RT 1040:20 (situation

12  with Eicher and Peikin "delicate;" RT 1622:2-3;  Aletheia "in an extremely ticklish

13  position".)  Moreover, Bishop noted and emphasized that, during deNeve and Olson's

14  tenure, the question of excessive compensation involved only historical claims, and

15  not a continuing violation.  (RT 2814:10-14.)  Thus, since it was no longer an issue for

16  Aletheia, prudence would dictate careful consideration before taking an action that

17  might destroy the business.

18       In the end, there is no evidence that anything that Olson and deNeve did, or did

19  not do, caused any injury to Aletheia.  Wertlieb testified only that, had an independent

20  board existed, it should have considered and evaluated whether to bring a claim

21  against Eichler and Peikin.  (RT 1918:7-17.)  But he declined to offer an opinion as to

22  how that evaluation would have concluded – whether a fully advised independent

23  board would or should pursue claims against Eichler and Peikin.  (RT 1918:15-17.)

24       Similarly, Prof. Kehr could not say what advice would be given by unconflicted

25  counsel.  As discussed above, because of the central role played by Eichler and the

26  status of Eichler and Peikin as founders, Prof. Kehr commented that  "[o]ne shouldn't

27  think in terms of suing Mr. Eichler or Mr. Peikin.  One should think in terms of

28  fulfilling responsibilities that are owed to all the shareholders . . . ."  (RT 1040:21-23.)

FINAL AWARD (CORRECTED)

But Prof. Kehr could not even say to whom Aletheia's unconflicted counsel should give its advice, whatever that advice may be.  (RT 1701:14-20; 1721:17-20.)  Prof. Kehr acknowledged that determining who, in these circumstances, should receive counsel's advice is "an extremely complex and difficult challenge that any lawyer representing only Aletheia would face and it would require careful consideration of how to proceed."  (RT 1721:17-20.)  He provided no opinion on the topic because "I've never thought through it before."  (RT 1701: 18-19.)

To sum up, Prof. Kehr could not say what advice unconflicted counsel should give regarding the pursuit of claims against Eichler and Peikin, he could not say to whom such advice should be given, and Wertlieb said that even if an independent board received such advice, he had no opinion as to what course it should take.  If the Trustee's experts have no opinions on what should have been done in a perfect world, there is no evidence from which one can determine how Olson or deNeve's conduct breached any duty they had to Aletheia or how it caused any injury.  (See also Sec. IV.C. above.)  The record therefore reflects that any claim against Olson and deNeve for breach of duty as counsel or as a corporate officer fails for lack of proof.

# V.

## CONCLUSION

Based on the foregoing, the Arbitrator finds and concludes as follows:

First, Respondents' representation of Aletheia, Eichler and other individuals in the Proctor litigation, from the initial investigation of the facts and law to the final effort to settle the dispute and beyond, conformed to the applicable standard of care in the community.  There was no malpractice.

Second, Respondents' joint representation of Aletheia, Eichler and other individuals was proper.  There was no actual or potential conflict in the joint representation at any time during the course of the representation.

Third, Respondents' had no duty to advise Aletheia regarding claims it could pursue against Eichler.  To the extent that it had a duty to alert regarding possible

FINAL AWARD (CORRECTED)

1   claims against Eichler and Peikin, Respondents fulfilled that obligation.  Aletheia's

2   senior managers and members of its board of directors were fully informed on those

3   issues.

4   Fourth, the Trustee did not properly and timely raise a claim regarding the

5   adequacy of O'Melveny's handling of the SEC investigation.  However, even if it had

6   been timely raised, the Trustee failed to meet his burden of showing that Respondents'

7   conduct either fell below the standard of care or amounted to a breach of their

8   fiduciary duties to Aletheia.

9   Fifth, even assuming that the Trustee had shown either malpractice or a breach

10  of fiduciary duty in respect to the handling of the Proctor litigation or the SEC

11  investigation, he failed to prove that any act or omission of the Respondents caused

12  Aletheia to incur damages.  The record is devoid of evidence as to how an attorney

13  representing only Aletheia would have conducted herself differently in respect to any

14  of these matters, and how such conduct would have yielded a superior result for

15  Aletheia.

16  Sixth, neither Olson nor deNeve breached any fiduciary duty to Aletheia either

17  as counsel or as officers of the company.

18  Because the Trustee failed to prove any of his claims against Respondents or to

19  prove that any of his claims caused injury and damage, the Arbitrator need not and

20  does not reach issue of collectability and disgorgement.  Likewise, to the extent that

21  the Trustee contemplated any other claims against O'Melveny and the other

22  respondents that may be the subject of this arbitration, he has offered no evidence in

23  support of such claims which are therefore not addressed in this Final Award and are

24  deemed abandoned.

25

26

27

28

FINAL AWARD (CORRECTED)

1    Accordingly, the Arbitrator finds and concludes that the Trustee take nothing by

2    virtue of the claims presented in this arbitration.

3    **IT IS SO ORDERED**.

4
DATED:  June 21, 2019          /s/ Gary A. Feess
5                                         Gary A. Feess
6                                         United States District Judge (Ret.)
                                          Phillips ADR Enterprises
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FINAL AWARD (CORRECTED)

# APPENDIX I

## WITNESS CREDIBILITY

Although credibility issues are addressed in specific contexts throughout the Final Award, the Arbitrator has determined that the subject of credibility deserves separate discussion because of its importance to the resolution of the merits of the disputes.

### Roger Peikin

To narrate the events at the center of this case, the Trustee needed a percipient witness, and for that purpose he commenced the presentation of evidence with testimony from Roger Peikin, one of the co-founders of the firm.  By the Trustee's own account, (RT 70:2-19), Peikin received a "sweetheart deal" in settlement of claims against him, paying only $100,000 to resolve a $9.7 million claim.  Moreover, Peikin's demeanor and manner throughout his testimony exhibited contempt and hostility toward his former co-founder, his former colleagues and the Respondents. He repeatedly went out of his way to include non-responsive negative commentary to his answers to counsels' questions.  But Peikin's demeanor is only a part of the evidence of his antagonism.

By Peikin's own account, he harbored deep seated hostility against Eichler and O'Melveny, as the following exchange demonstrates:

> These people -- Olson, deNeve, and Aronson --basically cratered our firm. They came in and they got their hooks into Eichler, who was impressed by Olson, and they were able to manipulate him to do all kinds of things that weren't in anybody's best interest and not in the firm's best interest.

(RT 71:4-9.)  He accused Olson and deNeve stealing his jobs, "detonating the firm," and then returning to O'Melveny, even though they joined Aletheia about a year after Peikin's departure for the purpose of implementing compliance reforms.   (RT 71:21-72:1)  He claimed that they listened only to Eichler, who he described as "a very

131

susceptible and willing foolish client," (RT 71:19-20) and that by listening and taking direction from Eichler, they "ran the company into the ground."  (*Id.*, at 18-19.)[43] "They burned down about 400 million dollars of value, of which I had an interest in, give or take about a quarter."  (RT 72:12-14.)  His repeated outbursts and snide comments at one point required the Arbitrator to admonish him against further improper commentary.  (RT 121: 2-11.)

Peikin's patent and acknowledge animosity alone, particularly since his accusations are not borne out by the record, would counsel careful scrutiny of his testimony.  But the record demonstrated much more, including serious inconsistencies that cannot be squared with an honest effort at providing truthful testimony.  One notable example involved his testimony that Patricia Barnes, who had worked with Eichler before the formation of Aletheia, was a "poster child for Stockholm syndrome" and was "deathly afraid of [Eichler]."  (RT 90:3-4.)  "I observed her coming into my office . . . almost ***from day one***, crying, breaking down, sobbing, telling me that she can't take it anymore."  (RT 90:14-17.)  (Emphasis added.)  Peikin was questioned under oath on this precise topic 10 years earlier, where he painted a radically different picture:

---

[43] Peikin's insistence that O'Melveny, Eichler and others are responsible for the demise of Aletheia ignores: (1) his own lack of qualifications for the CCO and CFO positions and the risk this posed to Aletheia in the SEC investigation (RT 275:1-18 (background as family law practitioner); Ex. 2150); (2) that FTI viewed him as a liability for Aletheia in the SEC investigation; (Ex. 337, Para. 39; see also Ex. 2150); (3) the desire of his own SEC counsel to have him removed from his CCO and CFO positions to achieve a better outcome for him with the SEC (RT 559:2-3; 1346-47; Ex. 339, Para. 12-15; Ex. 1041; Ex. 3002 [timeline]); (4) the expectation that he would remain as general counsel with the firm (RT 1346); and (5) the severe, possibly fatal, damage he did by leaving the firm, aligning with Proctor, and bringing his own lawsuit against Aletheia and Eichler, after having received millions of dollars in bonuses before his departure.  (E.g., Ex. 54.)  There are many reasons why businesses fail, but one could argue that Aletheia's decline coincided with Peikin's wrongful termination complaint, filed November 23, 2010.  Having survived a years' long dispute with Proctor, and having rebounded from the Great Recession, finishing 2010 with $7.2 billion in AUM, Aletheia's lost $6 billion in AUM in the two years following Peikin's highly publicized accusations against Eichler.  (Ex. 1285; RT 1310-11 (reference to New York Times article.)

Q:  Did you ever tell anyone at Aletheia that Patty Barnes would stand in
your office in tears about the way Eichler handled her?

A;  No.  What do you mean by handled her?

Q:  The way he spoke to her.

A:  No.

Q:  The way he treated her.

*A:  No.  Patty Barnes has not been in my office in tears.*

*Q:  So she never was in your office complaining about Peter Eichler?*

*A:  No, never.  Never.  Never.*

(RT 273:6-17.) (Emphasis added.)  The only plausible explanation for his present
altered recollection of events is that it served to diminish Barnes, who was a board
member, and to vilify Eichler, who retained O'Melveny as counsel.

Another example:  Peikin now contends that Eichler initiated the search for a
buyer of his stock because of his desire to monetize some of his stock holdings
because "he burned through cash at an alarming rate on a personal basis."  (RT 105:21
– 106:25.)  But, in 2010, when Aletheia moved to dismiss the New York claims,
Peikin swore under penalty of perjury that "Plaintiffs contacted Aletheia Research and
Management purporting to be investment marketing specialists. Aletheia [] did not
initiate contact with Plaintiffs."  (Ex. 2070, Para. 21.)  The documentary record
described in the award corroborates Peikin's 2010 testimony; his current version turns
reality on its head as part of an effort to blame Eichler for the problems that were at
least arguably the result of Proctor's failure to perform as promised.

Similarly, Peikin now contends that he was strongly opposed to filing the
amended complaint prepared by O'Melveny in April 2010 because, for example, he
did not believe that there was any truth to the allegations that Proctor had misled
Aletheia regarding its selling capabilities. (RT 174:18-24.)  This is directly
contradicted by Peikin's substantial assistance in the preparation of that document, his
review and approval of the document, and his inquiries as to why additional

FINAL AWARD (CORRECTED)

defendants hadn't been included.  (Exs. 1057, 2070, 2493, 2494; see also 2030, 2035, 2036 [Peikin role in 2007 and 2008].)  His own words, memorialized in documents prepared in 2010, show his unambiguous support for Aletheia's pursuit of substantial affirmative claims against Proctor.

Peikin also contradicted himself regarding the performance of his duties as an officer of the corporation.  For example, he admitted in his sworn testimony in the Boskovich litigation that he hadn't given formal notice of board meetings, but in his deposition in this case he gave sworn testimony that he had given all such notices.  (RT 333:12-336:25.)  This was another of several instances in which Peikin gave directly conflicting testimony while under oath.  See also RT 337:1-338:25.)

These are just some examples.  Others are discussed throughout the Final Award, and they show why the Trustee's reliance on Peikin's testimony to support his version of events was grievously misplaced.  See also RB, at 1:11-14 (citing 13 instances were Peikin's testimony was impeached.)  The Arbitrator finds that Mr. Peikin, whose testimony was essential to the Trustee's ability to meet his burden of proof, was neither credible nor persuasive with respect to the material issues in this case.

The O'Melveny Witnesses

Three O'Melveny attorneys testified as percipient witnesses:  Seth Aronson who was the responsible partner for the Aletheia matters, Steven Olson, a litigation partner, and Jorge deNeve, a counsel with an SEC background.  Each of them had impressive credentials, each had substantial relevant experience and expertise that they brought to bear on the numerous legal problems confronting Aletheia.  (E.g., Aronson: RT 697:22 – 703:3); Olson: RT 870; deNeve: RT 1180-82.)  Nevertheless, the Trustee attacked the credibility of Aronson and the other O'Melveny attorneys in two fundamental ways.  First, he impugned Aronson's, and therefore the firm's, motive.  Citing to declines in O'Melveny's revenues during the financial crisis and pressure to discount billing rates, the Trustee argued that Aronson launched Aletheia

on frivolous, scorched earth litigation because, in Eicher, he had "found a client willing to pay full rates on non-complex matters."  CB, at 30 n. 8.  First, the evidence indicates that Aletheia was confronting multiple issues, each of which could be considered complex, but which taken together placed Aletheia in a situation that even the Trustee's expert called "delicate" and "ticklish."  More importantly, the cited financial evidence also shows that, throughout the crisis years, O'Melveny continued to be a highly profitable law firm despite revenue declines.  Ex. 4B.  In 2009, the firm generated "only" $826.6 million in revenue.  (*Id.*)  This reportedly resulted in a 4.2% decrease in average profits per equity partner to $1.47 million, down from roughly $1.54 million the prior year or a $70,000 decrease.  (*Id.*)  In short, the firm was still highly profitable in a very difficult economy.  This is hardly evidence that the wolf was at O'Melveny's door, and it falls far short of making a plausible case that Aronson, a highly regarded and well respected practitioner in his field, would risk his standing in the community for a fee that, spread over more than two years, amounted to a little more than one percent of the firm's 2009 gross revenue.

The Trustee also attacks the O'Melveny attorneys by claiming that their testimony was not corroborated with documentation and therefore should be disregarded.  In fact, the testimony was in many instances corroborated by documents or other evidence.  Moreover, there is no rule that mandates corroboration as a condition of believability.  Applicable jury instructions provide that the trier of fact (in this case the Arbitrator) may give witness testimony the weight to which he believes it is entitled taking context into account and giving due consideration to the factors set forth in various model jury instructions including CACI Instruction 107 and Model Ninth Circuit Instructions, Instruction No. 1.14.  Model Instruction 1.14 teaches that "the weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it" and CACI 107 instructs that "If you believe it is true, the testimony of a single witness is enough to prove a fact."  Using those instructions as guidelines, the record reflects the following:

FINAL AWARD (CORRECTED)

- Inconsistency:  The Trustee has not cited to a single instance where any of the three O'Melveny witnesses, unlike Peikin, testified inconsistently in any material way with any prior testimony.  In some instances, the Trustee has attempted, without success, to attack testimony based on an absence of documentation.  A number of those are specifically addressed in the body of this document, and none altered the overall credibility of any of O'Melveny's percipient witnesses.

- Demeanor:  The demeanor and manner of the O'Melveny witnesses was professional and respectful of all counsel, the Arbitrator, and the legal process.  In contrast to Peikin, at no point in the process were they combative or hostile even in the face of provocative interrogation.

- Percipience:  As to events regarding O'Melveny's representation of Aletheia and Eichler, Aronson, Olson and deNeve throughout most of the period were in a much better position to see and hear and know about the things that they testified to than Peikin or any other of the Trustee's witnesses.

- Capacity:  The quality of the memory of the O'Melveny witnesses, Aronson in particular, was impressive.  Aronson's detailed testimony exhibited a thorough grasp of the relevant facts regarding the conduct of the Proctor litigation from the initial retention to the date that Freedman + Taitelman took over for O'Melveny.  All three witnesses were able to flesh out the context bearing on the events described in the contemporaneous documents.

- Reasonableness/Plausibility: Perhaps most important was the reasonableness of the O'Melveny witnesses in light of the all of the other evidence.  When the entire documentary record is viewed in context, it establishes a framework that is fully consistent with the overall testimony of the O'Melveny witnesses. The testimony of the O'Melveny witnesses was logical, coherent and informative on the material issues in the case and consistent with the weight of the other evidence presented.

FINAL AWARD (CORRECTED)

1    For all of the foregoing reasons, the Arbitrator found the testimony of the

2   O'Melveny witnesses to be credible on the material points in dispute in this matter.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FINAL AWARD (CORRECTED)

# APPENDIX II

# EXHIBIT LIST

FINAL AWARD (CORRECTED)

# Joint Exhibit List[44]

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1 | 1/11/2018 | Subpoena to Testify at a Deposition in a Civil Action To: Seth Aronson - Arbitration Before Phillips ADR | Admissible | |
| 2 | 4/15/2010 | OMM Invoice for services rendered to Aletheia in March 2010 | Admissible | |
| 2b | 5/5/2010 | Chart of Payment Totals for Peter Eichler by Aletheia for 1/21/10, 3/26/10, 5/5/10 - Total: $320,459.45 | Admissible | |
| 3 | 2/4/2010 | CA Complaint by Aletheia for declaratory relief filed by Peter Selvin at Loeb | Admissible | |
| 3b | 5/7/2012 | Chart of Multiple Payments ranging from 2/25/10 - 5/7/12 - Payor: Aletheia, Mount Kisco, Professional Indemnity, with subtotals, Grand Total: $9,114,197.79 | Admissible | |
| 4 | 2/16/2010 | NY Complaint by Proctor for declaratory judgment re ownership of Aletheia management stock, breach of side letter agreement, breach of fiduciary duty, etc. | Admissible | |
| 4b | 2/18/2010 | AM Law Daily print out "O'Melveny & Myers Revenue and Profits Drop" | Admissible | |
| 5 | 4/16/2010 | First Amended Complaint by Aletheia adding fraud claims, etc. | Admissible | |
| 5b | undated | Appendix III. New  Business Matters / Conflicts, page 166 to Appendix to Attorneys'  Guide to Policies and Procedures - Guidelines (undated) | Admissible | |
| 6 | 5/10/2010 | OMM Invoice for services rendered to Aletheia in April 2010 | Admissible | |
| 6b | 11/5/2009 | OMM Conflict of Interest Report, Client: P. Eichler, Proposed  matter: Aletheia Sec Matter | Admissible | |
| 7 | 3/25/2010 | Email string from M. Close to R. Silvers, etc. | Admissible | |
| 8 | 4/6/2010 | email from K. Mercer to R. Silvers | Admissible | |
| 9 | 7/6/2010 | Complaint by Proctor to Determine Validity of Election/Appointment of Director(s) [709 Action] | Admissible | |

---

[44] "Admissible" means admissible for all purposes at the evidentiary hearing, including authenticity and as a record of a regularly conducted activity (business record) within the meaning of Federal Rule of Evidence 803(6).  As for any court filings or documents or communications sent to or from Proctor where the parties have stipulated to admissibility, such stipulation shall not be deemed as adopting the statements in such filings, documents, or communications.

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 10 | 6/30/2010 | *Peikin v. Aletheia*; LASC SC108642 - Summons and 709 Complaint to Determine Validity of Appointment of Director, filed 6/30/10 | Admissible | |
| 11 | 11/3/2006 | Side Letter Agreement between Aletheia and Proctor | Admissible | |
| 12 | 7/1/2010 | email by J. deNeve to team | Admissible | |
| 13 | 7/2/2010 | email from R. Silvers to team | Admissible | |
| 14 | 7/10/2010 | email string from R. Silvers to team | Admissible | |
| 15 | 7/10/2010 | Email string from R. Silvers to team | Admissible | |
| 16 | 7/10/2010 | Email string from K. Mercer to R. Silvers | Admissible | |
| 17 | 7/11/2010 | Email string from S. Olson to team | Admissible | |
| 18 | 7/20/2010 | Email from R. Silvers to team | Admissible | |
| 19 | 7/21/2010 | Email from K. Mercer to S. Aronson and team | Admissible | |
| 20 | 7/24/2010 | Email from M. Close to team | Admissible | |
| 21 | 7/25/2010 | Email from M. Close to S. Aronson | Admissible | |
| 22 | 7/24/2010 | Email from M. Close to team | Admissible | |
| 23 | 7/26/2010 | Executed declaration of Peter Eichler re response to action to determine validity of election | Admissible | |
| 24 | 7/27/2010 | Proctor v. Aletheia; SC108674 - Aletheia's Memo of Points & Authorities in Opposition to Proctor's action to invalidate election of Bruce Lee | Admissible | |
| 25 | 7/27/2010 | Response by Alethia to Peikin's request summarily adjudicate validity of 6/15/10 election (filed by Jones Day in Peikin Action) | Admissible | |
| 26 | 6/15/2010 | Written Consent of the Majority Shareholder to elect Bruce Lee to Board of Directors | Admissible | |
| 27 | 1/18/2011 | Cross-Complaint by Proctor against Aletheia for dec relief, breach of side letter agreement, breach of fiduciary duty, etc. | Admissible | |
| 28 | 2/10/2011 | OMM Invoice for services rendered to Aletheia in January 2011 | Admissible | |
| 29 | 1/31/2011 | Email from R. Buckner to R. Silvers and K. Mercer | Admissible | |
| 30 | 2/14/2011 | Email from K. Mercer to D. Sestito | Admissible | |
| 31 | 3/11/2011 | Email from K. Mercer to team | Admissible | |
| 32 | 3/17/2011 | Email from K. Mercer to A. von Franque | Admissible | |
| 33 | 4/5/2011 | Aletheia's supplemental responses to Proctor's First Set of Special Interrogatories | Admissible | |
| 34 | 4/19/2011 | Email from K. Mercer to A. von Franque | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 35 | 8/26/2010 | Email from M. Close to team | Admissible | |
| 36 | 6/1/2011 | Email from D. Sestito to team | Admissible | |
| 37 | 6/1/2011 | Email string from K. Mercer to S. Aronson | Admissible | |
| 38 | 4/12/2011 | Email string from K. Mercer to D. Sestito | Admissible | |
| 39 | 6/10/2011 | Email string from R. Silvers to S. Aronson | Admissible | |
| 40 | 6/19/2011 | Email string from K. Mercer to R. Silvers | Admissible | |
| 41 | 6/20/2011 | Email string from K. Mercer to D. Sestito | Admissible | |
| 42 | 6/21/2011 | Email string from K. Mercer to D. Sestito | Admissible | |
| 43 | 6/21/2011 | Email from Silvers to Aronson | Admissible | |
| 45 | 7/22/2011 | Email from D. Tenner to D. Sestito | Admissible | |
| 46 | 9/21/2011 | Supplemental Responses by Aletheia to Proctor's First Set of Requests for Admission | Admissible | |
| 47 | 9/26/2017 | Subpoena for Peter Eichler | Admissible | |
| 48 | 10/4/2006 | Resolutions of BOD of Alethia re Employment Agreements; P. Eichler, R. Peikin Employment Agreements | Admissible | |
| 49 | 12/30/1997 | Indemnification Agreement between Aletheia and R. Peikin | Admissible | |
| 50 | 12/3/2007 | Letter from Loeb & Loeb to M. Aboelnaga | Admissible | |
| 51 | 12/18/2007 | Letter from Loeb & Loeb to M. Littenberg | Admissible | |
| 52 | 1/4/2008 | Letter from Loeb & Loeb to M. Littenberg | Admissible | |
| 53 | 1/22/2008 | Letter from Loeb & Loeb to M. Littenberg | Admissible | |
| 54 | 11/23/2010 | Peikin v. Aletheia; BC450058 - Complaint re Wrongful Termination | Admissible | |
| 55 | 6/30/2010 | Peikin v. Aletheia; SC108642 - Complaint to Determine Validity of Appointment of Director | Admissible | |
| 56 | 7/27/2010 | Letter from Jones Day to P. Eichler re Peikin v. Aletheia | Admissible | |
| 57 | 12/8/2010 | Letter from Jones Day to P. Eichler re Peikin v. Aletheia | Admissible | |
| 58 | 7/26/2010 | Declaration of P. Eichler ISO Response to Petitioner's Case-in-Chief Peikin v. Aletheia; SC108642 | Admissible | |
| 59 | 4/25/2011 | Letter from Greenberg Traurig to P. Eichler re Engagement and Conflict Waiver | Admissible | |
| 60 | 4/25/2011 | Peikin v. Aletheia; BC450058 - Notice of Hearing, Demurrer to First Amended Complaint | Admissible | |
| 61 | 1/6/2012 | Letter from Freedman & Taitelman, LLP to Aletheia c/o J. deNeve - Fee Agreement | Admissible | |
| 62 | 3/15/2012 | Letter from M. Sherman to Aletheia re Terms of Engagement | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 63 | 6/18/2012 | Letter from Stroock to P. Eichler and P. Barnes re Representation - Peikin v. Aletheia; BC450058 | Admissible | |
| 64 | 11/5/2009 | Letter from OMM to P. Eicher re SEC Matter - Engagement | Admissible | |
| 65 | 1/25/2010 | Email from J. deNeve to P. Eichler, etc. forwarding Engagement letters re SEC matter | Admissible | |
| 66 | 1/26/2010 | Email from J. deNeve to P. Eichler, etc. forwarding Joint Engagement Letter re SEC matter | Admissible | |
| 67 | 1/26/2010 | Letter from OMM to Aletheia, P. Barnes, etc. re SEC Investigation - Terms of Engagement | Admissible | |
| 68 | 2/16/2011 | Email chain from M. Lewis to A. Swanson | Admissible | |
| 69 | 7/7/2010 | Email chain from S. Olson to P. Eichler | Admissible | |
| 70 | 4/14/2011 | Letter from OMM to Aletheia, P. Eichler, P. Barnes, B. Lee re Terms of Engagement | Admissible | |
| 71 | 3/10/2011 | Aletheia v. Proctor; SC106700 - First Amended Cross-Complaint filed by Proctor against Aletheia | Admissible | |
| 72 | 8/23/2011 | Meeting Agenda, Topics for Discussion - August 2011 - Aletheia Research and Management 8/23 - 8/25 | Admissible | |
| 73 | 8/23/2011 | Memo from J. deNeve to Aletheia Executive Committee of BOD re: Litigation Update | Admissible | |
| 74 | 8/23/2011 | Executive Committee and Senior Management Meeting - August 2011 - Agenda, Discussion Topics, hand-written notes, index of binder | Admissible | |
| 75 | 12/10/2013 | Letter from Baker & Hostetler to R. Wilson of Landau, Gottfried & Berger | Admissible | |
| 76 | 4/22/2014 | Proof of Claim No. 15 filed by J. Golden, as Trustee of Aletheia, in P. Eichler's bk. Case | Admissible | |
| 77 | 12/14/2016 | Email from J. Bregman to P. Eichler, cc K. Ramlo re Spreadsheet / financial summary | Admissible | |
| 78 | 12/21/2016 | Email chain from J. Bregman to K. Ramlo re Eichler settlement discussions | Admissible | |
| 79 | undated | Financial Summary - Handwritten Notes - (undated) | Admissible | |
| 80 | undated | Financial Summary - Notes - typed to Jerry and Kurt (undated) | Admissible | |
| 81 | 3/29/2017 | Email string from J. Bregman to K. Ramlo re draft settlement agreement | Admissible | |
| 82 | 4/6/2017 | Email from K. Ramlo to J. Bregman, etc. re settlement agreement, with attached signed version | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 83 | multiple | Multiple stipulations and orders modifying pre-trial schedule in Kurtz v. Eichler adv. Proceeding (multiple dates) | Admissible | |
| 84 | 4/3/2017 | Order memorializing trustee Golden substituting in for Peter Eichler's bankruptcy | Admissible | |
| 85 | 11/6/2009 | OMM New Client and Matter print out - Client: P. Eichler | Admissible | |
| 87 | 1/21/2010 | OMM Conflict of Interest Report Client: Aletheia; Matter: SEC Investigation | Admissible | |
| 88 | 1/25/2010 | OMM New Client and Matter Print Out - Client: Aletheia | Admissible | |
| 89 | 1/26/2010 | OMM Letter to Aletheia, P. Barnes, etc. re Engagement / Conflict Waiver | Admissible | |
| 90 | 2/4/2010 | Aletheia v Proctor; LASC SC106700 - Complaint for Declaratory Relief | Admissible | |
| 92 | 2/22/2010 | Email string from R. Peikin to S. Olson attaching Proctor NY Complaint | Admissible | |
| 94 | 12/6/2007 | Schulte Roth & Zabel Letter to P. Selvin at Loeb | Admissible | |
| 96 | 12/21/2007 | Schulte Roth & Zabel Letter to P. Selvin at Loeb | Admissible | |
| 97 | 1/4/2008 | Loeb & Loeb Letter to M. Littenberg | Admissible | |
| 98 | 1/15/2008 | Email from P. Selvin to R. Peikin | Admissible | |
| 99 | 1/16/2008 | Schulte Roth email to P Selvin | Admissible | |
| 101 | 2/23/2010 | OMM Preliminary Conflict Request - New Matter for Existing Client: Alethia / Litigation with Proctor | Admissible | |
| 102 | 2/23/2010 | OMM Conflict of Interest Report, Client: Aletheia Research / Matter: Litigation with Proctor | Admissible | |
| 103 | 3/2/2010 | Email string from S. Aronson to R. Silvers, M. Close, E. Hassi | Admissible | |
| 104 | 3/23/2010 | OMM Invoice No. 786025 to P. Eicher (matter no.  0012608-00004) | Admissible | |
| 107 | 3/4/2010 | OMM New Matter for Existing Client  Print out: Litigation with Proctor  - Breach of Contract Action | Admissible | |
| 108 | 3/23/2010 | Email string from G. Pardo to S. Olson, R. Silver, etc. re – Boskovich | Admissible | |
| 109 | 4/13/2010 | OMM Engagement Letter to Aletheia , P. Eichler  (executed) | Admissible | |
| 110 | 4/13/2010 | OMM Engagement Letter to Aletheia and conflict waiver, not fully signed | Admissible | |
| 111 | 3/10/2010 | Email from R. Silvers to M. Close, cc: S. Aronson re Interview Outline - Aletheia v. | Admissible | |

143

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| | | Proctor - Peiken and Eichler, attaching v.2 doc | | |
| 113 | 4/16/2010 | **[Duplicate of 5]** *Aletheia v. Proctor; SC106700:* First Amended Complaint | Admissible | |
| 114 | 3/12/2010 | Email string from R. Silvers to M. Close forwarding S. Aronson email re a call re client meeting | Admissible | |
| 116 | 4/11/2010 | Email string from R. Silvers to K. Mercer re Proctor - re discussing conflict | Admissible | |
| 117 | 11/3/2006 | Stock Purchase Agreement | Admissible | |
| 119 | 11/3/2006 | Selling Agreement fully executed with schedules | Admissible | |
| 120 | 11/3/2006 | Option Agreement fully executed | Admissible | |
| 121 | 3/8/2007 | Resolutions adopted by Written Consent | Admissible | |
| 122 | 9/19/2007 | Email string from R. Peikin to S. Yates | Admissible | |
| 123 | 12/3/2010 | Email string from S. Aronson to K. Mercer re | Admissible | |
| 124 | 4/26/2006 | Email from Coley to P. Eichler Term Sheet | Admissible | |
| 125 | 9/21/2006 | Email from M. Aboelnaga to R. Peikin, Revised Summary of Terms | Admissible | |
| 129 | 4/1/2006 | April 2006 presentation  "Proctor Investment Managers" Strategy, Marketing process, etc. | Admissible | |
| 130 | 8/23/2011 | Memo from OMM to S. Olson and J . deNeve | Admissible | |
| 131 | 2/6/2007 | Email from J. Coley to G. Meredith, C. Rabbat, | | Not admitted |
| 133 | 5/10/2007 | Email from J. Coley to R. Peikin | Admissible | |
| 134 | 5/15/2007 | Email from J. Coley to P. Eichler, etc. | Admissible | |
| 135 | 6/15/2010 | Action by Written Consent of Majority Shareholder, election of B. Lee | Admissible | |
| 138 | 7/13/2010 | OMM Letter to B. Lee re Proctor Litigation - Engagement and Conflict Waiver, fully signed | Admissible | |
| 139 | 2/25/2011 | *Aletheia v. Proctor;* SC106700 - Plaintiff's Response to Proctor's Second Set of Special Interrogatories | Admissible | |
| 140 | 7/30/1997 | Aletheia Bylaws | Admissible | |
| 141 | 11/3/2006 | Certificate of Amendment of the Bylaws of Aletheia | Admissible | |
| 144 | 7/10/2010 | **[Duplicate of  150]** Email string from R. Silvers to M. Close, K. Mercer, etc. re Proctor | Admissible | |
| 146 | 7/21/2010 | Email string from S. Aronson to r. Silvers re Proctor | Admissible | |

144

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 147 | 7/14/2010 | Email from R. Silvers to S. Aronson, M. Close, etc. re Proctor | Admissible | |
| 148 | 7/20/2010 | Email from S. Aronson to R. Silvers, S. Olson, etc. re Proctor | Admissible | |
| 150 | 7/20/2010 | Email from R. Silvers to S. Aronson, S. Olson, etc. re Proctor | Admissible | |
| 155 | 1/28/2018 | Amended Notice of Deposition of PMK of OMM | Admissible | |
| 159 | 8/23/2010 | Email string from R. Silvers to S. Aronson, etc. | Admissible | |
| 160 | 1/6/2011 | Email string from S. Aronson to S. Olson re Aletheia | Admissible | |
| 164 | 4/14/2011 | OMM Letter to Aletheia, P. Eichler, P. Barnes, B. Lee re Terms of Engagement supplementing letters dated: 1/26/10, 3/18/10 and 7/13/10, signed by all | Admissible | |
| 165 | 4/18/2011 | *Aletheia v. Proctor*; SC106700 - Memo of Points and Authorities ISO Cross-Defendant's Motion to Disqualify OMM | Admissible | |
| 166 | 6/1/2011 | Email from K. Mercer to S. Aronson | Admissible | |
| 167 | 8/23/2011 | Draft Memo of Points and Authorities ISO Cross-Defendant's P. Barnes and B. Lee's Demurrer to First Amended X-Complaint, hearing 8/23/11 (undated) | Admissible | |
| 168 | 8/16/2011 | *Aletheia v. Proctor*; SC106700 - Reply Brief ISO Cross-Defendants P. Barnes and B. Lee's Demurrer to First Amended X-Complaint | Admissible | |
| 169 | 8/30/2011 | *Aletheia v. Proctor*; SC106700 - Minutes of 8/30/11 Hearing re R. Peikin's Demurrer to First Amended X-Complaint and P. Barnes and B. Lee's Demurrer to First Amended X-Complaint | Admissible | |
| 170 | 6/30/2011 | Aletheia v. Proctor; SC106700 - Memorandum of Points and Authoriites ISO P. Barnes and B. Lee Demurrers to First Amended Cross Complaint, signed by Aronson | Admissible | |
| 171 | 4/18/2011 | Email string from A. von Franque to S. Aronson, etc. | Admissible | |
| 172 | 6/6/2011 | *Aletheia v. Proctor*; SC106700 - Plaintiff's Memo of Points and Authorities In Opposition to Motion to Disqualify | Admissible | |
| 173 | 7/18/2011 | *Aletheia v. Proctor*; SC106700 - Minutes re 7/12/11 Hearing - Ruling on X-Defendant's Motion to Disqualify OMM - denied | Admissible | |
| 174 | 11/23/2011 | Email string from S. Aronson to S. Olson, etc. | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 175 | 12/21/2017 | Deposition Subpoena for R. Silvers | Admissible | |
| 177 | 2/16/2010 | **[Duplicate of 4, 91]** Proctor v. Aletheia; NYSC 10600397 - Summons and Complaint, filed 2/16/2011 | Admissible | |
| 178 | 3/2/2010 | Email from R. Silvers to C. Adams | Admissible | |
| 179 | 3/2/2010 | Email from R. Silvers to S. Aronson, cc M. Close | Admissible | |
| 180 | 3/2/2010 | Email string from S. Aronson to R. Silvers, cc M. Close | Admissible | |
| 181 | 3/10/2010 | **[Duplicate of 111]** Email from R. Silvers to M. Close, cc S. Aronson | Admissible | |
| 183 | 11/3/2006 | **[Duplicate of 11, 118, 401]** Agreement between Aletheia and Proctor, signed | Admissible | |
| 185 | 3/2/2010 | Email string from M.  Close to R. Silvers, S. Aronson | Admissible | |
| 186 | 3/25/2010 | **[Duplicate of 7, 115]** Email from M. close to R. Silvers | Admissible | |
| 187 | 7/30/2010 | **[Duplicate of 10]** Peikin v. Aletheia; LASC SC108642 - Summons and 709 Complaint to Determine Validity of Appointment of Director, filed 6/30/11 | Admissible | |
| 188 | 7/6/2010 | **[Duplicate of 9, 137]** Proctor v. Aletheia; LASC SC108674 - Summons and Complaint to Determine Validity of Election / Appointment of Directors | Admissible | |
| 191 | 7/20/2010 | **[Duplicate of 18, 149]** Email from R. Silvers to S. Aronson, S. Olson, etc. | Admissible | |
| 192 | 7/20/2010 | **[Duplicate of 150]** Email from R. Silvers to S. Aronson | Admissible | |
| 194 | 7/25/2010 | Email string from G. Pardo to R. Silvers, etc. | Admissible | |
| 195 | 7/25/2010 | Email from M. Close to S. Aronson | Admissible | |
| 196 | 7/11/2010 | **[Duplicate of 17, 145]** Email string from S. Olson to M. Close, S. Aronson | Admissible | |
| 197 | 7/12/2010 | Email string from R. Silvers to K. Mercer | Admissible | |
| 200 | 7/2/2010 | Email string from R. Silvers to S. Aronson, etc. | Admissible | |
| 201 | 8/26/2010 | **[Duplicate of 35, 128]** Email string from M. Close to R. Silvers, etc. | Admissible | |
| 202 | 1/18/2011 | **[Duplicate of 27]** Aletheia v. Proctor; SC106700: Cross Complaint, filed 1/18/12 | Admissible | |
| 203 | 1/31/2011 | 1/31/11 Email string from R. Buckner to R. Silvers | Admissible | |
| 204 | 4/5/2011 | *Aletheia v. Proctor*; SC106700: Plaintiff's Supplemental Response to Proctor's First Set of Special Interrogatories | Admissible | |

146

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 205 | 3/11/2011 | **[Duplicate of 31, 163]** Email string from K. Mercer to R. Buckner, S. Aronson, etc. | Admissible | |
| 207 | 6/30/2011 | **[Duplicate of 170]** Aletheia v. Proctor; SC106700 - Aletheia's Memo of Points and Authorities ISO P. Barnes and B. Lee's Demurrer to First Amended Cross-Complaint | Admissible | |
| 208 | 6/24/2011 | Email from R. Silvers to D. Tenner | Admissible | |
| 209 | 8/16/2011 | Aletheia v. Proctor; SC106700 - Aletheia's Reply Brief ISO P. Barnes and B. Lee's Demurrer to First Amended Cross-Complaint | Admissible | |
| 210 | 8/30/2011 | Minutes of 8/30/11 hearing at LASC, SC106700 - ruling on Cross-Defendants' Demurrers to the First Amended Complaint - overruled | Admissible | |
| 211 | 8/8/2011 | OMM Invoice no. 828386 (matter no. 0012608-00004) | Admissible | |
| 212 | 6/9/2011 | Email string from Silvers to D. Sestito | Admissible | |
| 213 | 6/11/2011 | Email string from S. Aronson to R. Silvers, K. Mercer | Admissible | |
| 214 | 6/10/2011 | **[Duplicate of 39]** Email from R. Silvers to S. Arsonson, etc. | Admissible | |
| 215 | 6/8/2011 | Email string from R. Silvers to K. Mercer | Admissible | |
| 216 | 6/8/2011 | Email string from K. Mercer to D. Sestito | Admissible | |
| 217 | 6/11/2011 | Email string from R Silvers to D Sestito etc | Admissible | |
| 218 | 6/19/2011 | Email string from R. Silvers to D. Sestito | Admissible | |
| 219 | 6/21/2011 | Email from S. Aronson to R. Silvers, D. Sestito | Admissible | |
| 220 | 6/22/2011 | Email from R. Silvers to S. Aronson | Admissible | |
| 221 | 6/22/2011 | Email string from S. Aronson to R. Silvers | Admissible | |
| 222 | 6/22/2011 | Email from D. Sestito to S. Olson, cc S. Aronson | Admissible | |
| 223 | 7/26/2011 | Email from D. Sestito to S. Aronson re Proctor Damages Analysis  Addendum, attaching 7/xx/11 Potential Damages Exposure memo, Analysis of x-complaint - Summary I, II, and III, 6/22/11 memo | Admissible | |
| 224 | 8/23/2011 | OMM's Memo to S. Olson and J. deNeve re Aletheia Report Analysis | Admissible | |
| 225 | 8/23/2011 | OMM Memo S. Olson and J. deNeve re Aletheia  v. Proctor - Initial Assessment of Aletheia's Defenses to Proctor's Cross-Claims | Admissible | |
| 226 | 8/23/2011 | OMM Memo to S. Olson and J. deNeve re Aletheia v. Proctor - Initial Assessment of Aletheia's Claims | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 228 | 11/3/2006 | Stock Purchase Agreement | Admissible | |
| 231 | 4/1/2007 | April 2007 Selling Agreement [Ex. 8 to Peikin Depo] | Admissible | |
| 232 | 6/15/2010 | Email from J. deNeve to J. Laco | Admissible | |
| 234 | 7/8/2010 | Email string from L. Grant to R. Silvers, K. Mercer | Admissible | |
| 235 | 7/6/2010 | Draft Minutes of Meeting of Board of Directors (unsigned) | Admissible | |
| 237 | 7/25/2010 | Email strong from R. Silvers to J. Laco | Admissible | |
| 238 | 3/17/2011 | Email string from S. Olson to A. von Franque, S. Aronson, J. deNeve, M. Close, etc. | Admissible | |
| 239 | 5/1/2011 | Employment Agreement between Aletheia and J. deNeve, unsigned, with unsigned exhibits | Admissible | |
| 240 | 5/3/2011 | Email string from K. Mercer to S. Olson, R. Buckner, cc: S. Aronson, J. deNeve | Admissible | |
| 241 | 5/11/2011 | Email String from J. deNeve to K. Emplem at Greenberg Traurig | Admissible | |
| 242 | 8/16/2011 | Annual Meeting of Shareholders - Agenda | Admissible | |
| 243 | 8/23/2011 | Aletheia Meeting Agenda - August 2011 [8/23 - 8/25] | Admissible | |
| 244 | 8/16/2011 | Aletheia Agenda for Meeting of the Board of Directors | Admissible | |
| 245 | 8/2/2011 | Draft minutes of 8/2/11 Board Meeting | Admissible | |
| 246 | 10/27/2011 | Minutes - Draft of 10/27/11 Executive Com meeting | Admissible | |
| 247 | undated | (undated) Resolution - Proposed - Creating Executive Committee | Admissible | |
| 248 | 6/28/2011 | Minutes of Meeting of BOD of Aletheia, unsigned | Admissible | |
| 249 | 1/13/2012 | Email from S. Aronson to J. Cotkin, cc: J. deNeve, etc. | Admissible | |
| 250 | 2/9/2012 | Email string from J. deNeve to M. Laney | Admissible | |
| 251 | 2/9/2012 | Email from J. deNeve to J. Kaplan | Admissible | |
| 252 | 2/9/2012 | Email from Davis to S. Schechter, cc: J. Deneve re Proctor, attaching M. Taitelman's letter of 2/9/12 - Litigation Report | Admissible | |
| 253 | 2/13/2012 | Email string from M. Taitelman to J. deNeve | Admissible | |
| 254 | 2/13/2012 | Email from M. Taitelman to J. deNeve | Admissible | |
| 255 | 12/14/2012 | Minutes of Meeting of Executive Committee of BOD - 12/14/12,  unsigned | Admissible | |
| 261 | 9/21/2017 | Subpoena to Peikin | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 262 | 6/30/2010 | Peikin v. Aletheia; SC108642 - Summons and Complaint to Determine Validity of Appointment of Director in 2010 | Admissible | |
| 263 | 9/19/2011 | Barnes v. Peikin; BC462946 - First Amended Complaint for Removal of Director | Admissible | |
| 265 | 1/28/2013 | Binder index for Meeting with Aletheia's Trustee and Aletheia's Employee Compensation spreadsheets | Admissible | |
| 266 | 10/7/2011 | Aletheia v. Proctor; SC106700 - Peikin's Answer to the First Amended Cross-Complaint | Admissible | |
| 267 | 11/16/2010 | Peikin v. Aletheia; SC110372 - Summons and First Amended Complaint for Indemnification | Admissible | |
| 268 | 10/19/2010 | Letter from R. Peikin to P. Eichler | Admissible | |
| 269 | 3/15/2011 | Letter from R. Peikin to P. Eichler and M. Laney | Admissible | |
| 270 | 5/26/2011 | Letter from R. Peikin to Aletheia, attn: M. Laney | Admissible | |
| 271 | 8/16/2011 | Minutes of an Annual Meeting of the Shareholders of Aletheia | Admissible | |
| 272 | 11/10/2014 | Adversary proceeding filed by J. Golden against R. Peikin | Admissible | |
| 273 | 1/14/2015 | Email Chain from R. Itkin to L. Raport, etc. re filing status report | Admissible | |
| 274 | 9/4/2015 | Email from E. Garofalo to L. Raport re Right to Attach order, with attachment | Admissible | |
| 275 | 12/31/2012 | Brokerage Statements for R. Peikin, combined, from U.S. Trust / BofA , 2012 | Admissible | |
| 276 | 12/31/2013 | Brokerage Statements for R. Peikin, IRA, from U.S. Trust / BofA, 2013 | Admissible | |
| 277 | 12/13/2013 | Brokerage Statements for R. Peikin, combined, from U.S. Trust / BofA , 2013 | Admissible | |
| 278 | 12/31/2011 | Brokerage Statements for R. Peikin, IRA, from U.S. Trust / BofA, 2011 | Admissible | |
| 279 | 12/31/2011 | Brokerage Statements for R. Peikin, combined, from U.S. Trust / BofA, 2011 | Admissible | |
| 280 | 12/31/2012 | Brokerage Statements for R. Peikin, IRA, from U.S. Trust / BofA, 2012 | Admissible | |
| 281 | 12/21/2010 | Bank Statement for R. Peikin from California Bank & Trust, 12/2010 | Admissible | |
| 282 | 6/11/2010 | U.S. Trust / BofA Confidential Personal Financial Statement / Certificate for P. Eichler | Admissible | |
| 283 | 7/14/2010 | Schedule of Assets and Debts Filed with Court, Eichler and Eichler | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 300 | 1/22/2018 | Subpoena to Testify at a Deposition in a Civil Action - Fabish | Admissible | |
| 301 | 4/29/2011 | O'Melveny & Myers Invoice dated April 29, 2011 | Admissible | |
| 302 | 3/7/2011 | Email Chain from K. Mercer to A. vonFranque, etc. re Conflict Issue | Admissible | |
| 303 | 3/7/2011 | E-mail Chain from R. Buckner to A. vonFranque | Admissible | |
| 304 | 5/19/2011 | **[Duplicate of 343-not complete]** E-mail chain from J. deNeve to A. vonFranque | Admissible | |
| 305 | 3/10/2011 | E-mail Chain from A. Aronson to R. Buckner, etc. | Admissible | |
| 306 | 3/10/2011 | Memorandum from A. von Franque to Seth Aronson, etc. | Admissible | |
| 307 | 3/11/2011 | E-mail Chain from A. von Franque to R. Buckner, etc. | Admissible | |
| 308 | 3/11/2011 | E-mail Chain from S. Aronson S. Olson, earlier email from A. vonFranque | Admissible | |
| 309 | 3/17/2011 | E-mail from A. vonFranque to R. Buckner, etc. | Admissible | |
| 310 | 3/17/2011 | E-mail Chain from S. Olson to S. Aronson, etc. | Admissible | |
| 311 | 3/17/2011 | E-mail Chain from S. Olson to S. Aronson, etc. | Admissible | |
| 312 | 3/17/2011 | E-mail Chain from S. Aronson to S. Olson | Admissible | |
| 313 | 3/17/2011 | E-mail Chain from A. von Franque to K. Mercer | Admissible | |
| 314 | 3/17/2011 | E-mail Chain from K. Mercer to A. vonFranque | Admissible | |
| 315 | 3/17/2011 | E-mail Chain from K. Mercer to A. vonFranque | Admissible | |
| 318 | 4/18/2011 | Aletheia v. Proctor; SC106700-Memorandum of Points and Authorities ISO Motion to Disqualify OMM | Admissible | |
| 319 | 4/18/2011 | **[Duplicate of 171]** E-mail Chain from A. vonFranque to S. Aronson, etc. | Admissible | |
| 320 | 4/19/2011 | E-mail Chain from A. vonFranque to S. Olson | Admissible | |
| 321 | 4/22/2011 | E-mail from Westlaw to A. vonFranque Gong case, with Attachment | Admissible | |
| 322 | 4/22/2011 | E-mail Chain from A. vonFranque to R. Buckner | Admissible | |
| 323 | 6/10/2011 | O'Melveny & Myers invoice no. 823899, dated June 10, 2011 (matter no. 0012608-00004) | Admissible | |
| 324 | 4/26/2011 | E-mail from A. vonFranque to S. Dunham | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 325 | 4/28/2011 | Email Chain from  A. vonFranque to S. Dunham | Admissible | |
| 326 | 4/29/2011 | Email Chain from S. Aronson to A. vonFranque, etc. | Admissible | |
| 327 | 5/5/2011 | E-mail Chain from A. vonFranque to K. Mercer | Admissible | |
| 328 | undated | Draft Declaration of J. Jorge deNeve ISO Plaintiff's Opposition to Motion to Disqualify | Admissible | |
| 329 | 5/4/2011 | E-mail Chain from A. vonFranque to M. Close | Admissible | |
| 330 | 5/18/2011 | E-Mail Chain from A. vonFranque to S. Dunham, etc. re Peikin Opposition Arguments outline | Admissible | |
| 331 | 5/18/2011 | E-Mail Chain from A. vonFranque to S. Dunham re Peikin Oppo. Arguments outline | Admissible | |
| 332 | 5/21/2011 | E-mail Chain from S. Dunham to S. Aronson, etc. re privileged commun. With OMM counsel, attaching changes to Aronson declaration | Admissible | |
| 333 | 6/2/2011 | Email Chain from A. vonFranque to D. Sestito re revised open issues list, attahching Aronson letter to  Friese, etc. | Admissible | |
| 334 | 7/12/2011 | O'Melveny & Myers Invoice no. 826108, dated 7/12/2011 | Admissible | |
| 335 | 6/5/2011 | Email Chain from A. vonFranque to D. Sestito re DQ Motion - red line | Admissible | |
| 336 | 6/6/2011 | Aletheia v. Proctor; SC106700-Memorandum of Points and Authorities ISO Motion to Disqualify OMM | Admissible | |
| 337 | 6/6/2011 | Aletheia v. Proctor; SC106700-Declaration of S. Aronson ISO Opposition to Motion to Disqualify | Admissible | |
| 338 | 6/6/2011 | Aletheia v. Proctor; SC106700-Declaration of J. Jorge deNeve ISO Plaintiff's Opposition to Motion to Disqualify | Admissible | |
| 339 | 6/6/2011 | Aletheia v. Proctor; SC106700-Declaration of S. Olson ISO Plaintiff's Opposition to Motion to Disqualify | Admissible | |
| 341 | 7/6/2011 | E-mail Chain from A. vonFranque to J. M cCarthy re Aletheia v. Proctor-hearing prep - redacted | Admissible | |
| 342 | 7/6/2011 | E-mail Chain from A. vonFranque to J. M cCarthy re Aletheia v. Proctor-hearing prep - Not Redacted | Admissible | |
| 343 | 5/19/2011 | E-mail Chain from J. deNeve to A. vonFranque re draft Aronson declaration, forwarding draft deNeve declaration | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 344 | 7/12/2011 | Aletheia v. Proctor; SC108642 - Minutes and Ruling re hearing on Peikin's Motion to Disqualify OMM - Ruling on Submitted Matter, denied | Admissible | |
| 345 | 7/12/2011 | E-mail Chain from A. vonFranque to D. Sestito re Motion to Disqualify forwarding R. Silvers email re hearing - Redacted | Admissible | |
| 346 | 7/12/2011 | E-mail from R. Silvers to A. vonFranque fowarding comments re Court's ruling on Motion to Disqualify | Admissible | |
| 350 | 1/24/2018 | Subpoena to Testify at Deposition - Freeman & Mills | Admissible | |
| 351 | 10/11/2011 | Email from W. Ackerman to R. Silvers, etc. re non payment of invoices | Admissible | |
| 352 | 5/19/2011 | Letter Agreement from Freeman & Mills to D. Sestito at OMM re Aletheia v. Proctor, fully signed 7/27/11, 8/2/11 | Admissible | |
| 353 | undated | Analysis of Proctor's Cross-Complaint Summary I | Admissible | |
| 354 | undated | Analysis of Proctor's Cross-Complaint Summary II | Admissible | |
| 355 | undated | Analysis of Proctor's Cross-Complaint Summary III | Admissible | |
| 356 | 7/18/2011 | Email Chain from C. Podlipna to R. Silvers, etc. attaching Summary of Analysis of Cross-Complaints I, II, III | Admissible | |
| 357 | 11/3/2006 | Agreement between Aletheia and Proctor, signed by Aletheia; also Ex. 6 to prior Peikin depo | Admissible | |
| 358 | 3/8/2007 | **[Duplicate of 121, 402]** Resolutions Adopted by the Unanimous Written Consent of the Board of Directors re Compensation , signed | Admissible | |
| 359 | 5/5/2011 | E-mail Chain from C. Podlipna to K. Mercer, W. Ackerman re Aletheia's payments to Proctor in 2007 | Admissible | |
| 361 | 10/4/2006 | Employment Agreement between Aletheia and P. Barnes, signed | Admissible | |
| 362 | 12/31/2006 | Aletheia Insider Index LP Financial Statements (2006) - Ernst & Young Report of Independent Auditors | Admissible | |
| 363 | 12/31/2007 | Aletheia Insider Index LP Financial Statements (2007)- Ernst & Young Report of Independent  Auditors | Admissible | |
| 364 | 12/31/2008 | Aletheia Insider Index LP Financial Statements (2008) - Ernst & Young Report of Independent Auditors | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 365 | 12/31/2009 | Aletheia Insider Index LP Financial Statements (2009) - Gifford Hillegass & Ingwersen - Independent Auditors' Report | Admissible | |
| 366 | 12/31/2006 | Aletheia Insider Index II LP Financial Statements (2006) - Ernst & Young Report of Independent Auditors | Admissible | |
| 367 | 12/31/2007 | Aletheia Insider Index II LP Financial Statements (2007) - Ernst & Young Report of Independent Auditors | Admissible | |
| 368 | 12/31/2008 | Aletheia Insider Index II Financial Statements (2008) - Ernst & Young Report of Independent Auditors | Admissible | |
| 369 | 12/31/2006 | Aletheia Bonuses Paid - 2006 | Admissible | |
| 370 | 12/31/2009 | Aletheia Insider Index II LP Financial Statements (2009) - Gifford Hillegass & Ingwersen Independent Auditors' Report | Admissible | |
| 371 | 2007 - 2010 | Financial information and spreadsheets re expenses, dividends and bonuses 2007 - 2010 | Admissible | |
| 372 | 11/3/2006 | **[Duplicate of 119 and 264]** Selling Agreement, signed with exhibits | Admissible | |
| 373 | 4/__/2007 | **[Duplicate of 231]** Selling Agreement - signed with exhibits "execution copy" | Admissible | |
| 374 | 3/31/2011 | List of Employees - position, earnings, bonuses 2006 – 2011 | Admissible | |
| 375 | 6/7/2011 | Email from C. Podlipna to W. Ackerman | Admissible | |
| 376 | 1/18/2011 | *Aletheia v. Proctor* - Second Amended Complaint | Admissible | |
| 377 | 3/10/2011 | **[Duplicate of 71, 162]** *Aletheia v. Proctor* - First Amended Complaint | Admissible | |
| 378 | 5/5/2011 | E-mail Chain from K. Mercer to C. Podlipna | Admissible | |
| 379 | 10/5/2011 | Freeman & Mills Invoice No. 5119, dated 10/5/11 | Admissible | |
| 380 | 6/3/2011 | E-mail Chain from C. Podlipna to K. Mercer, etc. | Admissible | |
| 381 | 6/10/2011 | E-mail Chain from K. Mercer to C. Podlipna | Admissible | |
| 382 | 6/10/2011 | E-mail Chain between C. Podlipna, K. Mercer, etc. | Admissible | |
| 383 | 2007 - 2011 | Analysis of Excess Bonuses Paid | Admissible | |
| 384 | 6/22/2011 | Email from Sestito to Olson with attachments (OMM_0021105-1163) | Admissible | |
| 385 | 7/14/2011 | Email chain from R. Silvers to C. Podlipna | Admissible | |
| 386 | 9/1/2011 | E-mail Chain between R. Silvers and C. Podlipna | Admissible | |
| 387 | 7/18/2011 | E-mail Chain between R. Silvers and C. Podlipna | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 388 | 9/12/2011 | Email from C. Podlipna to R. Silvers | Admissible | |
| 404 | 1/18/2008 | E-mail from P. Selvin to P. Eichler and R. Peikin | Admissible | |
| 405 | 6/22/2011 | Memorandum on OMM Letterhead to S. Olson and J. deNeve, subject: Potential Damages Exposure in Aletheia v. Proctor | Admissible | |
| 407 | 7/14/2010 | Schedule of Assets and Debtors, filed in Eichler v. Eichler, signed by Peter Eichler | Admissible | |
| 408 | 11/13/2012 | Omnibus Declaration of P. Eichler ISO First Day Motions | Admissible | |
| 500 | 7/29/2010 | FTI's Review of Aletheia Research & Management, Inc.'s Compliance Practices and Procedures, Internal Accounting Controls, and Infrastructure (Date is from email attaching report - not on report itself) | Admissible | |
| 501 | 8/3/2010 | Email from C. Roper to A. Piracha | Admissible | |
| 503 | 6/23/2010 | Letter from S. Aronson to R. Friese | Admissible | |
| 504 | 7/20/2010 | Email Chain from K. Mercer to S. Aronson, etc. | Admissible | |
| 506 | 12/13/2010 | Email Chain from S. Aronson to P. Eichler | Admissible | |
| 507 | 1/19/2011 | Email Chain from K. Mercer to R. Silvers | Admissible | |
| 509 | 11/23/2011 | Email chain from S. Aronson to S. Olson, J. deNeve | Admissible | |
| 510 | undated | Aletheia v. Proctor - List of Materials Received from Loeb & Loeb | Admissible | |
| 511 | Jan. 2008 | Aletheia v. Proctor - Unsigned - Complaint for Recision; Fraud and Deceit, etc. | Admissible | |
| 512 | 6/23/2010 | Letter from S. Aronson to R. Friese, signed for Seth Aronson | Admissible | |
| 514 | 1/24/2012 | Email chain from S. Aronson to J. Cotkin | Admissible | |
| 515 | 1/18/2012 | Aletheia v. Proctor; SC106700 - Substitution of Attorney for P. Eichler | Admissible | |
| 516 | 3/23/2011 | Email chain from S. Aronson to R. Buckner | Admissible | |
| 520 | 9/26/2006 | Preliminary Summary Terms and Conditions between Proctor and Aletheia | Admissible | |
| 521 | 5/24/2010 | Email Chain from S. Aronson to S. Olson | Admissible | |
| 550 | 1/24/2018 | Notice of Deposition | Admissible | |
| 551 | 6/14/2010 | Letter to R. Peikin from Nossaman LLP re engagement in *Proctor v. Aletheia* - NY case | Admissible | |
| 552 | 6/14/2010 | Letter to Director of Claims at Professional Indemnity Agency from J. Cotkin enclosing copy of Proctor NY lawsuit | Admissible | |
| 553 | 4/30/2012 | Settlement Agreement, Claim and Policy Release between Aletheia and Houston Casualty | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 554 | 7/16/2012 | Axis v. Aletheia, BC 485198-Cross-Complaint for Declaratory Relief, Breach of Insurance Bad Fath | Admissible | |
| 555 | 6/20/2017 | Trustee's Employment Application for BG in Aletheia bk | Admissible | |
| 556 | 4/12/2013 | Aleltheia Research and Management Workplan - April 12, 2013 | Admissible | |
| 557 | 11/2/2017 | Email chain from T. Yoo to K. Ramlo re Eichler | Admissible | |
| 558 | 4/28/2016 | Email chain from J. Golden to T. Yoo | Admissible | |
| 559 | 1/3/2014 | Email chain from T. Yoo to J. Golden | Admissible | |
| 560 | 4/20/2018 | Claimant's Amended Responses and Objections to Respondent's Second Requests for Admission to Claimant J. Golden | Admissible – Respondents only | |
| 561 | 4/21/2015 | Email chain from L. Raport to R. Itkin | Admissible | |
| 562 | 4/20/2018 | Claimant's Amended Responses and Objections to Respondent's Third Contention Interrogatories to Claimant J. Golden | Admissible – Respondents only | |
| 563 | 1/19/2018 | Claimant's Third Amended Response to Respondent OMM Contention Interrogatory No. 5 | Admissible – Respondents only | |
| 564 | 1/15/2013 | Letter from E. Goldberg to J. Golden | Admissible | |
| 565 | 1/16/2013 | Email chain from E. Goldberg to J. Golden | Admissible | |
| 566 | 1/24/2013 | Email chain from H. Davis to J. Golden | Admissible | |
| 567 | 1/28/2013 | Binder Index for Meeting with Aletheia's Trustee | Admissible | |
| 568 | 1/28/2013 | Memo from Schulte Roth & Zabel, H. Davis | Admissible | |
| 569 | 2/26/2013 | Email chain from E. Goldberg to B. Bash, attaching stipulation for dismissal | Admissible | |
| 570 | 3/7/2013 | Email chain from H. Davis tp B. Bash, attaching Confidential letter re Proctor's proposal | Admissible | |
| 571 | 8/27/2013 | Email from H. Davis to T. Wearsch | Admissible | |
| 572 | 10/7/2013 | Email chain from H. Davis to T. Wearsch | Admissible | |
| 573 | 12/20/2013 | Email from H. Davis to T. Wearsch, attaching Proctor/Aletheia settlement agreement | Admissible | |
| 574 | 4/1/2014 | Motion for Order Approving Settlement between Trustee and Proctor, in Aletheia bk case | Admissible | |
| 575 | 11/3/2014 | Email chain from J. Bregman to M. Kwon | Admissible | |
| 576 | 11/10/2014 | *Golden v. Peikin*, Adv. 14-01724-Complaint | Admissible | |
| 577 | 12/17/2015 | Motion for Order Approving Settlement Agreement between Trustee and R. Peikin, in Aletheia bk case | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 578 | 10/30/2015 | *Golden v. O'Melveny*, Adv. 14-08725-Declaration of R. Peikin | Impeachment only | |
| 579 | 1/14/2015 | Email chain from R. Itkin to L. Raport | Admissible | |
| 580 | 9/4/2015 | Email from E. Garofalo to L. Raport, attaching Right to Attach Order in Peikin/Friese | Admissible | |
| 581 | 9/29/2015 | Email chain from A. Stulman re Golden v. Peikin - substitution | Admissible | |
| 582 | 10/9/2015 | Email from R. Peikin to A. Stulman | Admissible | |
| 583 | 9/21/2017 | *Golden v. O'Melveny*, Arbitration-Subpoena to Produce Documents to R. Peikin | Admissible | |
| 584 | 11/28/2017 | Email chain from J. Bregman to J. Strumwasser re Request for Documents | Admissible | |
| 585 | 12/10/2013 | Letter from Baker Hostetler to R. Wilson | Admissible | |
| 586 | 1/3/2014 | Letter from J. Golden to C. Raineri at OUST | Admissible | |
| 587 | 4/22/2014 | *In re P. Eichler*, bk 2:13-bk-39626-Proof of Claim filed by Estate of Aletheia | Admissible | |
| 588 | 8/19/2014 | *Stahl v. Eichler*, Adv. 14-01547-Complaint against P. Eichler for Denial of Discharge | Admissible | |
| 589 | 11/17/2014 | *Stahl v. Eichler*, Adv. 14-01547-First Amended Complaint | Admissible | |
| 590 | 3/15/2015 | Email from J. Golden to J. Sturtevant, OUST, | Admissible | |
| 591 | 12/3/2016 | Email chain from J. Bregman to K. Ramlo | Admissible | |
| 592 | 1/28/2014 | Email from T. Yoo to L. Meyer at EY | Admissible | |
| 593 | 4/3/2017 | *Kurtz v. Eichler*, Adv. No. 2:14-ap-01547-Order on Stipulation for Substitution and Intervention of Creditor in Place of Plaintiff | Admissible | |
| 594 | Undated | Notes to Jerry and Kurt re 2007 to 2012 finances – handwritten | Admissible | |
| 595 | Undated | Notes to Jerry and Kurt re 2007 to 2012 finances - typed out | Admissible | |
| 596 | 4/6/2017 | Settlement Agreement between Eichler and Trustee | Admissible | |
| 597 | 3/29/2017 | Email chain from J. Bregman to K. Ramlo | Admissible | |
| 598 | 12/21/2016 | Email chain from J. Bregman to K. Ramlo | Admissible | |
| 599 | 11/2/2017 | Email chain from K. Ramlo to T. Yoo Eichler settlement terms | Admissible | |
| 600 | 10/9/2015 | *Golden v. O'Melveny*, Adv. 2:14-cv-08725-Plaintiff's Notice and Motion for Order Approving Settlement with Freedman & Taitelman | Admissible | |
| 601 | 11/10/2014 | *Golden v. O'Melveny*, Adv. 2:14-cv-08725-Complaint for Professional Negligence, etc. | Admissible | |
| 602 | 1/16/2015 | Email chain from K. Feldman to J. Bregman | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 603 | 3/17/2015 | Motion for Order Approving Settlement Agreement between Trustee and Bingham McCutchen, in Aletheia BK case | Admissible | |
| 604 | 3/18/2015 | Motion for Order Approving Settlement Agreement between Trustee and Stroock & Stroock & Lavan, in Aletheia BK case | Admissible | |
| 605 | 11/10/2014 | *Golden v. Eichler Family Trust*, Docket No. 667 in main case, Complaint for Avoidance of Fraudulent Transfers, etc. | Admissible | |
| 606 | 6/30/2015 | *Golden v. Eichler Family Trust*, Adv. 2:14-01733-Default Judgment | Admissible | |
| 607 | 11/10/2014 | *Golden v. Scalzo*, Docket No 666 in main case, Complaint against M. Scalzo for Disallowance of Claims, etc. | Admissible | |
| 608 | 7/9/2015 | Motion for Order Approving Settlement Agreement between Trustee and M. Scalzo, in Aletheia BK case | Admissible | |
| 609 | 7/9/2015 | Motion for Order Approving Settlement Agreement between Trustee and A. Santos, in Aletheia BK case | Admissible | |
| 610 | 11/10/2014 | *Golden v. A. Santos*, Docket No. 671 in main BK case-Complaint against A. Santos for Avoidance of Fraudulent Transfers, etc. | Admissible | |
| 611 | 11/10/2014 | *Golden v. Clay Lacy Aviation*, Adv. No. 14-01735-Complaint agaisnt Clay Lacy for Avoidance of  Fraudulent Transfers, etc. | Admissible | |
| 612 | 3/28/2017 | Motion for Order Approving Settlement Agreement between Trustee and Clay Lacy Aviation, in Aletheia BK case | Admissible | |
| 613 | 12/30/1997 | Indemnification Agreement between Aletheia and R. Peikin | Admissible | |
| 614 | 4/27/2012 | Settlement Agreement, Claim and Policy Release between Aletheia and Houston Casualty | Admissible | |
| 650 | 2/7/2008 | Loeb & Loeb Invoice re v. Proctor Investment | Admissible | |
| 651 | 12/10/2010 | Email chain from S. Aronson to S. Olson | Admissible | |
| 653 | 12/28/2007 | Letter from P. Selvin to M. Littenberg | Admissible | |
| 654 | 3/25/2010 | Email chain from S. Aronson to M. Close | Admissible | |
| 655 | 3/5/2010 | Email chain from R. Silvers to C. Adams | Admissible | |
| 656 | 3/31/2008 | Email from P. Selvin to R. Peikin | Admissible | |
| 657 | 10/15/2015 | Email chain from P. Selvin to J. Bregman | Admissible | |
| 658 | 10/20/2015 | Email chain from J. Bregman to P. Selvin | Admissible | |
| 659 | 9/20/2017 | Email from J. Bregman to P. Selvin | Admissible | |
| 660 | 3/12/2009 | Email from P. Selvin to R. Peikin | Admissible | |

157

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 700 | 4/19/2018 | Notice of Deposition of Thomas Jeremiassen | Admissible | |
| 701 | undated | Thomas Jeremiassen  Description of documents that may be relied on | Admissible | |
| 702 | undated | Revised - Thomas Jeremiassen  Description of documents that may be relied on | Admissible | |
| 703 | undated | Preliminary - Summary of Damages Based on Excess Compensation paid to Eichler and Peikin, prepared by DSI | Admissible | |
| 704 | undated | Preliminary - Summary of Damages Based on Excess Compensation paid to All Employees, prepared by DSI | Admissible | |
| 705 | 8/5/2010 | Settlement Agreement and Release of Claims between Boskovich and Aletheia, fully executed | Admissible | |
| 706 | 11/23/2010 | Common Stock Purchase Agreement between Aletheia and Boskovich Jr. | Admissible | |
| 707 | 8/9/2010 | Email chain from A.  Santos to M. Laney | Admissible | |
| 708 | 4/6/2018 | Claimant's Notice of Expert Designation Pursuant to Procedural Order No. 7 | Admissible – Respondents only | |
| 711 | 5/30/2018 | Claims Register for Case No. 2:12-bk-46618, Aletheia Research and Management, Inc. | Admissible | |
| 750 | 4/30/2018 | Notice of Deposition of J. Kinrich | Admissible | |
| 752 | 12/3/2015 | Stipulation and Protective Order | Admissible | |
| 753 | 4/16/2018 | Respondents' Expert Witness Designation | Admissible | |
| 757 | 11/3/2006 | **[Duplicate of 11]** Agreement between Aletheia and Proctor | Admissible | |
| 762 | 2/1/2010 | Income and Expense Declaration - filed in Eichler v. Eichler 2/1/10 | Admissible | |
| 805 | 4/4/2012 | Aletheia v. Proctor; LASC No. SC106700 - Deposition of Bruce Lee - Vol. I / Condensed version, no exhibits attached - see Ex. 806 | | Not admitted (see exhibit 1299) |
| 806 | 4/4/2012 | *Aletheia v. Proctor*; LASC No. SC106700 - Exhibits to Bruce Lee Deposition | | Not admitted |
| 814 | 11/13/2012 | Omnibus Declaration of P. Eichler in Support of First Day Motions | Admissible | |
| 821 | 6/15/2018 | Email from J. Treshinsky to K. Rosen re supplemental lists Wertlieb Description of documents | | Tentatively admitted |
| 822 | 6/19/2018 | Wertlieb - Wertlieb Law - Bio entitled "about" | | Tentatively admitted |
| 823 | | Wertlieb Law document entitled "Sample Expert Witness Engagements | | Tentatively admitted |
| 824 | | NJW | | Not admitted |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 825 | | Wertlieb Expert Witness and Consultant Engagements | | Tentatively admitted |
| 826 | | Wertlieb Current Professional Activities | | Tentatively admitted |
| 827 | | Bylaws with Wertlieb highlights | | Not admitted |
| 828 | | Bishop deposition notes | | Not admitted |
| 830 | undated | Kehr - Memo to Brutzkus - Aletheia file | | Not admitted but discussed on the record |
| 860 | 6/26/2018 | Second Amended Notice of Deposition of L. Marshall | Admissible | |
| 863 | | Professional Responsibility Course and Texts Required | Admissible | |
| 1001 | 7/24/1997 | Articles of Incorporation [OMM_00081405-08] | Admissible | |
| 1002 | 1/9/2006 | Proctor press release – Avatar [OMM_00077962] | Admissible | |
| 1003 | 5/11/2006 | Email from Coley to Eichler [OMM_00035344] | Admissible | |
| 1004 | 5/16/2006 | Email from Coley to Eichler [OMM_00035346] | Admissible | |
| 1005 | 6/26/2006 | Email from Coley to Eichler [OMM_00035353] | Admissible | |
| 1006 | 7/28/2006 | Email from Coley to Eichler [OMM_00039855] | Admissible | |
| 1007 | 8/2/2006 | Email from Coley to Eichler [OMM_00035358] | Admissible | |
| 1008 | 9/28/2006 | Email from Coley to Eichler [OMM_00039852] | Admissible | |
| 1009 | 10/26/2006 | Email from Coley to Eichler [OMM_00035360] | Admissible | |
| 1011 | 4/28/2007 | Email from Coley to Eichler [OMM_00039904] | Admissible | |
| 1012 | 5/1/2007 | Chart identifying potential clients contacted by Proctor in May [OMM_00039879-81] | Admissible | |
| 1013 | 5/22/2007 | Email from Coley to Eichler & Peikin with attached Q1 Activity Report | Admissible | |
| 1014 | 5/30/2007 | Email from Coley to Eichler & Peikin with April 2007 Activity Report attached [AdvisorMail] | Admissible | |
| 1015 | 5/30/2007 | Chart identifying potential client contacted by Proctor in April [OMM_00039871-77] | Admissible | |
| 1016 | 6/1/2007 | Chart identifying potential clients contacted by Proctor in June [OMM_00039883-88] | Admissible | |
| 1017 | 7/1/2007 | Chart identifying potential clients contracted by Proctor in July [OMM_00039890] | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1018 | 10/22/2007 | Queensland Investment Corporation Investment Management Agreement | Admissible | |
| 1019 | 11/5/2007 | Letter from Meredith to Eichler [OMM_00040541] | Admissible | |
| 1020 | 1/18/2008 | Email from P. Selvin to Eichler and Peikin with attached draft complaint [AdvisorMail] | Admissible | |
| 1021 | 1/21/2008 | Email from Selvin to Peikin [AdvisorMail] | Admissible | |
| 1022 | 1/24/2008 | Email from Selvin to Peikin [AdvisorMail] | Admissible | |
| 1023 | 1/29/2008 | Standstill Agreement between Proctor and Aletheia [OMM_00027671-73] | Admissible | |
| 1024 | 2/12/2008 | Letter from Selvin to Davis enclosing dividend check [OMM_00027728-30] | Admissible | |
| 1025 | 3/11/2008 | Extension of Standstill Agreement [OMM_00027766-67] | Admissible | |
| 1026 | 8/8/2008 | Email from McCroskey to Eichler [DLA-0005213-15] | Admissible | |
| 1027 | 1/9/2009 | Email from SYates to Ruthizer attaching Aletheia Report [identified as Tab 100 in Exhibit 224] [P0053431-P0053432, P0053349 – P0053430] | Admissible | |
| 1028 | 6/12/2009 | Letter from Davis to Selvin [OMM_00030378-80] | Admissible | |
| 1029 | 7/6/2009 | Letter from Selvin to Davis [OMM_00030387-434] | Admissible | |
| 1030 | 7/13/2009 | Letter from Davis to Selvin [OMM_00030436-38] | Admissible | |
| 1031 | 7/20/2009 | Email from Selvin to Peikin with attached draft complaint | Admissible | |
| 1032 | 7/21/2009 | Declaratory Relief Complaint filed by Aletheia [OMM_00029792-29808] | Admissible | |
| 1033 | 7/27/2009 | Letter from Davis to Selvin [OMM_00030450] | Admissible | |
| 1034 | 11/5/2009 | Preliminary Conflict Request—New Client and Matter [OMM_00211402-08] | Admissible | |
| 1035 | 11/5/2009 | Conflict of Interest Report [OMM_00211419-24] | Admissible | |
| 1036 | 11/6/2009 | Letter to D. Bunzel from R. Aronson [OMM_00211415-17] | Admissible | |
| 1037 | 11/16/2009 | Email from Aronson to Eichler [OMM_00211418] | Admissible | |
| 1038 | 12/31/2009 | Email from deNeve to Eichler, etc. with attached list of Aletheia shareholders [AdvisorMail] | Admissible | |
| 1039 | 12/31/2009 | List of Aletheia Shareholders as of 12/31/2009 [OMM_00034131]; | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1040 | 1/2/2010 | Email from Aronson to Eichler w/attachment [AdvisorMail] | Admissible | |
| 1041 | 1/5/2010 | Email from Friese to Aronson [OMM_00208932] | Admissible | |
| 1042 | 1/14/2010 | Conflict of Interest Report Aletheia SEC Investigation [OMM_00206236-414] | Admissible | |
| 1043 | 1/28/2010 | Letter from Davis to Selvin [OMM_00030454] | Admissible | |
| 1044 | 3/1/2010 | Substitution of Attorney [OMM_00159803] | Admissible | |
| 1045 | 3/3/2010 | Email from Aronson to Close, etc [OMM_00209302-03] | Admissible | |
| 1046 | 3/4/2010 | Email from Olson to Aronson [OMM_00096986] | Admissible | |
| 1047 | 3/5/2010 | Email from Silvers to Aronson [OMM_00105197-98] | Admissible | |
| 1048 | 3/5/2010 | Email from Hassi to Aronson [OMM_00122288] | Admissible | |
| 1049 | 3/8/2010 | Email from Silvers to Adams [OMM_00209292-93] | Admissible | |
| 1050 | 3/8/2010 | Email from Eftekhari to Hassi [OMM_00160581] | Admissible | |
| 1051 | 3/9/2010 | Email from Silvers to Close [OMM_00104528] | Admissible | |
| 1052 | 3/10/2010 | Email from Aronson to Close, etc [OMM_00102492-493] | Admissible | |
| 1053 | 3/18/2010 | Email from Aronson to Close [OMM_00205236-38] | Admissible | |
| 1054 | 3/30/2010 | Email from Aronson to Eichler, Peikin, etc with attachment [OMM_00109384-412] | Admissible | |
| 1055 | 3/30/2010 | Email from Close to Eichler, Peikin etc [OMM_00108215] | Admissible | |
| 1056 | 4/5/2010 | Email from Aronson to Eichler, Peikin w/attachment[AdvisorMail] | Admissible | |
| 1057 | 4/15/2010 | Email from Peikin to Mercer w/attachment [OMM_00158634-665] | Admissible | |
| 1058 | 5/17/2010 | Email from deNeve to Ernest C'DeBaca etc, with attachments [AdvisorMail] | Admissible | |
| 1059 | 5/20/2010 | Email from deNeve to Peikin attaching 4/13/2010 engagement agreement for Proctor and Boskovich w/attachment [AdvisorMail] | Admissible | |
| 1060 | 5/24/2010 | Email from deNeve to Pardo w/attachments [OMM_00112331-419] | Admissible | |
| 1061 | 6/3/2010 | Email from Aronson to deNeve [OMM_00097540-541] | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1062 | 6/14/2010 | Email from Laco to deNeve [OMM_00098723] | Admissible | |
| 1063 | 6/15/2010 | Email from Aronson to Friese [OMM_00156049] | Admissible | |
| 1064 | 6/15/2010 | Email from deNeve to Laco [OMM_00096608-09] | Admissible | |
| 1065 | 6/15/2010 | Letter from Friese to Aronson [OMM_00156051-54] | Admissible | |
| 1066 | 6/15/2010 | Email from deNeve to Eichler attaching Written consent [OMM_00098338-41] | Admissible | |
| 1067 | 6/17/2010 | Letter from Aronson to Friese [OMM_00156057-58] | Admissible | |
| 1068 | 6/18/2010 | Letter from Roger Peikin to Peter Eichler [OMM_00040724-725] | Admissible | |
| 1069 | 6/18/2010 | Letter from Cialone to Aronson [OMM_00117046-48] | Admissible | |
| 1070 | 6/22/2010 | Letter from Peter Eichler to Roger Peikin [OMM_00040729-730] | Admissible | |
| 1071 | 6/23/2010 | Notice of substitution of counsel and consent to change of counsel [OMM_00156066-71] | Admissible | |
| 1072 | 6/23/2010 | Letter from Roger Peikin to Peter Eichler [OMM_00040732-735] | Admissible | |
| 1073 | 6/25/2010 | Letter from Eichler to Proctor [OMM_00040550] | Admissible | |
| 1074 | 6/29/2010 | Email from Olson to R Echavez [AdvisorMail] | Admissible | |
| 1075 | 6/30/2010 | Email from Yates to Eichler etc attaching correspondence regarding annual meeting of shareholders w/attachment [AdvisorMail] | Admissible | |
| 1076 | 7/2/2010 | Letter from Eichler to Shareholders [OMM_00040555] | Admissible | |
| 1077 | 7/5/2010 | Letter from Aronson to Davis [OMM_00040557-58] | Admissible | |
| 1078 | 7/6/2010 | Minutes of a meeting of the Board of Directors of Aletheia Research and Management, Inc. (executed) [Lee Exhibit 11] | Admissible | |
| 1079 | 7/7/2010 | Email from Eichler to Olson [OMM_00095524 – OMM_00095525] | Admissible | |
| 1080 | 7/8/2010 | Email from Mercer to Silvers with attachment [OMM_00052520-24] | Admissible | |
| 1081 | 7/9/2010 | Letter from Davis to Aronson [00040560-64] | Admissible | |
| 1082 | 7/9/2010 | Email from Kemple to OMM [OMM_00040097-105] | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1083 | 7/9/2010 | Email from deNeve to Close, etc [OMM_0041106-10] | Admissible | |
| 1084 | 7/11/2010 | Email from Mercer to Silvers [OMM_00083131-34] | Admissible | |
| 1085 | 7/15/2010 | Internal OMM email circulating draft Eichler declaration [OMM_00050771-776] | Admissible | |
| 1086 | 7/15/2010 | Declaration of Roger B. Peikin in Support of Complaint to Determine Validity of Appointment of Director [OMM_00040611-672] | Admissible | |
| 1088 | 7/20/2010 | Email from Aronson to Silver, etc. [OMM_00066137] | Admissible | |
| 1089 | 7/21/2010 | Email from Aronson to Mercer [OMM_00057835-37] | Admissible | |
| 1090 | 7/23/2010 | Email from Olson to Mercer [OMM_00037355-57] | Admissible | |
| 1091 | 7/23/2010 | Email from Mercer to Aronson etc [OMM_00038111-14] | Admissible | |
| 1092 | 7/24/2010 | Email from Silvers to Mercer [OMM_00070558-560] | Admissible | |
| 1093 | 7/25/2010 | Email from Silvers to Laco [OMM_00051617-618] | Admissible | |
| 1094 | 7/26/2010 | Internal O'Melveny e-mail [OMM_00038288-314] | Admissible | |
| 1095 | 7/26/2010 | Email from Close to Kemple, etc. [OMM_00208896-897] | Admissible | |
| 1096 | 7/26/2010 | Email from Silver to Kemple w/attachment [OMM_00208904-29] | Admissible | |
| 1097 | 7/26/2010 | Email from Kemple to Mercer, etc. [OMM_00208939-63] | Admissible | |
| 1098 | 7/26/2010 | Email from Aronson to Kemple [OMM_00208964-65] | Admissible | |
| 1099 | 7/26/2010 | Email from Kemple to Mercer attaching Eichler Declaration [OMM_00208967-78] | Admissible | |
| 1100 | 7/26/2010 | Email from Aronson to Mercer [OMM_00037565-66] | Admissible | |
| 1101 | 7/26/2010 | Declaration of Peter Eichler with exhibits [OMM_0038939-39042] –See exhibit 23 (without exhibits) | Admissible | |
| 1102 | 7/26/2010 | Email from Silvers to Kemple, etc with attachment [OMM_00101422-23] | Admissible | |
| 1103 | 7/27/2010 | Declaration of Elizabeth Sanders in Support of Defendants' Opposition to Invalidate Election of Corporate Director and Appoint its Own Nominee [OMM_00047980-985] | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1104 | 7/29/2010 | Letter from Troe to Rosen [OMM_00211127] and FTI Report [OMM_00211081-126] | Admissible | |
| 1105 | 7/29/2010 | Email from Mercer to Aronson [OMM_00089455-491] | Admissible | |
| 1107 | 8/23/2010 | E-mail from Aronson to Silvers, et al. OMM_00070640 | Admissible | |
| 1108 | 8/30/2010 | Letter from Aronson to Lisa Troe [DLA-0000809-832] | Admissible | |
| 1109 | 10/6/2010 | OMM internal email [OMM_00037169] | Admissible | |
| 1110 | 11/24/2010 | Minutes of a Meeting of the Board of Directors of Aletheia Research and Management, Inc. [Lee Exhibit 14] | Admissible | |
| 1111 | 12/16/2010 | Email from Vergara to Mercer with Draft of conflicts letter to Eichler [OMM_00069087-91] | Admissible | |
| 1112 | 12/31/2010 | Aletheia Stock Ownership Chart [ARA00482610] | Admissible | |
| 1113 | 1/14/2011 | Email from Silvers to Aronson with attached redlined settlement proposal [OMM_00102517-20] | Admissible | |
| 1114 | 2/22/2011 | Minutes of a Meeting of the Board of Directors of Aletheia Research and Management, Inc. [Lee Exhibit 15] | Admissible | |
| 1115 | 2/22/2011 | Emails between OMM and Jones Day [OMM_00211215] | Admissible | |
| 1116 | 4/18/2011 | Minutes of a Meeting of the Board of Directors of Aletheia Research and Management, Inc. [Lee Exhibit 16] | Admissible | |
| 1117 | 4/18/2011 | April 18, 2011 Investor Letter | Admissible | |
| 1118 | 4/19/2011 | OMM Press Release, O'Melveny's Steve Olson and Jorge deNeve Join Aletheia Research & Management, Inc. as President and General Counsel Respectively | Admissible | |
| 1119 | 4/19/2011 | Email from Mercer to Buckner, etc. with attachments [OMM_0018243-253] | Admissible | |
| 1121 | 4/22/2011 | Email from Olson to Eichler [AdvisorMail] | Admissible | |
| 1122 | 4/29/2011 | Payments to Steven Olson from O'Melveny [OMM_00129596-604] | Admissible | |
| 1123 | 4/30/2011 | Email from Aronson to Dunham [OMM_00205831-838] | Admissible | |
| 1124 | 5/9/2011 | In the Matter of Aletheia Research and Management, Inc. Peter J. Eichler, Jr. and Roger B. Peikin Respondents [2011 WL 1760239] | Admissible | |
| 1125 | 5/11/2011 | Email from M Lewis to G. Ramos, etc. [OMM_00211372-74] | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1126 | 5/13/2011 | Email from deNeve to Sherman [OMM_00211158] | Admissible | |
| 1127 | 5/13/2011 | Email from M Laney [OMM_00211231] | Admissible | |
| 1128 | 5/13/2011 | Email from R. Silvers to A. vonFranque, etc re Revised Declaration [OMM_00168961-962] | Admissible | |
| 1129 | 5/13/2011 | Draft S. Aronson declaration ISO Oppos. To Motion to Disqualify [OMM_168980-168999] | Admissible | |
| 1130 | 5/16/2011 | Proctor Investment Managers LLC's Third Amended and Supplemental Responses to Aletheia Research and Management, Inc.'s Special interrogatories, Set One | Admissible | |
| 1131 | 5/19/2011 | Email from deNeve to von Franque [OMM_00159640-49] | Admissible | |
| 1132 | 5/19/2011 | Email from S. Aronson to D. Sestito re decl. of S. Aronson [OMM_00141758-759] | Admissible | |
| 1133 | 5/25/2011 | Email from Mike Laney to D. Sestito, etc w/excel attachments [OMM_00140752-54] | Admissible | |
| 1134 | 5/31/2011 | Steve Olson Payments from OMM [OMM_00129594] | Admissible | |
| 1135 | 6/1/2011 | Email from D. Sestito to R. Silvers, K. Mercer, etc. re open items [OMM_00144410-412] | Admissible | |
| 1136 | 6/14/2011 | Email from Olson to Berman with attachment [AdvisorMail] | Admissible | |
| 1137 | 6/17/2011 | Memo from D. Tenner to R. Silvers re Barnes / Lee Demurrer [OMM_00145344-349] | Admissible | |
| 1138 | 6/24/2011 | Email from Silvers to Tenner with attachment [OMM_00146875-878] [used in Silvers depo, but court reporter forgot to attach the attachment even though it was discussed and reviewed on the record] | Admissible | |
| 1139 | 6/28/2011 | Minutes of a Meeting of the Board of Directors of Aletheia Research and Management, Inc. [Lee Exhibit 18] | Admissible | |
| 1140 | 7/27/2011 | Close Matter—SEC Investigation [OMM_00211396] | Admissible | |
| 1141 | 8/2/2011 | Minutes of a Meeting of the Board of Directors of Aletheia Research and Management Inc [Lee Exhibit 19] | Admissible | |
| 1142 | 8/4/2011 | Notice of Annual Meeting of Shareholders of Aletheia Research and Management, Inc. [Lee Exhibit 20] | Admissible | |
| 1143 | 8/10/2011 | Email from deNeve to Eichler and Lee w/attachments [AdvisorMail] | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1144 | 8/16/2011 | Email from Tenner to Sestito etc [OMM_00143125-128] | Admissible | |
| 1145 | 8/23/2011 | Email from deNeve to Olson | Admissible | |
| 1146 | 8/29/2011 | Email from R. Silvers to D. Sestito re: Demurrer Argument Outline [OMM_00141458-463] | Admissible | |
| 1147 | 8/30/2011 | *Aletheia v. Proctor*; SC106700 - <u>Transcript</u> of 8/30/11 Hearing re R. Peikin's Demurrer to First Amended X-Complaint and P. Barnes and B. Lee's Demurrer to First Amended X-Complaint [OMM_00154727 – OMM_00154753] | Admissible | |
| 1148 | August 2011 | FTI Initial Report | Admissible | |
| 1149 | 9/16/2011 | Letter from deNeve to FTI Consulting [DLA-0000833-840] | Admissible | |
| 1150 | 9/16/2011 | Eichler Supplemental Response to Proctor Requests for Admission | Admissible | |
| 1151 | 9/16/2011 | Eichler Supplemental Response to Proctor Special Interrogatories | Admissible | |
| 1152 | 9/21/2011 | Aletheia's Second Supplemental Response to Proctor Special Rogs, Set One | Admissible | |
| 1153 | 9/21/2011 | Aletheia's Supplemental Response to Proctor Form Rogs, Set one | Admissible | |
| 1154 | 9/21/2011 | Aletheia's Supplemental Response to Proctor Special Rogs, Set 2 | Admissible | |
| 1155 | 10/27/2011 | Email from deNeve to Lee with attachments [AdvisorMail] | Admissible | |
| 1156 | 11/3/2011 | Email from Tenner to deNeve re: privilege log with attachment [AdvisorMail] | Admissible | |
| 1157 | 12/12/2011 | Email from deNeve to Connolly attaching FTI Final Report [AdvisorMail] | Admissible | |
| 1158 | 2011 | Redacted W-2 for Olson [JIG020822] | Admissible | |
| 1160 | 1/5/2012 | Email from deNeve to Barron, etc. attaching summary of penalties [AdvisorMail] | Admissible | |
| 1161 | 2/22/2012 | Email from deNeve to Lee [AdvisorMail] | Admissible | |
| 1162 | 3/6/2012 | Email from Chan to Rodriguez | Admissible | |
| 1163 | 3/8/2012 | Email from Kaplan to deNeve [AdvisorMail] | Admissible | |
| 1164 | 3/27/2012 | Email from deNeve to M Dunn [AdvisorMail] | Admissible | |
| 1165 | 4/2/2012 | Email from deNeve to Kaplan with attachments [AdvisorMail] | Admissible | |
| 1166 | 4/2/2012 | Email from deNeve to Kaplan with attachments [AdvisorMail] | Admissible | |
| 1167 | 4/2/2012 | Email from deNeve to Kaplan with attachments [AdvisorMail] | Admissible | |

166

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1168 | 4/2/2012 | Email from deNeve to Kaplan with attachments [AdvisorMail] | Admissible | |
| 1169 | 4/2/2012 | Email from deNeve to Kaplan with attachments [AdvisorMail] | Admissible | |
| 1170 | 5/17/2012 | Email from N. Roche to S. Aronson [OMM_00211383-86] | Admissible | |
| 1171 | 6/13/2012 | Close matter [OMM_00211375-76] | Admissible | |
| 1172 | 9/17/2012 | OMM Press Release, Jorge deNeve Returns to O'Melveny & Myers | Admissible | |
| 1173 | Multiple Dates | All invoices in matter 0012608-00004 [OMM_00031805-32248] | Admissible | |
| 1174 | Multiple Dates | All invoices in matter 0012608-00001 [OMM_0031288-558] | Admissible | |
| 1175 | Multiple Dates | All invoices in matter 0012608-00002 [OMM_0031562-656] | Admissible | |
| 1176 | Multiple Dates | All invoices in matter 0012608-00003 [OMM_0031657-804] | Admissible | |
| 1177 | Multiple Dates | All invoices in matter 0012608-00005 [OMM_00032249-32281] | Admissible | |
| 1178 | Multiple Dates | All invoices in matter 0012608-00006 [OMM_00032282-432] | Admissible | |
| 1179 | Multiple Dates | All invoices in matter 0012608-00007 [OMM_0032433-466] | Admissible | |
| 1180 | Multiple Dates | All invoices in matter 0012608-00008 [OMM_32467-32527] | Admissible | |
| 1181 | Multiple Dates | All invoices in matter 0012608-00009 [OMM_00032528-573] | Admissible | |
| 1182 | Multiple Dates | All invoices in matter 0012608-00010 [OMM_00032574-32653] | Admissible | |
| 1183 | Undated | Summary of amounts paid Aletheia [OMM_00211612] | Admissible | |
| 1184 | Undated | Summary of amounts paid Eichler [OMM_00211634] | Admissible | |
| 1185 | 2011- 2012 | deNeve W-2 [JIG020819, and Bregman Decl. Exhibit 11 to SJ motions] | Admissible | |
| 1186 | 11/11/2012 | Voluntary Petition | Admissible | |
| 1187 | 11/11/2012 | List of Creditors Holding 20 Largest Unsecured Claims | Admissible | |
| 1188 | 12/10/2012 | General Notes and Statements of Limitation, Methodology and Disclaimer Regarding Debtor's Schedules and Statements of Financial Affairs | Admissible | |
| 1190 | 12/14/2012 | SEC Complaint [DLA-0007280-314] | Admissible | |
| 1191 | 1/15/2013 | Notice of Appointment of Chapter 11 Trustee | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1194 | 4/5/2013 | Notice of Appointment of Trustee and Fixing of Bond; Acceptance of Appointment as Interim Trustee | Admissible | |
| 1195 | 7/11/2013 | 341(a) meeting transcript | Admissible | |
| 1196 | 8/1/2013 | OMM Press Release, Steve Olson Returns to O'Melveny | Admissible | |
| 1197 | 9/13/2013 | Consent of Defendant Aletheia Research and Management Inc. | Admissible | |
| 1198 | 9/16/2013 | Judgment as to Defendant Aletheia Research and Management Inc. | Admissible | |
| 1199 | 11/6/2013 | Consent of Peter Eichler | Admissible | |
| 1200 | 11/7/2013 | Judgment as to Defendants Peter J. Eichler, Jr | Admissible | |
| 1201 | 1/27/2014 | Plaintiff Securities and Exchange Commission's Memorandum of Points and Authorities in Support of Its Motion for Monetary Remedies Against Defendant Peter J. Eichler, Jr. [Kurtz-00008461-93] | Admissible | |
| 1203 | 4/20/2015 | Solvency Opinion of Aletheia Research and Management, Inc. [DLA-0007611-620] | Admissible | |
| 1204 | 5/11/2015 | SEC v. Aletheia Research and Management, 2015 WL 13404306 (C.D. Cal. May 11, 2015) | Admissible | |
| 1205 | 5/11/2015 | Judgment as to Defendant Peter D. Eichler, Jr. | Admissible | |
| 1207 | 1/11/2016 | Respondents' Responses and Objections to Claimant's First Request for Production of Documents | Admissible – Claimant only | |
| 1208 | 7/8/2016 | In the Matter of Peter J. Eichler, Jr [OMMEXP-K_00038623-31] | Admissible | |
| 1209 | 4/21/2017 | SEC v. Aletheia Research Management, 689 Fed. Appx. 512 (9th Cir. 2017) | Admissible | |
| 1210 | 8/11/2017 | Respondent's Responses and Objections to Claimant's First Contention Interrogatories to Respondent O'Melveny & Myers, LLP | Admissible – Claimant only | |
| 1211 | 8/14/2017 | Respondent's Responses and Objections to Claimant's First Requests for Admission to Respondent O'Melveny & Myers LLP | Admissible – Claimant only | |
| 1212 | 9/25/2017 | Respondent's Responses and Objections to Claimant's Second Request for Production of Documents | Admissible – Claimant only | |
| 1213 | 10/9/2017 | Respondent's Responses and Objections to Claimant's Second Contention Interrogatories to Respondent O'Melveny & Myers LLP | Admissible – Claimant only | |
| 1214 | 11/1/2017 | Respondent's Responses and Objections to Claimant's Second Requests for Admission to Respondent O'Melveny & Myers LLP | Admissible – Claimant only | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1215 | 11/1/2017 | Respondent's Responses and Objections to Claimant's third Contention Interrogatories to Respondent O'Melveny & Myers LLP | Admissible – Claimant only | |
| 1216 | 11/1/2017 | Respondents' Responses and Objections to Claimant's Third Request for Production of Documents | Admissible – Claimant only | |
| 1217 | 11/2/2017 | Respondents' Responses and Objections to Claimant's Fourth Request for Production of Documents | Admissible – Claimant only | |
| 1218 | 2/6/2018 | Respondent's Amended Responses and Objections to Claimant's First Contention Interrogatories to Respondent O'Melveny & Myers LLP | Admissible – Claimant only | |
| 1219 | 1/24/2018 | K. Mercer Deposition Transcript with Exhibits | [As designated and cross designated—objections highlighted] | |
| 1220 | 2/20/2018 | R. Silvers Deposition Transcript with Exhibits | [As designated and cross designated—objections highlighted] | |
| 1221 | 2/22/2018 | A. Fabish Deposition Transcript with Exhibits | [As designated and cross designated—objections highlighted] | |
| 1222 | 2/23/2018 | C. Podlipna Deposition Transcript with Exhibits | [As designated and cross designated—objections highlighted] | |
| 1223 | 4/9/2018 | Declaration of Kenneth Lyons | Admissible – Claimant only | |
| 1224 | 4/25/2018 | Deposition of Person Most Knowledgeable | [As designated and cross-designated—objections highlighted] | |
| 1226 | 2008-2012 | ARMI Summary of Financials 2008-2012 [excel spreadsheet] [from Jeremiassen production] | Admissible | |
| 1227 | 12/31/2006 | ARMI Consolidated Financial Statements [most recently produced in Jeremiassen production] | Admissible | |
| 1228 | 12/31/2007 | Consolidated Financial Statements - Aletheia Research and Management [Ernst & Young] [most recently produced in Jeremiassen production] | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1229 | 12/31/2008 | ARMI Consolidated Financial Statements [most recently produced in Jeremiassen production] | Admissible | |
| 1230 | 12/31/2009 | ARMI Consolidated Financial Statements [most recently produced in Jeremiassen production] | Admissible | |
| 1231 | 12/31/2010 | Consolidated Financial Statements - Aletheia Research and Management [Holthouse Carlin & VanTrigt] [most recently produced in Jeremiassen production] | Admissible | |
| 1232 | 12/31/2011 | ARMI Consolidated Financial Statements [most recently produced in Jeremiassen production] | Admissible | |
| 1233 | 12/31/2011 | ARMI Consolidated Financial Statements [most recently produced in Jeremiassen production] | Admissible | |
| 1234 | 11/3/2006 | Buy-Sell Agreement [OMM_00028788-28795] | Admissible | |
| 1235 | 1/2/2008 | Email from Selvin to Eichler [AdvisorMail] | Admissible | |
| 1236 | 1/8/2008 | Email from Selvin to Eichler, etc. [AdvisorMail] | Admissible | |
| 1237 | 1/22/2008 | Email from Selvin to Eichler, etc. with attachment [AdvisorMail] | Admissible | |
| 1238 | 1/23/2008 | Email from Jimmerson to Peikin with attachment [AdvisorMail] | Admissible | |
| 1239 | 1/23/2008 | Letter from Selvin to Davis with attachment [OMM_00029341-343] | Admissible | |
| 1240 | 1/25/2008 | Email from Selvin to Eichler with attachment [AdvisorMail] | Admissible | |
| 1241 | 3/4/2010 | Materials Received from Loeb & Loeb with attachments [OMM_00028744-29611]_ | Admissible | |
| 1242 | 10/7/2006 | Email from Yates to Peikin [AdvisorMail] | Admissible | |
| 1243 | 10/8/2006 | Email from Aboelnaga to Peikin [AdvisorMail] | Admissible | |
| 1244 | 10/30/2006 | Email from Aboelnaga to Peikin [AdvisorMail] | Admissible | |
| 1245 | 11/2/2006 | Email from Yates to Peikin [AdvisorMail] | Admissible | |
| 1246 | 11/2/2006 | Email from Aboelnaga to Peikin [AdvisorMail] | Admissible | |
| 1247 | 11/2/2006 | Email from Aboelnaga to Peikin [AdvisorMail] | Admissible | |
| 1248 | 11/8/2006 | Email from Coley to Peikin [AdvisorMail] | Admissible | |
| 1249 | 11/23/2007 | Email from Selvin to Eichler [AdvisorMail] | Admissible | |
| 1250 | 11/29/2006 | Email from Coley to Peikin [AdvisorMail] | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1251 | 7/22/2010 | Email from Kemple to Eichler with attachment [AdvisorMail] | Admissible | |
| 1252 | 7/22/2010 | Email from Aronson to Mercer [OMM_00088033] | Admissible | |
| 1253 | 6/14/2010 | Email from Santos to deNeve w/attachment [AdvisorMail] | Admissible | |
| 1254 | 6/15/2010 | Email from Santos to deNeve w/attachment [AdvisorMail] | Admissible | |
| 1255 | 6/16/2010 | Email from Kwak to Santos with attachment [AdvisorMail] | Admissible | |
| 1256 | 9/8/2008 | Email from Meredith to Peikin [AdvisorMail] | Admissible | |
| 1257 | 12/8/2010 | Email from deNeve to Mercer [OMM_000335711-602] | Admissible | |
| 1258 | 10/29/2010 | Email from Mercer to Silvers [OMM_00106082-6096] | Admissible | |
| 1259 | 1/2/2010 | Email from deNeve to Eichler [AdvisorMail] | Admissible | |
| 1260 | 3/7/2010 | Email from Olson to Peikin [AdvisorMail] | Admissible | |
| 1261 | 2/9/2010 | Email from deNeve to Peikin [AdvisorMail] | Admissible | |
| 1262 | 5/28/2010 | Email from Olson to Johnson [AdvisorMail] | Admissible | |
| 1263 | 6/4/2010 | Email from Olson to Aronson [AdvisorMail] | Admissible | |
| 1264 | 7/1/2010 | Email from deNeve to Eichler [AdvisorMail] | Admissible | |
| 1265 | 7/12/2010 | Email from deNeve to Eichler [AdvisorMail] | Admissible | |
| 1266 | 7/28/2010 | Email from deNeve to Eichler [AdvisorMail] | Admissible | |
| 1267 | 5/6/2010 | Email from Johnson to Barnes [AdvisorMail] | Admissible | |
| 1268 | 6/7/2010 | Email from Vergara to Barnes [AdvisorMail] | Admissible | |
| 1269 | 11/15/2010 | Email from Olson to Laney [AdvisorMail] | Admissible | |
| 1270 | 5/11/2011 | Email from Lewis to Ramos [OMM_00211380-211382] – duplicate of Exhibit 1171 | Admissible | |
| 1271 | 1/21/2010 | Preliminary Conflict Request [OMM_00211387-OMM_00211395] | Admissible | |
| 1272 | 11/5/2009 | Conflict of Interest Report [OMM_00211425-OMM_00211611] | Admissible | |
| 1273 | Multiple Dates | Invoices on Matter no. 0238993-00001 [OMM_00129614-00129630] | Admissible | |
| 1274 | 5/18/2011 | Email from von Franque to Olson [OMM_00203565-3566] | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 1275 | 6/28/2007 | Email from Coley to Eichler with attachment at[AdvisorMail] | Admissible | |
| 1276 | 5/14/2010 | Email from Olson to Eichler [AdvisorMail] | Admissible | |
| 1277 | 7/9/2007 | Email from Coley to Peikin [AdvisorMail] | Admissible | |
| 1278 | 7/10/2007 | Email from Coley to Peikin [AdvisorMail] | Admissible | |
| 1279 | 5/14/2010 | Email from deNeve to Santos [AdvisorMail] | Admissible | |
| 1280 | 6/10/2010 | Eamil from Peikin to deNeve [OMM_0037729-0037731] | Admissible | |
| 1281 | 5/28/2010 | Email from Olson to Johnson [AdvisorMail] | Admissible | |
| 1282 | 3/7/2010 | Email from Aronson to Close [OMM_00102068-69] | Admissible | |
| 1283 | 2010 | Aletheia Research and Management, Inc., Aletheia Value, Third Quarter 2010 Review | | Not admitted |
| 1284 | 1/2012 | Aletheia Value (Chart) | Admitted only as to right-hand column on page 2 (List of AUM) | |
| 1285 | 1/2012 | Aletheia Growth (Chart) | Admitted only as to right-hand column on page 2 (List of AUM) | |
| 1286 | 10/16/2010 | Email from Olson to Scalzo | Admissible | |
| 1287 | 10/19/2010 | Email from Olson to Scalzo | Admissible | |
| 1288 | 6/16/2010 | Email from Santos to Kwak (cc to deNeve) | Admissible | |
| 1289 | 11/23/2011 | Email from deNeve to Aronson and Olson | Admissible | |
| 1290 | 11/23/2011 | Email from Aronson to Olson and deNeve | Admissible | |
| 1291 | 11/23/2011 | Email from deNeve to Olson | Admissible | |
| 1292 | 5/20/2010 | Email from deNeve to Santos | Admissible | |
| 1293 | 6/2/2010 | Email from Piracha to Santos (copied to deNeve) | Admissible | |
| 1294 | 6/14/2010 | Email from Cotkin to Mercer | Admissible | |
| 1295 | 5/1/2018 | Deposition of Peter Selvin | [As designated and cross designated— objections in marginalia] | |
| 1296 | 12/10/2010 | Email from Kemple to Eichler [AdvisorMail] | Admissible | |
| 1297 | 7/31/2010 | Jones Day Billing Statement [AdvisorMail] | Admissible | |
| 1298 | 5/12/2010 | Notice of Motion | Admissible | |
| 1299 | 4/4/2012 | Depostion of Bruce Lee Excerpts | Admissible | |
| 2001 | 9/1/2010 | Examining REO Sales and Price Discounts in Massachusetts OMMEXP-K_00041560-69 | Expert | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2002 | July 1997/1998 | Aletheia Articles of Incorporation and attached amendment thereto. | Admissible | |
| 2003 | 7/30/1997 | Actions by Unanimous Written Consent of the Directors. ARA00013119-23 | Admissible | |
| 2004 | 7/09/2010 | deNeve email re Complaint to Determine Validity of Election/Appointment of Director(s) OMM_00097847-63 | Admissible | |
| 2006 | 9/29/2005 | Memorandum regarding Overture Asset Management, LLC, addressed to Louis Vachon and Normand Roy. Coley Ex. 20 | Admissible | |
| 2007 | Undated | Internal Proctor Document: Questions on the Formation of Proctor Investment Managers. Proctor Ex. 4 | Admissible | |
| 2008 | 1/6/2006 | Note Purchase Agreement between OAM Avatar, LLC and the Purchasers Listed on Exhibit A. Coley Ex. 13 | Admissible | |
| 2009 | 2/28/2006 | Email chain between Mark Scalzo, Jim Coley, Mona Aboelnaga, and Colete Rabbat. Aletheia PMK Ex. 56 in Proctor Lit. | Admissible | |
| 2010 | 3/6/2006 | Email from Mark Scalzo to Jim Coley and Mona Aboelnaga. Proctor Ex. 25 | Admissible | |
| 2011 | 4/26/2006 | Letter from James Coley to Peter Eichler, Jr. OMM_00082830-32 | Admissible | |
| 2012 | 5/5/2006 | Letter from James Coley to Peter Eichler, Jr. OMM_00027503-05 | Admissible | |
| 2013 | 3/31/2008 | Bank of America Statements for Account X876 OMMEXP-K_00025741-5890 | Admissible | |
| 2014 | 10/30/2006 | Proctor Memorandum. "Ref: Aletheia Research and Management"; "To: Internal Files." OMM_00070529-31 | Admissible | |
| 2015 | 1/18/2011 | Check Images for Account X876 OMMEXP-K_00026099-6230 | Admissible | |
| 2016 | 10/16/2011 | 530 Toyopa Amortization Schedule OMMEXP-K_00026245-55 | Admissible | |
| 2017 | 7/27/2010 | Mercer email re documents filed today OMM_00052851-53063 | Admissible | |
| 2018 | 7/14/2010 | Examination Testimony of Peter Eichler, Exhibit G OMMEXP-K_00040582-87 | Admissible | |
| 2019 | 12/5/2006 | Email from Jim Coley to Mona Aboelnaga Proctor Ex. 8 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2020 | 12/16/2006 | Email chain between Tony Kinsley, Jim Coley, and Mona Aboelnaga. Carlson Ex. 4 | Admissible | |
| 2021 | 12/21/2006 | Email chain between Jim Coley and Mona Aboelnaga. Proctor Ex. 9 | Admissible | |
| 2022 | Undated | Avatar AUM Growth plan. Proctor Ex. 21 | Admissible | |
| 2023 | 2/6/2007 | Email chain between Jim Coley and Mark Scalzo. OMM_00027614-17 | Admissible | |
| 2024 | 4/15/2014 | National Economic Research Associates Proof of Bankruptcy Claim OMMEXP-K_00041308-29 | Admissible | |
| 2025 | 9/6/2007 | Email from Jim Coley to Gregory Meredith. Coley Ex. 3 | Admissible | |
| 2026 | 9/20/2007 | Email from Mona Aboelnaga to Gregory Meredith and Colette Rabbat. Proctor Ex. 11 | Admissible | |
| 2027 | 9/25/2007 | Email chain between Gregory Meredith and Mona Aboelnaga. Coley Ex. 25 | Admissible | |
| 2028 | 11/12/2007 | Letter from Gregory Meredith to Peter Eichler, Jr., copying Roger Peikin and Patricia Barnes. OMM_00028412 | Admissible | |
| 2029 | 12/1/2007 | Email with attachment from Peter Selvin to David Grossman, copying Roger Peikin. JIG 052914-15 | Admissible | |
| 2030 | 12/20/2007 | Email from John Crittenden to Roger Peikin. OMM_00134280 | Admissible | |
| 2031 | 02/08/2010 | 2010-02-08 Loan Agreement OMMEXP-K_00026336-49 | Admissible | |
| 2032 | 06/29/2011 | Mercer email to Barnes re Demurrer OMM_00140695-707 | Admissible | |
| 2033 | 8/19/2010 | Mercer email re Orders on 709 complaints OMM_00066660-66707 | Admissible | |
| 2034 | 7/12/2010 | Mercer email to Santos re Draft declaration OMM_00066955-58 | Admissible | |
| 2035 | 1/9/2008 | John Crittenden forwards to Roger Peikin prior email chain between John Crittenden and Mona Aboelnaga. Coley Ex. 22 | Admissible | |
| 2036 | 1/13/2008 | Email chain between Peter Selvin and Roger Peikin. JIG 030493 | Admissible | |

174

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2037 | 11/15/2013 | Purchase Agreement for Interest in Moriah, LP<br>OMMEXP-K_00036489-97 | Admissible | |
| 2038 | 1/16/2008 | Email with attachment from Peter Selvin to Peter Eichler, Jr., and Roger Peikin.<br>JIG 028956-67 | Admissible | |
| 2039 | 11/9/2011 | 32 Silverstar Court Settlement Documents<br>OMMEXP-K_00037425-50 | Admissible | |
| 2040 | 1/24/2008 | Peter Selvin email with attachment to Roger Peikin.<br>JIG 028891-96 | Admissible | |
| 2041 | 1/25/2008 | Summons With Notice by Proctor.<br>OMM_00039006-08 | Admissible | |
| 2042 | 1/29/2008 | Letter from Peter Selvin to Harry Davis.<br>OMM_00079749-50 | Admissible | |
| 2043 | 2/1/2008 | Letter from Mark Scalzo to Greg Meredith, copying Mona Aboelnaga.<br>P0053467 | Admissible | |
| 2044 | 3/11/2008 | Letter to Peter Selvin from Harry Davis.<br>OMM_00049670-71 | Admissible | |
| 2045 | 9/27/2011 | Bank of America Statements for Account X876<br>OMMEXP-K_00025621-5740 | Admissible | |
| 2046 | 3/31/2008 | Email from Peter Selvin to Roger Peikin and Peter Eichler, Jr.<br>JIG 029094-95 | Admissible | |
| 2047 | 1/26/2009 | Letter from Peter Selvin to Peter Eichler, Jr., and Roger Peikin.<br>JIG 032518-24 | Admissible | |
| 2048 | 4/16/2009 | Selvin email re attached Term Sheet 1st version; Term Sheet 2nd version<br>JIG_034853-56 | Admissible | |
| 2049 | 5/27/2009 | Peikin letter to Selvin re Conflict Waiver Letter<br>JIG_041633-35 | Admissible | |
| 2050 | 12/7/2009 | Email from Daniel Friedman to Roger Peikin, copying Peter Selvin and Laura Wytsma<br>JIG 052724 | Admissible | |
| 2051 | Undated | Index of Binder Materials | Admissible | |
| 2052 | 12/14/2009 | Email chain culminating in email from Roger Peikin to Daniel Friedman, copying Peter Selvin.<br>JIG 052557-60 | Admissible | |
| 2053 | 12/15/2009 | Roger Peikin email to Peter Selvin.<br>JIG 051839 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2054 | 6/2/2009 | Murphy email re Executive Compensation Plan JIG_036420 | Admissible | |
| 2055 | 3/14/2011 | Mercer email to Laney re Compensation Schedules OMM_00063946 | Admissible | |
| 2056 | 12/13/2010 | Scalzo email re settlement discussions OMM_00074755-59 | Admissible | |
| 2057 | 01/26/2010 | Aletheia's Motion in Limine to Exclude any Evidence of (1) Aletheia's Corporate Expenditures or (2) Compensation of Aletheia Parties. ARA00017414-23 | Admissible | |
| 2058 | 01/28/2010 | Letter from Harry Davis to Peter Selvin. JIG 055703 | Admissible | |
| 2059 | 8/3/2010 | 2010-08-03 Loan Agreement OMMEXP-K_00026350-62 | Admissible | |
| 2060 | 12/17/2008 | 2008-12-17 Loan Agreement OMMEXP-K_00026363-76 | Admissible | |
| 2061 | 9/10/2010 | 24166 Malibu Road Amortization Schedule OMMEXP-K_00026457-63 | Admissible | |
| 2062 | 2009 - 2012 | US Trust Statements for Accounts X385, 919, 993, 492, 439, 943 OMMEXP-K_00026637-31260 | Admissible | |
| 2063 | 3/9/2010 | Email with attachment from Robert Silvers to Seth Aronson, Matthew Close, Edward Hassi, and Shiva Eftekhari. OMM_00107378-87 | Admissible | |
| 2064 | 12/7/2011 | Eichler v Eichler Satisfaction of Judgment OMMEXP-K_00031432-33 | Admissible | |
| 2065 | 3/30/2010 | Seth Aronson email with attachment to Peter Eichler, Jr., and Roger Peikin, copying Matthew Close and Robert Silvers. OMM_00109384-412 | Admissible | |
| 2066 | 3/30/2010 | Email from Matthew Close to Seth Aronson, Peter Eichler, Jr., and Roger Peikin, copying Robert Silvers. OMM_00108215 | Admissible | |
| 2067 | 1/14/2011 | Silvers email to Aronson re Proctor Proposal OMM_00102517-20 | Admissible | |
| 2068 | 4/15/2010 | Email chain with attachment between Katie Mercer, Seth Aronson, Matthew Close, Robert Silvers, and Roger Peikin. OMM_00038885-915 | Admissible | |
| 2069 | 1/31/2013 | Global Capital Arena Statements for Account X946 OMMEXP-K_00036189-366 | Admissible | |
| 2070 | 5/10/2010 | Affidavit of Roger B. Peikin in Support of Defendants' Motion to Dismiss the | Admissible | |

176

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| | | Complaint as to the Individual Defendants and to Dismiss or Stay this Action Under CPLR § 327(A). OMM_00038421-27 | | |
| 2071 | 12/5/2010 | Defendants' Memorandum of Law in Support of Their Motion to Dismiss this Action as to the Individual Defendants and to Dismiss or Stay this Action Under CPLR § 327(A). OMM_00039266-300 | Admissible | |
| 2072 | 5/21/2010 | Email chain between Matthew Close, Seth Aronson, Katie Mercer, Robert Silvers, Allan Johnson, and J. Jorge deNeve. OMM_00079082-84 | Admissible | |
| 2073 | 6/2/2010 | Email chain between Patricia Barnes, Steve Olson, Seth Aronson, and J. Jorge deNeve. OMM_00098933 | Admissible | |
| 2074 | 6/23/2010 | Aronson letter to Friese re Roger Peikin/Aletheia Research and Management, Inc. OMM_00095653-59 | Admissible | |
| 2075 | 6/9/2010 | Email with attachment from John Laco to J. Jorge deNeve, copying Steve Olson and Lycia Grant. OMM_00113414-17 | Admissible | |
| 2076 | 6/10/2010 | Email from Harry Davis to Robert Friese, copying Michael Kwon. SF000001 | Admissible | |
| 2077 | 11/1/2010 | Mercer email to Barnes re Proctor Claimed Accounts OMM_00056276-77 | Admissible | |
| 2078 | 5/17/2018 | California Penalty for Early IRA Withdrawals OMMEXP-K_00037688-90 | Expert | |
| 2079 | 6/14/2010 | Email chain between Matthew Close, Robert Silvers, Seth Aronson, Edward Hassi, Katie Mercer, Shiva Eftekhari, and Steve Olson. OMM_00073858-62 | Admissible | |
| 2081 | 6/17/2010 | Notice of Rulings by LASC. OMM_00045957-64 | Admissible | |
| 2082 | 6/17/2010 | Letter from F. Curt Kirschner, Jr., to Peter Eichler, Jr. JIG 012355-58 | Admissible | |
| 2083 | 6/18/2010 | Aletheia Research and Management, Inc., Minutes of a Meeting of the Board of Directors, June 18, 2010. | Admissible | |
| 2084 | 12/19/2016 | Email from Kurt Ramlo (LNBYB) to Bregman re Eichler JIG_009117 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2086 | 7/2/2010 | Email chain between Harry Davis, Bob Friese, and Frank Cialone, copying fine@dfis-law.com, michael@dfis-law.com, and Michael Kwon SF001370-72 | Admissible | |
| 2088 | 7/6/2010 | Minutes of a Meeting of the Board of Directors of Aletheia Research and Management, Inc., July 6, 2010 Ex. 11 (Lee); ARA00479340-41 | Admissible | |
| 2089 | 7/6/2010 | Resolutions of the Board of Directors of Aletheia Research and Management, Inc. ARA00094575 | Admissible | |
| 2091 | 2/18/2010 | Reply in Support of Aletheia's Motion in Limine to Exclude Any Evidence of (1) Aletheia's Corporate Expenditures or (2) Compensation of Any Aletheia Parties APSETTLEMENT0009177-81 | Admissible | |
| 2092 | 7/11/2010 | Email chain between Seth Aronson, Robert Silvers, Matthew Close, John Laco, Katie Mercer, and Steve Olson. OMM_00133726-34 | Admissible | |
| 2093 | 7/14/2010 | Katz-O'Neill email to Kwon & Friese re draft Memorandum in Section 709 Action SF001659-60 | Admissible | |
| 2094 | 7/12/2010 | Email from Harry Davis to fine@dfis-law.com; michail@dfis-law.com, Bob Friese, Frank Cialone, Erick Howard, and Simone Katz- O'Neill, copying Michael Kwon SF001628-29 | Admissible | |
| 2095 | 7/13/2010 | Letter from Seth Aronson to Aletheia, Peter Eichler, Jr., and Patricia Barnes. OMM_00040199-204 | Admissible | |
| 2096 | 9/10/2013 | HSBC Bank v Eichler OMMEXP-K_00038611-22 | Admissible | |
| 2097 | 7/14/2010 | Email from Michael Kwon to Frank Cialone, Robert Friese, SKatz@sflaw.com, crupright@sflaw.com, and dwilson@sflaw.com, copying Harry Davis. SF001639 | Admissible | |
| 2098 | 7/14/2010 | Email from Michael Kwon to Frank Cialone, Robert Friese, SKatz@sflaw.com, crupright@sflaw.com, and dwilson@sflaw.com, copying Harry Davis. SF001694 | Admissible | |
| 2099 | 7/15/2010 | Proctor's Memorandum of Points and Authorities in Further Support of Plaintiff's Action to Determine Validity of Election/Appointment of Director(s). OMM_00040575-94 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2100 | 7/15/2010 | Peikin's Memorandum in Support of Complaint to Determine Validity of Appointment of Director; Declaration of Peikin OMM_00040597-616 | Admissible | |
| 2101 | 7/15/2010 | Email chain between Michael Kwon, Frank Cialone, Robert Friese, Simone Katz-O'Neill, Chris Rupright, Derek Wilson, and Harry Davis. SF001773-76 | Admissible | |
| 2104 | 7/1/2010 | deNeve email re letter from Proctor OMM_00097625-26 | Admissible | |
| 2105 | 7/27/2010 | Declaration of Defendant Patricia Barnes in Support of Defendants' Opposition to [Proctor's] Action to Invalidate Election of Corporate Director and Appoint Its Own Nominee. OMM_00052899-900 | Admissible | |
| 2106 | 7/27/2010 | Declaration of Defendant Bruce Lee in Support of Defendants' Opposition to [Proctor's] Action to Invalidate Election of Corporate Director and Appoint Its Own Nominee. OMM_00178763-66 | Admissible | |
| 2107 | 7/27/2010 | Declaration of Mark Scalzo in Support of Defendants' Opposition to [Proctor's] Action to Invalidate Election of Corporate Director and Appoint Its Own Nominee. OMM_00178773-85 | Admissible | |
| 2108 | 7/27/2010 | Declaration of Elizabeth Sanders in Support of Defendants' Opposition to [Proctor's] Action to Invalidate Election of Corporate Director and Appoint Its Own Nominee. OMM_00178767-72 | Admissible | |
| 2109 | 11/7/2013 | Promissory Note Paid In Full OMMEXP-K_00041284-85 | Admissible | |
| 2110 | 3/27/2014 | HutnerKlarish Proof of Bankruptcy Claim OMMEXP-K_00041290-304 | Admissible | |
| 2111 | 7/27/2010 | Letter from Mark Kemple to Patricia Barnes re Roger Peikin v. Aletheia Research and Management, Inc., Peter Eichler, Jr. and Patricia Barnes. | Admissible | |
| 2112 | 1/31/2014 | Franchise Tax Board Proof of Bankruptcy Claim OMMEXP-K_00041305-07 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2113 | 8/5/2010 | Reply Memorandum of Points in Support of [Proctor's] Action to Determine Validity of Election/Appointment of Director(s). OMM_00038125-45 | Admissible | |
| 2114 | 8/12/2010 | Emails between Robert Friese, Paul Fine, Harry Davis, and Michael Kwon. SF004576-78 | Admissible | |
| 2115 | 8/17/2010 | Ruling on Submitted Matter: Plaintiff's Complaint to Determine Validity of Appointment of Director of Aletheia Research and Management Inc. Bruce Lee. OMM_00066684-707 | Admissible | |
| 2116 | 8/18/2010 | Email chain between Simone Katz-Oneill, Harry Davis, Robert Friese, Frank Cialone, and Michael Kwon. SF004619-20 | Admissible | |
| 2117 | 12/20/2016 | Bregman email to Eichler re Assets JIG_008970-71 | Admissible | |
| 2118 | 9/22/2010 | Ruling on Submitted Matters: National Bank of Canada Financial, Inc.,'s Demurrer to Plaintiff's First Amended Complaint; Defendant Proctor Investment Managers, LLC, Proctor Distributors, LLC, James C. Coley, II, and Mona Aboelnaga's Demurrer to Plaintiff's First Amended Complaint. | Admissible | |
| 2119 | 10/5/2010 | Email chain between Robert Silvers, Tamar Braz, Seth Aronson, Rich Buckner, Gabriel Pardo, and Katie Mercer.OMM_00105799-800 | Admissible | |
| 2120 | 10/21/2010 | Email chain between Robert Friese, Harry Davis, Michael Kwon, Frank Cialone, and Simone Katz-O'Neill. SF005047-48 | Admissible | |
| 2121 | 10/22/2010 | Order from Supreme Court of the State of New York – New York County. OMM_00118542 | Admissible | |
| 2122 | 10/22/2010 | Transcript from hearing before Supreme Court of the State of New York – New York County. OMM_00042299-324 | Admissible | |
| 2123 | 9/29/2010 | Laney email to Mercer re Proctor Discovery Responses OMM_00090102-03 | Admissible | |
| 2124 | 4/22/2014 | Christy Eichler Proof of Bankruptcy Claim #1 OMMEXP-K_00041406-09 | Admissible | |
| 2125 | 5/3/2017 | Christy Eichler Proof of Bankruptcy Claim #2 OMMEXP-K_00041410-12 | Admissible | |

180

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2126 | 12/08/2010 | Letter from Mark Kemple to Peter J. Eichler, Jr., on behalf of Aletheia Research and Management, Inc., re Roger Peikin v. Aletheia Research and Management, Inc., Peter Eichler, Jr., Patricia Barnes, Bruce Lee, Case No. 450058 | Admissible | |
| 2127 | 12/8/2010 | Letter from Mark Kemple to Patricia Barnes re Roger Peikin v. Aletheia Research and Management, Inc., Peter Eichler, Jr., Patricia Barnes, Bruce Lee, Case No. 450058 | Admissible | |
| 2128 | 12/8/2010 | Letter from Mark Kemple to Peter J. Eichler, Jr. re Roger Peikin v. Aletheia Research and Management, Inc., Peter Eichler, Jr., Patricia Barnes, Bruce Lee, Case No. 450058 | Admissible | |
| 2129 | 12/8/2010 | Letter from Mark Kemple to Bruce Lee re Roger Peikin v. Aletheia Research and Management, Inc., Peter Eichler, Jr., Patricia Barnes, Bruce Lee, Case No. 450058 | Admissible | |
| 2130 | 2/3/2014 | Anthony Sigalos Trust Proof of Bankruptcy Claim OMMEXP-K_00041424-37 | Admissible | |
| 2131 | 1/27/2011 | Email Chain between Robert Friese, Ellyn Garofolo, Harry Davis, Roger Peikin, and Mona Aboelnaga. SF005223-28 | Admissible | |
| 2132 | 2/3/2011 | Email chain between Harry Davis, Robert Friese, Ellyn Garofolo, and Michael Kwon. SF005234-35 | Admissible | |
| 2133 | 2/15/2011 | Letter from Joan Cotkin to Scott A. Schecter, copying Seth Aronson. OMM_00044883-85 | Admissible | |
| 2134 | 2/24/2014 | Landau Gottfried & Berger Proof of Bankruptcy Claim OMMEXP-K_00041459-64 | Admissible | |
| 2135 | 6/28/2011 | Garofalo email to Davis re shareholders' meeting DLA-0007173 | Admissible | |
| 2136 | 2/22/2011 | Email chain forwarded from Mark D. Kemple to Peter Eichler, copying Steve Olson, re: Response to Kemple email re Aletheia Board meeting of 2/2/11 OMM_00094847-63 | Admissible | |
| 2137 | 2/25/2011 | Plaintiff Aletheia Research and Management, Inc.'s Response to Defendant Proctor Investment Managers LLC's Second Set of Special Interrogatories. | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2138 | 2/28/2011 | Email chain between Frank Cialone and Harry Davis, copying Bob Friese, fine@dfis-law.com, Maureen Michail, Michael Kwon, and Michael Littenberg. SF005451-52 | Admissible | |
| 2139 | 2/26/2014 | IRS Proof of Bankruptcy Claim OMMEXP-K_00041474-76 | Admissible | |
| 2140 | 3/26/2014 | Abergel Proof of Bankruptcy Claim OMMEXP-K_00041475-1531 | Admissible | |
| 2141 | 2/1/2012 | Davis email to Garofalo re Proctor - Clay Lacy Exhibits for Peikin Deposition DLA-0003639 | Admissible | |
| 2143 | 4/18/2011 | Minutes of a Meeting of the Board of Directors of Aletheia Research and Management, Inc. ARA00479360-63 | Admissible | |
| 2144 | 4/18/2011 | Aletheia Research and Management, Inc. Review of Compliance Policies and Procedures. JIG 002567-73 | Admissible | |
| 2145 | 4/21/2011 | Letter from FTI Consulting to Peter J. Eichler, Jr. | Admissible | |
| | | | | |
| 2147 | 9/13/2010 | Silvers email to Santos re Discovery Responses OMM_00103332-33 | Admissible | |
| 2149 | 8/10/2012 | Garofalo email to Davis re Discovery DLA-0005207-09 | Admissible | |
| 2150 | 5/9/2011 | Order Instituting Administrative and Cease-and- Desist Proceedings, Pursuant to Section 15(b) of the Securities Exhange Act of 1934 and Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and Cease- and-Desist Order as to Aletheia Research and Management, Inc., Peter J. Eichler, Jr. and Roger B. Peikin. Ex. 23 to Aletheia PMK in Proctor Litigation | Admissible | |
| 2151 | 5/11/2011 | Letter from Michael A. Sherman to Aletheia Research and Management, Inc. and Steven Soberoff. | Admissible | |
| 2152 | 5/18/2011 | Email chain with attachment from Michael Kwon, to Frank Cialone, Bob Friese, copying Harry Davis, Rovert Ward, and Nancy Durand. SF008363-68 | Admissible | |
| 2153 | 5/18/2011 | Email chain between Michael Kwon, Frank Cialone, and Bob Friese, copying Harry Davis, Rovert Ward, and Nancy Durand. SF008371-72 | Admissible | |

182

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2155 | 5/20/2011 | Email with attachment from Arvin Santos to Lisa Troe, Jim Conversano, Simon Wu, Kelly Bossard, and Charles Lundelius, copying J. Jorge deNeve, Ann Marie Swanson, and Michael Laney. | Admissible | |
| 2156 | 5/20/2011 | Letter from Michael A. Sherman to Aletheia Research and Management, Inc., Patricia Barnes, Steven Soberoff, Robert Levin, Christine Sanders, Betsy Sanders, and Mark Scalzo. | Admissible | |
| 2157 | 5/20/2011 | Letter from Michael A. Sherman to Aletheia Research and Management, Inc., Peter Eichler, Patricia Barnes, and Bruce Lee. | Admissible | |
| 2158 | 5/23/2011 | Email with attachment from Frank Cialone to Harry Davis, copying Michael Kwon and Bob Friese. SF008424-29 | Admissible | |
| 2159 | 11/23/2007 | Selvin email re comments on Proctor Agreement JIG_052946-49 | Admissible | |
| 2160 | 6/2/2011 | Ruling on Submitted Matters: Demurrer to Second Amended Complaint; Motion to Quash Service of Summons for lack of Personal Jurisdiction and Motion to Seal Records Conditionally Filed Under Seal OMM_00118305-22 | Admissible | |
| 2161 | 6/3/2011 | Complaint for Removal of Director [California Corporations Code § 304] | Admissible | |
| 2162 | 11/30/2007 | Selvin email re draft letter regarding Proctor's breaches comments on Proctor Agreement JIG_052920-21 | Admissible | |
| 2163 | 1/9/2008 | Selvin email re Proctor JIG_030504 | Admissible | |
| 2164 | 1/11/2008 | Selvin email re Complaint against Proctor JIG_030498 | Admissible | |
| 2165 | 1/14/2008 | Selvin email re Proctor?Aletheia JIG_025145-47 | Admissible | |
| 2166 | 6/6/2011 | Email with attachment from Danielle Tenner to Robert Silvers, copying Dawn Sestito and Katie Mercer OMM_00189259-67 | Admissible | |
| 2167 | 6/7/2011 | Email chain with attachment between Seth Aronson, James McCarthy, and Teresa Doremus OMM_00201253-56 | Admissible | |
| 2168 | 6/9/2011 | Email chain between Robert Silvers, Dawn Sestito, and Seth Aronson OMM_00140708-14 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2169 | 1/16/2008 | Selvin email re attached Part 1 of complaint against Proctor JIG_028971-82 | Admissible | |
| 2170 | 6/23/2011 | Email with attachment from Danielle Tenner to Katie Mercer. OMM_00197712-29 | Admissible | |
| 2171 | 6/14/2011 | Tenner email to Aronson re Proctor Document OMM_00184101 | Admissible | |
| 2172 | 6/28/2011 | Minutes of a Meeting of the Board of Directors of Aletheia Research and Management, Inc. Ex. 18 (Lee); ARA00479364 | Admissible | |
| 2173 | 7/1/2011 | Reply Memorandum of Points and Authorities in Support of Cross Defendant's Motion to Disqualify O'Melveny & Myers, LLP | Admissible | |
| 2174 | 8/22/2011 | Garofalo email to Davis re Aletheia Litigations DLA-0006287 | Admissible | |
| 2175 | 3/31/2008 | Selvin email re Proctor JIG_029093 | Admissible | |
| 2176 | 4/7/2008 | Selvin email re Fw: Mtg in NY next week JIG_029082-83 | Admissible | |
| 2177 | 8/1/2011 | Proctor's Memorandum of Points and Authorities in Opposition to Demurrer of Cross-Defendants Patricia Barnes and Bruce Lee. OMM_00165512-34 | Admissible | |
| 2178 | 8/1/2011 | Proctor's Memorandum of Points and Authorities in Opposition to Demurrer of Cross-Defendant Roger B. Peikin. OMM_00165535-55 | Admissible | |
| 2179 | 8/2/2011 | Minutes of a Meeting of the Board of Directors of Aletheia Research and Management, Inc. Ex. 19 (Lee); ARA00479365-66 | Admissible | |
| 2180 | 8/4/2011 | Notice of Annual Meeting of Shareholders of Aletheia Research and Management, Inc. Ex. 9 in underlying Proctor Litigation | Admissible | |
| 2181 | 8/5/2011 | Email with attachment from Dawn Sestito to Jorge deNeve. OMM_00172465-66 | Admissible | |
| 2182 | 8/11/2011 | Independent Consultant's Initial Report: Aletheia Research and Management, Inc.'s Compliance with SEC Order and FTI Consulting's Prior Recommendations DLA-0000874-97 | Admissible | |
| 2184 | 9/16/2010 | Pardo email Requests for Production OMM_00109841-42 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2185 | 7/30/2009 | Selvin email re Proctor JIG_025697 | Admissible | |
| 2186 | 4/14/2011 | Kolodny & Anteau letter regarding Stipulation and Order re Subordination of Lien signed by Peter Eichler OMMEXP-K_00017830-35 | Admissible | |
| 2187 | 8/22/2011 | Letter from Seth Aronson to Harry Davis re Confidentiality Agreement for Settlement Discussion Between Aletheia Research and Management, Inc. et al. and Proctor Investment Managers, Inc. et al. OMM_00168956-60 | Admissible | |
| 2188 | 11/8/2009 | Aronson email to Murphy re Peter Eichler JIG_025863-65 | Admissible | |
| 2189 | 9/28/2011 | Mercer email to Barnes re Answer to First Amended Cross-Complaint OMM_00166692-700 | Admissible | |
| 2190 | 2/19/2010 | Peikin email to Olson re Proctor complaint with attached Peikin email OMM_00122170-71, OMM_00097666-67 | Admissible | |
| 2191 | 8/23/2011 | Aletheia's Claims & Proctor's Cross-Claims Binder (Table of Contents) OMM_00153076 | Admissible | |
| 2192 | 8/23/2011 | Aletheia's Claims and Proctor's Cross-Claims Index, Memos, and Binder of Exhibits | Admissible | |
| 2193 | 12/13/2011 | Aletheia chart showing Assets Under Management through time. | Admissible | |
| 2194 | 2/26/2010 | Selvin email to Aronson re Aletheia/Proctor OMM_00104250 | Admissible | |
| 2195 | 9/25/2006 | Proctor Investment - Proposal for Investment P0001915-1934 | Admissible | |
| 2196 | 8/23/2011 | Aletheia Research and Management, Inc., Salary and Bonus History, Peter J. Eichler, Jr. | Admissible | |
| 2197 | 8/23/2011 | Independent Consultant's Initial Report: Aletheia Research and Management Inc.'s Compliance with SEC Order and FTI Consulting's Prior Recommendations; EXECUTIVE SUMMARY | Admissible | |
| 2198 | 4/7/2010 | Padraig email to deNeve re Proposed wording for questionnaire OMM_00096979-80 | Admissible | |
| 2199 | 8/25/2011 | Garofalo email to Davis and Fine re Meeting at the Miramar DLA-0000160 | Admissible | |
| 2200 | 8/31/2011 | Email from Bruce Lee to Arvin Santos. | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2201 | 9/7/2011 | Email from Steve Olson to Seth Aronson and Dawn Sestito OMM_00165728 | Admissible | |
| 2202 | 8/24/2011 | Garofalo email to Davis and Fine re Meeting at the Miramar DLA-0000159 | Admissible | |
| 2203 | 9/6/2011 | Garofalo email to Davis re Letter re Meet & Confer - Peikin v. Aletheia DLA-0002415-16 | Admissible | |
| 2204 | 10/27/2011 | Garofalo email to Kwon re attached FAC DLA-0000289-94 | Admissible | |
| 2205 | 9/21/2011 | Plaintiff Aletheia Research and Management, Inc.'s Supplemental Response to Defendant Proctor Investment Managers LLC's Second Set of Interrogatories. OMM_00177511-73 | Admissible | |
| 2206 | 6/26/2008 | Peikin email to Selvin re attached Proposed Terms 08-0620 JIG_029214-15 | Admissible | |
| 2207 | 3/17/2011 | Erick Howard to Davis re Peikin's Motion to Disqualify SF006383 | Admissible | |
| 2208 | 10/17/2011 | Settlement Agreement and Mutual Release of Claims between Loeb & Loeb LLP and Aletheia Research and Management, Inc. JIG 003815-29 | Admissible | |
| 2209 | 10/27/2011 | Memorandum from Jorge deNeve to the Executive Committee of Aletheia Research & Management, Inc. re: Report on FTI's Recommendations Regarding Corporate Governance JIG 006292-95 | Admissible | |
| 2210 | 6/7/2011 | Mercer email to deNeve, Sestito, Aronson re Aletheia Claims with attachments OMM_00167321-23, OMM_00167329-30 | Admissible | |
| 2211 | 11/02/2011 | Email with attachment from Ellyn S. Garofolo to Harry Davis and Michael Kwon DLA-0001594-609 | Admissible | |
| 2212 | 11/04/2011 | Memorandum from Katharine S. Mercer and Daniell Tenner to Seth Aronson and Dawn Sestito re: Aletheia v. Proctor: PMK Notice 1 Deposition Prep of Michael Laney OMM_00146471-502 | Admissible | |
| 2213 | 11/18/2011 | Email chain with attachment between Katie Mercer, Dawn Sestito, and Jorge deNeve OMM_00141317-19 | Admissible | |
| 2214 | 11/21/2011 | Email with attachment from Katie Mercer to Jorge deNeve, copying Dawn Sestito and Seth Aronson OMM_00142099-104 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2215 | 11/23/2011 | Email with attachment from Harry Davis to Seth Aronson and Dawn Sestito, copying Greg Meredith, francois.lavallee@fbn.com, and bdavis@nbfinancial.com OMM_00166707-715 | Admissible | |
| 2216 | 11/23/2011 | Redlined document titled Aletheia Litigation Settlement Proposal | Admissible | |
| 2217 | 11/30/2011 | Email with attachment from Seth Aronson to Dawn Sestito and Katie Mercer, forwarding email chain. OMM_00167241-47 | Admissible | |
| 2218 | 10/3/2011 | Mercer email to deNeve re with attached Settlement Options OMM_00141641-44 | Admissible | |
| 2219 | 12/14/2011 | "12/14/11 Executive Committee" handwritten notes JIG 005851-52 | Admissible | |
| 2220 | 4/1/2011 | Declaration of Peter J. Eichler Jr OMMEXP-K_00016088-89 | Admissible | |
| 2221 | 4/2/2011 | Subordination Agreement and Stipulation and Order re Subordination of Lien signed by Christy Eichler OMMEXP-K_00020504-26 | Admissible | |
| 2222 | 08/15/2011 | Mercer email to Sestito re Demurrer Reply OMM_00167229-30 | Admissible | |
| 2223 | 1/17/2012 | Email from Ellyn S. Garofolo to Harry Davis. DLA-0006664-65 | Admissible | |
| 2224 | 1/18/2012 | Substitution of Attorney – Civil through which F+T replaces OMM. Ex. 515 | Admissible | |
| 2225 | 1/19/2012 | Email chain between Harry Davis and Ellyn S. Garofolo DLA-0002577-81 | Admissible | |
| 2226 | 1/28/2012 | Email from Harry Davis to Ellyn S. Garofolo, copying Michael Kwon. DLA-0003622 | Admissible | |
| 2227 | 6/28/2012 | Stroock engagement letter | Admissible | |
| 2228 | 8/1/2011 | Stipulation and Order re Subordination of Lien signed OMMEXP-K_00016027-34 | Admissible | |
| 2229 | 4/18/2012 | "Internal Memorandum" from Ann Marie Swanson to Compliance File JIG 002597 | Admissible | |
| 2230 | 8/1/2011 | Kolodny & Anteau letter regarding BOA Amendment No. 1 to Loan Agreement signed by Peter Eichler OMMEXP-K_00016098-101 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2231 | 9/9/2011 | Houston Casualty Company Declarations and Insurance Policy HCC00436-81 | Admissible | |
| 2232 | 6/18/2012 | Letter from John Loftus to Patricia Barnes, Robert K. Levin, Christine W. Roper, Mark Scalzo, Steven L. Soboroff, and Elizabeth Sanders re Consent to Representation/Patricia Barnes, et al. vs. Roger B. Peiken (Case No. BC462946) | Admissible | |
| 2235 | 11/11/2012 | Aletheia Chapter 11 petition for bankruptcy, 12-bk-47718. DLA-0005113-47 | Admissible | |
| 2236 | 12/20/2012 | Debtor's application to employ Dechert LLP as Special Litigation Counsel; Declaration of Robert A. Robertson in Support Thereof | Admissible | |
| 2237 | 6/2/2009 | Axis Declarations and Insurance Policy | Admissible | |
| 2238 | 5/23/2012 | Complaint in Axis Surplus Ins. Co. v. Aletheia | Admissible | |
| 2239 | 1/3/2013 | Eichler Income and Expense Declaration. | Admissible | |
| 2240 | 1/7/2013 | Declaration of Jeffrey I. Golden re: Notice of Acceptance as Chapter 11 Trustee | Admissible | |
| 2241 | 7/19/2010 | Mercer email re attached Proctor's filings OMM_00068615-16 | Admissible | |
| 2242 | 6/22/2011 | deNeve email to Lee re Aletheia Special Board Meeting | Admissible | |
| 2243 | 8/15/2011 | Lee email to deNeve re Demurrer Reply | Admissible | |
| 2244 | 2/1/2013 | Email chain between Harry Davis and Ellyn Garofolo. DLA-0005088-89 | Admissible | |
| 2245 | 8/17/2011 | Olson email to Barnes and Lee re Phone Call Today | Admissible | |
| 2246 | 8/31/2011 | Lee email to Santos re To do's from Sept 24/25 | Admissible | |
| 2247 | 3/29/2013 | Order Granting Chapter 11 Trustee's Motion for Order Converting the Debtor's Case from Chapter 11 to Chapter 7 Pursuant to 11 U.S.C. § 1112(b) OMMEXP-K_00031826-29 | Admissible | |
| 2248 | 9/1/2011 | Lee email to deNeve and Olson re Katie M | Admissible | |
| 2249 | 9/27/2011 | deNeve email to Lee and Barnes re Executive Committee Meeting | Admissible | |
| 2250 | 12/12/2013 | Jeffrey I. Golden Complaint Against Peter J. Eichler, Jr. for: (1) Collection on Debt; (2) Avoidance of Fraudulent Transfers (Actual Intent); (3) Avoidance of Fraudulent Transfers (Actual Intent); (4) Avoidance of Fraudulent Transfers (Constructive Fraud); (5) Avoidance of Fraudulent Transfers | Admissible | |

188

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| | | (Constructive Fraud); Recovery of Avoided Transfers | | |
| 2251 | 12/19/2013 | Eichler bankruptcy petition. | Admissible | |
| 2252 | 10/28/2011 | Lee email to deNeve re Executive Committee Meeting | Admissible | |
| 2253 | 11/3/2011 | deNeve email to Barnes and Lee re Executive Committee Follow-up with attachments | Admissible | |
| 2254 | 12/21/2011 | Lee email to deNeve re Insurance Case | Admissible | |
| 2255 | 11/3/2011 | Lee email to deNeve re Executive Committee Follow-up | Admissible | |
| 2256 | 1/16/2014 | Eichler Summary of Schedules in personal bankruptcy. | Admissible | |
| 2257 | 12/21/2011 | Barnes email to deNeve and Lee re Insurance Case | Admissible | |
| 2258 | 2/22/2010 | Olson email to Aronson and deNeve re attached Proctor complaint OMM_00097666-716 | Admissible | |
| 2259 | 8/10/2010 | Aronson email to Lee re Aletheia Call at 5 pm OMM_00045604-05 | Admissible | |
| 2260 | 7/26/2010 | Silvers email re attached Proctor Oppo to 709 Petition OMM_00050501-18 | Admissible | |
| 2261 | 5/5/2014 | Order Granting Motion and Authorizing Trustee to Enter into Settlement with Proctor Investment Managers LLC, Proctor Investment Distributors LLC, and Related Parties | Admissible | |
| 2262 | 7/14/2010 | Mercer email to Aronson re Engagement Letter OMM_00091097-99 | Admissible | |
| 2263 | 7/23/2010 | Mercer email re Bruce Lee Declaration OMM_00129496 | Admissible | |
| 2264 | 9/28/2011 | Mercer email to Lee re Barnes and Lee Answer to FAC OMM_00140743-51 | Admissible | |
| 2265 | 10/16/2017 | Subpoenaed Third Party Roger B. Peikin's Objections and Responses to Gibson Dunn & Crutcher LLP's Subpoena to Produce Documents | Admissible | |
| 2266 | 8/9/2010 | Mercer email to Lee re Aletheia Call OMM_00178075 | Admissible | |
| 2267 | 7/12/2010 | Mercer email to Lee re Draft Declaration OMM_00178711 | Admissible | |
| 2268 | 4/20/2011 | Lee email to Aronson re Proctor Cross Complaint and Engagement Letter OMM_00202650-51 | Admissible | |

189

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2269 | 6/22/2010 | Cotkin email re attached acknowledgement letter OMM_00095763-65 | Admissible | |
| 2270 | 3/10/2011 | Mercer email to Cotkin re attached First Amended Cross-Complaint OMM_00032865-924 | Admissible | |
| 2271 | 6/14/2010 | Cotkin email to Mercer re Aletheia's Insurance Notice for Proctor Matters OMM_00037368-71 | Admissible | |
| 2272 | 6/14/2010 | Cotkin email to Mercer re Notice to Insurer re Proctor claim OMM_00049648-50 | Admissible | |
| 2273 | 6/15/2010 | Cotkin email to Peikin re Notice Letter OMM_00049653-55 | Admissible | |
| 2274 | 7/12/2010 | Mercer email to Kemple re Tendering Complaints OMM_00091524 | Admissible | |
| 2275 | 6/11/2010 | Mercer email to Cotkin re Aletheia's Insurance Notice for Proctor Matters OMM_00066450 | Admissible | |
| 2277 | 11/3/2015 | Email chain between Roger Peikin and Aaron Stulman. JIG 024274 | Admissible | |
| 2278 | 11/5/2015 | Order Granting Plaintiff's Motion For Order Approving Settlement With Freedman & Taitelman, LLP | Admissible | |
| 2281 | 9/29/2010 | Mercer email re Response to First RFP and Interrogatory Response (First Set) OMM_00033976-34024 | Admissible | |
| 2282 | 6/29/2011 | Sestito email to deNeve re Demurrer OMM_00166977-90 | Admissible | |
| 2283 | 6/19/2013 | Trustee Final Report | Admissible | |
| 2284 | 10/7/2006 | Email from Stacie Yates to Peikin re Revised Purchase Agreement ARA00005640-62 | Admissible | |
| 2285 | 12/3/2007 | Letter from Peikin to Gregory Meredith re letter to Eichler ARA00001441 | Admissible | |
| 2286 | 12/23/2007 | Selvin email to Eichler and Peikin re Letter to Proctor JIG_026913-17 | Admissible | |
| 2287 | 1/4/2008 | Selvin email to Eichler and Peikin re Next revision JIG_030529-33 | Admissible | |
| 2288 | 1/4/2008 | Selvin email to Eichler and Peikin re Further revision to letter to Littenberg JIG_030534-38 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2289 | 1/3/2008 | Selvin email to Peikin and Eichler re Re-draft of letter to Littenberg JIG_030556-60 | Admissible | |
| 2290 | 12/28/2007 | Selvin email to Peikin and Eichler re Further revision JIG_052956-59 | Admissible | |
| 2291 | 6/21/2017 | Trustee's Final Report in Eichler bankruptcy action, Case 2:13-bk-39626-RK, Dkt. 177 | Admissible | |
| 2292 | 9/8/2017 | Chapter 7 Trustee's Final Account And Distribution Report Certification That The Estate Has Been Fully Administered And Application To Be Discharged in Eichler bankruptcy action, Case 2:13- bk-39626-RK, Dkt. 187 | Admissible | |
| 2293 | 12/27/2007 | Selvin email to Eichler and Peikin re revised letter to Littenberg JIG_052960-63 | Admissible | |
| 2294 | 2/27/2018 | Declaration of Elizabeth Seabrook Regarding Documents Produced By Shartsis Friese LLP | Admissible | |
| 2295 | 03/01/2018 | Declaration of Non-Party DLA Piper LLP (US) | Admissible | |
| 2296 | 07/20/2018 | Motion for Order Approving Settlement Between Chapter 7 Trustee, Jeffrey I. Golden, and Peter J. Eichler, Jr. (Adv. No. 2:14-ap-01547-RK) , Pursuant to Federal Rule of Bankruptcy Procedure 9019; Memorandum of Points and Authorities; and Declarations of Heide Kurtz and Jeffery I. Golden in Support Thereof. | Admissible | |
| 2297 | Undated | PDF of Spreadsheet of O'Melveny Collections re Aletheia matters. Ex. 3 (Aronson) | Admissible | |
| 2298 | Undated | Spreadsheet of O'Melveny Collections re Aletheia matters. OMM_00211612 | Admissible | |
| 2299 | 12/26/2007 | Selvin email to Eichler and Peikin re Draft letter to Proctor JIG_052964-67 | Admissible | |
| 2300 | 12/17/2007 | Selvin email to Eichler and Peikin re Proposed letter to Littenberg, to be sent tomorrow JIG_052968-71 | Admissible | |
| 2301 | 12/23/2007 | Selvin email to Peikin re Pls call me in the ofc JIG_053000 | Admissible | |
| 2302 | 7/27/2010 | Letter from Mark Kemple to Eichler re Roger Peikin v. Aletheia Research and Management, Inc., Peter Eichler, Jr. and Patricia Barnes. | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2303 | 3/12/2008 | Selvin email to Peikin re Valuation DD List JIG_028998-9002 | Admissible | |
| 2304 | 7/20/2009 | Selvin email to Peikin re Draft Proctor complaint JIG_042952-56 | Admissible | |
| 2305 | 12/31/2007 | Aletheia Research and Management, Inc. and Subsidiaries financial statements for year ended 12/31/2007 by Ernst & Young. OMM_00053988-4003 | Admissible | |
| 2306 | 12/31/2008 | Aletheia Research and Management, Inc. and Subsidiaries financial statements for year ended 12/31/2008 by Holthouse Carlin & Van Trigt LLP. | Admissible | |
| 2307 | 12/31/2009 | Aletheia Research and Management, Inc. and Subsidiaries financial statements for year ended 12/31/2009 by Holthouse Carlin & Van Trigt LLP. OMM_00174670-89 | Admissible | |
| 2308 | 12/12/2011 | Independent Financial Consultant's Final Report:  Aletheia Research and Management, Inc.'s Compliance with SEC Order and FTI Consulting's Prior Recommendations. DLA-0000849-73 | Admissible | |
| 2309 | 7/21/2010 | Email from Seth Aronson to Robert Silvers, subsuming a longer email chain. OMM_00136295-302 | Admissible | |
| 2310 | 12/15/2009 | Selvin email to Eichler re Draft email to Harry Davis JIG_051836 | Admissible | |
| 2311 | 4/14/2011 | Declaration of Roger B. Peikin in Support of Motion to Disqualify O'Melveny & Myers OMM_00118375-8422 | Admissible | |
| 2312 | 11/28/2017 | Bregman email to Peikin re Aletheia T'ee v. O'Melveny et al. Request for Documents | Admissible | |
| 2313 | 4/20/2015 | Solvency Opinion of Aletheia JIG_024742-51 | Admissible | |
| 2314 | 10/22/2015 | Peikin email to Bregman re Peikin Settlement JIG 000549-50 | Admissible | |
| 2315 | 6/10/2010 | Lisa Jensen email to Davis re Employment Agreement SF001169-74 | Admissible | |
| 2316 | 6/2/2009 | Murphy email re Executive Compensation Plan JIG_036420 | Admissible | |
| 2317 | 6/25/2010 | Bank of America Statements for Account X876 OMMEXP-K_00025501-5620 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2318 | 7/14/2010 | Peikin letter to Eichler re Interception of Documents and Communications | Admissible | |
| 2319 | 5/11/2011 | Bingham-Aletheia Engagement Letter re Peikin Removal with Billing Guidelines | Admissible | |
| 2320 | 5/25/2011 | Cialone email to Davis re shareholder meeting SF008435 | Admissible | |
| 2321 | 1/26/2011 | Friese email to Davis re Meeting Next Week SF005212 | Admissible | |
| 2322 | 4/28/2011 | Memorandum of Points and Authorities in Support of Cross-Defendant Roger Peikin's Demurrer to First Amended Cross-Complaint OMM_00197015-32 | Admissible | |
| 2323 | 3/20/2017 | Claimant's Responses To Respondent O'Melveny & Myers LLP's Requests For Admission, Set One | Admissible – Respondents only | |
| 2324 | 4/3/2017 | Claimant's Responses To Respondent O'Melveny & Myers LLP's Contention Interrogatories | Admissible – Respondents only | |
| 2325 | 4/21/2017 | Claimant's First Amended Responses To Respondent O'Melveny & Myers LLP's Contention Interrogatories, Set One | Admissible – Respondents only | |
| 2326 | 4/20/2018 | Claimant's Amended Responses And Objections To Respondent's Second Requests For Admission To Claimant Jeffrey I. Golden | Admissible – Respondents only | |
| 2327 | 4/20/2018 | Claimant's Amended Responses And Objections To Respondent's Third Contention Interrogatories To Claimant Jeffrey I. Golden | Admissible – Respondents only | |
| 2328 | 4/27/2018 | Claimant's Fourth Amended Response To Respondent O'Melveny & Myers LLP's Contention Interrogatory No. 5 | Admissible – Respondents only | |
| 2329 | 3/11/2011 | Meredith Notice of Hearing on Demurrer to Second Amended Complaint OMM_00057215-39 | Admissible | |
| 2330 | 8/30/2011 | Hearing Transcript re Demurrer OMM_00154091-117 | Admissible | |
| 2331 | undated | John Spiegel CV | Admissible | |
| 2332 | 1/14/2010 | Residential Purchase Agreement for Malibu Property OMMEXP-K_00026401-435 | Admissible | |
| 2333 | 6/17/2011 | Amendment No. 1 to Loan Agreement OMMEXP-K_00026242-44 | Admissible | |
| 2334 | 2/2/2000 | Stipulation Resolving Various Post-Judgment Issues; and Order OMMEXP-K_00022636-76 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2335 | 7/00/2010 | Draft Santos Declaration in Support of Opposition to [Proctor's] Action to Determine Validity of Election/Appointment of Director OMM-00036083-85 | Admissible | |
| 2336 | 12/4/2015 | Respondent O'Melveny's First Set of RFPs to Claimant | Admissible – Respondents only | |
| 2337 | 12/16/2015 | Respondent O'Melveny's Second Set of RFPs to Claimant | Admissible – Respondents only | |
| 2338 | 1/4/2016 | Claimants Responses to RFP Set One | Admissible – Respondents only | |
| 2339 | 1/19/2016 | Claimant's Response to RFP (2nd Set) | Admissible – Respondents only | |
| 2340 | 8/25/2017 | Respondent O'Melveny's Third Set of RFPs to Claimant | Admissible – Respondents only | |
| 2341 | 9/25/2017 | Claimant's Response to Respondent's Third Request for Production of Documents | Admissible – Respondents only | |
| 2342 | 11/10/2017 | Respondent O'Melveny's Fourth Set of RFPs to Claimant | Admissible – Respondents only | |
| 2343 | 12/11/2017 | Claimant's Response to Respondent's Fourth Request for Production of Documents | Admissible – Respondents only | |
| 2344 | 4/30/2018 | Claimant's Rebuttal Expert Witness Designation | Admissible – Respondents only | |
| 2345 | 1/18/2011 | Aletheia's Second Amended Complaint OMM_00104436-4467 | Admissible | |
| 2346 | 2010-2012 | OMM Invoices re Proctor Litigation OMM_00031805-32248 | Admissible | |
| 2347 | 11/25/2013 | Bank of America Statements for Account X398 OMMEXP-K_00000006-24 | Admissible | |
| 2348 | 1/28/2013 | Bank of America US Trust Statements OMMEXP-K_00001294-1346 | Admissible | |
| 2349 | 12/17/2015 | Declaration of Peter James Eichler Jr Opposing Alberta Stahl's Motion for Partial Summary Judgment OMMEXP-K_00001849-1934 | Admissible | |
| 2350 | 12/17/2013 | Defendant Peter J. Eichler, Jr's Opposition to Emergency Motion for Issuance of Right to Attach Order and Writ of Attachment Against Peter OMMEXP-K_00002072-77 | Admissible | |
| 2351 | 12/10/2012 | General Notes and Statements of Limitation, Methodology and Disclaimer Regarding Debtor's Schedules and Statements of Financial Affairs -1 OMMEXP-K_00002636-2769 | Admissible | |

194

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2352 | 5/30/2013 | 530 Toyopa Drive Seller Settlement Statement OMMEXP-K_00002948-49 | Admissible | |
| 2353 | 12/12/2013 | LTR - Jeffrey I Golden to Jade Mills and Steve Lewis re Property being sold by Peter J Eichler 500 Toyopa Dr. OMMEXP-K_00003098-99 | Admissible | |
| 2354 | 1/31/2013 | Wells Fargo PMA Statements OMMEXP-K_00003529-3658 | Admissible | |
| 2355 | 5/30/2013 | 530 Toyopa Drive Transaction File OMMEXP-K_00004745-5232 | Admissible | |
| 2356 | 1/1/2013 | Global Arena Capital Corp Account Statements OMMEXP-K_00005256 | Admissible | |
| 2357 | 4/5/2011 | 2011-04-05 Eichler Declaration re Assets OMMEXP-K_00008813-54 | Admissible | |
| 2358 | 9/13/2011 | 2011-09-12 Eichler Declaration re Assets OMMEXP-K_00008855-77 | Admissible | |
| 2359 | 12/13/2012 | Tahoe Properties Final Settlement Statement OMMEXP-K_00009030-31 | Admissible | |
| 2360 | 4/8/2013 | 2013-04-08 Responsive Declaration to Request for Order OMMEXP-K_00009084-188 | Admissible | |
| 2361 | 5/30/2013 | 530 Toyopa Seller Settlement Statement OMMEXP-K_00009189-90 | Admissible | |
| 2362 | 7/30/2015 | Declaration of Stahl in support of Motion for partial Summary Judgment OMMEXP-K_00009193-380 | Admissible | |
| 2363 | 4/26/2016 | Deposition of Peter J. Eichler Jr. OMMEXP-K_00009472-9805 | Admissible | |
| 2364 | 6/21/2017 | Trustee's Final Report OMMEXP-K_00009811-38 | Admissible | |
| 2365 | 11/5/1992 | Stipulation Resolving Various Post-Judgment Issues, and Order OMMEXP-K_00009856-70 | Admissible | |
| 2366 | Undated | Eichler 2008 W2 OMMEXP-K_00009908-09 | Admissible | |
| 2367 | Undated | Eichler 2009 W2 OMMEXP-K_00009910-11 | Admissible | |
| 2368 | Undated | Eichler 2010 W2 OMMEXP-K_00009912-13 | Admissible | |
| 2369 | 2/1/2010 | Income and Expense Declaration OMMEXP-K_00009914-19 | Admissible | |
| 2370 | 7/2/2010 | Bank of America Private Wealth Management Statement OMMEXP-K_00009920-23 | Admissible | |
| 2371 | 7/14/2010 | Schedule of Assets OMMEXP-K_00009924-30 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2372 | Undated | Eichler 2011 W2 OMMEXP-K_00009931-32 | Admissible | |
| 2373 | Undated | Eichler 2012 W2 OMMEXP-K_00009935-36 | Admissible | |
| 2374 | 1/3/2013 | Eichler Schedule of Assets OMMEXP-K_00009939-52 | Admissible | |
| 2375 | 3/29/2013 | Eichler Financial Statement OMMEXP-K_00009958-64 | Admissible | |
| 2376 | 12/4/2013 | Peter and Christy Eichler Financial Statement OMMEXP-K_00009967-68 | Admissible | |
| 2377 | 2/27/2014 | Second Amended Bankruptcy Schedules OMMEXP-K_00010034-59 | Admissible | |
| 2378 | 10/11/2012 | Peter Eichler 2011 Federal Tax Return OMMEXP-K_00010071-10331 | Admissible | |
| 2379 | 10/12/2013 | Peter Eichler 2012 Federal Tax Return OMMEXP-K_00010332-426 | Admissible | |
| 2380 | 7/20/2011 | 24166 Malibu Road Seller Settlement Statement OMMEXP-K_00010570 | Admissible | |
| 2381 | 11/19/2013 | Union Bank Mortgage Statements OMMEXP-K_00010587-88 | Admissible | |
| 2382 | 8/26/2010 | Petitioner Claire P. Eichler's Separate Statement in Support of Motion to Complete Compliance with the Deposition Subpoena for Production of Business Records Directed to Roger B. Peikin. OMMEXP-K_00015040-55 | Admissible | |
| 2383 | 9/23/2011 | Stipulation and Order for Withdrawal of Funds OMMEXP-K_00016019-24 | Admissible | |
| 2384 | 7/5/2011 | Re: Marriage of Eichler Balance of Fees Outstanding OMMEXP-K_00016025-26 | Admissible | |
| 2385 | 6/9/2011 | Orders After Hearing on April 18, 2011 OMMEXP-K_00016054-64 | Admissible | |
| 2386 | 9/13/2011 | Eichler Divorce Documents OMMEXP-K_00016160-207 | Admissible | |
| 2387 | 5/25/2011 | Kolodny & Anteau Invoices OMMEXP-K_00016242-62 | Admissible | |
| 2388 | 6/30/2011 | Open Positions for Account X026 OMMEXP-K_00016840-41 | Admissible | |
| 2389 | 8/16/2011 | IRA Distribution Request for Account X073 OMMEXP-K_00016897 | Admissible | |
| 2390 | 4/27/2011 | Open Positions for Account X026 OMMEXP-K_00016911-12 | Admissible | |
| 2391 | 8/31/2011 | Open Positions for Account X026 OMMEXP-K_00016949-52 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2392 | 3/31/2011 | Open Positions for Account X026 OMMEXP-K_00016980-81 | Admissible | |
| 2393 | 5/31/2011 | Monthly Activity for Account X026 OMMEXP-K_00017016 | Admissible | |
| 2394 | 5/4/2011 | Eichler Wire Transfers OMMEXP-K_00017045-46 | Admissible | |
| 2395 | 2/28/2011 | Monthly Activity for Account X026 OMMEXP-K_00017063-65 | Admissible | |
| 2396 | 5/2/2011 | Re: Marriage of Eichler OMMEXP-K_00017088-89 | Admissible | |
| 2397 | 7/1/2010 | Participating Note in Aletheia Research and Management Inc. OMMEXP-K_00018233-54 | Admissible | |
| 2398 | 9/2/2010 | Sterling Trust Private Debt Direction of Investment OMMEXP-K_00018273-80 | Admissible | |
| 2399 | 8/7/2006 | Union Banc Retail Customer Information OMMEXP-K_00018392-405 | Admissible | |
| 2400 | 2/28/2011 | US Farming Realty Trust Funding Call #3 OMMEXP-K_00018408-10 | Admissible | |
| 2401 | 10/29/2010 | Subscription Booklet for US Farming Realty Trust, LP OMMEXP-K_00018412-40 | Admissible | |
| 2402 | 10/26/2010 | FW: IFC - USFRT PPM, LPA & SB - Peter J. Eichler, Jr. OMMEXP-K_00018441-71 | Admissible | |
| 2403 | 11/15/2010 | US Farming Realty Trust Funding Call OMMEXP-K_00018472-74 | Admissible | |
| 2404 | 6/10/2011 | US Farming Realty Trust Notice of Default OMMEXP-K_00018662-64 | Admissible | |
| 2405 | 2/11/2010 | Wells Fargo Balance for Account X247 OMMEXP-K_00018683-88 | Admissible | |
| 2406 | 2/11/2010 | Wells Fargo Outgoing Wire Transfer Request Form OMMEXP-K_00018695-708 | Admissible | |
| 2407 | 4/21/2010 | Wells Fargo Outgoing Wire Transfer Request Form OMMEXP-K_00018834-39 | Admissible | |
| 2408 | 12/12/2011 | Terra Coastal Wiring Instructions OMMEXP-K_00018840-44 | Admissible | |
| 2409 | 11/16/2011 | Eichler Wire Transfers OMMEXP-K_00018845-50 | Admissible | |
| 2410 | 8/23/2011 | Eichler Wire Transfers OMMEXP-K_00018870-71 | Admissible | |
| 2411 | 4/20/2011 | US Farming Realty Trust Partnership Interest for Peter and Christy Eichler Family Trust OMMEXP-K_00018910-11 | Admissible | |

197

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2412 | 3/24/2011 | US Farming Realty Trust Funding Evidence OMMEXP-K_00018943-47 | Admissible | |
| 2413 | 10/12/2010 | Subject: Taxes OMMEXP-K_00019095-9127 | Admissible | |
| 2414 | 12/31/2009 | Wells Fargo Statements for Account X247 OMMEXP-K_00019128-47 | Admissible | |
| 2415 | 2/28/2011 | US Trust All Accounts OMMEXP-K_00019167-75 | Admissible | |
| 2416 | 6/20/2011 | Daily Variation Margin Report OMMEXP-K_00019176-98 | Admissible | |
| 2417 | 6/15/2011 | Designation of Beneficiary by IRA Grantor for Account X032 OMMEXP-K_00019199-202 | Admissible | |
| 2418 | 4/21/2011 | California Bank and Trust Statements OMMEXP-K_00019295-96 | Admissible | |
| 2419 | 8/31/2011 | First California Bank Statements OMMEXP-K_00019299-302 | Admissible | |
| 2420 | 6/30/2012 | Aletheia Securities Inc Statements for Account X001 OMMEXP-K_00019309-351 | Admissible | |
| 2421 | 6/30/2012 | Aletheia Securities Inc Cash Ledger for Account X494 OMMEXP-K_00019352-88 | Admissible | |
| 2422 | 6/30/2012 | Aletheia Securities Inc Statements for Account X524 OMMEXP-K_00019389-422 | Admissible | |
| 2423 | 6/30/2012 | Aletheia Research Management Inc Cash Ledger OMMEXP-K_00019423-31 | Admissible | |
| 2424 | 6/30/2012 | Aletheia Securities Account Summary for Account X712 OMMEXP-K_00019432-36 | Admissible | |
| 2425 | 5/27/2011 | IRA Distribution Request for Account X421 OMMEXP-K_00019437-38 | Admissible | |
| 2426 | 6/30/2011 | Request for Withdrawal from Limited Partnership OMMEXP-K_00019439-49 | Admissible | |
| 2427 | 3/9/2012 | K-1 from South LaSalle Partners OMMEXP-K_00019450-52 | Admissible | |
| 2428 | 3/24/2011 | Account Summary for Account X494 OMMEXP-K_00019624-27 | Admissible | |
| 2429 | 3/24/2011 | Aletheia Securities Account Summary for Account X524 OMMEXP-K_00019628-34 | Admissible | |
| 2430 | 12/9/2008 | Wire Transfer for Union Bank Account X424 OMMEXP-K_00019635-710 | Admissible | |

198

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2431 | 12/21/2009 | Eichler Account Activity OMMEXP-K_00019743-44 | Admissible | |
| 2432 | 9/7/2010 | Eichler Union Bank Statements OMMEXP-K_00020464-503 | Admissible | |
| 2433 | 4/5/2010 | Account Summary for Account X494 OMMEXP-K_00020671-72 | Admissible | |
| 2434 | 4/21/2014 | Akin Gump Proof of Bankruptcy Claim OMMEXP-K_00021228-76 | Admissible | |
| 2435 | 12/20/2012 | 2134 The Back Road Escrow Documents OMMEXP-K_00022297-2345 | Admissible | |
| 2436 | 12/13/2012 | 2138 The Back Road Escrow Documents OMMEXP-K_00022346-70 | Admissible | |
| 2437 | 5/17/2018 | Tax Penalties for Early IRA Withdrawals OMMEXP-K_00025344-47 | Admissible | |
| 2438 | 12/7/2011 | Acknowledgement of Satisfaction of Judgment OMMEXP-K_00025351-55 | Admissible | |
| 2439 | 1/10/2013 | Certificate of Release of Federal Tax Lien OMMEXP-K_00025356 | Admissible | |
| 2440 | 12/13/2013 | Release of Mechanic's Lien on 500 Toyopa Drive OMMEXP-K_00025383-84 | Admissible | |
| 2441 | 2/19/2010 | O'Melveny & Myers Invoice re SEC OMM_00031288-588 | Admissible | |
| 2442 | 3/4/2010 | O'Melveny & Myers Invoice re Boskovich OMM_00031657-1804 | Admissible | |
| 2443 | 4/15/2010 | O'Melveny & Myers Invoice re Compliance OMM_00031562-31656 | Admissible | |
| 2444 | 3/8/2010 | deNeve email to Olson re FTI meeting OMM_00097389-90 | Admissible | |
| 2445 | 12/10/2009 | O'Melveny & Myers Invoice re SEC Investigation/Subpoena OMM_00099284-91 | Admissible | |
| 2446 | 1/8/2010 | O'Melveny & Myers Invoice re SEC Investigation/Subpoena OMM_00099526-42 | Admissible | |
| 2447 | 9/13/2010 | Scalzo email to Santos re Call with OMM | Admissible | |
| 2448 | 3/25/2011 | Laney email to Santos re Review of 2006 through 2011 Compensation | Admissible | |
| 2449 | 9/13/2010 | Silvers email to Santos re Discovery Responses OMM_00114742-73 | Admissible | |
| 2450 | 1/5/2010 | Email with attachments from Friedman to Peikin, copying Selvin and Wytsma JIG_062825-37 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2451 | 1/6/2010 | Email with attachments from Friedman to Barnes, copying Peikin, Eichler, Selvin and Wytsma | Admissible | |
| 2452 | 2/2/2010 | Letter to Peter Eichler from Horizon Asset Management re: LaSalle Partners LLP OMMEXP-K_00019453 | Admissible | |
| 2453 | 7/5/2011 | Declaration by Douglas Bagby and Attachments OMMEXP-K_00008699-812 | Admissible | |
| 2454 | 12/9/2008 | Abstract of Support Judgment OMMEXP-K_00025348 | Admissible | |
| 2458 | 4/25/2018 | J. Golden PMK Deposition Transcript with Exhibits – Vol. I | [As designated and cross designated—objections in marginalia] | |
| 2459 | 5/4/2018 | J. Golden PMK Deposition Transcript with Exhibits – Vol. II | [As designated and cross designated—objections in marginalia] | |
| 2460 | 5/20/2010 | Proctor demurrer to ARMI First Amended Complaint. | Admissible | |
| 2461 | 6/3/2010 | Aletheia Opposition to Proctor Motion for Stay | Admissible | |
| 2462 | 8/5/2010 | Peikin 709 reply brief. | Admissible | |
| 2463 | 2/11/2010 | Peikin email to Selvin. | Admissible | |
| 2464 | 6/14/2010 | Mercer email to Cotkin. | Admissible | |
| 2465 | 2/12/2010 | Peikin email to Selvin, copying Cotkin. | Admissible | |
| 2466 | 3/11/2011 | Laney email to Barnes and Lee, copying Swanson. | Admissible | |
| 2467 | 8/11/2010 | Nossaman invoice. | Admissible | |
| 2468 | 2/17/2010 | Nossaman fee agreement. | Admissible | |
| 2469 | 6/19/2012 | Nossaman invoice. | Admissible | |
| 2470 | 10/18/2018 | Notice of Dismissal of Adversary Proceeding | Admissible | |
| 2471 | 1/29/2008 | Selvin email to Peikin and Eichler re Aletheia/Proctor JIG_025243-44 | Admissible | |
| 2472 | 9/17/2009 | Pettigrew email to Peikin and Barnes re PMK depo notice JIG_047206-22 | Admissible | |
| 2473 | 12/8/2009 | Peikin email to Selvin re Telephone conf with Harry Davis JIG_052649 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2474 | 2/4/2010 | Selvin email to Eichler and Peikin re draft letter to Davis JIG_056504-07 | Admissible | |
| 2475 | 7/1/2010 | Aronson email to deNeve and Olson OMM_00097023-25 | Admissible | |
| 2476 | 7/1/2010 | Email re Proctor response to Aletheia shareholder meeting OMM_00098037-40 | Admissible | |
| 2477 | 8/24/2018 | Order Approving Settlement Agreement | Admissible | |
| 2478 | 3/23/2010 | Email to Peikin re Litigation Summary Request | Admissible | |
| 2479 | 9/23/2009 | Declaration of Roger Peikin | Admissible | |
| 2480 | 12/1/2001 | Lee email to Echavez re Peter Eichler | Admissible | |
| 2481 | 1/11/2011 | Laney email to Swanson re Peikin Complaint | Admissible | |
| 2482 | 10/22/2018 | Order Dismissing Adversary Proceedings and Granting Discharge | Admissible | |
| 2483 | 10/22/2018 | Order of Discharge – Chapter 7 | Admissible | |
| 2484 | 9/28/2010 | Mercer email to Santos re Bylaws OMM_00039455-78 | Admissible | |
| 2485 | 2/22/2011 | Mercer email to Laney re Discovery Responses OMM_00040256-40406 | Admissible | |
| 2486 | 3/2/2011 | Mercer email to Laney re Aletheia Responses to Proctor Rogs OMM_00043869-973 | Admissible | |
| 2487 | 2/24/2011 | Laney email to Mercer re Discovery Responses OMM_00082042-43 | Admissible | |
| 2488 | 4/4/2011 | Laney email to Mercer re Supplemental Discovery Responses OMM_00085587-88 | Admissible | |
| 2489 | 4/4/2011 | Mercer email to Laney re Supplemental Discovery Responses OMM_00088270-341 | Admissible | |
| 2490 | 9/27/2010 | Swanson email to Mercer re Interrogatory responses Proctor OMM_00094340-45 | Admissible | |
| 2491 | 9/21/2010 | Pardo email to Swanson re Aletheia/Proctor: Document Collection OMM_00112528-30 | Admissible | |
| 2492 | Undated | Kinrich Exhibit A – more legible version of Exhibit 755 | Admissible | |
| 2493 | 4/19/2010 | Email from Peikin to Katie Mercer OMM_00158671-73 | Admissible | |

FINAL AWARD (CORRECTED)

| Exhibit No. | Date | Description | Admissibility | Admitted/not Admitted |
|---|---|---|---|---|
| 2494 | 5/19/2010 | Email from Peikin to Katie Mercer OMM_00066716 | Admissible | |
| 2496 | 11/5/2007 | Email from Jim Coley to Peter Eichler with attachment | Admissible | |
| 2497 | 10/16/2007 | Email from Jim Coley to Peter Eichler and Roger Peikin | Admissible | |
| 3000 | 1/20/2012 | Chart: Aletheia's Stockholder's Equity Roll-Forward | Admissible | |
| 3002 | 3/7/2011 | Email with timeline | Admissible | |
| 3003 | 12/13/2009 | Aronson email re Aletheia/SEC | Admissible | |
| 3004 | 12/14/2009 | Email from Friese to Murphy re Memo | Admissible | |
| 3005 | 7/26/2010 | Kemple email to Eichler re resignation letter | | Not admitted |
| 3006 | 11/20/2009 | McDowell email re model vs. composite returns | Admissible | |
| 3007 | 11/20/2009 | McDowell email re model returns | Admissible | |
| 3008 | 11/23/2009 | Murphy email re letter to SEC | Admissible | |
| 3009 | 11/25/2009 | Letter to SEC | Admissible | |
| 3011 | 12/31/2007 | Consolidated Financial Statements | Admissible | |
| 3012 | 12/31/2008 | Consolidated Financial Statements | Admissible | |
| 3013 | 12/31/2009 | Consolidated Financial Statements | Admissible | |
| 3014 | 7/15/1998 | Stipulation and Pretrial Order No. 1 | | Not admitted |
| 3015 | 7/26/2010 | Email from Mercer to Scalzo with attachments | Admissible | |
| 3017 | 4/8/2009 | Wall Street's 20 Highest Earners | Impeachment only | |
| 3018 | 4/1/2011 | NYTimes Article: Top Earning Hedge Fund Managers 2010 | Impeachment only | |
| 3019 | 5/18/2018 | Alpha's Rich List | Impeachment only | |
| 3020 | 5/21/2018 | Barclay Hedge - Hedge Fund Salaries – What Is The Average Salary of a Hedge Fund Manager? | Impeachment only | |
| 3021 | Undated | Kinrich Presentation slide 9 - Visual Summary of Ex. 2492 – Eichler's Net Assets: Jan. 2010-Dec. 2013 | Admissible | |
| 3022 | Undated | Kinrich Presentation slide 7 - Summary of Ex. 2492 – Eichler's Net Assets on Various Dates Before Litigation/Transaction Costs | Admissible | |
| 3023 | Undated | Kinrich Presentation slide 62 (Ex. 703 p. 1: Ex. 704 p.1) – Mr. Jeremiassen Incorrectly Calculated the Necessary Dividend Offset | Admissible | |
| 3024 | Undated | Kinrich Presentation slide 64 (Ex. 703 p. 1: Ex. 704 p.1) – Excess Compensation and "Damages" Decrease if Bonus Amounts Are Additive | Admissible | |

FINAL AWARD (CORRECTED)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FINAL AWARD (CORRECTED)